**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **SYLVIA SUMMERS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. 1:08-CV-784-MEF** |
| | ) |
| **THE CITY OF DOTHAN,** | ) |
| | ) |
| **Defendant.** | ) |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Defendant, The City of Dothan ("City" or "Defendant"), hereby submits the following Brief in Support of Its Motion for Summary Judgment, seeking summary judgment on the claims asserted by the Plaintiff, Sylvia Summers ("Summers" or "Plaintiff"). Based upon the undisputed material facts and for the reasons stated below, no genuine issue of material fact exists, and Defendant is entitled to judgment as a matter of law.

**I.   INTRODUCTION**

Plaintiff, a former police officer for the City, alleges that she was subjected to discrimination by Defendant on the basis of sex and race relating to the terms, conditions, discipline, and termination of her employment with the City in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"), 42 U.S.C. § 1981, and the Fourteenth Amendment, by and through

1

42 U.S.C. § 1983.[1]  Plaintiff's Complaint ("Compl."), § V, Count II, III, and IV. Additionally, Plaintiff claims that Defendant retaliated against her for engaging in protected activities in violation of Title VII and Section 1981 and Section 1983. Compl. § V, Count II, III, and IV.

Plaintiff's claims against this Defendant are due to be dismissed because (1) many of her claims are procedurally barred and untimely;  (2) she cannot establish a *prima facie* case of sex discrimination, race discrimination, or retaliation; and (3) she cannot establish that the legitimate, nondiscriminatory and nonretaliatory actions taken against her were pretext for sex discrimination, race discrimination, or retaliation.

## II.  STATEMENT OF UNDISPUTED FACTS

### 1.  The City of Dothan Personnel Rules and Regulations

The City of Dothan's employees are governed by the City's Personnel Rules and Regulations.  All City employees are provided with these Rules which serve as a guide in administrative action concerning various personal activities of the city. Employees are expected to comply with the provisions of the Rules and Regulations.  Affidavit of Delvick McKay ("McKay Aff."), ¶ 2; Exhibit ("Ex.") A, City of Dothan Personnel Rules and Regulations ("Personnel Rules"), p. 1; Sec. 3-10(1).  Under the Rules, offenses for which employees may be disciplined, are

---

[1] All claims against John Powell have been dismissed.  [Doc. 23].

classified as 'Minor,' 'Major,' and 'Intolerable.' McKay Aff. Ex. A, Personnel Rules, Sec. 3-20(1) – 3-20(3). Major offenses are defined as "offenses that are extremely serious in nature but not so serious that a discharge is required upon committing the first such offense." McKay Aff. Ex. A, Personnel Rules, Sec. 3-20(2). The first Major offense committed shall result in a "final warning" and a suspension without pay for between one and twenty days. McKay Aff. Ex. A, Personnel Rules, Sec. 3-20(2)(a). The Personnel Rules also contain a 'Schedule of Disciplinary Penalties' that, while not all inclusive, identifies infractions that fall into each classification of offense. McKay Aff. Ex. A, Personnel Rules, Sec. 3-40 – 3-44. One infraction identified as a Major Offense is, "Action(s), or lack of action(s) that could endanger the life or health of self or others, that could cause undue financial loss to the City, negligence in carrying out assigned tasks or duties or responsibilities of one's position." McKay Aff. Ex. A, Personnel Rules, Sec. 3-42(6). "Violation of any subsequent 'Major' offense within two years shall be grounds for discharge." McKay Aff. Ex. A, Personnel Rules, Sec. 3-20(2)(a).

## 2. EEOC and AAP Policies.

The City has an EEO Policy and an Affirmative Action Plan (the "Policy") and Rules and Regulations which assure equal opportunity for all applicants and employees without regard to sex or race, and provide that all personnel decisions will be made without regard to an individual's sex or race. McKay Aff. ¶ 3; Ex. B.

The Policy also prohibits discrimination on the basis of sex and/or race. *Id.* The Policy further provides available avenues for an employee making a complaint of discrimination and assures that no retaliation will be taken against any employee making a complaint. *Id.*

### 3. Dothan Police Department Rules and Regulations.

Police Officers employed by the Dothan Police Department are expected to adhere to certain rules and regulations. The Dothan Police Department provides its offices with standard procedural guidelines in the form of Procedural General Orders ("PGOs"). PGO 511 sets forth the criteria for, among other things, arrest procedures, booking procedures, warrants, and jurisdiction. Plaintiff's Deposition ("Pl. Depo"), Defendant's Exhibit ("DX")-36; Affidavit of John R. Powell ("Powell Aff."), ¶ 5; Ex. A. Section II(A) of PGO states the following:

> The Officer shall be responsible for obtaining warrants in State misdemeanor cases the same working day, if possible, or the next working day the Magistrate is available. Prisoners charged with State misdemeanors or felonies will not be transferred without warrants unless ordered by the judge with jurisdiction in the particular offense or the sheriff of the affected county.

Pl. Dep. DX-36; Powell Aff. Ex. A.

Police officers are also expected to abide by the laws of the state. Rule 19 of the Alabama Rules of Judicial Administration sets forth the requirements for issuing traffic citations. According to Rule 19(6)(a)(1) of the Alabama Rules, the law enforcement officer responsible for issuing the traffic ticket shall, after signing

and presenting a copy of the ticket to the motorist, "without unnecessary delay, normally within 48 hours, acknowledge under oath the facts alleged therein before any person within the judicial branch of government who is authorized by the State of Alabama to administer oaths and file the court copies of the ticket with the court. . . ." Appeal Hearing of Sylvia Summers, August 1, 2007, ("Pl. App. Hearing"), City's Exhibit ("CX")-11; Powell Aff. Ex. D.

### 2. Plaintiff's Initial Hiring with the City.

Plaintiff, an African-American female, was hired by the City as a Jail Security Officer on June 12, 2000. Compl. § V, ¶ 13. During her time as a Jail Security Officer, Plaintiff complained about a hostile work environment and a discriminatory job evaluation. Pl. Dep. p. 99:4-10; DX-12. In her Complaint, Plaintiff alleges that she was subjected to racially and sexually discriminatory remarks and comments by her co-workers and supervisors. Compl. § V, ¶ 16. She claims that a male co-worker told her that he did not like working with women and that women were not as strong as men. *Id.* Plaintiff also claims that she was not allowed to process inmates and/or to fingerprint inmates, but the male officers were allowed to do those things. *Id.* Plaintiff's complaints were fully investigated by the City's Personnel Director, and, during the course of this investigation, Plaintiff was promoted to the position of Police Officer on April 22, 2001, with a pay increase, and assigned to the Patrol Division. *Id.*; Pl. App. Hearing p. 21:21-

22:14 (Testimony of Kai Davis ("Davis")). During her six years as a Police Officer, Plaintiff also worked, at various times, in the Third Squad, Fourth Squad, and Sixth Squad Divisions. Pl. Dep. p. 153:11-17. As a police officer, she has received training in many areas, including firearms, constitutional law, baton, defensive maneuvering, traffic accidents, explosives, use of force, report writing, CPR and AED certification, basic drug/gang awareness, sexual assault, sexual harassment, Draeger certification, negotiating as first responder, and basic courtroom testimony. Pl. Dep. p. 112:11-113:7; DX-18.

Throughout 2002 and 2003, Plaintiff received a number of disciplinary infractions and had a number of performance issues. In May 2002, she received a 12-hour suspension for engaging in a motor vehicle collision on April 1, 2002, while on duty. Pl. Dep. p. 133:17-134:11; DX-25. This was determined to be a major category offense. *Id.*. On May 9, 2002, Plaintiff failed to report for duty, and this was the third time Plaintiff had failed to report. As a result, Summers received formal counseling and was charged with a minor category offense. Pl. Dep. p. 134:12-135:9; DX-26. In May 2002, Plaintiff received a performance evaluation, and the evaluation form noted that she needed to do a much better job keeping track of when to do things, such as "turn in tickets, swear to complaints and attend court and regular duty." Pl. Dep. p. 132:23-133:9; DX-24. On this same evaluation form, Plaintiff received an "unsatisfactory" score in the category

of "dependability." DX-24. On October 2, 2002, Plaintiff made an arrest without the appropriate backup, and she received another written warning for a minor category offense. Pl. Dep. p. 135:19-137:4; 143:5-11; DX-27. On November 17, 2003, Summers was involved in a second motor vehicle collision while on duty. Pl. Dep. p. 149:3-11; DX-29. The Employee Safety/Committee Accident Review Board determined that she was careless and had caused or contributed to the accident. *Id.* at p. 149:12-15; DX-29 As a result, Plaintiff received a five-day suspension on January 26, 2004. *Id.*

### 3. Plaintiff's Transfers to Various Divisions -- Environmental Compliance Bureau, Criminal Investigations Division, Vice/Intelligence Division, and Patrol.

In or around May 2004, Plaintiff was transferred to the Environmental Compliance Bureau. Pl. Dep. p. 153:18-154:6. Approximately five months later, in November 2004, Plaintiff was transferred to the Criminal Investigations Division ("CID"). Pl. Dep. p. 160:3-13. While working in CID, Plaintiff alleges that she was treated differently because she was a black female. Pl. Dep. p. 164:5-7. She claimed that she complained about this treatment to Sergeant Roy Woodham ("Woodham") and Chief of Police John Powell ("Chief Powell"). *Id.* at p. 164:5-8. Specifically, Plaintiff's allegations were about Willie Williamson ("Williamson"), a white female, who, at the time, was the supervisor over the

Paper Crimes Unit. Pl. Dep. p. 165:9-17; 169:11-14. However, Plaintiff also alleges that she complained about Woodham, as well. Pl. Dep. p. 172:18-173:2.

Around the same time Plaintiff transferred to CID, Rhett Davis ("Davis"), a white male, also joined this division. *Id.* at p. 165:21-22. Another female, Brandy Bracken, was also part of the Paper Crimes Unit. *Id.*at p. 165:9-15. During her time in CID under Williamson's and Woodham's supervision, Plaintiff alleges that she was (1) assigned closed or inactive cases (while Davis was allowed to go out with other investigators to see how the process worked), (2) told by Williamson to stay away from the Sergeant Steven Hamm's and Mike Etras's offices, (3) told by Woodham not to wear a skirt to work (4) told by Williamson that she did not like Plaintiff's perfume, (5) instructed by Williamson to "call out" when she left for lunch, and (6) denied training in certain schools, such as interview or interrogation. Pl. Dep. p.166:3-20; 167:19-168:15; 172:21-173:2; 173:21-174:6; 175:21-176:7; 327:1-15. Plaintiff stated that she talked to Chief Powell about experiences in CID and thinks, but is not sure, she gave him a document containing a list of complaints. Pl. Dep. p. 183:8-18; 184:16-185:20; DX-32. Chief Powell, however, did not receive this list or document. Powell Aff. ¶ 19. The list mostly documented Plaintiff's complaints against Williamson, such as accusations that Williamson changed the access to her case assignments, accused Plaintiff of talking about her cases with other people, did not speak to Plaintiff in passing, told

Plaintiff that she spent too much time in a co-worker's office, and instructed Plaintiff not to allow others to use her computer terminal. Pl. Dep. DX-32. On that same list, Plaintiff alleged that she was in her office with Williamson and Davis, and Williamson said to Davis, "I have something to tell you, but I will wait until you are not in there." *Id.* Plaintiff stated that she was the only other person in the office, besides Williamson and Davis, and that Williamson "obviously has a strong dislike for me, and I again feel that it is racially motivated." *Id.*

On October 20, 2005, Plaintiff transferred out of CID and into the Vice/Intelligence Division of the Investigative Services Bureau ("Vice") as an Investigator. Pl. Dep. 200:13-21; DX-33. Plaintiff did not have any complaints during her time in Vice, and Plaintiff testified that her transfer from Vice was not based on her race or sex. Pl. Dep. p. 205:19-206:6. Her supervisor was Governor Jackson ("Jackson") (black, male). McKay Aff. ¶ 4. During this time, Plaintiff missed work and call out. Pl. Dep. p. 203:22-205:10. Because of her deficiencies and lack of dependability, Jackson told her she would be transferred back to Patrol. Pl. Dep. p. 205:1-23. Plaintiff never filed a complaint of race and/or sex discrimination or retaliation while she worked in Vice. McKay Aff. ¶ 5. Plaintiff did not feel that Jackson's treatment toward her was based on race, sex, or retaliation. Pl. Dep. p. 206:2-6. From Vice, Plaintiff was transferred back to Patrol. Pl. Dep. p. 206:7-14; DX-34.

### 4.     Plaintiff's Arrest of Brian Shack.

On April 5, 2006, Plaintiff arrested Brian Shack ("Shack") for criminal trespassing.  Pl. Dep. p. 242:18-20; DX-38.  After the arrest, Plaintiff failed to follow standard procedure, as required by PGO 511, in that she failed to complete a complaint of arrest on Shack and to swear to a complaint before a magistrate.  Pl. Dep. p. 242:7-13; 244:4-13; DX-38; Pl. App. Hearing p. 119: 17-120:6 (Testimony of Sylvia Summers ("Plaintiff")); 128:8-11 (Testimony of Chief John Powell ("Chief Powell")); Powell Aff. ¶ 5.

After an officer makes an arrest, he or she should fill out the complaint and turn the complaint in to the docket sergeant.  Pl. App. Hearing p. 45:14-16 (Testimony from Michelle Sellers-Smith ("Sellers-Smith")).  If a complaint is not properly turned in, the person remains in jail without any record of an arrest.  *Id.* at p. 45:24-46:2.  Plaintiff's actions were a violation of PGO 511.  Pl. Dep. p.. 237:17-238:7; 244:14-22; DX-36; DX-38.  Even though it was her responsibility as the arresting officer, Plaintiff never filled out a complaint for Shack, and, thus, the court system had no notice that Shack was in jail.  Pl. App. Hearing p. 47:21-23 (Sellers-Smith).  Because Plaintiff completed no paperwork regarding Shack's arrest, and because no complaint was sworn, the Municipal Court had no record of Shack's arrest, and he was confined to the Police Department Detention Facility

for 103 days.  Pl. Dep. p. 244:4-13; DX-38; Pl. App. Hearing p. 128:8-9; Powell Aff. ¶ 6.

Per Dothan Police Department rules, the arresting officer bears the ultimate responsibility for filling out and swearing to the arrest complaint before a Magistrate.  Pl. Dep. p. 242:7-13; 288:8-12; DX-36.  However, no one in the Magistrate's office ever received a complaint, sworn or unsworn, for Shack's April 5, 2006 arrest until Plaintiff filled the complaint out more than three months later in late July 2006, after someone in the jail reported that Shack had spent an inordinate amount on time in jail without being brought before the judge.  Pl. Dep. p. 290:21-291:7; Pl. App. Hearing p. 44:1-13; 44:19-22; 46:3-10; 47:9-48:9 (Sellers-Smith); CX-3.  Only at that time did Plaintiff fill out and swear to an arrest complaint on Shack.  Pl. App. Hearing p. 46:7-13; CX-3.

When Chief Powell learned of this in late July 2006, he turned the matter over to Lieutenant Ray Owens who, in turn, assigned the matter to Corporal John Brackin ("Brackin") in Internal Affairs, who investigated the circumstances surrounding Plaintiff's arrest of Shack on April 5, 2006.  Powell Aff. ¶ 6; Ex. B. Brackin determined that Plaintiff was, in fact, the arresting officer, and Plaintiff could not recall any specific information about ever signing a complaint of arrest for Shack.  Powell Aff. Ex. B.  After a thorough investigation, Brackin concluded that Plaintiff did not swear to an arrest complaint until July 28, 2006, 103 days

after she arrested Shack. *Id.* Following the investigation and recommendation from Internal Affairs that Plaintiff had violated and committed a major offense for violating Personnel Rule 3-42(6) – conduct that could cause undue financial loss to the City or negligence in carrying out assigned tasks or duties or responsibilities of one's position - Chief Powell administered a final written warning for a major offense for violating Personnel Rule 3-42(6). Pl. Dep. p. 242:18-245:13; DX 38; Powell Aff. ¶ 5. Plaintiff did not appeal this disciplinary action. Pl. Dep. p. 245:11-113.

During this investigation, Internal Affairs discovered that, approximately six months before Plaintiff arrested Shack, another officer, Robert Cole ("Cole"), arrested Shack for the same offense, criminal trespassing. Pl. App. Hearing p. 133:3-8 (Powell); CX-4; Powell Aff. ¶ 8; Ex. C. Cole arrested Shack on November 22, 2005, and Cole timely filled out an arrest complaint the <u>next morning</u> and turned it in to the docket sergeant. Pl. App. Hearing p. 47:6-18 (Sellers-Smith); Powell Aff. ¶ 8; Ex. C. Once Cole turned in the complaint for Shack's arrest, the Magistrate's office was advised that an individual was in jail with a pending charge. Pl. App. Hearing p. 47:21-48:6 (Sellers-Smith); Powell Aff. Ex. C. At the time he went to the Magistrate's office, there was no Magistrate available. Pl. App. Hearing p. 127:24-128:7. Cole also attempted to sign the paperwork on a second occasion, but the Magistrate's office could not locate the

paperwork, even though they had record of it. *Id.* Because Cole filled out an arrest complaint and attempted on two occasions to sign the necessary documents, his conduct, though not acceptable, was not as serious as that of Plaintiff who totally failed to turn in any paperwork to the Magistrate's office regarding Shack's arrest. Pl. App. Hearing p. 128:8-11 (Powell). Cole followed police procedure by timely filling out his arrest complaint and sending it to the docket sergeant, but Cole failed to swear to the complaint until thirteen days after he arrested Shack. Pl. App. Hearing p. 35:22-23 (Davis); CX-4; Powell Aff. Ex. C. As a result, Cole received a reprimand for a minor offense. Pl. App. Hearing 127:14-20 (Powell); Employees Ex. 1; Powell Aff. ¶ 9; *see* p. 39 of Brief.

### 5.   June 2006 Annual Performance Evaluation

On May 17, 2006, Sergeant Mark Nelms ("Nelms") and Sergeant Bradford Baum ("Baum") completed an evaluation on Plaintiff, and they rated her performance as "satisfactory" in all categories, except she received an "unsatisfactory" rating for "Task 2" because "Off. Summers has failed to perform some necessary duties on calls on occasion and relies on supervisors too much for making decisions." Pl. Dep. p. 210:2-15; DX-34; Affidavit of Larry E. Draughon ("Draughon Aff."), ¶ 2. Plaintiff's overall score was "satisfactory," and she believes she received a wage increase after this evaluation. Pl. Dep. p. 236:10-14. Specifically, Nelms wrote that Plaintiff "has some good qualities but they are

usually overshadowed by her lack of confidence and mistakes. She needs to improve on her dependability and decision-making. . . . . For the amount of time in this job, she should be more advanced." Pl. Dep. p. 209:11-20; DX-34. The evaluation was reviewed with her on June 1, 2006. Pl. Dep. p. 210:2-9; DX-34.

That same day, June 1, 2006, Plaintiff filed a complaint with Chief Powell regarding this performance evaluation. Pl. Dep. p. 214:13-216:7; DX-35; Powell Aff. ¶ 15. In her statement to Chief Powell, Plaintiff stated that she felt the evaluation was "not fair and unbiased, due to the supervisors [Nelms and Baum] unwillingness to help me with complaints and conflicts I have sought there [sic] assistance on. These complaints were in reference to situations which put my safety and/or the safety of my family at risk." Pl. Dep. DX-35; Powell Aff. ¶ 16. The "situations" Plaintiff is referring to are instances when she alleges that she did not receive proper back-up from other police officers after she called dispatch. Pl. Dep. p. 217:22-218:18. Plaintiff claimed that when she, and other females, would radio dispatch to report an emergency situation, the dispatchers would send "regular" back up officers from the other side of the city, as opposed to treating the situation as "emergency traffic." *Id.* at p. 218:5-13; 222:21-224:7. Plaintiff also claims that the female dispatchers were not courteous to her on the radio and would respond to the male officers before the female officers. Pl. Dep. p. 229:18-21; 230:6-23. Plaintiff does not remember the names of the dispatchers.

In her statement to Chief Powell, Plaintiff reported that she requested to speak to Lieutenant (now Captain) Larry Draughon ("Captain Draughon") to discuss some of the problems with her shift. Pl. Dep. p. 234:7-11; DX-35; Powell Aff. ¶ 16; Draughon Aff. ¶ 2. Captain Draughon told Plaintiff that he would look into her situation, which he did, and found no merit to her complaint. Draughon Aff. ¶ 2. Draughon followed up with Plaintiff approximately six months later, and Plaintiff said things were fine. Pl. Dep. p. 235:3-11; Powell Aff. ¶ 16; Draughon Aff. ¶ 3; Ex. A.

### 6.    Transfer Back to the First Squad Division in Patrol.

In or around July 2006, Plaintiff was transferred back to the First Squad Division, and she was again under the supervision of Woodham. Compl. § V, ¶ 31; Pl. Dep. p. 204:23-205:10; Pl. App. Hearing p. 63:15-21 (Testimony of Roy Woodham ("Woodham")). On or around January 26, 2007, Plaintiff spoke with the City of Dothan EEO Officer, David M. Thornton ("Thornton"), at his request, regarding a separate investigation surrounding Officer Raemoncia Carney ("Carney") that he was conducting. Pl. Dep. p. 256:7-11; 258:3-22; Declaration of David Thornton ("Thornton Decl."), ¶ 5. Carney was complaining about Sergeant Charlotte Jenkins ("Jenkins") and the dispatchers.[2] Thornton Decl. ¶ 4. During her meeting with Thornton, Plaintiff claimed that she was being treated differently

---

[2] Carney is currently employed with the City as a police officer. McKay Aff. ¶ 8.

than the males on her assigned shift.  Pl. Dep. p. 256:7-11; Thornton Decl. ¶¶ 5-6.  More specifically, Plaintiff described issues with Jenkins.  Pl. Dep. p. 257:18-258:22.  Thornton investigated these matters and found no evidence of race or sex discrimination and closed the matter out.  Thornton Decl. ¶ 6.  Plaintiff never filed an internal complaint with Thornton or the EEO office.  Thornton Decl. ¶ 7.  Chief Powell was not aware of Plaintiff going to the EEO office.  Powell Aff. ¶ 19.

### 7.  Uniform Traffic Citation Incident and Termination.

In June 2007, less than six months after Plaintiff was charged with a major offense regarding the Shack arrest, Plaintiff was charged with another major category offense for an incident occurring on March 15, 2007, when she failed to timely turn in and swear to three uniform traffic citations ("UTCs").  Pl. Dep. p. 245:15-246:3; DX-39; Powell Aff. ¶ 11, 14.  On March 15, 2007, Plaintiff issued three UTCs to three different motorists in Dothan.  DX-39.  The Dothan Police Department, in accordance with Rule 19, requires officers to "acknowledge under oath, before a magistrate or judge, the facts alleged on the UTC, within 48 hours of issuance."  Pl. App. Hearing p. 6:19-22 (Davis); CX-11; Pl. Dep. DX-37; Powell Aff. Ex. D.  On or around April 17, 2007, one of the motorists who received a ticket on March 15, 2007 went to the Magistrate's office to pay the traffic ticket, but there was no record of the tickets on file.  Pl. Dep. p. 246:21-248:8; DX-39; Pl. App. Hearing p. 65:6-66:11 (Woodham).  Sergeant Benny Baxley ("Baxley")

received a phone call from Corporal Jeff Schulmerick ("Schulmerick"), another police officer, who had spoken to the motorist regarding the missing UTC. Pl. App. Hearing p. 65:6-16 (Woodham); CX-7. Around that same time, Woodham found out about the missing UTCs, and instructed Baxley to investigate why the tickets were missing, who wrote them, why there was a delay, etc. Pl. App. Hearing p. 65:13-25 (Woodham). Baxley discovered that Plaintiff was responsible for writing the tickets and had not complied with Rule 19's 48 hour requirement. Pl. App. Hearing p. 7:8-15 (Davis); 65:6.-66:4 (Woodham). Baxley met with Plaintiff, and, at first she denied having any unsworn tickets, but then Plaintiff discovered the three unsworn UTCs tucked in the backside of her ticket book. Pl. Dep. p. 246:21-247:7; 247:22-248:8.; Pl. App. Hearing p. 7:15-19 (Davis). Shortly thereafter, after discovering the missing UTCs, Plaintiff went to the Magistrate's office and swore to the tickets, 32 calendar days after she had issued the tickets. Pl. Dep. p. 248:12-17. Due to Plaintiff's negligence in not turning in her issued UTCs, the court had no record, or even knowledge, of these traffic tickets, and the motorist was unable to pay her ticket (despite multiple attempts). Pl. App. Hearing p. 51:14-25 (Sellers-Smith); Powell Aff. Ex. F.

If an officer does not turn in their UTCs to the Magistrate's office, the clerk has no record that the officer ever issued the ticket. Pl. App. Hearing p. 51:14-17 (Sellers-Smith). The Magistrate's office cannot process someone's payment for a

ticket that was never turned in, and that person will be sent away. *Id.* at p. 51:18-25. According to Rule 19, emphasized in an order from Chief Powell in October 2006, all UTCs must be submitted to the court or Magistrate and sworn to within 48 hours after the UTC is issued.[3] Pl. Dep. p. 238:8-239:8; DX-37.

On April 25, 2007, Baxley and Woodham each drafted a memorandum to Chief Powell regarding this incident. Powell Aff. ¶ 11; Ex. E, F. Baxley wrote about his encounter with Plaintiff regarding the missing UTCs. Powell Aff. ¶ 11; Ex. F. Baxley stated that he met with Plaintiff on April 17, 2007, and asked her if she had not turned in any tickets. Powell Aff. Ex. F. Plaintiff reported that she had sworn to all of her tickets except for the issued on April 16 and 17, 2007. *Id.* Baxley then asked Plaintiff for the UTC transmittal form, which showed when and where she had sworn to her tickets. *Id.* While looking for this form, Plaintiff discovered the unsworn tickets from March 15, 2007. *Id.* Baxley instructed Plaintiff to immediately go to the Magistrate's office and swear to them. Powell Aff. Ex. F. On April 20, 2007, Baxley obtained a copy of Plaintiff's UTC transmittal form and verified that the three missing tickets from March 15 were not sworn to until April 17, 2007. *Id.* Woodham informed Chief Powell about the situation and noted Plaintiff's first major category offense from January 2007. Pl.

---

[3] If the Chief of Police or the Police Department is unaware of, or has no knowledge, an officer turning in a ticket in an untimely fashion, there is no basis to take disciplinary action. Pl. App. Hearing p. 77:1-9 (Woodham); 129:14-130:7 (Powell); 157:3-9 (Magistrate Ann Baxter).

App. Hearing p. 67:4-68:18; CX-6; Powell Aff. ¶ 11; Ex. E.  At that time, Chief Powell contacted Lt. Ray Owens in Internal Affairs and turned the matter over to Internal Affairs.  Pl. App. Hearing p. 123:12-15; Powell Aff. ¶ 12.  Chief Powell also referred the matter to the legal department.  Pl. App. Hearing p. 125:7-18 (Powell); Powell Aff. ¶ 12.  After completing its investigation regarding Plaintiff's failure to timely submit three UTCs, Internal Affairs recommended that Plaintiff be charged with a major category offense, which was her second within a six month period.  Pl. App. Hearing p. 132:23-124:15 (Powell).

Based on Plaintiff's conduct, Chief Powell made the decision to administer a write-up for a major category offense in accordance with the City's Personnel Rules and Regulation, Section 3-42(6), "action(s) or lack of action(s) that could endanger the life or health of self or others, that could cause undue financial loss to the City, negligence in carrying out assigned task or duties or responsibilities of one's position."  Pl. App. Hearing p. 8:2-7 (Davis); Pl. Dep. DX-39; Powell Aff. ¶ 12.

On June 12, 2007, Plaintiff sent a statement (using form PD-12) to Chief Powell asking to speak with Captain Draughon about a transfer to another day shift assignment and about her working conditions.  Pl. Dep. DX-44; Powell Aff. ¶ 16. Plaintiff did speak with Captain Draughon about a transfer and about an incident

she had while working in CID under Woodham's supervision two years earlier.  Pl. Dep. p. 255:8-22; Draughon Aff. ¶¶ 4-6.

During her meeting with Captain Draughon, Plaintiff requested a transfer to another shift in Patrol.  Draughon Aff. ¶ 4.  Captain Draughon explained there were other officers ahead of her waiting for transfers and that there would be no more transfers until the end of July or August of 2007.  Draughon Aff. ¶ 4; Powell Aff. ¶ 18.  Captain Draughon instructed Plaintiff to try and work on her current problems, including timely turning in of UTCs, her hostility with a motorist regarding her insistence on his social security number (which was not required), her defiant actions towards a supervisor, her mishandling of an attempted suicide call, borderline insubordination when questioned about the attempted suicide call, and, on more than one occasion, leaving Waffle House without paying for her meal.  Draughon Aff. ¶ 4; Powell Aff. ¶ 18.  Plaintiff also reported that she was having problems with the dispatchers and that one dispatcher in particular was slow to respond to Plaintiff's radio calls.  Draughon Aff. ¶ 5.  Captain Draughon told Plaintiff he would look into the issue.  Plaintiff also told Captain Draughon about two incidents with Jenkins: (1) Plaintiff was out on patrol, and Jenkins gave Plaintiff a list of violations to enforce during their shift and told Plaintiff to write a book of tickets, and (2) Jenkins took the radar guns from Plaintiff and two other officers and gave them to different officers.  *Id.*  Plaintiff also brought up an issue

she had with Woodham, while working in CID two years earlier, regarding wearing a dress suit to work. *Id.* Plaintiff did not mention Baxley, and, when Captain Draughon asked her about him, she said she did not have a problem with him. *Id.* Captain Draughon investigated Plaintiff's concerns and complaints and found they had no merit. Draughon Aff. ¶ 6.

On June 20, 2007, at 4:07 p.m., Plaintiff was served with notice of a Determination Hearing set for June 22, 2007, which showed that she was being charged with her second major category offense for her failure to submit three issued UTCs within a 48 hour period. Pl. Dep. DX-39; Powell Aff. ¶ 13. Two major category offenses within a twenty-four month time period results in termination. McKay Aff. Ex. A. Plaintiff was aware that this was her second major category offense within twenty-four months, and, on the same day after she was served with notice of the Determination Hearing, Plaintiff faxed a written statement to the EEOC on June 20 at 11 p.m. alleging sex and race discrimination and retaliation. Pl. Dep. p. 294:2-16; DX-4. The City did not receive notice of this EEOC Charge until July 3, 2007. McKay Aff. ¶ 6.

A Determination Hearing was held on June 22, 2007, and Plaintiff was given an opportunity to respond to the charges against her. Pl. Dep. DX-40; Powell Aff. ¶ 13. Plaintiff only stated that her failure to timely submit and swear to the three UTCs was "a good faith mistake." Pl. Dep. p. 250:6-15; DX-40; Powell Aff.; ¶ 14.

On June 25, 2007, the final decision was made to terminate Plaintiff based on her "reoccurring errors and consistently poor judgment in routine job decisions, and the fact that this [was her] second Major Category Offense within 6 months . . . ." Pl. Dep. DX-40; Powell Aff. ¶ 13.

Plaintiff's employment was terminated on June 25, 2007. Pl. Dep. DX-40; Powell Aff. ¶ 13. On July 10, 2007, Plaintiff amended her EEOC charge to reflect her termination. Pl. Dep. p. 297:3-298:9; DX-47. Plaintiff appealed the termination decision to the Dothan Personnel Board, and, on August 1, 2007, her appeal was heard by the City of Dothan Personnel Board ("Personnel Board"). Pl. Dep. p. 250:20-251:14; DX-42. The Personnel Board ratified the termination decision on September 19, 2007. Pl. Dep. p. 251:18-21; DX-42. Plaintiff also appealed to the Circuit Court, but she later dismissed her appeal with prejudice. Pl. Dep. p. 252:18-253:15; DX-43.

## III.    **SUMMARY JUDGMENT STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment in its favor as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-28 (1996). In making this determination, all facts and inferences are to be viewed in a light most favorable to the non-moving party. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n. 2 (11th

Cir. 1988) (noting that non-moving party need not be given the benefit of every inference, only every reasonable inference). Therefore, "the moving party has the burden of demonstrating that there is no genuine issue as to any material fact, and a summary judgment is to be entered if the evidence is such that a reasonable jury could only find for the moving party." *Hilburn v. Murata Electronics N.A., Inc.*, 181 F. 3d 1220, 1225 (11th Cir. 1999).

## IV. ARGUMENT

### A. SOME OF PLAINTIFF'S § 1981 AND § 1983 CLAIMS AGAINST DEFENDANT ARE UNTIMELY AND DUE TO BE DISMISSED

#### 1. Many of Plaintiff's § 1981 Claims Are Untimely.

There are two potential statutes of limitations applicable to claims under §1981 depending upon whether the claim was cognizable under §1981 prior to Congress' 1991 expansion of §1981. *Hithon v. Tyson Foods, Inc.*, 144 Fed. Appx. 795, *6 (11th Cir. 2005)(unpublished) *cert. denied* 2006 U.S. LEXIS 1148 (U.S. Feb. 21, 2006) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 185 (1989)). If Plaintiff's claims were cognizable under §1981 prior to the 1990 amendments, a two year statute of limitations applies. The four year statute of limitations applies only if the cause of action was not available before the 1991 amendments to the statute. *Id.*

Plaintiff filed her Complaint on September 23, 2008. Compl. [Doc. 1]. Any allegations of race discrimination or retaliation that occurred prior to **September**

**23, 2004 are absolutely time-barred** under the four year statute.[4] Plaintiff's

claims relating to her position as a Jail Security Officer are untimely. Plaintiff was

hired as a Jail Security Officer in June 2000, and she remained in that position until

April 2001. Compl. § V, ¶ 13, 16. Thus, Plaintiff's claims relating to this position

in 2000 -2001 are absolutely time-barred.

In April 2001, Plaintiff was promoted to the position of Police Officer and

assigned to the Patrol Division. Compl. § V, ¶ 16; Pl. App. Hearing p. 21:21-22:14

(Davis). She remained in this position until May 2004. Plaintiff's claims

regarding her position in Patrol beginning in April 2001 through May 2004 are

likewise absolutely time-barred because she did not file her Complaint until

September 2008, more than <u>four (4) years</u> after the alleged unlawful employment

actions. As such, Plaintiff's § 1981 claims relating to her first stint in Patrol are

also time-barred.

In May 2004, Plaintiff was transferred to the Environmental Compliance

Bureau, and she remained in this division until she was transferred to the Criminal

Investigations Division ("CID") in November 2004. Pl. Dep. p. 153:18-154;

---

[4] Section 1981 only applies to race and does not provide a cause of action for discrimination or retaliation on the basis of sex. *Milner v. Lee County*, 2006 U.S. Dist. LEXIS 33578, *2 n.1 (M.D. Ala. May 16, 2006) (citing *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960-961 (11th Cir. 1997)) ("Section 1981 was enacted to prevent discrimination based on race, not sex.")

160:3-13.  Plaintiff does not complain of any discriminatory treatment during her time in the Environmental Compliance Bureau.

### 2. Many of Plaintiff's § 1983 Claims Are Untimely and Procedurally Barred.

The applicable statute of limitations to §1983 claims is two years. *See Stuart v. Jefferson County Dep't of Human Resources,* 152 Fed.Appx. 798 (11th Cir. 2005)(unpublished) (*citing Luftkin v. McCallum,* 956 F.2d 1104 (11th Cir. 1992)); *Hughes v. Lott,* 350 F.3d 1157 (11th Cir. 2003).  Accordingly, any Fourteenth Amendment claims asserted under § 1983 based on alleged race and/or sex discrimination or retaliation occurring **prior to September 23, 2006 are time-barred**.

Despite any claim to the contrary, local government entities, such as the City of Dothan, sued pursuant to §1983, may not be held liable under a theory of *respondeat superior.  See Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 691 (1978).  Instead, in order to state a cause of action against the City, Plaintiff must allege that the acts complained of were in furtherance of an official policy or custom of the City.  *See e.g.*, *Monell*, 436 U.S. at 694; *Polk County v. Dodson*, 454 U.S. 312, 326 1981), *Hammer v. Hillsborough County Bd. of County Commissioners*, 927 F. Supp. 1540, 1546 (M.D. Fla. 1996).  To establish a custom, Plaintiff must show a persistent and widespread practice. *Church v. City of Huntsville,* 30 F.3d 1332, 1345 (11th Cir. 1994).  Moreover, actual or

constructive knowledge of such customs must be attributed to the governing body of the municipality. *Id.* Furthermore, it is not enough merely to show the existence of a policy, but also that its application resulted in a deprivation of Plaintiff's constitutional rights. In the present case, Plaintiff cannot establish that the acts of alleged discrimination she allegedly endured were in furtherance of any official policy or custom of the City. Plaintiff is the <u>only</u> black police officer whose employment has been terminated by the City since 2005. McKay Aff. ¶ 7. In the absence of any evidence that the alleged discrimination she allegedly endured was the result of any policy or custom of the City, Plaintiff's §1983 claim against the City of Dothan must be dismissed.[5] *See Hammer*, 927 F. Supp. at 1546.

**B.    SEVERAL OF PLAINTIFF'S TITLE VII CLAIMS AGAINST DEFENDANT ARE UNTIMELY AND DUE TO BE DISMISSED.**

A number of Plaintiff's Title VII claims are untimely because they were not filed within 180 days of the alleged discriminatory employment action. It is well established that before bringing suit under Title VII, a plaintiff must file a charge with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e5(e)(1). Failure to do so procedurally bars a litigant's Title VII claims. *Thomas v. Ala. Council on Human Relations*, 248 F. Supp. 2d 1105, 1115 (M.D. Ala. 2003). "[T]he 180-day period is

---

[5] This includes Plaintiff's Fourteenth Amendment claims which cannot be pursued independently but rather only through 42 U.S.C. §1983.

counted from the date the employee receives *notice* of the [employment decision]." *Wright v. AmSouth Bancorporation*, 320 F.3d 1198, 1202 (11th Cir. 2003)( emphasis in original) (internal quotations omitted); *see, e.g., Del. State College v. Ricks*, 449 U.S. 250, 258, 260, n.15 (1980) ("limitations periods normally commence when the employer's decision is made," not thereafter). Plaintiff's claims are discreet acts and also must be timely filed. *See Nat'l. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) (discussing that promotion claims are discreet acts over which a charge must be timely filed); *Anderson v. Twitchell,* 76 F. Supp. 2d 1279, 1292 (M.D. Ala. 1999).

Plaintiff faxed a statement to the EEOC on the night of June 20, 2007, and the EEOC accepted this statement as a charge of discrimination. Pl. Dep. p. 294:2-16; 297:23-298:13; DX-46; DX-47. Accordingly, every Title VII claim made by Plaintiff in this suit that occurred **prior to December 22, 2006 (180 days prior to June 20, 2007) is untimely and due to be dismissed**.

Plaintiff alleges that while she was a Jail Security Officer (June 2000-April 2001) she was treated differently than her white, male co-workers with respect to job assignments. Compl. § V, ¶ 16. She further claims that she complained to "numerous supervisors and members of management, including the Warden," but she did not file a complaint with the EEOC or the internal EEO office. Compl. §

V, ¶ 21.  Therefore, any Title VII claims pertaining to her position as a Jail Security Officer are untimely.  *Thomas*, 248 F. Supp. 2d at 1115.

In addition to not filing a complaint with the EEOC while she was a Jail Security Officer, Plaintiff did not file an EEOC Charge or internal complaint when she was assigned to the following divisions: Patrol (Third, Fourth, and Sixth Squads); Environmental Compliance Bureau; CID; and Vice.  In fact, Plaintiff's "formal complaint" to the EEOC, dated June 20, 2007, only mentioned her then-current assignment in the Patrol Division on First Squad and her then-current supervisors Roy Woodham, Charlotte Jenkins, Michael Cirrelli, and Benny Baxley. Pl. Dep. DX-46.

In her deposition, Plaintiff testified that she did not have any complaints about Michael Cirrelli or Benny Baxley.  Pl. Dep. p. 277:1-7; 311:20-312:2 Furthermore, two out of the three specific instances of alleged discrimination listed in Plaintiff's EEOC charge - lack of back up on high risk traffic stops and denial to the same training schools as her white co-workers – occurred more than 180 days before she filed her EEOC charge on June 20, 2007.  Plaintiff complained about not receiving proper back up in June 2006 while she was assigned to the Sixth Squad Patrol, but she transferred out of the Sixth Squad and into the First Squad in July 2006.  Pl. Dep. p. 231:22-218:18; 222:21-224:7; 229:18-21; 230:6-23; DX-35. However, Plaintiff did not mention any issues regarding back up to Thornton.

With respect to her complaints about training, those relate to her time spent in CID during the time period between November 2004 and October 2005, which is more than a year and a half before she filed her EEOC charge. Pl. Dep. p. 176:3-7; 327:1-15. Thus, Plaintiff's Title VII claims relating to every position and allegation, except her assignment to First Squad Patrol, are absolutely time-barred.

## C. EVEN IF PLAINTIFF'S CLAIMS ARE NOT TIME-BARRED, SHE CANNOT ESTABLISH A *PRIMA FACIE* CASE OF RACE AND/OR SEX DISCRIMINATION.[6]

To establish a *prima facie* case of race or sex discrimination, the plaintiff must prove that "(1) she belongs to a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).[7]

First, "[n]ot everything that makes an employee unhappy is an actionable adverse action." *Stavropoulos v. Firestone*, 361 F.3d 610, 618 (11th Cir. 2004) ("[The employment action] is not adverse merely because the employee dislikes it

---

[6] As Title VII claims, § 1981 claims, and § 1983 have the same requirements of proof and analytical framework, Defendant will address the claims concurrently throughout the brief. *See Underwood v. Perry County Comm'n*, 431 F.3d 788, 793 (11th Cir. 2005); *Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998).

[7] A plaintiff may also establish a *prima facie* case of race discrimination by showing that: "(1) [s]he was a member of a protected class; (2) [s]he was qualified to do the job; (3) [s]he was subjected to an adverse employment action by [her] employer; and (4) similarly situated employees outside of the protected class were treated more favorably." *Oliver v. Nat'l Beef Packing Co**., LLC**,* 294 Fed. Appx. 455, 457 (11th Cir. 2008) (citing *Wilson,* at 1087 (11th Cir. 2004)); *Holifield v. Reno*, 115 F. 3d 1555, 1562 (11th Cir. 1997) (citing *McDonnell Douglas Corp*., 411 U.S. 792, 802 (1973)).

or disagrees with it. . . . To be actionable, the adverse employment action must be 'material.'") (quoting *Malladi v. Brown*, 987 F. Supp. 893, (M.D. Ala. 1997)). The Eleventh Circuit has repeatedly held that for an employment action to be considered adverse, a plaintiff must demonstrate that the employer took an employment action against the employee and the employment action impacted the "terms, conditions or privileges" of the plaintiff's job in an "objectively serious and tangible" way. *Hooks v. Bank of Am.*, 2006 U.S. App. LEXIS 11354 (11th Cir. 2006); *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, (11th Cir. 2001) ("…the asserted impact cannot be speculative at all and must at least have a tangible adverse effect on [Plaintiff's] employment…Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling"). There must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, etc. *Davis*, 245 F.3d at 1239.

Second, an essential element of a *prima facie* case of discrimination is that an employer treated a plaintiff less favorably than a similarly-situated individual outside the plaintiff's protected class. *Wilson*, 376 F.3d at 1091. To make such a showing, Plaintiff must identify a comparator that is similarly situated "in all relevant respects … to prevent courts from second-guessing a reasonable decision by the employer." *Id.* "Plaintiff must show that employees are treated differently

for nearly identical conduct." *Anderson v. Twitchell-A Tyco Int'l LTD. Co.*, 76 F. Supp. 2d 1279, 1286 (M.D.Ala. 1999); s*ee also Stephens v. Regions Bank*, No. 2:04-cv-1161-F, 2005 U.S. Dist. LEXIS 35455, at *21 (M.D. Ala. Oct. 25, 2005) (comparator must have engaged in "the same or similar conduct"). "'If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.'" *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).

As discussed earlier, the majority of Plaintiff's complaints are untimely. The only instances of alleged discrimination that fall within the relevant time frame are (1) complaints about Williamson and Woodham while working in CID (November 2004-October 2005); (2) complaints regarding Jenkins as set forth in Plaintiff's meeting with Thornton; (3) complaints about the dispatchers contained in her meeting Thornton; (4) discipline imposed after Plaintiff failed to complete and swear to the complaint regarding Shack's arrest in April 2006; (5) discipline she received after she failed to turn in three UTCs from March 2007; and (6) Plaintiff's termination. Plaintiff cannot establish a *prima face* case of sex and/or race discrimination for any of these actions because she cannot demonstrate that she suffered an adverse employment action and/or she cannot identify a similarly-situated white male employee who was treated more favorably.

### 1. Complaints about Woodham and Williamson.

Plaintiff alleges a myriad of complaints while she was under Woodham's and Williamson's supervision in the CID unit in 2004 and 2005. For instance, Plaintiff claimed that she was (1) assigned closed or inactive cases (while Davis was allowed to go out with other investigators to see how the process worked), (2) told by Williamson to stay away from the Sergeant Steven Hamm's and Mike Etras's offices, (3) told by Woodham not to wear a skirt to work (4) told by Williamson that she did not like her perfume, (5) instructed by Williamson to "call out" when she left for lunch, and (6) denied training in certain schools, such as interview or interrogation. Pl. Dep. p.166:3-20; 167:19-168:15; 172:21-173:2; 173:21-174:6; 175:21-176:7; 327:1-15. In an undated document that Plaintiff does not know whether or not she ever gave to Chief Powell and Chief Powell did not receive, Plaintiff typed up certain complaints against Williamson, such as allegations that Williamson changed the access to her case assignment, accused Plaintiff of talking about her cases with other people, did not speak to Plaintiff in passing, and instructed Plaintiff not to allow others to use her computer terminal. Pl. Dep. p. 183:8-18; 184:16-185-17; DX-32; Powell Aff. ¶19.

### a. Plaintiff did not suffer an adverse employment action.

However, none of the complaints about Williamson or Woodham rise to the level of adverse employment action. *See Osahar v. Postmaster General of U.S.*

*Postal Service*, 263 Fed. Appx. 753, 762-64 (11th Cir. 2008) (affirming summary judgment in favor of defendant where plaintiff was never suspended, did not suffer any reduction in wages, job title, seniority status or any other benefits).   Plaintiff's complaints about being assigned closed or inactive cases are merely complaints related to her work assignments and did not result in a tangible change in the terms and conditions of Plaintiff's employment.  *See Davis*, 245 F.3d at 1239 (rejecting the plaintiff's claims that his work assignment constituted an adverse employment action, stating that a "contrary view would potentially open the door to a wide variety of unfair work assignment claims that should not be litigated in the federal courts."); *Dunn v. City of Tallahassee*, 2002 U.S. Dist. LEXIS 18375 (N.D. Fla. 2002) (holding that employees' claim that he was assigned unfavorable jobs was insufficient to constitute an adverse employment action).

Additionally, Plaintiff's complaints that Williamson told her to stay out of certain people's office, that she did not like Plaintiff's perfume, did not speak to her in passing, told Plaintiff to "call out" before going to lunch, and instructed Plaintiff not to allow others to use her computer terminal, and Woodham's statement about not wearing a skirt to work fail because, even if true, Plaintiff has failed to establish how this alleged action resulted in any significant change in the terms and conditions of her employment.

Plaintiff further contends that Williamson changed the access to her case assignments, but, when questioned about this during her deposition, was unable to explain the manner in which her access was changed. Pl. Dep. p. 186:15-191:19. (Pl. Dep., pp. 198-199). However, Plaintiff has failed to show how the change in computer access, which did not affect her ability to view her assigned cases, affected the terms and conditions of her employment. Pl. Dep. p. 188:22-189:6.

Plaintiff has not presented substantial evidence that she suffered a "serious and material" change to her employment as a result of these employment decisions. Plaintiff was not demoted and did not suffer a change in responsibilities as a result of any of these employment decisions. Plaintiff cannot establish that any employment action taken against her had some tangible effect on the terms and conditions of her employment, and as a result, this claim must fail.

> b. Plaintiff cannot identify a similarly-situated employee who was treated more favorably.

With respect to her claims about denial of training, Plaintiff alleges that she requested certain training schools, such as interview and interrogation, but was ultimately denied. Pl. Dep. p. 176:3-7. First, there is no evidence that Plaintiff complained about her training requests until she alleged it in her June 2007 EEOC charge (well more than 180 days after she her training requests were denied). Second, Plaintiff is unable to substantiate her general allegations that she was not provided the same training as "other white male Officers." Pl. Dep. p. 327:1-20;

DX-47.  While Williamson allegedly told her that other people needed to go to those schools first, Plaintiff is unaware whether anyone even went to the training school, and, even more importantly, Plaintiff cannot identify any "white males" who participated in the training that she was denied.  Pl. Dep. p. 176:5-7; 327:16-20.  In fact, Plaintiff received a considerable amount of training during her employment.  Pl. Depo, p. 112:11-113:7; DX-18.

Quite simply, Plaintiff offers no evidence of any similarly situated white employee treated more favorably than Plaintiff.  Accordingly, this claim fails.

### 2.    Complaints About Jenkins.

In a meeting with EEO Officer Thornton, Plaintiff reported several issues regarding her relationship with Jenkins.  Pl. Dep. p.  257:18-258:22.  In her deposition, Plaintiff also described an instance when Jenkins instructed Plaintiff and Carney to give their radar guns to two other police officers.  Pl. Dep. p. 262:12-263:19.

None of these complaints about Jenkins rise to the level of adverse employment action.  *See Osahar*, 263 Fed. Appx. 753, 762-64 (affirming summary judgment in favor of defendant where plaintiff was never suspended, did not suffer any reduction in wages, job title, seniority status or any other benefits).   While Plaintiff may have been annoyed by Jenkins' request, Plaintiff did not suffer any

change in the "terms, conditions or privileges" of her position. *Hooks*, 2006 U.S. App. LEXIS 11354.

Plaintiff's complaints about Jenkins also fail to establish a *prima facie* case of discrimination because Plaintiff cannot point to a similarly situated male employee who was treated more favorably by Jenkins. Plaintiff's protected classification is female, and therefore, she must show that Defendant treated similarly-situated <u>males</u> more favorably. *See Wilson*, 376 F.3d at1091 (the third element of a *prima facie* case of discrimination is to show that her "employer treated similarly situated employees <u>outside</u> her classification more favorably") (emphasis added). Plaintiff has failed to provide any evidence that Jenkins did so.

Because Plaintiff cannot assert comparator or other evidence of discrimination, Plaintiff's discrimination claim should dismissed. *See Dent v. Fed. Mogul Corp.,* 129 F. Supp. 2d 1311, 1314 (N.D. Ala. 2001) ("The Court concludes that summary judgment is warranted on both of Plaintiff's Title VII claims because Plaintiff has failed to identify an employee of another race or gender who was both treated more favorably than and 'similarly situated' to him, for purposes of establishing a prima facie case…Plaintiff does not identify by name any specific employee as being similarly situated"); *Jean-Francois v. Anderson,* 2008 U.S. Dist. LEXIS 102247, *26 (M.D. Ga.) (granting summary judgment and holding "[h]ere, Plaintiff fails to specifically identify any similarly situated employee

outside of his classification that was treated differently"); *White v. Sears, Roebuck & Co.,* 2006 U.S. Dist. LEXIS 58890, *7 (N.D. Ga. 2006) (granting summary judgment on Title VII claim where plaintiff failed to identify a similarly situated comparator).

### 3. Complaints About Dispatchers.

Plaintiff also complained about the way the radio dispatchers treated her. In her meeting with Thornton, Plaintiff reported that the dispatchers refused to acknowledge her on the radio. Pl. Dep. p. 218:5-7. In actuality, the dispatchers never ignored Plaintiff's radio calls or refused to respond to her. Pl. Dep. p. 250:5-20. Plaintiff is complaining that, on occasion, she would call in to the dispatchers, and they would answer another police officer's call first, even if that officer radioed in after her. Pl. Dep. p. 220:5-20. Plaintiff considers the dispatcher responding to another officer before her as "ignor[ing her] call out." *Id.* at p. 220:17. However, Plaintiff does not allege an instance in which a dispatcher <u>never</u> responded to her call.

While Plaintiff may have resented the dispatchers' alleged treatment towards her, this conduct does not constitute an adverse employment action. *See Osahar*, 263 Fed. Appx. at 762-64. The dispatchers did not curse or use inappropriate language with Plaintiff over the radio. Pl. Dep. p. 133:16-21. Plaintiff did not

suffer any change in the "terms, conditions or privileges" of her position as a result of the dispatchers' actions. *Hooks v. Bank of Am.*, 2006 U.S. App. LEXIS 11354.

Equally detrimental to her claim is Plaintiff's inability to sufficiently identify a white male comparator who was treated more favorably. Again, Plaintiff attempts to satisfy this prong by using the broad identifier of males or "guys." Pl. Dep. p. 218:5-18. However, this is insufficiently specific, and Plaintiff has failed to meet her burden. *Dent*, 129 F. Supp. 2d at 1314; *Jean-Francois*, 2008 U.S. Dist. LEXIS 102247 at *26; *White*, 2006 U.S. Dist. LEXIS 58890 at *7.

### 4. Discipline After Shack Arrest Incident.

Plaintiff's sex discrimination claim regarding the discipline she received after failing to follow standard arrest procedure should be dismissed because Plaintiff explicitly testified that the City's actions were not based upon her sex. Pl. Dep. p. 269:19-22.

In support of her race discrimination claim surrounding this incident, Plaintiff points to Robert Cole ("Cole"), a white male, who arrested Shack in November 2005 and failed to swear to a complaint before a Magistrate. Pl. App. Hearing p. 27:4-15 (Davis); Pl. Dep. p. 310:2-18. She claims Cole failed to comply with PGO 511, but was only charged with a minor category offense. Pl. App. Hearing p. 27:16-20 (Davis).

While on the surface, Plaintiff's arrest of Shack and violation of PGO 511 appear similar, the circumstances are entirely distinguishable. When Cole arrested Shack in 2005, Cole completed a complaint and made attempts to swear to the complaint in the Magistrate's office. Pl. App. Hearing p. 127:24-128:11 (Powell); Powell Aff. Ex. C. Plaintiff neither completed nor submitted a complaint regarding Shark's arrest, whereas Cole turned in a complaint the day after he arrested Shack and made multiple attempts to swear to the complaint. Pl. App. Hearing p. 27:11-14 ; 35:25-36:3 (Davis); Powell Aff. Ex. C. During her termination appeal hearing, Chief Powell, who made both disciplinary decisions regarding Plaintiff's and Cole's Shack arrests, testified that he did not view their conduct the same. Pl. App. Hearing p. 127:14-20 (Powell); Powell Aff. ¶ 9.

> Officer Cole actually prepared the complaint and actually made efforts to try to sign the complaint before a magistrate, but was unable to do so because the magistrate was not available. He even responded back to the magistrate's office after being notified by the magistrate's office to come in and sign the complaint, but by the time he arrived, the contacting magistrate had already left and they couldn't find the documentation. [Plaintiff] didn't prepare the paperwork. There was no complaint forwarded to the magistrate's office for the individual to get docketed so they could be seen by the judge.

Pl. App. Hearing p. 127:24-128:11 (Powell). In order for Plaintiff to show that Cole is a proper comparator, Plaintiff must show that both she and Cole were "treated differently for nearly identical conduct." *Anderson*, 76 F. Supp. 2d at 1286. As evidenced by the testimony at Plaintiff's termination appeal hearing, her

conduct was not "nearly identical" to Cole's, and he is not a proper comparator for Plaintiff's discrimination claim. Because Plaintiff offers no evidence of any similarly situated white male employee treated more favorably than Plaintiff, this claim fails.

5. **Discipline After Failure to Timely Submit Three UTCs.**

Plaintiff's discrimination claim regarding the discipline she received after failing to timely submit and swear to three UTCs should also be dismissed because Plaintiff expressly testified that the City's actions were not based upon her sex or race. Pl. Dep. p. 278:5-11. Moreover, this discipline was not based on her sex or race but was based on her negligent conduct in misplacing three UTCs and failing to turn them in until the matter came to the attention of the Police Department, more than one month later, after a motorist was unsuccessful in paying her traffic ticket. Powell Aff. ¶¶ 12-14.

Plaintiff cannot point to a similarly-situated male or white officer who engaged in similar conduct. Even if a police officer were delinquent in turning in a ticket, if the Police Department or Chief of Police had no knowledge of such conduct, the Police Department would not be in a position to impose any discipline. Pl. App. Hearing p. 129:14-130:7 (Powell).

6. **Termination.**

Plaintiff does not directly contend that her termination was discriminatory on the basis of sex and/or race, and in any assertion to that effect is entirely without merit. The City ultimately terminated Plaintiff because she received two major offense write-ups within a six month period (January 2007 and June 2007).[8] Powell Aff. ¶ 12, 14. As stated earlier, Plaintiff testified that she did not believe either of the two major offense disciplinary measures were based upon her sex. Pl. Dep. p. 269:19-22; 278:5-11. As such, any sex discrimination claim based upon Plaintiff's termination is due to be dismissed for failure to establish a prima facie case. Furthermore, Plaintiff testified that she did not believe that discipline she received after violating Rule 19 was based on her race. Pl. Dep. p. 278:5-11. Chief Powell has also stated that his decision to terminate Plaintiff was not motivated by race or sex. Powell Aff. ¶ 14. Plaintiff has offered no evidence of any similarly situated white male employee who received two major offense category write-ups within a twenty-four month period and was not terminated. In fact, Plaintiff is the only black police officer, out of twenty, who has been terminated since 2005. McKay Aff. ¶ 7.

Because Plaintiff cannot establish a *prima facie* case with respect to any of her claims of discrimination claims, summary judgment for Defendant is appropriate.

---

[8] Personnel Rule 3-20(2)(A) speaks to termination for two major offenses within a twenty-four month period. McKay Aff. ¶ 2; Ex. A.

## D. PLAINTIFF'S RETALIATION CLAIMS ARE DUE TO BE DISMISSED FOR FAILURE TO ESTABLISH A *PRIMA FACIE* CASE.[9]

To establish a *prima facie* case of retaliation, Plaintiff must prove that: (1) she engaged in protected activity, (2) she suffered an adverse employment action and (3) there was a causal connection between her protected activity and the adverse employment action. *Stravropoulos v. Firestone*, 361 F.2d 610, 616 (11th Cir. 2004); *Bass v. Bd. of County Comm'rs.*, 256 F.3d 1095, 1117 (11th Cir. 2001).

To establish an "adverse employment action" for purposes of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S 53, 58 (2006) (citations omitted). In *Burlington Northern*, the Supreme Court noted that there are significant differences between "*material* adversity" and "trivial harms." *Id*. at 68. (emphasis in original). "An employee's decision to report discriminatory behavior cannot immunize the employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id*. (citing B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d

---

[9] As Title VII claims, § 1981 claims, and § 1983 claims have the same requirements of proof and analytical framework, Defendant will address the claims concurrently throughout the brief. *See Underwood v. Perry County Comm'n*, 431 F.3d 788, 793 (11th Cir. 2005); *Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998).

ed. 1996) (noting that "court have held that personality conflicts at work that generate antipathy" and "snubbing by supervisors and co-workers" are not actionable under Section 704(a) [of Title VII])).

Furthermore, Plaintiff must prove, at a minimum, that the decision-maker was aware of the Plaintiff's opposition before taking adverse employment action. *See Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (the requirement of knowledge "rests upon common sense. A decision-maker cannot have been motivated to retaliate by something unknown to him."); *Bowen v. Jameson Hospitality,* 214 F. Supp. 2d 1372, 1382 (11th Cir. 2002) (same). "It is insufficient to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the **person taking the adverse action** was aware of the protected expression." *Bass,* 256 F.3d at 1120; *Harris v. Corr. Corp. of Am.,* 2005 U.S. App. LEXIS 11451, at *8 (11th Cir. 2005) (plaintiff failed to prove *prima facie* case of retaliation where decision-maker was not aware plaintiff filed an EEOC charge).

Finally, Plaintiff must satisfy the temporal proximity requirement necessary to demonstrate a casual connection. To do so, Plaintiff must provide evidence that a substantial amount of time did not elapse between the protected activity and the alleged retaliatory action. *See Tran v. Boeing Co.,* 2006 WL 2167329, *5 (11th Cir. 2006) (affirming summary judgment on retaliation claim and holding "a four-

month gap between protected activity and the adverse employment event is too long, by itself, to establish retaliation."); *Miller v. Lectra USA, Inc.,* 2005 U.S. App. LEXIS 16867, at *3 (11th Cir. 2005) (holding seven month gap between protected activity and termination "falls outside the parameters for establishing causation."); *Wascura v. City of S. Miami,* 257 F.3d 1238, 1248 (11th Cir. 2001) (rejecting a retaliation claim because three and a half months was too long to find a retaliatory connection).

Plaintiff's claims of retaliation fail for two reasons, either: 1) she cannot show that she suffered an adverse employment action; and/or 2) she cannot establish a casual connection based on the decision-maker's knowledge of her protected activity or temporal proximity between the protected activity and the employment action.

**1.     Alleged Treatment by Woodham and Williamson.**

a.     Plaintiff did not suffer an adverse employment action.

Plaintiff's complaints about being assigned closed or inactive cases are merely complaints related to her work assignments and did not result in a tangible change in the terms and conditions of Plaintiff's employment. *See Morton v. Astrue*, 2010 WL 2130613, *2 (11th Cir. May 27, 2010) (work assignments or reassignments without any tangible harm, such as a decrease in pay, do not constitute an adverse employment action); *Grimsley v. Marshalls of MA, Inc.*, 284

Fed. Appx. 604, 609 (11th Cir. 2008) (assigned tasks, temporary in nature and without a change in compensation or position, do not amount to a "serious and material change in the terms, conditions, or privileges of employment"); *Davis*, 245 F.3d at 1239 (rejecting the plaintiff's claims that his work assignment constituted an adverse employment action, stating that a "contrary view would potentially open the door to a wide variety of unfair work assignment claims that should not be litigated in the federal courts."); *Dunn v. City of Tallahassee*, 2002 U.S. Dist. LEXIS 18375 (N.D. Fla. 2002)(holding that employees' claim that he was assigned unfavorable jobs was insufficient to constitute an adverse employment action).

Additionally, Plaintiff's complaints that Williamson told her to stay out of certain people's office, that she didn't like Plaintiff's perfume, didn't speak to her in passing, told Plaintiff to "call out" before going to lunch, and instructed Plaintiff not to allow others to use her computer terminal, and Woodham's statement about not wearing a skirt to work fail because Plaintiff has not proven that she suffered a significant change in the terms and conditions of her employment.

Plaintiff further contends that Williamson changed the access to her case assignments, but, when questioned about this during her deposition, was unable to explain the manner in which her access was changed. Pl. Dep. p. 186:15-191:19. Furthermore, Plaintiff has failed to show how the change in computer access,

which <u>did not affect her ability to view her assigned cases</u>, affected the terms and conditions of her employment.  Pl. Dep. p. 188:22-189:6.  *See Orquiola v. Nat'l City Mortg. Co.,* 510 F. Supp. 2d 1134, 1158 (N.D. Ga. 2006) (employer's decision to cut off employee's access to computer did not rise to the level of adverse employment action); *Swanson v. Civil Air Patrol*, 37 F. Supp. 2d 1312, 1328 (M.D. Ala. 2002) (computer "lock down" did not constitute adverse employment action because employee had no evidence that the lock-out had an adverse impact on his present or future employment performance or opportunity, at most employee fell a little behind on answering emails).

Plaintiff has not presented substantial evidence that she suffered a "serious and material" change to her employment as a result of these employment decisions. Plaintiff was not demoted and did not suffer a change in responsibilities as a result of any of these employment decisions. Plaintiff cannot establish that any employment action taken against her had some tangible effect on the terms and conditions of her employment, and as a result, this claim must fail.

> b.  <u>There is no causal connection between Plaintiff's complaints about Williamson and Woodham and any alleged adverse employment action.</u>

Even if Plaintiff could show that she suffered an adverse employment action, she cannot establish a causal connection between her complaints and any alleged adverse action.  The only alleged protected activity that can serve as the basis of

her retaliation claim for this allegation is an internal complaint directed to then-Chief of Police John White ("White") in 2001 regarding her experiences working as a Jail Security Officer. Pl. Dep. DX-12. Additionally, Plaintiff was working as a Jail Security Officer at the time she wrote her statement to White, and Plaintiff has no evidence that Williamson or Woodham ever became aware of these complaints.

Finally, Plaintiff clearly cannot establish temporal proximity between the protected activity and the employment action (or non-action). Plaintiff's statement to White in 2001 cannot possibly be the reason she was (1) assigned closed or inactive cases, (2) told by Williamson to stay away from the Sergeant Steven Hamm's and Mike Etras's offices, (3) told by Woodham not to wear a skirt to work (4) told by Williamson that she did not like her perfume, (5) instructed by Williamson to "call out" when she left for lunch, and (6) denied training in certain schools, such as interview or interrogation. These statements to White and the complaints surrounding Williamson and Woodham occurred years apart from each other, with the statement dated March 23, 2001, and the alleged retaliatory actions occurring while Plaintiff was working in CID (November 2004 – October 2005). This temporal gap completely undercuts Plaintiff's ability to demonstrate a casual connection necessary for a *prima facie* case of retaliation. In sum, Plaintiff is

unable to establish a *prima facie* case for retaliation with regard to the alleged acts by Williamson and Woodham.

**2.      Alleged Treatment by Jenkins.**

In a meeting with Thornton, Plaintiff discussed her issues and complaints about Jenkins.  Pl. Dep. p. 256:9-11; Thornton Decl. ¶¶ 5-7.  In her deposition, Plaintiff also described an instance when Jenkins instructed Plaintiff and Carney to give their radar guns to two other police officers.  Pl. Dep. p. 262:12-263:19.

None of these alleged actions constitutes an adverse employment action.  As discussed earlier, Plaintiff was bothered by the way she claims Jenkins treated her, but in no way does Jenkins' alleged conduct constitute a "serious and material" change to her employment status.  *See Morton*, 2010 WL 2130613, at *2; *Grimsley,* 284 Fed. Appx. at 609; *Davis* 245 F.3d at 1239; *Dunn*, 2002 U.S. Dist. LEXIS 18375.

Moreover, Plaintiff is unable to establish a causal connection between the alleged treatment by Jenkins and any alleged protected activity.  There are two instances of alleged protected activity that could serve as the basis for her claim that Jenkins' alleged treatment was retaliatory in nature: (1) an undated complaint regarding actions by Williamson and Woodham, which Plaintiff was uncertain that she gave to Chief Powell and Chief Powell did not receive, or (2) a letter to Chief Powell, dated June 1, 2006, complaining about her 2006 evaluation.  Pl. Dep. DX-

32; DX-35. However, neither the undated complaint nor the letter to Chief Powell mention Jenkins, and Plaintiff has not offered any evidence to show that Jenkins was even aware of Plaintiff's previous internal complaints. As such, any claims of retaliation surrounding the way Jenkins alleged treated Plaintiff should be dismissed.

### 3.    Treatment by Dispatchers.

Plaintiff also alleges that the radio dispatchers retaliated against her by the way they talked to her and refusing to acknowledge her on the radio. Pl. Dep. p. 218:5-7. As discussed earlier, none of the dispatchers' alleged actions constituted an adverse employment action. At most, the dispatchers' actions were simply a "minor annoyance" that Plaintiff had to cope with as part of her job. *Burlington Northern*, 548 U.S. at 68. Plaintiff's allegations that the dispatchers refused to acknowledge her are more serious, but Plaintiff does not know the names of the dispatcher(s) who did this nor can she remember specific dates. Pl. Dep. p. 221:5-14. Regardless, Plaintiff did not suffer any change in the "terms, conditions or privileges" of her position as a result of the dispatchers' actions. *Hooks v. Bank of Am.*, 2006 U.S. App. LEXIS 11354.

Likewise, Plaintiff is also unable to establish a causal connection between the dispatchers' alleged actions and any protected activity because she cannot demonstrate any temporal proximity whatsoever between her statutorily protected

activity and the alleged retaliatory action by the dispatchers. Plaintiff's complaints about the dispatchers stem from her time in Patrol. However, from November 2004 through October 2005 Plaintiff worked in CID. During her time in CID, Plaintiff alleged she complained internally in writing about Williamson and Woodham. Pl. Dep. DX-32. However, Chief Powell never received this alleged complaint, and Plaintiff does not remember whether or not she ever gave it to him. Pl. Dep. p. 185:5-186:11. In October 2005, Plaintiff was transferred to Vice, and she did not lodge any complaints during the few months in this division. Her supervisor while in Vice, Jackson, a black male, felt she was missing too much work to effectively perform her job, and Plaintiff was transferred out of Vice. Pl. Dep. p. 203:22-205:18. Interestingly, Plaintiff did not think that Jackson's conduct towards her or her transfer were discriminatory. *Id.* at p. 205:19-206:6.

In early 2006, Plaintiff was transferred back to Patrol, and her statement to Chief Powell in June 2006 is the first time Plaintiff alludes to any issues, although not outright, with the dispatchers.[10] In that statement, Plaintiff wrote that her evaluation, in which she received an overall score of "satisfactory," was "not fair and unbiased, due to the supervisors [Nelms and Baum] unwillingness to help [her] with complaints and conflicts that [she had] sought there [sic] assistance on." Pl.

---

[10] Shortly after Plaintiff complained about her June 2006 performance evaluation from Nelms and Baum, Plaintiff was transferred, July 2006, to another squad division in Patrol. Compl. § V, ¶ 31. Plaintiff also received a pay increase. Pl. App. Hearing CX-1, p. 9.

Dep. DX-34; DX-35. However, in her deposition, Plaintiff testified that the "complaints" are instances when Plaintiff alleges that she complained to Nelms and Baum about the dispatchers. Pl. Dep. p. 231:10-233:21. Nowhere in this statement does Plaintiff mention the radio dispatchers outright. More importantly, nowhere in this statement does she complain of race or sex discrimination. Pl. Dep. DX-35. Captain Draughon followed up on Plaintiff's complaints and found no merit to them. Draughon Aff. ¶ 2.

For Plaintiff to establish a causal connection between the dispatchers' conduct and her internal complaints, Plaintiff would have to show that the dispatchers had knowledge of her complaints about Williamson and Woodham from her time in CID. Plaintiff has not provided any evidence to substantiate this link. Even if Plaintiff could show the dispatchers knew about Plaintiff's previous complaints, at least four months (and two transfers) had elapsed between her most-recent internal complaint, after her June 2006 evaluation, and the dispatchers' alleged "retaliatory actions."

### 4. Discipline After Shack Arrest Incident.

In her deposition, Plaintiff testified that she did _not_ believe that the discipline she received after failing to turn in and swear to Shack's arrest complaint was retaliation for her internal complaints. Pl. Dep. p. 269:4-15. Furthermore, Plaintiff has not and cannot establish any temporal proximity between her first

major offense write-up for violation of PGO 511 and her previous internal complaints. On January 18, 2007, Plaintiff was informed that she was charged with a major category offense and suspended for two days for her actions surrounding Shack's arrest in April 2006. Pl. Dep. DX-38; Powell Aff. ¶ 9. Plaintiff's complaints, in writing, to Chief Powell in June 2006, about her evaluation occurred more than six months before a determination hearing was held and discipline issued on January 16, 2007. The substantial time gap between the protected activity and the alleged adverse employment action does not support a casual connection needed to establish a *prima facie* case of retaliation.

### 5. Discipline After Failure to Timely Submit Three UTCs.

Additionally, Plaintiff cannot establish a causal connection between the protected activity and the retaliatory action, which is the discipline she received for violating Rule 19 – failing to swear to three issued UTCs within 48 hours. She admitted that she mistakenly just forgot to turn in three UTCs from March 2007, but Plaintiff alleges that her second major category offense write-up, in June 2007, was in retaliation for her internal complaints. Pl. Dep. p. 278:12-16; DX-40. It was discovered that Plaintiff had failed to turn in three UTCs when a motorist came to the Magistrate's office to pay for their traffic ticket, was unable to do so because their was no record of the ticket, and lodged a complaint about the incident. Pl. App. Hearing p. 7:8-15 (Davis).

In his memorandum to Chief Powell, dated April 25, 2007, Baxley wrote about his encounter with Plaintiff regarding the missing UTCs. Powell Aff. ¶ Ex. F. After initially denying that she did not have any unsworn tickets, except for the ones issued on April 16 and 17, Plaintiff discovered the unsworn tickets from March 15, 2007. Powell Aff. Ex. F. Baxley then instructed Plaintiff to immediately go to the Magistrate's office and swear to them, and Plaintiff's UTC transmittal form proves that the three missing tickets from March 15 were not sworn to until April 17, 2007. *Id.*

In her letter to the EEOC on June 20, 2007, Plaintiff listed Baxley as one of her supervisors, but she did not specify any complaints against him. Pl. Dep. DX-46. In fact, Plaintiff does not mention Baxley in any of her internal complaints, and she testified that she does not have any complaints against Baxley. Pl. Dep. p. 311:17-312:2. Without showing such knowledge, Plaintiff cannot establish the requisite causal connection between the alleged retaliatory action and protected activity.

Woodham instructed Baxley to thoroughly investigate Plaintiff's missing UTCs, and Woodham wrote a memo to Chief Powell informing him of Plaintiff's failure to comply with the 48 hour rule for turning in UTCs. Pl. App. Hearing p. 65:13-25 (Woodham). However, Plaintiff cannot demonstrate a causal connection between Woodham's investigation of Plaintiff's failure to turn in three UTCs and

Plaintiff's previous internal complaints against Woodham. The first and only time Plaintiff complained about Woodham was when she was working in CID, and Woodham allegedly told her not to wear a skirt to work anymore. Pl. Dep. p. 172:21-173:2. In January 2007, when Plaintiff was again under Woodham's supervision, Plaintiff met with Thornton, at Thornton's request as part of his investigation into a complaint filed by Carney, and complained about Jenkins and the dispatchers, but she did not mention any issues with Woodham. Thornton Decl. ¶¶ 4-6. Plaintiff has absolutely no evidence that Woodham or Chief Powell knew about this internal meeting with Thornton.

Furthermore, Plaintiff cannot establish temporal proximity because of the four month gap between her meeting with Thornton (January 2007) and the point in time when Woodham sent his memo to Chief Powell based on events brought to his attention. *See Tran v. Boeing Co.,* 2006 WL 2167329, *5 (11th Cir. 2006) (affirming summary judgment on retaliation claim and holding "a four-month gap between protected activity and the adverse employment event is too long, by itself, to establish retaliation."); *Wascura v. City of S. Miami,* 257 F.3d 1238, 1248 (11th Cir. 2001) (rejecting a retaliation claim because three and a half months was too long to find a retaliatory connection). Thus, Plaintiff cannot establish a *prima facie* case for retaliation for this action.

6.    **Termination.**

Plaintiff's retaliation claim with respect to her termination fails as a matter of law because Plaintiff cannot establish a causal connection between her termination and alleged protected activity. Plaintiff's meeting with Thornton in late January 2007, regarding the Carney investigation, is too far removed in time to serve as Plaintiff's alleged protected activity.[11] *See Tran*, 2006 WL 2167329, at *5; *Wascura*, 257 F.3d at 1248. Furthermore, Chief Powell has no knowledge that Plaintiff met with Thornton. Thornton Decl. ¶¶ 4-5; Powell Aff. ¶ 19.

The only other action that could qualify as Plaintiff's protected activity is her meeting with Captain Draughon sometime after June 12, 2007. In her June 12, 2007 statement to Chief Powell, Plaintiff requested to speak with Captain Draughon regarding a transfer and her current working conditions. Pl. Dep. DX-44; Powell Aff. ¶ 17; Draughon Aff. ¶¶ 4-6. In her statement, Plaintiff did not report that she felt like she was being discriminated against. Draughon Aff. ¶¶6-7. Shortly thereafter, Plaintiff met with Captain Draughon and spoke about her desire for a transfer and issues with Jenkins, Woodham, and the dispatchers. Draughon Aff. ¶¶ 4-5. Plaintiff described two incidents involving Jenkins: (1) Plaintiff was out on patrol, and Jenkins gave Plaintiff a list of violations to enforce during their shift and told Plaintiff to write a book of tickets, and (2) Jenkins took the radar guns from Plaintiff and two other officers and gave them to different officers.

---

[11] Carney was the police officer who directly complained, and she remains employed with the City. McKay Aff. ¶ 8.

Draughon Aff. ¶ 5.   Plaintiff also described issues with the dispatchers.   *Id.*

Plaintiff also drudged up the comment Woodham made about her work attire while

she was working in CID.   *Id.*   Plaintiff did not mention any issues with Baxley and

said she did not have a problem with him.   *Id.*   Even though Plaintiff complained to

Captain Draughon about her employment, he was not involved in the final decision

to charge Plaintiff with a major category offense on either occasion or the final

decision to terminate Plaintiff.   Pl. App. Hearing p.121:14-22; 127:14-17 (Powell);

Draughon Aff. ¶ 7; Powell Aff. ¶ 9, 12, 14.

Furthermore, Chief Powell signed the June 22, 2007 Decision of

Determination Hearing document, and he made the decision to terminate Plaintiff.

Pl. App. Hearing p. 127:14-17 (Powell); Pl. Dep. DX-40; Powell Aff. ¶ 14.

However, there is no evidence that Chief Powell made his decision to terminate

Plaintiff based on Plaintiff's June 12, 2007 request to speak to Captain Draughon.

Other than addressing the statement to him, Plaintiff does not mention Chief

Powell nor does she allege any complaints about him.   In sum, Plaintiff is unable to

establish a *prima facie* case for retaliation with regard to her termination.

**E.   PLAINTIFF'S CLAIMS FAIL AS A MATTER OF LAW BECAUSE DEFENDANT HAS PROVIDED LEGITIMATE, NONDISCRIMINATORY AND NONRETALIATORY REASONS FOR ITS ACTIONS, AND PLAINTIFF CANNOT ESTABLISH PRETEXT.**

If a plaintiff successfully establishes a *prima facie* case, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for the challenged employment action sufficient to allow the trier of fact to conclude that the decision was not motivated by an unlawful reason. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981); *Pennington v. City of Huntsville*, 261 F.3d 1261, 1266 (11th Cir. 2001) (holding that defendants must articulate a legitimate, nonretaliatory reason for the employment action).

Once a defendant produces a legitimate, nondiscriminatory or nonretaliatory reason for its decision, the presumption of discrimination created by *McDonnell Douglas* "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255 & n.10 (1981). At that point, "the plaintiff must then present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext." *Id.*

For Plaintiff's general claims of retaliation and race discrimination, Plaintiff must "meet [the proffered] reason head on and rebut it, and the employee cannot not succeed by simply quarrelling with the wisdom of that reason." *Brooks,* 446 F.3d at 1163 (citing *Chapman v. A1 Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000)(en banc)). "A plaintiff must show . . . that [Defendants] were in fact motivated by [race or retaliation]." *Lee v. Florida GTE Inc.*, 226 F.3d 1249, 1253 (citing *Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000)).

Here, Plaintiff cannot demonstrate that any of Defendant's actions were pretextual for discrimination or retaliation. When Plaintiff arrested Shack in April 2006, she did not fill out an arrest complaint nor did she swear to an arrest complaint until 103 days after the arrest after she was directed to do so. Defendant had a legitimate, nondiscriminatory and nonretaliatory reason for disciplining Plaintiff – she failed to properly and timely fill out and swear to an arrest complaint. As the result of Plaintiff's action, Shack stayed in jail for 103 days. This was a violation of PGO 511, and Plaintiff was charged with a major category offense and received a two-day suspension. As such, Plaintiff cannot successfully rebut Defendant's legitimate, nondiscriminatory and nonretaliatory reason and establish pretext.

Similarly, Plaintiff is unable to establish pretext relating to the discipline she received after she failed to timely submit three UTCs from March 2007. Plaintiff admitted she mistakenly forgot to submit the UTCs. Pl. Dep. p. 248:9-11; DX-40; Pl. App. Hearing p. 110:23-111:22 (Plaintiff). It was not until April 2007, after a motorist was unable to pay for their traffic ticket, that Defendant discovered Plaintiff's mistake. Pl. Dep. DX-40; Pl. App. Hearing p. 64:23-66:16 (Woodham). Plaintiff unequivocally violated Rule 19, and a directive issued to all officers via a memorandum from Chief Powell from October 20, 2006, which states, "[e]ffective immediately **ALL** issued traffic citations will be submitted to the court or

magistrate with the acknowledge oath within 48 hours (excluding holidays)." Pl. Dep. DX-37; DX-40. In accordance with the City's Personnel Rules and Regulations, Plaintiff's conduct violated Section 3-42(6). Therefore, Defendant had a legitimate, nondiscriminatory and nonretaliatory reason for charging Plaintiff with a major category violation.

Likewise, Defendant had a legitimate, nondiscriminatory and nonretaliatory reason for terminating Plaintiff: two major category offenses within a twenty-four month period. According to Personnel Rule 3-20(2)(a), if an officer is charged two major category offenses within twenty four months of each other, the individual should be terminated. Pl. App. Hearing p. 10:19-25 (Davis); McKay Aff. Ex. A. Hence, because Plaintiff cannot show the City's legitimate reasons for its actions were a pretext for discrimination or retaliation, this claim must also fail.

## IV.    CONCLUSION

For the foregoing reasons, Defendant is entitled to a complete summary judgment on all counts in Plaintiffs' Complaint.

Respectfully submitted,

/s/ *Carol Sue Nelson*
Carol Sue Nelson
Alyson C. Saad
Attorneys for Defendant
City of Dothan

**OF COUNSEL:**

MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
Suite 2400 AmSouth Harbert Plaza
Birmingham, Alabama 35203
(205) 254-1000

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Ann C. Robertson, Esq.
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building
301 19th Street North
Birmingham, AL  35203

/s/ *Carol Sue Nelson*
OF COUNSEL