# EXHIBIT A

Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
 2    FOR THE MIDDLE DISTRICT OF ALABAMA
 3         SOUTHERN DIVISION
 4    CASE NO. 1:08-CV-784-MEF
 5    SYLVIA SUMMERS,
 6
 7        Plaintiff(s),
 8    v.
 9    THE CITY OF DOTHAN,
10
11        Defendant(s).
12
13         DEPOSITION TESTIMONY OF:
14             SYLVIA SUMMERS
15
16
17
18
19
20    Commissioner:
21    Renny D. McNaughton, CSR
22    May 25, 2010
23    Dothan, Alabama
```

Page 3

```
 1    McNaughton, am hereby delivering to  Ms.
 2    Summers the original transcript of the oral
 3    testimony taken the 25th day of May, 2010,
 4    along with exhibits.
 5        Please be advised that this is the
 6    same and not retained by the Court Reporter,
 7    nor filed with the Court.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 2

```
 1         STIPULATION
 2       IT IS STIPULATED AND AGREED by and
 3    between the parties through their respective
 4    counsel that the deposition of Sylvia
 5    Summers, may be taken before Renny D.
 6    McNaughton, Certified Court Reporter and
 7    Notary Public, State at Large, at the
 8    offices of the City of Dothan, 126 North
 9    Saint Andrews Street, Dothan, Alabama, on
10    the 25th day of May, 2010, commencing at
11    approximately 9:00 a.m.
12       IT IS FURTHER STIPULATED AND AGREED
13    that it shall not be necessary for any
14    objections to be made by counsel to any
15    questions, except as to form or leading
16    question and that counsel for the parties
17    may make objections and assign grounds at
18    the time of trial or at the time said
19    deposition is offered in evidence, or prior
20    thereto.
21       In accordance with Rule 5(d) of the
22    Alabama Rules of Civil Procedure, as
23    amended, effective May 15, 1988, I, Renny D.
```

Page 4

```
 1             INDEX
 2    EXAMINATION BY:           PAGE NO.
 3    Ms. Summers          8
 4       E X H I B I T S
 5    Defendant's
 6    No. 1            10
 7    No. 2            22
 8    No. 3            56
 9    No. 4            57
10    No. 5            81
11    No. 6            84
12    No. 7            85
13    No. 8            85
14    No. 9            93
15    No. 10           95
16    No. 11           96
17    No. 12           102
18    No. 13           102
19    No. 14           103
20    No. 15           104
21    No. 16           106
22    No. 17           107
23    No. 18           113
```

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

| 1 | CONTINUED | |
|---|---|---|
| 2 | No. 19 | 116 |
| 3 | No. 20 | 117 |
| 4 | No. 21 | 118 |
| 5 | No. 22 | 130 |
| 6 | No. 23 | 131 |
| 7 | No. 24 | 132 |
| 8 | No. 25 | 134 |
| 9 | No. 26 | 134 |
| 10 | No. 27 | 136 |
| 11 | No. 28 | 143 |
| 12 | No. 29 | 149 |
| 13 | No. 30 | 156 |
| 14 | No. 31 | 162 |
| 15 | No. 32 | 184 |
| 16 | No. 33 | 192 |
| 17 | No. 34 | 209 |
| 18 | No. 35 | 214 |
| 19 | No. 36 | 237 |
| 20 | No. 37 | 239 |
| 21 | No. 38 | 242 |
| 22 | No. 39 | 246 |
| 23 | No. 40 | 249 |

Page 7

```
 1              A P P E A R A N C E S
 2
 3    FOR THE DEFENDANT (S):
 4    Ms. Carol Sue Nelson
 5    Maynard, Cooper & Gale, P.C.
 6    1901 6th Ave N Ste 2400
 7    Birmingham, AL 35203-2618
 8    E-mail: cnelson@maynardcooper.com
 9    Phone: (205) 254-1119
10    FOR THE PLAINTIFF (S):
11    Ms. Ann Carroll Robertson
12    Wiggins, Childs, Quinn & Pantazis
13    The Kress Building
14    301 19th St N
15    Birmingham, AL 35203-3118
16    E-mail: acr@wcqp.com
17    Phone: (205) 314-0500
18
19    Also Present:
20    Delvick J. McKay
21    City of Dothan
22
23
```

Page 6

| 1 | CONTINUED | |
|---|---|---|
| 2 | No. 41 | 251 |
| 3 | No. 42 | 251 |
| 4 | No. 43 | 253 |
| 5 | No. 44 | 254 |
| 6 | No. 45 | 300 |
| 7 | No. 46 | 295 |
| 8 | No. 47 | 296 |
| 9 | No. 48 | 299 |
| 10 | No. 49 | 299 |
| 11 | No. 50 | 300 |
| 12 | No. 51 | 301 |

Page 8

```
 1         I, Renny D. McNaughton, a Court
 2    Reporter of Greenville, Alabama, and a
 3    Notary Public for the State of Alabama at
 4    Large, acting as Commissioner, certify that
 5    on this date, pursuant to the Alabama Rules
 6    of Civil Procedure, and the foregoing
 7    stipulation of counsel, there came before me
 8    at the offices of the City of Dothan, 126
 9    North Saint Andrews Street, Dothan, Alabama,
10    commencing at approximately 9:00 o'clock
11    a.m. on the 25th day of May, 2010, Sylvia
12    Summers, witness in the above cause, for
13    oral examination, whereupon the following
14    proceedings were had:
15
16         SYLVIA SUMMERS,
17    being first duly sworn, was examined and
18    testified as follows:
19         EXAMINATION
20    BY MS. NELSON:
21         Q   Ms. Sylvia, I'm one of the
22    lawyers that represents the City of Dothan
23    in a lawsuit that you filed against the
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

1  city. And I'm sure your lawyer has
2  explained to you, I'm going to be asking
3  some questions today about your lawsuit.
4      A   Yes.
5      Q   And I will try to be clear with
6  my questions. I can't promise I'll always
7  do that. So if you don't understand me,
8  please let me know, and I'll be glad to try
9  to rephrase the question. Is that
10  understood between us?
11     A   Yes.
12     Q   Okay. And I'm sure she's told
13  you the court reporter is taking down
14  everything we say.
15         MS. ROBERTSON: Keep your voice
16  up just a little.
17     Q   So you'll have to speak up and --
18     A   Okay.
19     Q   -- say yes or no or give your
20  answer as opposed to nodding your head one
21  way or the other, because the court reporter
22  can't pick that up; is that okay?
23     A   Yes.

1      Q   And, otherwise, you know, when I
2  ask you a question, that you're under oath
3  and you will be truthfully answering my
4  questions; is that understood?
5      A   Yes.
6      Q   Now, is there any reason -- are
7  you on any type of medications or anything
8  that would prevent you from understanding me
9  or truthfully answering my questions today?
10     A   No.
11     Q   Okay. Are you on any
12  medications?
13     A   No.
14         (Whereupon, Defendant's
15         Exhibit No. 1 was marked and
16         attached to the deposition.)
17  BY MS. NELSON:
18     Q   I had given this to your
19  attorney. It's -- I'm not sure this is one
20  actually for today, but it's the same thing.
21  But it's like the -- in essence, the
22  document that was inviting you to come here
23  today?

1          MS. NELSON: And I know you've
2  filed some objections. And you've said
3  you given me everything you've got.
4      Q   But, Ms. Summers, that's
5  basically asking you to be here today and
6  asking you about certain documents you might
7  have. You did not bring any documents with
8  you today, did you?
9      A   No.
10     Q   Okay. Did you review any
11  documents today to prepare for your
12  deposition?
13     A   Yes.
14     Q   Okay. Can you -- I mean, we're
15  going to go through a number of documents.
16  Can you tell me, to the best of
17  recollection, what you reviewed?
18     A   The initial complaint and a
19  videotape.
20     Q   Okay. Did you review like your
21  personnel file or any of your disciplinary
22  actions or performance reviews, anything
23  like that?

1      A   No.
2      Q   Okay. Let me --
3      A   Let me ask you a question.
4  You're talking about today or since being
5  terminated?
6          MS. ROBERTSON: She's talking
7  about in preparation.
8      Q   I'm talking about in preparation
9  for today?
10     A   No.
11     Q   Will you state your full name for
12  the record, please, ma'am?
13     A   Sylvia Janine Summers.
14     Q   And what is your address?
15     A
16  Enterprise.
17     Q   Enterprise? And how long have
18  you lived there?
19     A   A little more than a year.
20     Q   And where did you live prior to
21  that?
22     A   Before that, I didn't have a
23  residence before that. I lived with my

1 daughter. And before that, when I -- the
2 last residence I had prior to that was
3
4 Q
5 A   Yes.
6 Q   And where is that located?
7 A   In Dothan.
8 Q   Okay. And where did your
9 daughter live?
10 A
11 Q   Is that here in Dothan?
12 A   Yes. There's a couple of other
13 places that I stayed when I didn't have a
14 residence, but I don't remember the
15 addresses right now.
16 Q   Okay. Now, how long were you at
17         .?
18 A   I believe eight or eleven months,
19 something like that.
20 Q   Are you married?
21 A   No.
22 Q   Ever been married?
23 A   No.

1 Q   You've got -- I know you've
2 got -- you said you had a daughter. Any
3 other children?
4 A   I have three children.
5 Q   Okay. Can you give me just their
6 names and ages?
7 A   Corrien Summers. She is twenty.
8 Cortez Summers. He's 23. Courtney Summers.
9 She is 24.
10 Q   Do they live in Dothan?
11 A   Yes.
12 Q   Okay.
13         MS. ROBERTSON: She's obviously
14 not Jewish. We don't name our people
15 after other people that are alive.
16 Q   The three Cs?
17 A   Uh-huh. Yes.
18 Q   Corrien, does she work?
19 A   She just enlisted in the
20 military, so she's on -- Does she work?
21 Q   Yeah. I guess she definitely
22 does?
23 A   Yes, she works.

1 Q   Okay.
2 A   Yes, she works.
3 Q   Is she like in Fort Rucker?
4 A   No. She's with me right this
5 minute.
6 Q   Okay. And what branch of the
7 military is she in?
8 A   Army.
9 Q   Okay. And Cortez, does he work?
10 A   No.
11 Q   Is he in school?
12 A   No.
13 Q   Unemployed?
14 A   Yes.
15 Q   What does he do with his time?
16 A   Sick a lot of times. Other
17 times, I don't know.
18 Q   And Courtney Summers. Is that
19 male or female?
20 A   Female.
21 Q   Does she work?
22 A   Yes.
23 Q   And where does she work?

1 A   Nip and Ernie's in Dothan.
2         MS. ROBERTSON: Keep your voice
3 up just a little bit louder.
4 A   She works in Dothan.
5 Q   Okay. And is that a restaurant?
6 A   A restaurant.
7 Q   Okay. Okay. Are your parents
8 living?
9 A   Yes.
10 Q   Do they live here in Dothan?
11 A   My mother does.
12 Q   Okay. What's her name?
13 A   Almeda.
14 Q   Summers?
15 A   Yes.
16 Q   Okay. Does she work?
17 A   No.
18 Q   And your father, where does he
19 live?
20 A   I believe Daleville.
21 Q   Okay. And what's his name?
22 A   Josefus Summers.
23 Q   And does he work anywhere?

1    A    No.
2    Q    Well, do you have other relatives
3  over the age of nineteen, eighteen, nineteen
4  living in south Alabama?
5    A    Yes.
6        MS. NELSON: Okay. Well, I'm
7    going take you up on your offer, Ann,
8    to --
9  BY MS. NELSON:
10   Q    If y'all, at the appropriate
11  time, could provide me a list of your
12  relatives?
13   A    Okay.
14   Q    And their names and --
15       MS. ROBERTSON: Their
16   spouses --
17       MS. NELSON: -- and where they
18   work. Yeah. That'd be fine.
19       MS. ROBERTSON: Yeah. We'll be
20   happy to do that.
21  BY MS. NELSON:
22   Q    Okay. Now, do you have a Social
23  Security number?

1    A    Yes.
2    Q    You can give me that?
3    A    -4468.
4    Q    And do you have a driver's
5  license?
6    A    Yes.
7    Q    Is it an Alabama driver's
8  license?
9    A    Yes.
10   Q    Do you know the number?
11   A    5188717.
12   Q    If anybody asked me my driver's
13  license, I would have to look it up. And
14  your date of birth?
15   A        1966.
16   Q    And I'm sorry. Maybe I didn't
17  ask. The father of your children is -- Do
18  they all have the same father?
19   A    Yes.
20   Q    And what his name?
21   A    Kelvin Brantley.
22   Q    And is Mr. Brantley -- does he
23  live in this area?

1    A    No.
2    Q    Where does he live?
3    A    Somewhere in Texas.
4    Q    Okay. Did he ever recently live
5  here?
6    A    Not to my knowledge. Not for
7  years.
8    Q    Did he work anywhere here that
9  you know of?
10   A    I don't know.
11   Q    Okay. You just don't have any
12  contact with him?
13   A    No.
14   Q    Okay. So you've never been
15  married so you've never been divorced or
16  separated? Did you and Mr. Brantley live
17  together for a while?
18   A    Yes.
19   Q    And how long did y'all live
20  together?
21   A    Thirteen years.
22   Q    Okay. And when did y'all
23  separate?

1    A    When my youngest daughter was
2  four months old, about around that time.
3    Q    Have you ever been arrested for
4  anything?
5    A    Yes.
6    Q    And what have you been arrested
7  for?
8    A    Harassing -- harassment, a
9  criminal trespass, and a youthful offender
10  case.
11   Q    Three different times? Three
12  different arrests?
13   A    Two incidents, three arrests.
14   Q    Okay. The harassment charge, can
15  you tell me what that involved?
16   A    A bus driver cussing at my
17  children to the point I could hear her
18  inside the house. And I went outside to
19  find out what was going on. Because my son
20  has always been sick. And he was a young
21  boy then. And I went up on the bus, not to
22  hit her or anything. But she was talking to
23  him in a manner that I didn't agree with.

1    And we had words.
2         Q    And did she file a local
3    complaint against you?
4         A    Yes. I tried find out her name
5    to file a complaint against her. But they
6    wouldn't give me her name.
7         Q    Okay. And when did this take
8    place approximately?
9         A    '91, '92, somewhere around that
10   time.
11        Q    And what was the outcome of that
12   arrest?
13        A    I believe it was nol prossed.
14        Q    How about the criminal trespass?
15        A    I think it was also. I'm not
16   sure.
17        Q    Was that regarding the same
18   incident?
19        A    Yes.
20        Q    Okay. I started -- Just for the
21   record, I think I showed you the Notice of
22   Deposition, which was for May 11th. I'm
23   going to show you the notice as Exhibit

1    No. 2 for today?
2         MS. ROBERTSON:  Right. The old
3    one was Defendant's 1.
4         MS. NELSON:  Yeah. And that's
5    Defendant's 2.
6         MS. ROBERTSON:  Okay.
7         (Whereupon, Defendant's
8         Exhibit No. 2 was marked and
9         attached to the deposition.)
10   BY MS. NELSON:
11        Q    And you said -- I think you said
12   the third one was like a youthful offender;
13   is that correct?
14        A    Yes.
15        Q    And how old were you when that
16   particular arrest took place?
17        A    I believe eighteen.
18        Q    And can you just tell me
19   generally the nature of the circumstances
20   that led to that arrest?
21        A    I was just told that it was a
22   youthful offender case, so it was sealed.
23        MS. ROBERTSON:  Yeah. I'm

1    going to tell her not to answer.
2    Because I never do understand this. And
3    we may have to just ask the Court and he
4    will let her answer. But it's a
5    youthful offender. It's sealed.
6         MS. ROBERTSON:  Okay. I
7    understand, but I, you know, reserve the
8    right to revisit that.
9         MS. ROBERTSON:  I agree. I
10   mean, I understand. And, you know, I
11   ordinarily don't tell people to not
12   answer. But this is something that I
13   think is not supposed to be public
14   knowledge.
15   BY MS. NELSON:
16        Q    Okay. And, again, I'm just
17   basing this on an AlaCourt search. Have you
18   ever been charged with theft of property,
19   second degree?
20        A    Yes.
21        Q    Now, I mean, was that related to
22   your youthful offender? I won't get into it
23   if that was the same charge regarding

1    youthful offender?
2         A    Yes.
3         Q    That was it? Okay. And it's
4    your understanding that was under -- That
5    was in 1986; does that sound right?
6         A    Yes.
7         Q    And you were under twenty-one at
8    that time? Okay. Any other arrests or
9    convictions other than those two that --
10   well, the two incidents you've mentioned to
11   me?
12        A    No. I don't know of any other
13   arrests.
14        Q    Okay. Were you ever in any
15   traffic offenses?
16        A    Yes.
17        Q    Okay. And what were the nature
18   of those?
19        A    Traffic accidents, tickets.
20        Q    Speeding?
21        A    Running a stop sign.
22        Q    Okay. Ever filed for bankruptcy?
23        A    Yes.

1    Q    And when did you do that?
2    A    I believe it's 2000.
3    Q    I don't know whether you -- There
4  are different types of bankruptcies. Do you
5  have any understanding of the -- There's
6  like a Chapter 7, Chapter 13. Do you have
7  any understanding what type of bankruptcy
8  you filed for?
9    A    I don't know which one it was.
10   Q    Okay. Do you know who
11 represented you in that matter? I mean, was
12 there a lawyer?
13   A    It was a lawyer from Dothan. But
14 I don't remember his name right now.
15   Q    Okay.
16   A    But I could try to find out. But
17 I don't remember his name.
18   Q    And do you remember, I mean, what
19 the outcome of that particular bankruptcy
20 was?
21   A    What do you mean?
22   Q    Well, was the case ultimately
23 closed or dismissed? Were your debts --

1  outstanding debts discharged or did they put
2  you on some type of payment plan?
3    A    No. It was discharged.
4    Q    Discharged? And is that
5  bankruptcy still pending?
6    A    No.
7    Q    Okay. It's been closed to your
8  knowledge?
9    A    To my knowledge, yes.
10   Q    Did you ever live on Scott Road?
11   A    Yes.
12   Q
13   A    Yes.
14   Q    Do you know how long you lived
15 there?
16   A    Several years.
17   Q    Now you said -- are you currently
18 -- You're in Enterprise; is that correct?
19   A    Yes.
20   Q    All right. Do you rent a house
21 or apartment, own a house?
22   A    I rent.
23   Q    Rent? Is it a house or an

1  apartment or what?
2    A    A trailer.
3    Q    A trailer. Okay. Have you ever
4  owned a house or a trailer?
5    A    No.
6    Q    Okay. You always rented?
7    A    Yes.
8    Q    Did your daughter that you lived
9  with, did she rent or own at            .?
10   A    Rent.
11   Q    Okay. Have you ever filed for
12 unemployment compensation?
13   A    Yes.
14   Q    And how many times?
15   A    Twice, I think.
16   Q    And the first time that you
17 remember?
18   A    Years ago.
19   Q    Okay. Was it after you lost a
20 job?
21   A    I don't know.
22   Q    Okay. And the second time?
23   A    After my termination from the

1  City of Dothan.
2    Q    Did you draw -- did you draw
3  unemployment compensation after you left the
4  City of Dothan?
5    A    Yes.
6    Q    Do you know about how much money
7  you made or how long you drew?
8    A    For a few months. I don't know
9  exactly.
10   Q    Did you go to work after you
11 left --
12   A    Yes.
13   Q    -- the City of Dothan?
14   A    Yes.
15   Q    And what was your first job after
16 you left the City?
17   A    Level Plains Police Department.
18   Q    Level Plains?
19   A    Yes.
20   Q    And do you know when you started
21 working there?
22   A    Two years ago.
23   Q    Which would be? I mean, it's

## Page 29

1  2010. 2008. Do you remember the date you
2  started?
3     A   No.
4     Q   Sometime in 2008?
5     A   Late 2008.
6     Q   And are you currently employed?
7     A   Yes.
8     Q   And where are you -- Are you
9  employed there?
10    A   Yes.
11    Q   And what is your job there?
12    A   I am the Patrol Sergeant and
13 Narcotics Investigator.
14    Q   Okay.  When you first started
15 working there, what was your job?
16    A   Patrol Officer.
17        (Phone Ringing)
18 BY MS. NELSON:
19    Q   I guess we need to cut that off
20 unless it's an emergency, of course.
21    A   I know.  I'm trying to turn it
22 off.
23    Q   Okay.  So I should -- You are

## Page 30

1  Sergeant Summers; is that correct?
2     A   Yes.
3     Q   When you went to work as a patrol
4  officer, do you remember what your pay was?
5     A   Nine something.  I don't know.
6     Q   And what is your pay today?
7     A   A little bit more than that.
8  It's under ten.
9     Q   Do you get benefits?
10    A   Yes.
11    Q   Can you tell me briefly what
12 benefits you have?
13    A   State retirement, BlueCross
14 BlueShield, dental.  That's all I --
15    Q   You had state retirement here at
16 Dothan?
17    A   Yes.
18    Q   So did that, in essence, just
19 continue?  Your state retirement benefits
20 continued when you went to work for Level
21 Plains?  If you know?
22    A   What do you mean, when I left --
23    Q   Well, I mean, you were in the

## Page 31

1  state retirement system here --
2     A   Right.
3     Q   -- at Dothan; is that correct?
4     A   Yes.
5     Q   And then you reentered the state
6  retirement system when you were at Level
7  Plains; is that correct?
8     A   Yes.
9     Q   Have you ever been in the
10 military?
11    A   No.
12    Q   Ever filed for disability?
13    A   I don't think for myself.  But
14 for my son, yes.
15    Q   And when did you file for your
16 son?
17    A   When he was very young.  I don't
18 know if he was an infant or a toddler, but
19 somewhere around that time.
20    Q   Okay.  This is Cortez; is that
21 correct?
22    A   Yes.
23    Q   And what is his disability?

## Page 32

1     A   Severe asthma, allergies,
2  learning disability and some other health
3  problems.
4     Q   And did you draw disability
5  benefits for him?  I'm sorry.  I may have
6  asked you that?
7     A   Yes.  For a while.
8     Q   Okay.  And is he currently
9  drawing any type of disability?
10    A   No.
11    Q   Okay.  And do you know how long
12 you drew disability for him?
13    A   No.
14    Q   Okay.  Did he outgrow some of
15 those problems?
16    A   No.
17    Q   He still has them?
18    A   Yes.
19    Q   Okay.  Do you know if he's
20 applied as an adult?
21    A   I helped him to apply again.  But
22 we have to keep going back for appeals, or
23 to re-file again.  He was denied.  And then

8 (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1 you have so much time to file again or
2 whatever, the action or whatever they tell
3 you that you need to do. But he's not
4 currently on any --
5   Q   Are any of your children married?
6   A   No.
7   Q   Do you have any grandchildren?
8   A   Yes.
9   Q   How many grandchildren?
10  A   Four. Correction. Five.
11     MS. ROBERTSON: I'm sorry.
12 What did she say?
13     THE WITNESS: Five.
14 BY MS. NELSON:
15  Q   Five. And can you just tell me
16 who -- how many children each of your
17 children have?
18  A   Courtney has three children.
19  Q   Okay?
20  A   I'm sorry. That is correct.
21 Four. Cortez has one and is supposed to
22 have another one. I don't know about that.
23 That's where the five comes in at. But four

Page 34

1 that are here now.
2   Q   Okay. One on the way?
3   A   Yeah.
4   Q   Do you help support them in any
5 way?
6   A   Yes.
7   Q   Do you help support your
8 children?
9   A   Yes.
10  Q   Does anybody else reside with you
11 and your daughter in Enterprise at the
12 trailer?
13  A   No. Not now.
14  Q   Is this -- You live with Corrine?
15  A   No. Corrine lives with me.
16  Q   Oh, okay. I'm sorry. I'm
17 getting things confused.
18  A   Cortez is with me. But a lot of
19 times, he's in Dothan. He's up there. He's
20 in Dothan. Corrine just moved back home so
21 it's in and out. And I've had other
22 children at different times. They're just
23 not currently there. Other people at

Page 35

1 different times. I help my mom as well.
2   Q   Do you have any other means of
3 support besides your income from the police
4 department that you currently have with
5 Level Plains Police Department?
6   A   If there's a off-duty job to do,
7 I'll pick that up, or someone wants their
8 hair done, I'll do that. Some just odd jobs
9 afterwards, and looking for an --
10     MS. ROBERTSON: Now, I didn't
11 know that about you. You can do
12 something about this? Excuse me. Off
13 the record.
14     (Whereupon, an off the
15 record discussion was had.)
16 By Ms. Nelson:
17  Q   I did ask for you tax returns.
18 Do you file a tax return each year?
19  A   Yes.
20  Q   Okay. I would need your tax
21 returns at least going back probably, like,
22 to 2006 to the present, or any W-2s that you
23 would have. If you could get those to your

Page 36

1 attorney, she can get them to me.
2   A   Okay.
3   Q   And, like, when you say you work
4 off duty, like as a security or as a officer
5 or like at a private business?
6   A   Sometimes as security, which is
7 not in the capacity of a police officer, but
8 you're in -- not in your department uniform.
9 If there's a concert, if there is a --
10 something going on, a MMA fight or something
11 of that nature, and they want to hire off
12 duty police officers, then I'll work there.
13 Just odd jobs.
14  Q   And your tax return would reflect
15 any type of income you earn from doing those
16 type of odd jobs?
17  A   Not all of it.
18  Q   Okay. Like when you do
19 somebody's hair, do you just charge them per
20 customer? It depends on like if you cut
21 hair or color hair? I mean --
22  A   Yes.
23  Q   -- anything like that? Anything

9 (Pages 33 to 36)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

## Page 37

1     else that you have an income?
2        A   There may be something else, but
3     I -- I'm not thinking of anything right now.
4        Q   Now, are you a member of any
5     church? Do you regularly attend a church?
6        A   Yeah. I attend church.
7        Q   I mean, what's the name of the
8     church that you go to?
9        A   Mount Olive is where I'm a member
10    of now.
11       Q   Is that where?
12       A   That's in Arrington.
13       Q   Is that a certain denomination?
14       A   It's a Baptist church. But I
15    don't have a specific denomination.
16       Q   Okay. Now, are you a member of
17    any type of clubs or social clubs or
18    anything like that when you're not working.
19       A   Social clubs? Like IBPO or
20    something of that nature?
21       Q   Yeah?
22       A   I used to be a member of IBPO.
23    But my membership is not current.

## Page 38

1       Q   What -- I know with family and
2    work and all, you sound pretty busy. But if
3    you do anything in your spare time?
4       A   A lot of work in the community.
5       Q   Yeah?
6       A   A neighborhood watch.
7       Q   Like do you work with Girls Club
8    or the elderly?
9       A   I work in the surrounding
10    community doing neighborhood watch, speaking
11    to groups, doing things with children, doing
12    fundraisers.
13       Q   That's what I'm trying to get a
14    idea of.
15       A   Okay.
16       Q   Like fundraisers to help who?
17       A   Every year we do fundraisers to
18    do a big event called Springfest. And it's
19    to do kind of a carnival with slides and
20    games and concessions so that the kids don't
21    have to pay. The goal of --
22       Q   Excuse me. I don't mean to
23    interrupt. Is it for their school?

## Page 39

1       A   No.
2       Q   Okay.
3       A   It's just for the community.
4       Q   The community?
5       A   To promote police relations with
6    the community is what it's for, and give the
7    kids something to do so that they are not
8    just out getting into trouble.
9       Q   And this is in Level Plains?
10      A   Yes.
11      Q   That's for anything else like
12    that, that you do?
13      A   There's a lot of different -- I
14    speak at different churches. Wherever they
15    ask me to go. The women's group. I think
16    sisters -- Strengthening Sisters.
17      Q   Do you speak as a member of the
18    police department, as a sergeant of the
19    police department of Level Plains when
20    you're doing this or --
21      A   I speak about law enforcement, if
22    that's the question. But mostly it's for
23    women, professional women doing -- that's

## Page 40

1     career oriented is what it's about, and
2     trying to get women to set goals, young
3     girls to set goals.
4        MS. ROBERTSON: I think what
5     she's asking you is does the police
6     department send you or pay you or do you
7     just --
8       A   No. I don't get paid.
9       Q   Volunteer?
10      A   Yeah.
11      Q   You just volunteer some of this?
12      A   Yeah.
13      Q   Okay?
14      A   It depends on if I do it as a
15    requirement from the police department, then
16    I get paid. But if it's -- these events
17    that I do that is not through the police
18    department, I don't get paid.
19      Q   Okay.
20      A   So there are some that's through
21    the police department, and there's some that
22    are not through the police department.
23      Q   Have you ever, besides this

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

1 lawsuit -- And I'll ask you a lot more
2 questions about this lawsuit. But other
3 than this lawsuit, have you ever been
4 involved in filing a lawsuit against any
5 other company or employer that you've had?
6    A   Yes.
7    Q   And what is that?
8    A   Alabaster Bay Apartments.
9    Q   Okay. And what were the
10 circumstances that you sued Alabaster Bay?
11    A   The hot water heater in the
12 apartment blew up four or five times. And
13 it ruined -- it flooded the apartment each
14 time. There was already a mold problem in
15 the apartment. It ruined a large majority
16 of just about everything in the apartment,
17 old papers, computers furniture, a lot of
18 different things.
19    Q   And approximately when was that,
20 that you sued them?
21    A   It was when I worked for the City
22 of Dothan when it was filed.
23    Q   So my recollection is you worked

1 for the City of Dothan like around 2002 to
2 2009 or 2007? Does that sound right?
3    A   I believe it was 2008 that I
4 left.
5    Q   Okay?
6    A   I think. But it was around 2007,
7 I want to say.
8    Q   And was that filed here in
9 Houston County?
10    A   Yes.
11    Q   And what was the outcome of that?
12    A   They paid for the property, but
13 not the medical bills.
14    Q   And what -- You had medical bills
15 related to an injury or mold or what?
16    A   Because of the mold, because of
17 the -- the flooding made the mold grow even
18 worse. It was making family members sick
19 and was affecting our health.
20    Q   Okay. Any other lawsuits that
21 you filed?
22    A   No, I don't think so.
23    Q   What about have you ever had

1 anybody file a lawsuit against you?
2    A   Yes.
3    Q   And how many lawsuits have been
4 filed against you?
5    A   One, that I recall, or could have
6 been another one. But there was one that I
7 recall.
8    Q   And which one is that?
9    A   Strickland.
10    Q   Strickland?
11    A   Was his last name.
12    Q   Okay. And what was the nature of
13 that lawsuit?
14    A   I arrested him on a DUI. He
15 pulled out, headlights off, weaving across
16 the roadway. He failed field sobriety. But
17 I did not prove what he was on, so they
18 settled it.
19    Q   Okay. And you said he failed
20 field sobriety?
21    A   Yes.
22    Q   What does that mean?
23    A   Test that you give to determine

1 whether a person can operate a vehicle, a
2 motor vehicle safely in the field.
3    Q   Okay. It's not like a
4 breathalyzer. It's more of a -- is it like
5 walk the yellow line?
6    A   The one-leg stand, the walk and
7 turn, the horizontal gait and nystagmus.
8 Different tests that they have to --
9    Q   It's a physical task --
10    A   Yes.
11    Q   -- test? Okay. And you're
12 saying that case was settled?
13    A   Yes.
14    Q   And was that while you worked for
15 the City of Dothan?
16    A   Yes.
17    Q   Okay. Any other lawsuits that
18 you can remember? Do you remember being
19 sued for any -- I'm sorry. Go ahead. I
20 didn't mean to interrupt you. Do you
21 remember being sued for any debts --
22    A   Yes.
23    Q   -- or collections?

1    A    Yes.
2    Q    What do you remember about --
3    A    The hospitals, both Flowers and
4  the Medical Center.
5    Q    And what were they over?
6    A    Medical bills.
7    Q    For you or a family member?
8    A    For my children.
9    Q    And do you remember the nature of
10  the -- Were they in the hospital or --
11    A    It was a lot of different times
12  of going in and out of the hospitals, a lot
13  of different incidences.
14    Q    Some like using the emergency
15  room?
16    A    Yes.  And being hospitalized,
17  too, if I remember right.
18    Q    And what were they hospitalized
19  for?
20    A    Asthma, surgery.
21    Q    Okay.  Any others that you know
22  of?
23    A    None that I can think of.  I

1  don't know.  If there's a specific one that
2  you ask me about, I could tell you about it.
3  But I don't remember right now.  If it was
4  anybody else -- I don't think of anybody
5  else right now.
6    Q    Heilig-Meyers Furniture, do you
7  remember them filing a complaint against
8  you?
9    A    I don't remember that.
10    Q    Pilcher's Ambulance Service?
11    A    That could have been.
12    Q    Money to Lend?
13    A    Could have been.  If it's there,
14  then they filed a complaint.  But I don't
15  remember.
16    Q    Have you ever given a deposition
17  like we're doing today in any other case
18  where you gave testimony?
19    A    Yes.
20    Q    And what was that?
21    A    With -- I think it was the City
22  of Dothan.  And also, I think with the suit
23  filed against Alabaster Bay.

1    Q    The City of Dothan suit meaning
2  the Strickland suit?
3    A    Yes.
4    Q    Was the City of Dothan also sued
5  in that Strickland case?
6    A    I believe so.
7    Q    Did they provide a defense for
8  you or they defend the case for you?
9    A    The city attorney handled it.
10    Q    You didn't have to hire your own
11  lawyer, did you?
12    A    No.
13    Q    Do you remember First Finance --
14  First Southern Finance Company?  Do you
15  remember a case that they filed against you?
16    A    I remember paying them off.
17    Q    Okay?
18    A    But if they filed one, it was
19  paid off before any proceedings.  But, yeah.
20    Q    Okay.  Did you pay off the
21  hospitals?
22    A    Yes.  Not all the medical bills,
23  the new ones after that, but all the ones

1  that were filed against me, yes.
2    Q    And you also, involving in this
3  case that I'm questioning you about today,
4  you appeared before the Personnel Board in a
5  hearing, didn't you?
6    A    Yes.
7    Q    Okay.  And you testified in that
8  case; is that correct?
9    A    Yes.
10    Q    And did you testify truthfully in
11  that case?
12    A    Yes.
13    Q    Have there been any other times
14  that you've had to go to court, either as a
15  witness where you saw, like, an automobile
16  accident or any other type of case where you
17  had to go to court, or -- whether it's
18  Circuit Court or Municipal Court, where
19  you've had to testify?
20    A    Yes.
21    Q    And what -- what were the
22  circumstances of that?
23    A    I don't know.  There's several

1 different cases as a witness or as an
2 officer that I had to go to court on.
3      Q    Would this generally be like
4 Municipal Court? Did you have to testify
5 whether you were either the arresting
6 officer or involved?
7      A    I went to Municipal and Civil
8 and, I believe, District as well.
9      Q    That's all in your capacity as a
10 police officer for the City of Dothan; is
11 that correct?
12     A    In my career as a police officer,
13 I believe so, yes.
14     Q    And the same for Plain Level?
15          MS. ROBERTSON: Level Plains.
16     Q    Level Plains. I'm sorry. I'm
17 not familiar with that. I thought I knew
18 most south Alabama towns. Have you had to
19 testify in court as an officer or sergeant
20 for Level Plains?
21     A    Yes.
22     Q    In the same types of cases when
23 it involved your duties as a police officer

1 or a police sergeant?
2      A    Yes.
3      Q    Have you, other than the -- In
4 this particular case against the City, you
5 filed what's known as a EEOC charge. Do you
6 know what I'm referring to there? A charge
7 of discrimination with the Equal Employment
8 Opportunity Commission?
9      A    Yes.
10     Q    You filed one of those in the
11 case -- in this case that I'm asking you
12 about regarding the City of Dothan; is that
13 correct?
14     A    Yes.
15     Q    And have you ever filed any other
16 EEOC charge against any other company or
17 entity?
18     A    Yes.
19     Q    Okay. And who have you filed
20 against?
21     A    It was just the City of Dothan.
22     Q    Just the City?
23     A    Uh-huh. Yes.

1      Q    I mean, nobody else? No other --
2 I maybe misunderstood what you're saying?
3          MS. ROBERTSON: She's filed
4 more than one is what she's trying to
5 say.
6      Q    Oh, you filed more than one
7 charge with the City of Dothan?
8      A    More than one time.
9      Q    Okay. How many EEOC charges have
10 you filed?
11     A    Two.
12     Q    Okay. And can you tell me what
13 two those were?
14     A    What do you mean what two those
15 were? This current one. And a few years
16 back, I filed the same type of complaint.
17     Q    Was it arising out of your
18 termination?
19     A    No.
20     Q    What was it arising out of?
21     A    Being treated differently because
22 I was a black female.
23     Q    And do you have a copy of that

1 charge?
2      A    No.
3      Q    Does your attorney --
4      A    I had some other paperworks, but
5 some items were lost and destroyed when my
6 property got messed up.
7      Q    Back when you said this water
8 heater --
9      A    No. It was -- Yeah. That's when
10 that got -- What are you asking me?
11     Q    Well, I'm asking you if you had a
12 -- You said you filed a charge arising out
13 of your being treated differently because
14 you were black; is that correct?
15          MS. ROBERTSON: Object.
16     Q    I'm just trying get some
17 understanding --
18          MS. ROBERTSON: Well, she said
19 a black female. That's what I was
20 objecting to.
21     Q    Black female. I'm sorry. Black
22 female. I'm just trying to -- And you said
23 -- I asked if you had a copy of it?

Page 53

1    A  No, I don't have a copy of it.
2    Q  Okay. Because I'm not aware of
3  that charge. And I've not ever seen that
4  charge. And you said any papers you might
5  have on that would have been lost or
6  destroyed?
7    A  The EEOC should have a copy of
8  that.
9    Q  And you filed it with the EEOC in
10  Birmingham; is that correct?
11    A  Yes.
12    Q  And you're saying this is
13  different from the time you filed when you
14  were terminated?
15    A  It's a different incident, but
16  the same types of --
17    Q  I understand that's what your
18  saying. But I'm just trying to get an
19  understanding of when you filed that. You
20  were terminated from the City of Dothan in,
21  like, the summer of 2007; is that correct?
22    A  If that's what my termination
23  paper says, then that's correct.

Page 54

1    Q  Okay.
2    A  Because I don't remember the
3  exact date.
4    Q  Okay. Well, earlier you said you
5  thought maybe it was 2008?
6    A  I thought it might have been
7  around that time because it wasn't a whole
8  year that I can remember that passed between
9  being unemployed and finding a new job.
10    Q  So you -- Could you have started
11  working for Level Plains in 2007 instead of
12  2008? Maybe your years are getting mixed
13  up?
14    A  No. I'm just -- I don't know the
15  exact dates. I can go and ask them what
16  date did I start. But I don't remember the
17  exact date. And I don't want to tell you
18  one date and it's not that exact date.
19    Q  Okay. But you don't think it was
20  a full year before you got --
21    A  No, I don't think it was a full
22  year.
23    Q  It was more like several months?

Page 55

1    A  Could have been, yes.
2    Q  And -- and you -- Okay. And you
3  filed a charge of discrimination against the
4  City after you were terminated; is that
5  correct?
6    A  No.
7    Q  You did not?
8    A  No. That is not correct. I
9  filed a complaint before I was terminated.
10    Q  Okay. Well, when you say filed,
11  what is your understanding of filed, please?
12    A  I made the complaint before I was
13  terminated.
14    Q  And how soon before?
15    A  I don't know how many days or
16  weeks or whatever, what the time limit was.
17    Q  It's when you --
18    A  But it was before I got
19  terminated.
20    Q  Was it when you received notice
21  that you were put on notice that there was
22  going to be a determination hearing and that
23  you were about to be terminated?

Page 56

1    A  I believe it was before then.
2    Q  Do you know a person named Brian
3  Jones?
4    A  Yes.
5    Q  Who is Brian Jones?
6    A  He was a neighbor, a friend of
7  the family.
8    (Whereupon, Defendant's
9  Exhibit No. 3 was marked and
10  attached to the deposition.)
11  BY MS. NELSON:
12    Q  I'm kind of jumping ahead, but
13  I'm getting confused. I'm going to show you
14  what I've marked Defendant's Exhibit No. 3.
15  It's your initial disclosure, Bates 21.
16  And, Sergeant Summers, I will show you
17  Defendant's Exhibit 3. Is that a letter
18  from you to the Equal Employment Opportunity
19  Commission?
20    A  Yes.
21    Q  And that -- it's dated June 20,
22  2007; is that correct?
23    A  Yes.

1    Q   And signed by you; is that
2  correct?
3    A   Yes.
4    Q   And up at the top it appears to
5  have, like, a -- what I would generally
6  think of as some -- right, it's, like, up at
7  the very top. It says June 20, '07, 11:01 P
8  at the very top.
9    A   Yes.
10   Q   And it's got Brian Jones. It's
11  got a telephone number. So I generally
12  think of that as, like, an indication that
13  something has been faxed. Is that -- Did
14  you fax this from Brian Jones' home or
15  business?
16   A   Yes.
17   Q   To the EEOC?
18   A   Yes.
19      (Whereupon, Defendant's
20      Exhibit No. 4 was marked and
21      attached to the deposition.)
22  BY MS. NELSON:
23   Q   Okay. And this actually may go

1  with that. I'm going to mark as Defendant's
2  Exhibit 4. It may be the fax cover page of
3  that. Maybe I have them separated. I'm
4  showing you Defendant's 4. Is that the fax
5  cover sheet?
6    A   Yes.
7    Q   To the EEOC, dated June 20, '07?
8    Q   And it was faxed at 11:01? I'm
9  
10  sorry. I apologize. I only have one copy.
11  That was faxed at the same time?
12      MS. ROBERTSON: Let her see it
13      back. I do that, too, all the time.
14      You give it to them and need to see it
15      back.
16   Q   Faxed at 11:01 p.m.; is that
17  correct?
18   A   Yes.
19   Q   Okay. Now was that the first
20  EEOC charge you filed?
21   A   No. I talked to them before
22  faxing it. She asked me to fax it. But I
23  actually verbally made the complaint before

1  I sent the fax.
2    Q   Okay?
3    A   And did what whoever I spoke to
4  instructed me to do.
5    Q   Okay. You talked to them that
6  day, you think, the 20th of June, 2007?
7    A   It was before then.
8    Q   Okay. A few days before?
9    A   I don't know exactly when. But
10  it was before then.
11   Q   Okay. You verbally talked to
12  somebody at the EEOC? You don't remember
13  who?
14   A   No, I don't remember who.
15   Q   Okay. But they asked you to get
16  something to them in writing; is that
17  correct?
18   A   Yes.
19   Q   Okay. And based on that
20  conversation, you sent them Defendant's
21  Exhibits 3 and 4?
22   A   Yes.
23   Q   Okay. Now, that's what I'm

1  trying to understand. You talked to them
2  before that. You sent Defendant's Exhibit 3
3  and 4. Before that time, had you ever
4  talked to them or filed any type of charge
5  with the EEOC in Birmingham?
6    A   Years before then, I did.
7    Q   Okay?
8    A   And they sent me some paperwork
9  to fill out, and I sent it back to them.
10   Q   Okay. Do you remember what --
11  And you don't have any of that paperwork?
12   A   No. Because I sent forms back to
13  them. And I think they sent me copies of
14  the complaint. But that I don't remember.
15  But any paperwork that I had from back then
16  I don't have anymore.
17   Q   Do you remember what your job was
18  at the time?
19   A   I could have been working in the
20  jail or new as a police officer, somewhere
21  around in that time. I don't know the exact
22  time, but it was early on in my career.
23   Q   And early on, you first started

15  (Pages 57 to 60)

1   working with the City as a jail security
2   officer; is that correct?
3       A   Yes.
4       Q   And it's my understanding you've
5   had a -- you did have a complaint regarding
6   some issue with the way you were being
7   treated or being sexually harassed; is that
8   correct?
9       A   Yes.
10      Q   And following that particular
11  incident, you moved to -- you were promoted
12  to police officer; is that correct?
13      A   Yes.
14      Q   Okay.  So do you think the EEOC
15  charge that you're talking about that you
16  said was regarding the time as the jail
17  security officer?
18      A   I think that it was after that
19  time when I was new as a police officer,
20  after the promotion, somewhere in between
21  that time.  They should have a record of it.
22  I don't have the exact dates of when that
23  complaint was filed.  I don't have any of

1   that paperwork.
2       Q   Well, and I'm just going to say
3   for the record, nor do I, nor does the City.
4   So I --
5       MS. ROBERTSON:  Tell her the
6   circumstances under which you did, or as
7   I understand it.  I may have gotten it
8   confused.
9       A   When I worked in the jail,
10  Sergeant Mixon and I worked down in A Team.
11  And he would get me separated from the other
12  jailers and have me to come up front and
13  work with him.  And he would make a lot of
14  racial comments about black people and about
15  non-white races.  There was a particular day
16  when there was a black guy on the phone.
17  And Mixon called me over from near the
18  fingerprint machine and asked me why do all
19  black guys play with their balls.  And I
20  told him I don't have any.  Why are you
21  asking me?  And I walked away.  He later
22  called me inside the booking booth where the
23  sergeants and everything are, when he and

1   Tisdale were in there, and he said, When you
2   get to my age, you build a shed to put your
3   tool under.  You may not be able to see it,
4   but if you'll whistle for it, it will come
5   out.  And I kept telling and I kept telling
6   that I was uncomfortable working with him.
7       And there was a lot of other different
8   incidences where the way he talked to
9   people, the way he talked me, the jokes that
10  he would crack around me, and just separate
11  me.  And I told different supervisors that I
12  was uncomfortable working with him.  And it
13  seemed like nobody was listening at first.
14  And I just kept telling someone until
15  finally somebody listened.
16      At some point -- and there were some
17  other incidences.  But at some point,
18  Captain Smith called me and some other
19  jailers up there and listened to our
20  complaints about what was going on.  I
21  talked to the EEO officer that was here then
22  about the situation.  I talked to Internal
23  Affairs about it.  I talked to Jared about

1   it.  He said that I wouldn't have to work
2   underneath him.  And I still ended up having
3   to work underneath him.  He was allowed to
4   do my evaluations, even after I complained.
5       When I got promoted before going to the
6   academy, they moved me from the jail and put
7   me over there at Central Dispatch.  And
8   there were some not-so-nice words or some
9   very negative things said about me, that I
10  talk too much, I'm a troublemaker because I
11  told on Mixon about what he has said to me
12  and some of the things that he had done, was
13  improperly disposing of drugs, and just the
14  way he acted towards not just me but some of
15  the other people, and nothing happening to
16  him.
17      Maybe about a year later, but after I
18  got promoted to police officer, they moved
19  me a couple of times.  Jared spoke with
20  someone.  Jared was the lieutenant over the
21  jail.  Jared spoke with someone and had me
22  to come back and work in the jail, even
23  after being promoted, for a short time

1    before going to the police academy. And
2    then after that, it was just a lot more
3    trouble from telling in the first place.
4         MS. ROBERTSON: Well, I wasn't
5    much help. I was trying to get her to
6    tell you the circumstances under which
7    she filed the first EEOC charge.
8         Q   Well, I'm just saying, was your
9    first -- you claim your first --
10        A   There was a lot of different
11   things going on. And me being --
12        Q   Well, did you file over -- about
13   Mixon and the comments that he made, or he
14   and Tisdale made, while you were in the
15   jail? Is that what you filed over?
16        A   It was not only that. But it was
17   even after being put on a squad, it was
18   like, we don't trust her because she'll
19   tell. She's the one that told on Mixon. I
20   was basically blackballed, and hadn't even
21   been on the street. Just new to becoming a
22   police officer. And being -- Just the
23   treatment, the interaction.

1         Q   Well, I'm going to -- And it's
2    your testimony you filed an EEOC charge over
3    all this?
4         A   Yes.
5         MS. ROBERTSON: Tell her how
6    that came about. Do you remember? So
7    she can understand. She -- about how
8    you filed the first EEOC charge.
9         A   I'm trying to remember some of
10   the major circumstances. But I know at that
11   time that I wasn't the only one that filed.
12   And we had some of the same, similar
13   circumstances of being treated different
14   because we were black females. That was
15   myself and Officer LaMonica Carney. She
16   filed a complaint at the same time I did.
17   So that was what makes me think it was
18   sometime around -- after the incident, but
19   during the time of being sworn as a police
20   officer. I'd like to be able to tell you
21   the dates and all. But --
22        Q   But you don't know?
23        A   I don't know. Now, if it'll

1    help, I'll call them or try to get a date
2    for you. But I don't have anything to --
3    You asked me about if I ever filed one. I
4    was just making you aware that I had filed
5    one.
6         Q   And you could not be confusing
7    your filing with going to -- You said you
8    went to the EEOO officer here at the City?
9         A   No. I'm not confusing it.
10        Q   Or you went to the Personnel
11   Department here at the City?
12        A   After I went to him. Yeah. I
13   went to the Personnel Department. I went
14   through the chain of command. But that
15   complaint was filed, as I'm recalling the
16   different things, and as the complaint was
17   filed, me and Carney filed them at the same
18   time. I was not working in the jail then.
19   I had to be a police officer then. But
20   there were several events that she and I
21   both were being treated different because we
22   were black females. And it was no other
23   difference between us but that we were black

1    and female. But, now, to recall the exact
2    circumstances, I can't tell you at this
3    time.
4         Q   Okay. Going back to -- You're
5    talking about being at the jail. You said
6    finally somebody listened. You mentioned
7    Captain Smith. Did he listen?
8         A   He listened to not only my
9    complaint, he listened to several. All of
10   them that I remember were black female.
11        Q   Okay. Do you remember Shannon
12   Overts?
13        A   Yeah, I remember her.
14        Q   Was she black or white?
15        A   She was a white female.
16        Q   Do you know that she complained?
17        A   I don't know.
18        Q   Do you know any other whites that
19   complained?
20        A   I don't know.
21        Q   Do you know of any other men that
22   complained?
23        MS. ROBERTSON: Object.

1     Q   I'm just asking?
2     MS. ROBERTSON: Well, I'm
3 not -- They complained about what?
4     Q   Well, I was asking about
5 complained about the situation at the jail
6 and what she was meeting with Captain Smith
7 about. You don't know of anyone?
8     A   I can tell you some of the people
9 that I saw, that I know complained. But I
10 can't tell you everybody.
11     Q   Okay. Who did you go talk to,
12 the EEO officer?
13     A   I don't remember his name. But
14 he is a older, black male that's kind of
15 heavy around.
16     MS. ROBERTSON: Pear shaped?
17     THE WITNESS: Yes.
18 BY MS. NELSON:
19     Q   You said you talk to --
20     A   I don't remember his name. But
21 he was here before. There's been, I think,
22 two that I -- three. This gentleman here,
23 Mr. McKay. And before him, I think it was

1 Thornton. Before him there was somebody
2 else. It might have been four EEO officers
3 back --
4     Q   Okay. And did he take any steps
5 that you're aware of regarding your
6 complaint?
7     A   To my knowledge, he did. But I
8 don't know what he did.
9     Q   You said you talked to Internal
10 Affairs?
11     A   Yes.
12     Q   Do you remember who you talked
13 to?
14     A   Lieutenant Keith Gray was one
15 person that I talked to.
16     MS. ROBERTSON: Keith who?
17     THE WITNESS: Gray. Lieutenant
18     Keith Gray. I don't know who else was
19     up in the Internal Affairs at that time.
20 BY MS. NELSON:
21     Q   Did you talk to Kay? Do you
22 remember Kay Davis?
23     A   Yes. I talked to her at some

1 point about it, too.
2     Q   Again, do you know of any action
3 that she took?
4     A   After a long time, she told me
5 that he was written up for sexual and racial
6 discrimination, is what she told me.
7     Q   Who was that?
8     A   Kay Davis.
9     Q   Who was written up?
10     A   Mixon. And she said that there
11 was a copy of the write-up in his file. But
12 she would not give me a copy of it.
13     Q   And you were promoted shortly
14 thereafter; is that correct?
15     A   Yes.
16     Q   Did you ever talk to Warden
17 Grubbs?
18     A   Yes.
19     Q   Did she take any action that you
20 know of?
21     A   I believe at the time, whenever
22 Captain Smith -- when they started calling
23 people up to tell -- to talk to him about, I

1 believe she talked to Captain Smith. She
2 talked to somebody. She could have talked
3 to EEO officer, too. But I don't know
4 everybody that she talked to.
5     Q   Do you know when you were
6 promoted to police officer?
7     A   Maybe around 2001 or the end of
8 2000 or early -- in the beginning of 2001.
9     Q   Where did you go to high school?
10     A   Dothan High School, Northview
11 High School, Hollindale High School.
12     Q   What was the third one?
13     A   Hollindale.
14     Q   Did you graduate?
15     A   GED.
16     Q   And what year was that? Did you
17 get your GED?
18     A   I withdrew in my -- I think it
19 was four years later.
20     Q   After you withdrew?
21     A   Yes. I withdrew from in my 12th
22 grade year.
23     Q   And why did you withdraw?

1    A    I was real sick, and I ended up
2  being pregnant.
3    Q    And four years later, you got
4  your GED?
5    A    That might not be the exact time,
6  but it was a few years later, yes.
7    Q    Well, when?
8    A    In '84.
9    Q    1984?
10    A    '84 would have been the
11  graduation year.
12    Q    Got you.
13    A    So --
14    Q    Around 1988?
15    A    Maybe even '90.  But it should be
16  in my personnel file.
17    Q    And after you got your GED, did
18  you take any other courses or training or
19  college or --
20    A    I went to Wallace.
21    Q    Wallace Community College?
22    A    Yes.
23    Q    And do you remember when that

1  was?
2    A    I believe '92 to '94.
3    Q    Did you graduate from there?
4    A    No.  I received a certification,
5  but I didn't finish up getting the
6  associates.
7    Q    What was your certification in?
8    A    Emergency medical technician.
9    Q    Okay.  Any other training or
10  education?  I'm not talking about on-the-job
11  training, but just going to school or
12  community college or trade school or
13  technical schooling, anything like that?
14    A    Probably was some other schools.
15  But the ones that stand out more to me --
16  maybe one other school.  But I don't know.
17  I can't even say that.
18    Q    What was the first job you held,
19  first full-time job?
20    A    I think it was McDonald's.
21    Q    And how old were you there?
22    A    Eighteen.
23    Q    And what was your job?

1    A    Cashier.
2    Q    And how long did you stay there?
3    A    Maybe a year, maybe a little
4  less.
5    Q    Okay.  And why did you leave?
6    A    I was really sick when I was
7  younger.
8    Q    And what were you sick from?
9    A    Severe asthma, migraine
10  headaches.
11    Q    Do you still have those?
12    A    No.  I outgrew the asthma.  But
13  occasionally I still have migraines.
14    Q    So you quit McDonald's because
15  you were sick?
16    A    I could have gotten terminated
17  for missing too many days.
18    Q    Okay.  Do you remember who your
19  supervisor was?
20    A    No.
21    Q    And what -- where in McDonald's?
22  Is that here in Dothan?
23    A    Yes.

1    Q    Is there more than one McDonald's
2  here, or what's the address, if you know?
3    A    It was South Side McDonald's.
4    Q    South Side.  Okay.  What was your
5  next job?
6    A    I don't know chronologically, but
7  I worked at a Burger King.  I worked at a
8  couple of convenience stores.  I worked at a
9  Pizza Hut.  I worked at a hospital.
10    Q    What hospital did you work at?
11    A    Flowers.
12    Q    And what was your job there?
13    A    Housekeeping.
14    Q    Do you remember approximately
15  when that was?
16    A    No.
17    Q    And why did you leave there?
18    A    I think it was sick, missing some
19  days.
20    Q    Missed work.  Were you
21  terminated?
22    A    I believe.  Yeah, I think so.  It
23  might have been transportation then because

## Page 77

1 I didn't live here then.
2    Q   But you couldn't get to work
3 because --
4    A   Because I didn't have a car and I
5 lived in another city.
6    Q   Where were you living?
7    A   In Headland.
8    Q   Do you remember who your
9 supervisor was at Flowers?
10    A   I couldn't tell you.
11    Q   Besides Flowers Hospital, any
12 other places?
13    A   Checkers, as an assistant
14 manager. Like I said, a couple of -- a few
15 convenience stores, some temp services, Sony
16 through a temp service, the pajama factory.
17    Q   Is that a clothing store or --
18    A   No. It was a --
19    Q   -- did they make pajamas?
20    A   -- a sewing factory.
21    Q   What was your job --
22    A   And I don't remember the name of
23 it.

## Page 78

1        MS. ROBERTSON: You let her
2 finish and then she'll let you finish.
3 Because he can't write both of you.
4        THE WITNESS: Okay.
5 BY MS. NELSON:
6    Q   So you worked at the pajama
7 factory, which is a sewing factory; is that
8 correct?
9    A   Yes.
10    Q   And what was your job?
11    A   Sewing whatever clothing
12 together.
13    Q   Is that business still in
14 operation?
15    A   I don't think so.
16    Q   Why did you leave the pajama
17 factory?
18    A   I think it closed or shut down
19 and they laid people off.
20    Q   Why did you leave? And I didn't
21 mean to interrupt you. Why did you leave
22 Checkers?
23    A   To get a better job. I think I

## Page 79

1 left Checkers and got a job at Movie Gallery
2 as a store manager.
3    Q   And how long did you work at
4 Movie Gallery?
5    A   I believe a year.
6    Q   And where was that located?
7    A   The first store was in Dothan on
8 West Main Street, as a assistance manager, I
9 started out. And then I went to be store
10 manager in Abbeville, and in Headland.
11    Q   And why did you leave Movie
12 Gallery?
13    A   To work for the City of Dothan.
14    Q   Had you worked any other
15 municipalities or cities before the City of
16 Dothan?
17    A   No. I was a volunteer
18 firefighter. But --
19    Q   And where was that?
20    A   Midland City.
21    Q   Did you get paid?
22    A   That wasn't a paying job. But
23 they did give you fifteen dollars if you

## Page 80

1 went out on a run.
2    Q   And how long did you do that?
3    A   Maybe a year. I think I was
4 going to EMT school then.
5    Q   Other places you can think of?
6    A   Not right now, no.
7        MS. ROBERTSON: Do you want to
8 take a little break?
9        MS. NELSON: Yeah. Let me do
10 this real quick.
11        MS. ROBERTSON: Oh, okay.
12 That's fine.
13        MS. NELSON: I'm just going to
14 show her an application and just see if
15 this refreshes her on any real quick on
16 the jobs.
17 BY MS. NELSON:
18    Q   When you went to work for the
19 City of Dothan, do you remember filling out
20 an application of employment?
21    A   Yes.
22    Q   And did you do that through the
23 personnel office? We're in the Civic Center

1 building here today. Did you do that
2 downstairs in the personnel office?
3     A  Yes.
4     (Whereupon, Defendant's
5     Exhibit No. 5 was marked and
6     attached to the deposition.)
7 BY MS. NELSON:
8     Q  Okay. I'm going to show you what
9 I marked as Defendant's Exhibit No. 5 and
10 ask if you can identify this as your first
11 application that you submitted to the City
12 of Dothan? It's several pages, so if you
13 want to take a minute just to look through
14 it. The last page, is that your signature?
15     A  Yes.
16     Q  Do you recognize that as your
17 application?
18     A  Yes.
19     MS. NELSON: Why don't we take
20     a quick break.
21     (Whereupon, a short break was taken.)
22 BY MS. NELSON:
23     Q  I'll show you Defendant's Exhibit

1 5, which was your application. It shows you
2 went to Wallace Community College and took
3 some nursing courses; is that correct?
4     A  I applied for nursing, but you
5 have to be accepted. So what is it? Oh,
6 I'm sorry. I believe that was the medical
7 terminology or whatever. It's some courses
8 that you take that's not -- it's nursing
9 courses, but it's not a nursing degree.
10     Q  But your EMT certification is
11 what you received; is that correct?
12     A  Yes, ma'am.
13     Q  Okay. And Murphy Mill
14 Convenience Store, that was one of the
15 convenience stores you worked at?
16     A  Yes.
17     Q  And you worked at One Price
18 Clothing Store; is that correct?
19     A  Yes.
20     Q  And Midland City Fire and Rescue,
21 that was the volunteer fire department that
22 you mentioned?
23     A  Yes.

1     Q  And those are the only three that
2 you mentioned, three places of employment
3 that you mentioned on this application; is
4 that correct?
5     A  Yes.
6     Q  You were applying for a jail
7 security officer; is that correct?
8     A  Yes.
9     Q  And you were ultimately hired as
10 a jail security officer; is that correct?
11     A  Yes.
12     Q  And do you remember what your
13 hire date was?
14     A  I believe it was either in April
15 or June. I don't know which one. I don't
16 know what the hire date was.
17     Q  All right. And the year 2000; is
18 that correct?
19     A  Yes.
20     Q  And when you went to work there,
21 do you remember receiving, like, an employee
22 handbook or any type of rules of conduct
23 or --

1     A  I could have, yeah. I don't
2 remember exactly what was issued to me. But
3 if you got a list, I'll look at it and I
4 will tell you.
5     Q  I just wanted to see what you
6 remembered.
7     (Whereupon, Defendant's
8     Exhibit No. 6 was marked and
9     attached to the deposition.)
10 BY MS. NELSON:
11     Q  I'm going to show you Defendant's
12 Exhibit No. 6?
13     A  Okay.
14     Q  And ask if you can identify that
15 for me, please?
16     A  Yes.
17     Q  Okay. And that's an
18 acknowledgement that you received the
19 employee handbook and Civil Service Act and
20 various rules and regulations regarding your
21 employment; is that correct?
22     A  Yes.
23     Q  And you signed that in June of

## Page 85

1  2000; is that correct?
2      A   Yes.
3      Q   And that would be about the time
4  you started working for the City of Dothan;
5  is that correct?
6      A   Yes.
7          (Whereupon, Defendant's
8          Exhibit No. 7 was marked and
9          attached to the deposition.)
10 BY MS. NELSON:
11     Q   And I'm also going to show you
12 Defendant's Exhibit No. 7.  Ask if you can
13 identify that for me?  Is that your
14 signature?
15     A   Yes.
16     Q   And that's just an
17 acknowledgement that you had received a copy
18 of the drug -- the City's drug-testing
19 policy; is that correct?
20     A   Yes.
21         (Whereupon, Defendant's
22         Exhibit No. 8 was marked and
23         attached to the deposition.)

## Page 86

1  BY MS. NELSON:
2      Q   Defendant's No. 8 -- I'm sorry.
3  I messed that up -- which is the
4  disciplinary policy from the personnel rules
5  and regulations of the City of Dothan.  Have
6  you -- Do you recall being issued those as a
7  part of the employee handbook?
8      A   If it says I was issued it, then
9  it was issued to me.
10         MS. ROBERTSON:  Well --
11     Q   Well, I'm just asking do you
12 remember?
13     A   I don't remember it, no.
14     Q   Okay.  You were aware that there
15 were some disciplinary rules and a
16 disciplinary policy in the employee
17 handbook.
18         MS. ROBERTSON:  Well, I object
19 because this says it was revised in '03.
20 So, obviously, she wasn't given it in
21 2000.  So this is not -- Whatever she
22 was issued, this can't be it.
23     Q   Well, do you remember getting,

## Page 87

1  like, a booklet of policies and procedures
2  from the City?
3      A   I remember getting a packet with
4  several different items in it.
5      Q   And if -- Do you remember if
6  there were ever any rule changes that the
7  Personnel Department would provide you with
8  those rule changes?
9      A   I don't remember that.
10     Q   You're saying you could have, you
11 just don't remember?
12     A   Yes, ma'am.
13     Q   Do you remember receiving ever --
14 Do you recall ever receiving the City's
15 Equal Opportunity Policy and Affirmative
16 Action Policy?
17     A   I remember receiving a booklet
18 that had a lot of different items in it,
19 booklets and information.  But what exactly,
20 I can't sit here and tell you I remember
21 each one that was contained in that book or
22 in that -- in the -- when my employee stuff
23 was issued, because I don't remember.

## Page 88

1      Q   Were you aware that the City has
2  a Equal Employment and Affirmative Action
3  Plan?
4          MS. ROBERTSON:  Object.
5          MS. NELSON:  I'm just asking if
6  she's aware of it.
7          MS. ROBERTSON:  Well, you don't
8  want me -- you don't want -- Do you want
9  me to tell you why I'm objecting?
10         MS. NELSON:  Well, you can
11 object to form.  But you can tell me if
12 you want to.
13         MS. ROBERTSON:  Well, I mean,
14 if it's -- My position is if it's
15 non-enforced and non-obeyed, it's not a
16 plan.
17         MS. NELSON:  You can state your
18 objection.
19 BY MS. NELSON:
20     Q   I'm just asking are you aware
21 that the City has an Equal Employment and
22 Affirmative Action Plan?
23         MS. ROBERTSON:  Object.

22  (Pages 85 to 88)

1      Q    You're just saying you don't
2  know?
3      A    No.
4      Q    Could have been in the packet
5  that you received, but you're not sure?
6      A    I don't remember that being in
7  the packet. So, I don't -- I can't answer
8  that yes and not remember exactly the exact
9  forms that were in the booklet, the items
10  given to me.
11      Q    But when you -- I'm sorry. If I
12  could see --
13      A    Is it this one?
14      Q    No. Let's see. That's one of
15  the last few I gave you.
16      MS. ROBERTSON: That was the
17  last one you gave her.
18      MS. NELSON: It's probably 7 or
19  6.
20      MS. ROBERTSON: This is the
21  drug policy. It's probably 6 that
22  you're talking about.
23  BY MS. NELSON:

1      Q    Okay. But 6, you do remember
2  signing this acknowledgment that you had
3  received those documents described in Number
4  6; is that correct?
5      A    I did sign saying that I received
6  some documents and whatever booklet that
7  they gave. But, again, I don't remember
8  exactly those exact booklets, what year it
9  was on the booklets and all that. No, I
10  can't tell you that.
11      Q    I understand. Now, your first
12  job, you were hired as a jail security
13  officer; is that correct?
14      A    Yes.
15      Q    And who was your supervisor?
16      A    There were several supervisors.
17  And not necessarily in chronological order,
18  but LaVera McClain was a supervisor.
19  Stephanie Johnson was a supervisor. A
20  female, Sergeant Montgomery, and I don't
21  remember her first name, was a supervisor.
22      Q    Okay. LaVera McClain. I'm sorry
23  excuse me. She's a black female; is that

1  correct?
2      A    Yes.
3      Q    Sergeant Montgomery, she's a
4  black female; is that correct?
5      A    Yes.
6      Q    Stephanie Johnson, is she black
7  or white?
8      A    Black female.
9      Q    Warden Mamie Grubbs, what's her
10  race?
11      A    She's a black female.
12      Q    What were your duties as a jail
13  security officer?
14      A    The person comes into the jail,
15  book them in, take their property and log
16  it. Fingerprinting, photographing, feeding,
17  picking up trays, taking them to court,
18  bringing them back, medical call, medicine
19  call, keeping track of prisoners in the cell
20  block, counting them, and several other
21  things that we did.
22      Q    And approximately how long did
23  you work as a jail security officer?

1      A    Less than a year.
2      Q    And what was your next job that
3  you held?
4      A    As a police officer.
5      Q    Okay. And how did you come to
6  get the police officer job?
7      A    I applied for it in whatever
8  manner they submitted -- whether I submitted
9  a -- whatever the forms it was to be
10  considered for it, went on a interview, took
11  the test, not necessarily in that order.
12  Took the written test, took the physical
13  agility.
14      Q    It was a promotion; is that
15  correct?
16      A    Yes.
17      Q    Now, while you were a jail
18  security officer, did you ever receive any
19  disciplinary action?
20      A    Yes.
21      Q    And do you remember what that
22  was, what disciplinary action you received?
23      A    It was more than one. If I could

Page 93

1    look at the documents, then I could answer
2    your question.
3             (Whereupon, Defendant's
4             Exhibit No. 9 was marked and
5             attached to the deposition.)
6    BY MS. NELSON:
7         Q    Let me just see if I can refresh
8    you. I'll show you what I'm going to mark
9    as Defendant's Exhibit 9. Sergeant, I'm
10   going to show you Defendant's Exhibit No.
11   9. Does that refresh your recollection of
12   one of the disciplinary actions that you
13   received while you were a jail security
14   officer?
15        A    I remember receiving this. But I
16   didn't do this.
17        Q    Okay. And what did they accuse
18   you of doing?
19        A    Locking down a prisoner for
20   something that she did. I don't remember
21   the exact circumstances. But I didn't do
22   it.
23        Q    You were charged with not

Page 94

1    following procedure in locking down a
2    prisoner?
3         A    Yes. And I disagreed because I
4    did not lock down Maurine Brown. I didn't
5    lock her down.
6         Q    Did you appeal that in any way?
7         A    I believe I did. But I don't --
8    It's not something that went before the
9    Personnel Board. But I disagreed with it.
10   And I voiced that I disagreed with it
11   because I didn't do it.
12        Q    Who did you voice that to?
13        A    Sergeant Johnson, Sergeant
14   Montgomery, I believe, Warden Salfoe -- at
15   the time, it was Warden Salfoe -- Warden
16   Grubbs.
17        Q    So Warden Salfoe and Warden
18   Grubbs are the same person?
19        A    The same person, yes.
20        Q    I called her Grubbs. She may be
21   Salfoe now? No. She was Salfoe. Now she's
22   Grubbs?
23        A    She's not Grubbs now.

Page 95

1         Q    She's not Grubbs?
2         A    But I don't know her last name.
3         Q    Okay.
4         A    Something with an M, but I don't
5    remember what her last name is.
6         Q    But she's the same warden that
7    we're talking about?
8         A    Yes, she's the same warden that
9    was then.
10             MS. ROBERTSON: She might
11        should have kept her name.
12             (Whereupon, Defendant's
13             Exhibit No. 10 was marked and
14             attached to the deposition.)
15   BY MS. NELSON:
16        Q    Okay. I'm going to show you what
17   I've marked as Defendant's Exhibit No. 10,
18   Sergeant, and ask you if you recognize that?
19   That's one of disciplinary actions you
20   received while you were a jail security
21   officer. Do you recognize that?
22        A    Yes.
23        Q    Okay. And that's a disciplinary

Page 96

1    action you received for, I think, being
2    late; is that correct?
3         A    Yes.
4         Q    And I think that last page of
5    that is your rebuttal or response to why you
6    were late?
7         A    Yes.
8         Q    Okay. And that was issued to you
9    by the warden or was that Sergeant McClain?
10        A    Yes.
11        Q    LaVera McClain?
12        A    Yes. I think it says on here
13   Sergeant McClain and Sergeant Johnson.
14             (Whereupon, Defendant's
15             Exhibit No. 11 was marked and
16             attached to the deposition.)
17   BY MS. NELSON:
18        Q    Okay. I will show you what's
19   been marked as Defendant's Exhibit No. 11.
20   Is that another disciplinary action for
21   tardiness that you received while you were a
22   jail security officer? I think it's a
23   counseling is what it's called?

24 (Pages 93 to 96)

1    A  I don't remember receiving that
2  one.
3    Q  You don't?
4    A  No, ma'am.
5    Q  Do you remember LaVera McClain
6  counseling you about being late?
7    A  I remember her talking to me,
8  yes.
9    Q  So you don't deny that you were
10  occasionally late at work while a jail
11  security officer, do you?
12    A  No, I'm not denying it.
13    Q  Now --
14    MS. NELSON: What are you
15  checking there?
16    MS. ROBERTSON: I think that
17  Defendant's 11 and 10 relate to the same
18  thing because it shows that it was -- it
19  started on 3/22/01. And that's the date
20  of the Defendant's 10 write-up. So it
21  looks like, to me, that they're just the
22  same thing, just documented two
23  different places. I don't know. But

1  that's what it looks like to me.
2  BY MS. NELSON:
3    Q  Well, the last one I just showed
4  you I believe was dated in April; is that
5  not correct?
6    MS. ROBERTSON: You mean this
7  little funny little piece of paper?
8    MS. NELSON: I mean Defendant's
9  Exhibit 11, which she said she didn't
10  remember. I believe it's dated April.
11    MS. ROBERTSON: Yeah. But see
12  down there -- See? It says that it
13  starts on March the 22nd and goes to
14  March the 21st of 2002. So I don't
15  know.
16    MS. NELSON: Okay. So it's
17  your contention that they're the same.
18    MS. ROBERTSON: I don't know.
19    MS. NELSON: She said she
20  didn't remember.
21    MS. ROBERTSON: Yeah. I don't
22  know for sure. But it just looks like
23  to me it's just two different ways to

1  document the same thing. I don't know.
2    MS. NELSON: That's fine.
3  BY MS. NELSON:
4    Q  When you were telling me earlier,
5  it's while you were a jail security officer
6  that you made a complaint of harassment
7  about the way you were being treated while
8  working as a jail security officer; is that
9  correct?
10    A  Yes.
11    Q  And do you remember actually
12  writing out a complaint to the chief of
13  police at the time, John White?
14    A  Yes.
15    Q  And do you remember -- Well, did
16  he ask you to do that or what the
17  circumstances were that you prepared?
18    A  Did he who ask that?
19    Q  John White, Chief John White?
20    A  He asked me -- did he ask me to
21  --
22    Q  To write a complaint?
23    A  No, I don't remember him asking

1  me to write a complaint.
2    (Whereupon, Defendant's
3    Exhibit No. 12 was marked and
4    attached to the deposition.)
5  BY MS. NELSON:
6    Q  Well, I'm going to show you
7  what -- Again, this is your initial
8  disclosures, Pages 143 to 162. I'm going to
9  show you. Your attorney provided that to
10  me, Sergeant Summers. Do you recognize that
11  particular document?
12    A  Yes.
13    Q  Okay. And can you tell me what
14  you remember the circumstance of your
15  providing that to Chief White?
16    A  Because I felt like I was working
17  in a hostile environment. And I wanted him
18  to know a lot of things I don't know if he
19  was aware of. But I had to put it -- wrote
20  it -- put it in writing to submit it.
21    Q  Now, do you -- do you call that,
22  like, a PD-12 or just is that a written
23  summary? Does that particular document have

1  any name, the form that you wrote it on?
2      A   It's referred to as a PD-12.
3  Officers refer to it as a PD-12.
4      Q   Now, you said earlier you met
5  with, I think Captain Smith, is that right,
6  and Kay Davis, and talked to the EEO
7  officer?  Was that -- Did you write that
8  before or after talking to them?
9      A   I don't remember exactly when it
10 was, before or after.  But can I have just
11 few minutes to reread this over this --
12     Q   Sure?
13     A   -- if you want to ask me some
14 more questions about it?
15     Q   Absolutely.
16     A   Okay.
17     Q   Can you give me the date of that,
18 that you wrote that?
19         MS. ROBERTSON:  March the 23rd,
20     2001.
21         MS. NELSON:  Okay.
22 BY MS. NELSON:
23     Q   Are you ready?

1      A   Yes.  I've read the majority of
2  it.
3      Q   Okay.  Well, I want to give you a
4  chance.  I don't really know that I'm going
5  to ask you that much about it.  I'm sorry.
6  Tell me, what's the day of that again?
7  March?
8         MS. ROBERTSON:  March 23, 2001.
9      Q   And while you worked as a
10 employee of the City, both as a jail
11 security officer and police officer, you
12 received performance evaluations; is that
13 correct?
14     A   Yes.
15     Q   I'm just going to show you.  Do
16 you recall how you were rated when you
17 worked as a jail security officer?
18     A   No.  I know I received
19 performances, but I can't tell you what the
20 score was on them.
21         (Whereupon, Defendant's
22     Exhibit No. 13 was marked and
23     attached to the deposition.)

1  BY MS. NELSON:
2      Q   I'm going to show you Defendant's
3  Exhibit 13.  Is that one of the performance
4  evaluations you received while you were a
5  jail security officer?
6      A   Yes.
7      Q   And do you recall that when you
8  were first employed, that you -- in that
9  first year of employment, you got several
10 evaluations; is that correct?  Do you
11 remember that?
12     A   Yes.  I remember getting --
13     Q   I'm sorry?
14         MS. ROBERTSON:  Y'all don't
15     talk over each other.
16     A   Go ahead.
17     Q   As to after that first year,
18 you're generally evaluated every -- one time
19 a year; is that correct?  Do you know?
20     A   No.
21         (Whereupon, Defendant's
22     Exhibit No. 14 was marked and
23     attached to the deposition.)

1  BY MS. NELSON:
2      Q   I'm going to show you Defendant's
3  Exhibit 14, and ask if you recognize that as
4  one of the performance reviews you received
5  as a jail security officer?  I believe that
6  was December of 2000; is that correct?  Do
7  you recall receiving that evaluation,
8  Ms. Summers?
9      A   I recall receiving it, but I
10 disagreed with it.
11     Q   And who gave you that evaluation?
12     A   Sergeant Mixon and Sergeant
13 Kimberly.
14     Q   And who was Sergeant Kimberly?
15     A   Another sergeant who was there.
16         (Whereupon, Defendant's
17     Exhibit No. 15 was marked and
18     attached to the deposition.)
19 BY MS. NELSON:
20     Q   I will show you Defendant's
21 Exhibit No. 15.  See if you can identify
22 that as an evaluation that you received
23 while you were a jail security officer?  I

Page 105

1 believe that was in March of 2001. Do you
2 recall receiving that one? Do you recall
3 receiving that evaluation, Ms. Summers?
4     A  Yes.
5     Q  And who was your evaluating
6 supervisor?
7     A  Sergeant McQueen or Sergeant
8 Johnson and, again, Sergeant Mixon.
9     Q  So who actually signed the
10 evaluation? Was it Sergeant McClain? I'm
11 sorry. I'm looking on the last page, which
12 is Bates 661. It's signed by Sergeant
13 McClain and Sergeant Johnson; is that
14 correct?
15     A·  If that's the signatures that's
16 there, yes.
17     Q  That's LaVera McClain?
18     A  Yes.
19     Q  And Sergeant Johnson?
20     A  Stephanie.
21     Q  Stephanie Johnson? Okay. And
22 some of the weaknesses noted is that your
23 work often contained errors, and that you're

Page 106

1 constantly calling to say you'll be late or
2 not coming to work. Is that noted on your
3 evaluation?
4     A  That's what they wrote. That's
5 what one of them wrote on there, whoever
6 wrote it on there.
7     Q  And you didn't agree with that?
8     A  No, I didn't.
9     (Whereupon, Defendant's
10 Exhibit No. 16 was marked and
11 attached to the deposition.)
12 BY MS. NELSON:
13     Q  I will show you Defendant's
14 No. 16, which is a -- ask if you can
15 identify that as another evaluation you
16 received as a jail security officer? That
17 was in May of 2001. Do you recall receiving
18 that?
19     A  Yes.
20     Q  Okay. Do you recall
21 complaining -- You didn't agree with that
22 evaluation either, did you?
23     A  No.

Page 107

1     Q  Do you recall complaining to
2 Chief White about that evaluation?
3     A  Yes.
4     Q  Do you remember doing so in
5 writing?
6     A  Yes. I remember complaining.
7 And that's some of the writing that I wrote
8 to Chief John White.
9     Q  You were point to --
10     MS. ROBERTSON: Plaintiff's --
11 I mean, Defendant's Exhibit 12.
12     (Whereupon, Defendant's
13 Exhibit No. 17 was marked and
14 attached to the deposition.)
15 BY MS. NELSON:
16     Q  I'm going to show you Defendant's
17 Exhibit 17. Do you recall sending that to
18 Chief White about that specific evaluation,
19 the evaluation being Defendant's Exhibit 16?
20 Did you write that Defendant's Exhibit 17?
21     A  Yes.
22     Q  To Chief Don White?
23     A  Yes.

Page 108

1     Q  And, again, in relation to all
2 this, do you know at what point you talked
3 to Kay Davis or Daryl Mathews?
4     A  I talked to a lot of different
5 people during that time at some point. But
6 exactly when, I cannot tell you.
7     Q  And after you complained, you
8 were promoted to police officer; is that
9 correct?
10     A  At some time afterwards, yeah, I
11 was promoted to police officer. Yes.
12     Q  Do you remember when you were
13 promoted?
14     A  Whatever date that they have
15 listed. I don't know the exact promotion
16 date.
17     Q  Is this something -- You were
18 telling me earlier, did you have to bid on
19 or interview for?
20     A  You had to go through an
21 interview, the same things that you had to
22 go through, some of the same things that you
23 go through when you apply from the street,

27 (Pages 105 to 108)

1    you had to go -- you had to be -- to be up
2    for promotion for a police officer and go
3    through the written, the physical and the
4    some same things. It's not just you just
5    get a promotion. You have to --
6        Q    You had to earn it?
7        A    Yes.
8        Q    And you earned it, and you were
9    promoted; is that correct?
10       A    Yes.
11       Q    Okay. And then you said
12   something about going to the academy. Is
13   that a requirement? In other words, once
14   you're promoted and then you move to -- then
15   you go to the academy after you're selected?
16       A    Yes.
17       Q    And you went to academy; is that
18   correct?
19       A    Yes.
20       Q    And how long does -- how long
21   were you -- how long does that take to go
22   through the academy?
23       A    I think it's thirteen weeks.

1        Q    I'm looking at a salary approval
2    form by the Personnel Board, which indicates
3    you were promoted on April 22, 2001. Do you
4    have any reason to disagree with that date?
5        A    No.
6        Q    And, of course, I guess if you
7    went to the police academy, you successfully
8    graduated from the academy; is that correct?
9        A    Yes. Yes.
10       Q    And do you remember what your
11   first assignment was when you finished the
12   academy and started working as a police
13   officer?
14       A    No. Patrol.
15       Q    Patrol? Do you remember who your
16   supervisor was?
17       A    No. I don't -- I know I had
18   supervisors. But I don't know which squad I
19   was on at the time and who were the
20   supervisors on that particular squad.
21       Q    You don't remember any -- there
22   being any particular issues or you feeling
23   like you were not treated fairly at the

1    time?
2        A    There were several issues. But
3    if there's something to show what squad I
4    went to, then I can look at it and tell you
5    what I remember about what issues that
6    happened. But I can't sit here and tell you
7    I went to first squad when I first came out,
8    and then I went to this squad after that,
9    and I went to this squad after that. I
10   can't tell you that without --
11       Q    But you have worked several
12   different squads, haven't you?
13       A    Yes.
14       Q    And you also worked -- it's
15   called CID?
16       A    Yes.
17       Q    The Criminal Investigative
18   Division?
19       A    Yes.
20       Q    And you've also worked Vice?
21       A    Yes.
22       Q    When you -- when you were first
23   promoted to police officer and you were

1    working on a squad, what, generally, were
2    your duties? Is that like a patrol squad?
3        A    Patrol duty. Get out, write
4    tickets, enforce traffic laws, criminal
5    laws, answer calls, work your zone.
6        Q    Do you get particular training,
7    on-the-job training as an officer?
8        A    Yes.
9        Q    Do you remember some of the
10   training that you've received?
11       A    You go through several training
12   classes over your -- the course of your
13   career as a police officer because you have
14   to keep up your credits. So there's
15   different training that I went through.
16       Q    And that's what I'm asking. Do
17   you remember some of the training that you
18   went through?
19       A    Firearms training, constitutional
20   law, baton, PPCT.
21       Q    What is that?
22       A    Pressure points. It's defensive
23   maneuvers that you use to apprehend --

28 (Pages 109 to 112)

1    MS. ROBERTSON: Keep your
2  voices up.
3    A   Defensive maneuvers that you use
4  to apprehend a person when they resist.
5    Q   Anything else you remember?
6    A   Traffic accidents school, report
7  writing. May I ask a question? Are you
8  asking me for a specific school?
9    Q   No. I'm just asking for all the
10  training that you remember?
11    A   I can't tell you all the
12  training.
13    (Whereupon, Defendant's
14    Exhibit No. 18 was marked and
15    attached to the deposition.)
16  BY MS. NELSON:
17    Q   Okay. Well, I'm just trying to
18  see what you remember. I'm going to show
19  you what I've marked as Defendant's Exhibit
20  18 and ask you if you could take a look at
21  -- There's several documents there, which
22  are records that pertain to your training
23  and ask if that helps to refresh your

1  memory. Take a minute to look through that.
2  Does that help refresh --
3    A   As I said, there's a lot of
4  classes that -- training that I went to.
5  But I can't sit there and name off every
6  single class.
7    Q   Well, I'm not asking -- I
8  understand that there's quite a few. But,
9  basically every training course that's
10  listed on that Defendant's Exhibit No. 18,
11  you were given all of that training; is that
12  correct?
13    A   Yes. That's not all the
14  training, but yes.
15    Q   There's other training? Other
16  than what's listed in Defendant's Exhibit
17  No. 18, can you think of any other training
18  that you received?
19    A   I'd rather get a list of it from
20  my current employer and just give you that.
21  Because I can't sit here and tell you all
22  the training. There's other courtroom
23  testimony, recertifications.

1    Q   No. I'm just talking about when
2  you worked for the City of Dothan?
3    A   Oh. This is training that I
4  received.
5    Q   And you're saying there may be
6  others, but you're just not -- besides
7  what's listed in Defendant's 18?
8    A   Yes.
9    Q   I'm sorry. Is that yes?
10    A   Yes.
11    Q   And this is sort of a loose end.
12  I showed you earlier an application where
13  you applied to the City to work as a jail
14  security officer for which you were hired;
15  is that correct?
16    A   Yes.
17    Q   And you also remember applying to
18  the City before you were hired to be a
19  police officer, completing the second
20  application for employment. I'm sorry. Do
21  you remember --
22    A   No. May I see --
23    Q   -- first applying for a Dale

1  security officer?
2    A   Can I see the second application?
3    Q   Well, I'm just ask asking. You
4  don't remember, then, the second time you
5  applied to be a police officer? You don't
6  remember that?
7    A   No.
8    (Whereupon, Defendant's
9    Exhibit No. 19 was marked and
10    attached to the deposition.)
11  BY MS. NELSON:
12    Q   Okay. I'm going to show you what
13  I've marked as Defendant's Exhibit 19 and
14  ask if you can identify that as an
15  employment application to the City of
16  Dothan? And I think it's, like, about March
17  of 2000. Does that refresh your
18  recollection?
19    A   Yes.
20    Q   You filled out a second
21  application?
22    A   Yes.
23    Q   Now, I was asking you when you

## Page 117

1  worked -- when you first were promoted, I
2  think, then you went to the police academy,
3  do you remember the date you actually
4  started the --
5      A    No.
6      Q    I think it would have been, like,
7  around August of 2001 or September?
8      A    No.
9      Q    Okay.  Sometime maybe the summer
10  of 2001?  When you're at the academy, do you
11  spend all the time at the academy or are you
12  sometimes back at the city?
13      A    You come home on the weekends.
14      Q    Okay.  Do you ever remember being
15  supervised by Sergeant Danny Smith?
16      A    No.
17          (Whereupon, Defendant's
18          Exhibit No. 20 was marked and
19          attached to the deposition.)
20  BY MS. NELSON:
21      Q    I will show you Defendant's
22  Exhibit No. 20.  The -- Let me check the
23  date.  I will show you Defendant's Exhibit

## Page 118

1  No. 20.  And it's a performance evaluation
2  given to you in the summer of 2001.  Do you
3  recall receiving that?
4      A    Donnie Smith.
5      Q    Is it Donnie Smith?
6      A    Yes.
7      Q    Do you remember him?
8      A    Yes.
9      Q    And do you later remember being
10  evaluated by Sergeant Hughes?
11      A    I could have been.  He was over
12  -- He was a supervisor.
13          (Whereupon, Defendant's
14          Exhibit No. 21 was marked and
15          attached to the deposition.)
16  BY MS. NELSON:
17      Q    I will show you what I've marked
18  as Defendant's Exhibit No. 21.  See if you
19  can identify that performance evaluation
20  given to you by Sergeant Hughes?  Do you
21  recall receiving that?
22      A    I don't remember receiving it,
23  no.

## Page 119

1      Q    You don't remember seeing that?
2      A    No.
3      Q    Is that your signature?  You're
4  shaking your head.  I'm sorry.  Is that not
5  your signature?
6      A    My signature is not on it.
7          MS. ROBERTSON:  Yeah.  We don't
8      even -- I mean, where it says employee's
9      signature, there's nothing there.
10      Q    Do you remember reporting to
11  Sergeant Hughes at some point in that first
12  year that you were a police officer?
13      A    Sergeant Hughes was a supervisor
14  over the training divisions.  So there were
15  other supervisors underneath him.  He was a
16  supervisor over me, but I don't -- not
17  reporting directly to him, there were two
18  other -- I believe it was two other that was
19  underneath him.  So he would have been the
20  head of it.  So, no, I can't say I recall
21  that, no.
22      Q    Do you remember anyone ever
23  telling you that there had been instances

## Page 120

1  reported to the Training Division where you
2  had been uncooperative with fellow students
3  and staff while attending the police
4  academy?
5      A    Repeat your question again.
6      Q    I said, do you remember anyone
7  telling you that there had been reported
8  instances of -- to the Training Division
9  where you had been uncooperative with fellow
10  students and staff while you were attending
11  the police academy?
12      A    Someone could have told me that.
13  But I called from the police academy and
14  made a complaint about the way that the
15  officers that I went to the police academy
16  were doing.  The supervisors at the academy
17  were made aware of it as well.
18      Q    And I'm sorry.  What complaints
19  were you making?
20      A    Because they were circulating a
21  petition to try to get me out of the police
22  academy.  And I wasn't failing anything.
23      Q    Who was circulating the petition?

| Page 121 |
|---|
| 1 People in the academy? |
| 2     A  No. What I was told was Salvatar |
| 3 Costello and -- |
| 4     MS. ROBERTSON: Salvador? |
| 5     A  Yeah. Salvador Costello, Arthur |
| 6 Schaffer and Saxon Foster. And my |
| 7 understanding was Foster -- Trooper Daryl |
| 8 Moore, who was one of the instructors, |
| 9 pulled me aside and said, hey, your own guys |
| 10 are trying to get you kicked out of the |
| 11 academy. And, again, I wasn't failing |
| 12 anything. |
| 13     Q  Who told you, the instructor? |
| 14     A  One of the instructors. |
| 15     Q  What's his name? |
| 16     A  Daryl Moore. And there were |
| 17 other students that went to the same class |
| 18 that were telling me, your own guys are |
| 19 against you. |
| 20     Q  Your own guys being who? |
| 21 Other -- |
| 22     A  The guys that -- I went to the |
| 23 academy with four other officers. |

| Page 122 |
|---|
| 1     Q  From Dothan? |
| 2     A  Three of the four were -- I was |
| 3 told was trying to get the other students in |
| 4 our class to write -- to sign a petition to |
| 5 get me kicked out of the academy to bring it |
| 6 back to the Training Division. |
| 7     Q  And who told you this? |
| 8     A  Several of the other cadets in |
| 9 the class and instructor. |
| 10     Q  Okay. And that's what I'm |
| 11 saying. What other cadets told you? |
| 12     A  I can't tell you their names. |
| 13 But it was more than a couple of them that |
| 14 told me that. |
| 15     Q  But you don't remember -- |
| 16     A  So I asked to speak with -- When |
| 17 I was made aware of it, I asked to speak |
| 18 with the commander of the post, and the |
| 19 instructor that told me that, and Salvador |
| 20 Costello. |
| 21     Q  And I'm sorry. Who is Salvador |
| 22 Costello? |
| 23     A  He's a police officer with |

| Page 123 |
|---|
| 1 Dothan. |
| 2     Q  And he was attending the police |
| 3 academy with you? |
| 4     A  Yes. |
| 5     Q  So you're saying Costello, |
| 6 Schaffer and Saxon, you had been told were |
| 7 opposed to you -- |
| 8     A  Graduating the police academy, |
| 9 yes. |
| 10     Q  And you're saying you know that |
| 11 based on supposedly what the instructor, |
| 12 Daryl Moore, told you and some of the other |
| 13 cadets that you don't remember who they were |
| 14 told you? |
| 15     A  Yes. |
| 16     Q  And you asked to speak to the |
| 17 Commander of the post? |
| 18     A  Yes. |
| 19     Q  And who was that? |
| 20     A  I believe his last name is Ellis. |
| 21     Q  Okay. Did you speak to Commander |
| 22 Ellis? |
| 23     A  Yes. |

| Page 124 |
|---|
| 1     Q  Okay. And what did you tell him? |
| 2     A  That I was not failing anything, |
| 3 that it had to be a personality conflict. |
| 4 But if there was a problem, he could have |
| 5 come to me and addressed the problem, not to |
| 6 be circulating a petition to get me kicked |
| 7 out because I wasn't failing anything. |
| 8     Q  Did you get along with -- |
| 9     A  I didn't have a problem with |
| 10 them. |
| 11     Q  -- Costello, Schaffer, Saxon and |
| 12 Foster? |
| 13     A  Yes. |
| 14     Q  Did you cooperate with them? |
| 15     A  What do you mean cooperate? If |
| 16 you ask me if we just got along every day? |
| 17 What exactly are you asking me? |
| 18     Q  I said, did you cooperate with |
| 19 them? |
| 20     A  I cooperated. |
| 21     Q  Did your ever talk to either |
| 22 Costello, Schaffer, Saxon or Foster about |
| 23 this petition you testified about? |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

Page 125

```
1        A   I talked to Costello.
2        Q   And did you talk to him there at
3   the police academy?
4        A   Yes.
5            MS. ROBERTSON:  I think she
6        said she talked with him and Ellis and
7        Daryl Moore.  Isn't that what you
8        testified to?
9            THE WITNESS:  Yes.
10  BY MS. NELSON:
11       Q   At the same time?
12       A   At one point, I talked to -- I
13  think the four of us was there together.
14       Q   Had you ever talked to --
15       A   But I talked to them separately
16  as well.
17       Q   What did you talk to Costello
18  separately about?
19       A   I didn't want to speak to
20  Costello without having some witnesses there
21  to witness to what I said to him.
22       Q   So you didn't --
23       A   That's why I asked to speak to --
```

Page 126

```
1   for some other instructors to be there so
2   nobody couldn't tell a lie and say I said
3   something that I didn't say.
4        Q   So you didn't talk to Costello
5   one on one?
6        A   No.
7        Q   You talked with him -- with the
8   group?
9        A   With the instructors.
10       Q   With Ellis and then with the
11  instructors?
12       A   Yes.
13       Q   I'm sorry.  I'm getting confused.
14  With Ellis and Moore?
15       A   Yes.
16       Q   And Costello?  And what did you
17  say in that group meeting?
18       A   Just if it wasn't police
19  department related, then we're not -- I'm
20  not going to have a friendship with him
21  because I trusted him.  And you're doing --
22  I talked to him about what he was doing --
23  what I felt like he was doing to me.
```

Page 127

```
1        Q   And what was that?
2        A   Which was trying to get me kicked
3   out of the academy based on what?  If there
4   was a issue, if he had problem, I felt like
5   he was a friend enough that he could come to
6   me and say, hey, Summers, I don't agree with
7   this or I don't like that.  So I don't know
8   why the petition was being circulated.  But
9   I found out from others there.
10       Q   And what did they say?
11       A   Again, that Costello, Saxon, and
12  Schaffer were trying to get me kicked out of
13  the police academy, and they were asking the
14  other students to sign a petition.
15       Q   I'm asking, why were they trying
16  to get you kicked out?
17       A   I can't answer that.
18       Q   Did Costello say anything in that
19  meeting?
20       A   I don't remember what he said in
21  the meeting.  I just can tell you what I
22  said.  But we had a conversation.  But I
23  can't tell you everything that was said in
```

Page 128

```
1   there.  I need to take a break.
2            MS. ROBERTSON:  You need to
3        take a break?
4            THE WITNESS:  I need to go to
5        the restroom.
6            MS. NELSON:  Okay.  That's
7        fine.
8   (Whereupon, a short break was taken.)
9   BY MS. NELSON:
10       Q   You were talking about the police
11  academy.  Did all four of you graduate from
12  the police academy?
13       A   Yeah.  All five of us, we
14  graduated.
15       Q   Five of you?  There were four
16  other guys?  And were you ever told that you
17  fell out of several group runs and did not
18  double time between classes, meals, when you
19  were required to?
20       A   Was I ever told that?
21       Q   Yeah.
22       A   No, I wasn't told that.  But did
23  I fall back from a run?  Yes.
```

32 (Pages 125 to 128)

# FREEDOM COURT REPORTING

Page 129

```
1      Q   You did?
2      A   Because I was running with a leg
3  injury at the academy. But that's not
4  something that's going to fail you. Some
5  people run faster than other people.
6      MS. ROBERTSON: They have a
7      time. I mean, I can't even imagine that
8      those yahoos who hadn't passed the
9      police academy were evaluating her.
10     Q   Were you ever told you needed to
11 work on your firearm handling skills? That
12 there were times when your handgun was
13 un-holstered when it shouldn't have been?
14     A   No, I don't remember being told
15 that.
16     Q   When you came back, did you and
17 any of these four other guys, were y'all
18 assigned to work together?
19     A   Yes.
20     Q   Did y'all get along?
21     A   Yes.
22     Q   Did they ever try to do anything
23 -- did they try to do anything to affect
```

Page 130

```
1  your employment at the City of Dothan when
2  you got back to the academy?
3      A   No, not to my knowledge. No.
4      Q   Do you remember being evaluated
5  by Sergeant Baum, B-A-U-M?
6      A   He was one of my supervisors.
7      Q   Did you get along with him?
8      A   I didn't have a problem with him.
9      Q   Did you have any reason to
10 disagree with the evaluation he gave you?
11     A   Let me clarify what I just said.
12     Q   Okay.
13     A   I didn't have a problem doing
14 what he told me to do or obeying orders or a
15 conflict with him.
16     Q   Or what?
17     A   Or a conflict with him. Did we
18 get along? As far as I know, we did.
19     (Whereupon, Defendant's
20     Exhibit No. 22 was marked and
21     attached to the deposition.)
22 BY MS. NELSON:
23     Q   I'm going to show you Defendant's
```

Page 131

```
1  Exhibit 22 and ask if you remember receiving
2  that evaluation from Sergeant Balm. Do you
3  recall receiving that evaluation, Sergeant?
4      A   Yes.
5      Q   Do you have any reason to
6  disagree with that evaluation?
7      A   No.
8      Q   No?
9      A   Did you ask me do I have any
10 reason to disagree with the evaluation.
11     Q   Yes?
12     A   No.
13     (Whereupon, Defendant's
14     Exhibit No. 23 was marked and
15     attached to the deposition.)
16 BY MS. NELSON:
17     Q   Let me show you what I've marked
18 as Defendant's Exhibit No. 23. Do you
19 remember reporting to Sergeant Hamm?
20     A   Yes.
21     Q   Do you remember him doing an
22 evaluation on you?
23     A   He was one of my supervisors.
```

Page 132

```
1      Q   Okay. Do you have any
2  disagreements or issues with Sergeant Hamm?
3      A   No.
4      Q   You were working patrol; is that
5  correct? You worked for him?
6      A   I worked for him in patrol, yes.
7  But we worked together again later.
8      Q   And where? Later where?
9      A   CID.
10     Q   CID. Okay. Let me show you the
11 evaluation marked Defendant's Exhibit 23,
12 which is for, like, the spring of 2002, ask
13 if you recall receiving that particular
14 evaluation? I'm sorry. You have no reason
15 to disagree with that evaluation; is that
16 correct.
17     A   No.
18     (Whereupon, Defendant's
19     Exhibit No. 24 was marked and
20     attached to the deposition.)
21 BY MS. NELSON:
22     Q   Let me show you -- I'm sorry.
23 Let me see 23 for just a minute. I will
```

33 (Pages 129 to 132)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

Page 133

1   show you Defendant's Exhibit 24, which is an
2   evaluation from Sergeant Baum near or about
3   the same timeframe. Do you recall receiving
4   that particular evaluation? Do you recall
5   receiving that evaluation, Sergeant Summers?
6       A   Yes.
7       Q   Do you have any reason to
8   disagree with that evaluation?
9       A   No.
10          MS. ROBERTSON: Keep your voice
11   up.
12      A   No.
13      Q   Now, it was noted in there that
14   you were having some, either attendance or
15   tardiness problems; is that correct?
16      A   I could have been.
17      Q   And I think you'd also had a
18   motor vehicle accident for which you had a
19   one day suspension; is that correct?
20      A   Yes.
21      Q   And you were disciplined for
22   having that motor vehicle accident while on
23   duty; is that correct?

Page 134

1       A   Yes.
2           (Whereupon, Defendant's
3           Exhibit No. 25 was marked and
4           attached to the deposition.)
5   BY MS. NELSON:
6       Q   Okay. Let me show you
7   Defendant's Exhibit 25. Is that a copy of
8   the disciplinary action you received for the
9   motor vehicle accident that you were in? Is
10  that correct?
11      A   Yes.
12      Q   And I want to show you also -- Do
13  you also recall being formally disciplined
14  for not reporting for duty at the required
15  time?
16      A   I could have been.
17          (Whereupon, Defendant's
18          Exhibit No. 26 was marked and
19          attached to the deposition.)
20  BY MS. NELSON:
21      Q   I will show you Defendant's
22  Exhibit 26 and ask if that's a disciplinary
23  warning you for not reporting to duty at the

Page 135

1   required time? I think it goes on to this
2   is the third time that this same infraction
3   has occurred in a twenty-eight-day work
4   period?
5       A   I don't know about that. But
6   I -- This is my signature here, so I
7   received it. Yeah.
8       Q   You did sign it?
9       A   Yes.
10      Q   Is that --
11          MS. NELSON: No. I'm sorry.
12          MS. ROBERTSON: How about 25?
13  Would that be right.
14          MS. NELSON: No, it's the
15  performance review. That one.
16          MS. ROBERTSON: This one.
17  Okay.
18  BY MS. NELSON:
19      Q   Sergeant Summers, do you also
20  recall receiving a disciplinary action for
21  making an arrest without awaiting for a
22  proper backup, violating General Order 17?
23      A   I remember receiving an action.

Page 136

1   But that's not true.
2       Q   I'm sorry. You recall receiving
3   a disciplinary?
4       A   Yes.
5       Q   You disagree with the reason it
6   was given to you?
7       A   Yes.
8       Q   Okay. Well, I'll ask you about
9   that and give you a chance to tell me. Let
10  me -- I'm going to show you the disciplinary
11  action. Do you remember an arrest of a
12  Marshall Drinkard?
13      A   Yes.
14          (Whereupon, Defendant's
15          Exhibit No. 27 was marked and
16          attached to the deposition.)
17  BY MS. NELSON:
18      Q   And I'm going to show you
19  Defendant's Exhibit 27. And this particular
20  disciplinary action arose out of an attempt
21  to arrest an individual named Marshall
22  Drinkard; is that correct?
23      A   If that's what the disciplinary

34 (Pages 133 to 136)

Page 137

1 action says, yes.
2 Q And you signed this on November
3 3, 2002; is that correct?
4 A Yes.
5 Q And it basically says you
6 obtained a warrant for Drinkard in a
7 personal matter. He is flagged in the CAD
8 system for carrying -- Is that a edged
9 weapon? What is that? Disorderly assault?
10 A It looks like edged weapon.
11 Q An aged?
12 A Edged.
13 Q Edged. What is that?
14 A Knife, sharp object.
15 Q Disorderly, assault risk,
16 narcotics user, uses false names, rape
17 suspect and drunkard. You made an arrest of
18 Drinkard without awaiting for backup
19 officers to arrive. This is violation of --
20 I guess General Order PGO-17 and PGO-21.
21 There's a second part. But let's talk about
22 that part first. Did you attempt to arrest
23 Marshall Drinkard without a backup?

Page 138

1 A No.
2 Q And then the second -- And did
3 you arrest him?
4 A He was arrested on the warrant.
5 But I didn't -- I wasn't the one that put
6 cuffs on him. I transported him. But I was
7 the first one to make contact with him. But
8 there were several -- If you pull the call
9 up in the city system, you will see that
10 there's -- It said that I didn't wait for
11 backup. They are, like, minutes I'm out
12 here at this time. And then the second car
13 pulls up. Then the third car pulls up. And
14 then they turn it around when I go to
15 complain to the supervisor, which was
16 DeVane, about part of the call. Then he
17 turned it around on me and said I didn't
18 wait for backup, which was not true. Back
19 up was there.
20 The family member did get in my face
21 and tried to -- If it had been any other
22 officer, that person would have been
23 arrested for disorderly conduct because she

Page 139

1 stepped out and tried to interfere with the
2 lawful arrest of a person who had a warrant.
3 Now, I never would have even made contact
4 with him if Sergeant Hamm hadn't instructed
5 me. If you see him out, go ahead and arrest
6 him. I wasn't off duty. I was on duty
7 patrolling in that area, leaving a traffic
8 stop in that area.
9 So, if I had not been told by Sergeant,
10 that, well, if you see him out, go ahead and
11 arrest him, I never would have even called
12 out that and got him in sight. He has a
13 warrant or whatever. And that is false
14 about me not waiting for backup.
15 Q Okay. When you said Sergeant
16 Hamm said if you see him, see him, Marshall
17 Drinkard?
18 A Yes.
19 Q Okay. So you were in the area,
20 you saw him. What's the procedure when you
21 see somebody that there's an existing
22 warrant on?
23 A You make contact with them. You

Page 140

1 confirm the warrant. You make contact with
2 them and you place them under arrest.
3 Q Okay. Are you supposed to wait
4 for backup?
5 A If you feel the need to wait for
6 backup. But I didn't not wait for backup.
7 That's false.
8 Q And apparently a family member
9 became upset, made a derogatory comment to
10 you.
11 A No. She started cussing and
12 yelling. And there's several people out
13 there on the streets.
14 Q Okay. And it says you attempted
15 to arrest the family member; is that true?
16 A For disorderly conduct, yes.
17 Q Okay.
18 A Well, I asked another officer to
19 place her under arrest because myself and
20 another officer -- I was standing there next
21 to Drinkard, and the other officer was
22 putting the cuffs on him for me to put him
23 in my car.

35 (Pages 137 to 140)

Page 141

1     Q  Okay. Who were some other
2  officers there that day?
3     A  It's documented in the system.
4  But I know Costello was one of them. But I
5  don't know who the other couple of officers
6  were.
7     Q  Now, this --
8     MS. ROBERTSON: That was the
9  guy that got sued.
10     THE WITNESS: Oh, Sutley.
11     MS. ROBERTSON: Is that before
12  or after Sutley did what he did?
13     THE WITNESS: I don't know. I
14  think it was after.
15  BY MS. NELSON:
16     Q  And this warning was given to you
17  by Sergeant Reid; is that correct? Keith
18  Reid?
19     A  Yes.
20     Q  Was he there at the scene?
21     A  I don't think so.
22     Q  Do you know how he learned about
23  it?

Page 142

1     A  I believe I went to them first to
2  complain about part of the call.
3     Q  And what did you complain about?
4     A  Was that during the course of
5  getting him under arrest, when that girl
6  started being disorderly and the other
7  officers got on scene, and I asked the other
8  officer to place her under arrest. And they
9  just totally disregarded everything.
10     And that's not the way that police
11  officers normally interact with each other.
12  If somebody's being disorderly -- Had it
13  been any -- I felt like if it had been any
14  other officer, they would have went ahead
15  and arrested her. But because it was me,
16  they did not. So I went to talk to the
17  Sergeant about it, and then everything got
18  turned around on me.
19     Q  And what sergeant did you go talk
20  to?
21     A  I talked with -- I did talk to
22  Reid. And I talked with DeVane, who was the
23  Lieutenant.

Page 143

1     Q  And what did they say?
2     A  They would look into it, or
3  something to that effect. That's not their
4  exact words. But --
5     Q  But you received the warning, and
6  you signed it; is that correct?
7     A  I signed it acknowledging that I
8  received it. Yes.
9     Q  And you didn't appeal or grieve
10  that to the Personnel Board, did you?
11     A  No.
12     Q  Do you remember being evaluated
13  by Sergeant Long -- Scott Long?
14     A  He was one of my supervisors.
15     Q  Do you have any reason to -- Do
16  you and Sergeant Long get along or have any
17  disagreements with each other?
18     A  Not that I can recall. I don't
19  -- May I see the -- Do you have the
20  evaluation?
21     (Whereupon, Defendant's
22     Exhibit No. 28 was marked and
23     attached to the deposition.)

Page 144

1  BY MS. NELSON:
2     Q  Do you have any reason to
3  disagree with the evaluation that he gave
4  you? I'm showing you Defendant's Exhibit
5  28, which is the evaluation given to you,
6  performance evaluation, by Sergeant long.
7  I'm sorry. Can you tell me the date at the
8  top? Is it May of 2003?
9     A  5/19/2003.
10     Q  I'm sorry. Do you have any
11  reason to disagree with that evaluation?
12     A  I don't understand why this end
13  with this evaluation is that -- I don't know
14  about that time.
15     MS. ROBERTSON: Keep your voice
16  up.
17     A  Okay. I don't understand why
18  these two things are in here with the
19  evaluation.
20     MS. ROBERTSON: Tell her the
21  Bates stamp number. See down here?
22  Those are Bates stamp numbers.
23     THE WITNESS: Okay.

1  MS. ROBERTSON: She said she
2  doesn't understand why 0606 and 0607 are
3  part of evaluation.
4  BY MS. NELSON:
5  Q  Unless they were just pending --
6  A  They're in the middle of the
7  evaluation.
8  Q  -- disciplines at the time. If I
9  can take a look. Well, you don't remember
10  them being attached as part of --
11  A  No.
12  Q  Okay. Were they were not active
13  -- they were active?
14  A  I don't recall receiving no
15  evaluation with two documents stuck in the
16  center of them. No. I'm not agreeing to
17  those two documents in there. I'll take a
18  look at the evaluation that you asked me
19  about, the evaluation. But that seems like
20  a second part of something else.
21  Q  Well, I won't remove them from
22  the exhibit. Basically, what they are, are
23  counseling reports on you that were pending

1  at the time the performance evaluation was
2  given. For example, when you received this
3  in May of 2003, you had a tardiness?
4  MR. McKAY: Supervisor's
5  documentation, it's attached to the
6  evaluation.
7  Q  You had a tardiness pending,
8  which was about to expire in May of '03.
9  And you had a -- the arrest without the
10  backup that we just talked about that
11  expired -- that was active and didn't expire
12  until October of '03. So they were active
13  counselings that you've had.
14  A  Well, maybe I didn't understand
15  your question. Because I thought that you
16  asked me about evaluation, not about --
17  Q  I did.
18  A  -- whatever the other two
19  documents are. So I was about to answer
20  about the evaluation. But I --
21  Q  Okay?
22  A  -- didn't see two documents stuck
23  in the center of my evaluation.

1  Q  You don't remember those being
2  there?
3  A  No.
4  Q  Okay. You're not taking issue
5  that you had counseling reports outstanding?
6  You just didn't see them in your evaluation?
7  A  I haven't received an evaluation
8  with two documents attached to them.
9  Q  Okay?
10  A  I don't remember having no
11  evaluations like that. And so I was just
12  trying to --
13  MS. ROBERTSON: It's not the
14  custom or the practice of the Dothan
15  Police Department to put documents in
16  the middle of evaluations. Is that what
17  you mean?
18  MR. McKAY: What it is, is just
19  a justification from the supervisor that
20  when he went to complete the evaluation,
21  that's just the record, if there were
22  any actions or any things that reminded
23  him in doing that evaluation.

1  BY MS. NELSON:
2  Q  But you don't recall -- all
3  you're saying is you don't recall seeing
4  those as part of your evaluation?
5  A  Correct.
6  Q  Well, I can either remove them or
7  we can state for the record that the witness
8  does not -- did not recall seeing Bates 606
9  or 607 to the evaluation. Is that fair?
10  MS. ROBERTSON: Why don't you
11  take them out because unless they're
12  referenced -- Excuse me -- reference,
13  like, attached or referenced in the
14  evaluation.
15  MS. NELSON: Okay. I will take
16  them out. I think I've already asked
17  her about the two disciplinary issues.
18  I will just take them out. Okay. I
19  have removed those two documents.
20  BY MS. NELSON:
21  Q  Now, looking at that Exhibit 28,
22  is that what you recall receiving, Sergeant
23  Summers? Okay. You will agree with me you

Page 149

1  did receive that; is that correct?
2      A   Yes.  The evaluation, yes.
3      Q   Now, do you recall being
4  disciplined or receiving a written
5  discipline for having a second traffic
6  violation or automobile accident while on
7  duty --
8      A   Yes, I had a second --
9      Q   -- while working for the City?
10     A   -- automobile accident.  Yeah, I
11  had a second one.
12     Q   And for that, you were suspended
13  for five days; is that correct?
14     A   I don't know how many days I was
15  suspended.
16         (Whereupon, Defendant's
17         Exhibit No. 29 was marked and
18         attached to the deposition.)
19  BY MS. NELSON:
20     Q   I'm going to show you what I've
21  marked as Defendant Exhibit 29 and see if
22  this can refresh your recollection that --
23  And there's several pages here.  So if you

Page 150

1  want to take a moment to look through all
2  that -- through here.  But the charge is
3  that you were involved in a motor vehicle
4  collision on November 17, 2003, while
5  operating a Dothan police vehicle.  An
6  Employee Safety Committee Accident Review
7  Board convened on December 11, 2003, found
8  that you were careless and thereby caused or
9  contributed to the accident.  And this was
10  violation of Personnel Rule and Regulation
11  Section 3-45.  And it shows a -- I will let
12  you look at Defendant's Exhibit 29 and ask
13  if you can identify those documents and that
14  you received those documents?  Do you recall
15  receiving Exhibit 29?
16     A   Just a couple of more minutes,
17  please.
18     Q   Okay.
19     A   I remember receiving the write-up
20  in these documents that I signed.  But I
21  don't remember receiving this.
22     Q   That's the Safety Committee --
23         MS. ROBERTSON:  She's talking

Page 151

1  about the 05990660 and 0601.
2      Q   Which is labeled the Safety
3  Committee report?
4      A   Yes, and 0603.
5      Q   And 0603 is?
6          MS. ROBERTSON:  Like an
7  incident report.
8      A   A traffic accident report.
9      Q   Okay.  But you were served with
10  the notice of discipline and you were
11  ultimately suspended; is that correct?
12     A   Yes.
13     Q   And you failed to show up at the
14  determination hearing, didn't you?
15     A   Yes.  I believe there was a
16  family emergency during that same time.  As
17  I said before, single parent and I had one
18  child that was extremely sick.  But I can't
19  tell you exactly what was going on during
20  that time -- at this time.  But I believe
21  there was a family emergency that kept me
22  from going to -- at that one and getting
23  there at that time.

Page 152

1      Q   You're not sure, but think that's
2  what it is?
3      A   Something went on.
4      Q   Okay?
5      A   And I think that it was either
6  one of them had to go to the hospital.  At
7  the time, we had a death.
8      Q   And you did not appeal that
9  disciplinary, that five-day suspension, did
10  you?
11     A   No.
12         MS. NELSON:  I assume you are
13  going to want a lunch break?
14         MS. ROBERTSON:  Sure.
15         MS. NELSON:  Okay.  If we can
16  go for about another fifteen minutes --
17         MS. ROBERTSON:  Are you okay
18  with that?  I'm okay with that.
19         THE WITNESS:  Uh-huh.
20  BY MS. NELSON:
21     Q   Do you recall being evaluated by
22  John Collier?
23     A   He was my supervisor.

38 (Pages 149 to 152)

Page 153

1    Q   Do you remember where you were
2    working at the time?  Were you working
3    patrol, CID?
4    A   No.  Ordinance Compliance.
5    Q   Okay.  And what is Ordinance
6    Compliance?
7    A   Enforcing the City ordinances.
8    Q   Is that the Environmental
9    Compliance Bureau?
10   A   Yes.
11   Q   So I have your record showing
12   that you worked just Third Squad Patrol,
13   Fourth Squad Patrol, Environmental
14   Compliance Bureau, CID, Vice Intelligence,
15   Sixth Squad Patrol and First Squad Patrol;
16   is that correct?
17   A   I believe so.
18   Q   Okay.  So at this point in time,
19   which is reporting to Collier would have
20   been in May of 2004, you would be working in
21   Environmental Compliance Bureau; is that
22   correct?
23   A   Yes.

Page 154

1    Q   Okay.  How did you come to work
2    in Environmental Compliance Bureau?
3    A   I don't know.  I don't know.  I
4    believe I was requested.  I don't know.
5    Q   Okay.  And what were --
6    A   I was just transferred.  I don't
7    really know how it came about.
8    Q   Do you think somebody requested
9    you?
10   A   I'm just saying --
11   Q   Not sure?
12   A   -- I'm not sure.
13   Q   What were your job duties there
14   in that particular department?
15   A   Enforcing the City ordinances,
16   whatever ordinances were that the City had,
17   going out checking for violations of those
18   ordinances.
19   Q   All right.
20   A   And there's several different
21   ones.
22   Q   Can you give me an example?
23   A   Abandoned property, which is

Page 155

1    not -- it may not be the correct terminology
2    for it.  But -- Abandoned cars --
3    Q   It's not patrol.  You're not
4    pulling people over for speeding?
5    A   No.
6    Q   You're checking for ordinances,
7    like neighborhoods in compliance with
8    certain ordinances and --
9        MS. ROBERTSON:  Like these poor
10   policemen that had to come to my house
11   and tell me that complained that my car
12   was in the easement.  But they didn't
13   know of any law that I'd broken.  They
14   finally passed a law.  I had stopped
15   parking in the easement, but they
16   finally passed a law, you couldn't pass
17   in the easement.
18       MS. NELSON:  Well, I know.  I
19   saw that Birmingham passed something you
20   can't park in your front yard or
21   something.  Off the record.
22       (Whereupon, an off the
23       record discussion was had.)

Page 156

1    BY MS. NELSON:
2    Q   Okay.  I'm sorry.  We diverted
3    there.  But that type of -- there may be
4    ordinances affecting what's on your property
5    and keeping your property clean or things
6    like -- I mean, that's what you were doing?
7    A   That's some of the duties, yes.
8        (Whereupon, Defendant's
9        Exhibit No. 30 was marked and
10       attached to the deposition.)
11   BY MS. NELSON:
12   Q   Okay.  Okay.  I'm going to show
13   you the Defendant's Exhibit 30, which
14   appears to be an evaluation -- your
15   evaluation done by Sergeant Collier.  Do you
16   recognize that particular document?  Is that
17   the evaluation that you received from
18   Sergeant Collier?
19   A   I received this evaluation.
20       MS. ROBERTSON:  Everything but
21   589.
22   A   But 589, I don't remember
23   receiving that document.

Page 157

1    Q   Okay.  This is the last page of
2  that.  Again, Sergeant Collier gave you a
3  good evaluation.  He marked you down in
4  safety consciousness because you just had
5  that wreck and written up and gotten the
6  five-day suspension; is that correct?
7    A   No, I can't say I'd just gotten
8  written up.  But I had been written up in my
9  career as a police officer.  But I can't say
10  I had just gotten written up for that.  But
11  I'm not disagreeing about the evaluation.
12    Q   Okay.  Well, just look with me
13  quickly on the last discipline I showed you
14  that we -- the previous suspension that you
15  received, Defendant's Exhibit 29?
16    A   Okay.
17    Q   What was that dated?
18      MS. ROBERTSON:  You should have
19    been beating up deaf guys because you
20    can't get written up for that.
21    A   The date of the suspension?
22  12/18/03.
23      MS. ROBERTSON:  What?  What

Page 158

1  date?
2      THE WITNESS:  She asked me
3    about the date I was suspended.  It was
4    my --
5      MS. ROBERTSON:  Yeah.  There's
6    the date of the accident.  That's the
7    date.
8  BY MS. NELSON:
9    Q   Well, your determination hearing
10  that you did not attend was January 6th of
11  '04; is that correct?  The record can speak
12  for itself.
13      MS. ROBERTSON:  Yeah.  We found
14    it.  Yeah.
15    Q   Okay.  And at the time Sergeant
16  Collier reviewed you, you -- it had been
17  less than five months that you had been
18  suspended for five days for a motor vehicle
19  accident; is that correct?
20    A   I'm not denying the fact that I
21  got written up or that I got suspended.  You
22  just ask me was that correct that I just
23  received that write-up.  And that's the only

Page 159

1  part that I dispute, that, I just --
2    Q   Okay.  It wasn't just -- okay.
3  It was several months prior to that?
4      MS. ROBERTSON:  It appears that
5    it was in the evaluation period.
6      MS. NELSON:  Thank you.
7  BY MS. NELSON:
8    Q   You're saying the last page you
9  did not receive?
10    A   Yes.
11    Q   Which is similar to the two
12  documents that we removed from the last
13  review, which appears to be just a record,
14  the supervisor's record of active
15  disciplines that you have.  I'm going to
16  take that off of this, just to make the
17  record clear.  You did not receive that.
18      Okay.  But he did mark you down in
19  safety.  And he marked you down -- I say
20  low.  He gave you a one in safety
21  consciousness and a two in dependability.
22  But otherwise he gave you all threes; is
23  that correct?  A pretty good report; is that

Page 160

1  correct?
2    A   Yes.
3    Q   Okay.  Now, how long did you stay
4  in the Environmental Compliance Bureau?
5    A   I don't know.
6    Q   But from there you moved to the
7  Criminal Investigation Division or CID?
8    A   Yes.
9    Q   And how did you come to move to
10  CID?
11    A   When the position was opened, I
12  submitted a request to be considered for
13  CID.
14    Q   Okay.  And did you go through any
15  type of interview process?
16    A   Yes.
17    Q   Do you remember who you
18  interviewed with?
19    A   No.
20    Q   Okay.  And you were selected to
21  go there; is that correct?
22    A   At some point, yes, I was
23  selected.

40  (Pages 157 to 160)

Page 161

```
1      Q   Okay.  Is that a promotion?
2      A   No.
3      Q   Okay.  And why did you want to
4   move from the environmental unit or
5   department to CID?
6      A   Because I wanted to be an
7   investigator.
8      Q   What do you do in CID?
9          MS. ROBERTSON:  Object.
10     Q   That was not very well phrased.
11  Tell me, were you called an investigative
12  officer?  What was the title of the job you
13  were seeking to get?
14     A   Investigator.
15     Q   Okay.  Tell me, as you understand
16  it, the duties of an investigator in CID?
17     A   You're assigned to look into,
18  investigate different crimes, document,
19  develop leads, document evidence, process
20  evidence, and several other tasks.
21     Q   And who was your supervisor in
22  CID?
23     A   Willie Williamson.
```

Page 162

```
1      Q   Okay.  Anybody else?
2      A   Roy Woodham.  Michael Surelly.
3      Q   Okay.  Do you know when you went
4   to CID?
5      A   No.
6      Q   Do you remember being evaluated
7   by Lieutenant Woodham when you went to CID?
8      A   He was my supervisor.
9          (Whereupon, Defendant's
10         Exhibit No. 31 was marked and
11         attached to the deposition.)
12  BY MS. NELSON:
13     Q   I'm going to show you what I've
14  marked as Defendant's Exhibit 31.  Is that
15  the evaluation that Woodham performed or
16  gave to you when you went to CID?  Is that
17  the evaluation he to gave you?
18     A   Yes.
19     Q   You signed that; is that correct?
20     A   Yes.
21     Q   And it just -- I believe it notes
22  that you had only been in CID approximately
23  eight months; is that correct?
```

Page 163

```
1      A   If that's what it, says.
2      Q   But overall you got a
3   satisfactory review; is that correct?
4      A   Yes.
5      Q   Okay.  And how long did you stay
6   in CID?
7      A   I don't know.  Less than a year.
8   I'm not sure of the exact time.
9      Q   Okay.  And why did you leave CID?
10     A   I was transferred to Vice.
11     Q   And is this -- And what is Vice?
12     A   Narcotics Division, Vice
13  Intelligence Division.
14     Q   Okay.  Did you seek that
15  transfer?
16     A   Earlier in my police career, but
17  not at that time when I was transferred.
18  No.
19     Q   Okay.  When you sought it
20  earlier, when was that?
21     A   I don't know.
22     Q   And what -- Why did you -- Were
23  you asked to leave CID, or did somebody at
```

Page 164

```
1   Vice ask for you to transfer to their
2   department, or were they acting on your
3   previous request to go there?  Do you know
4   why you transferred?
5      A   While in CID, I made a couple of
6   complaints about being treated different
7   because I was a black female.
8      Q   Who did you complain to?
9      A   Roy Woodham and John Powell.
10     Q   And at different times or did you
11  meet with both of them at the same time?
12     A   At different times.
13     Q   Did you go to Roy Woodham first
14  or John Powell first?
15     A   Roy Woodham.
16     Q   And when did you meet with Roy
17  Woodham?
18     A   I don't know the dates.
19     Q   Was anybody else present?
20     A   Could have been.  But I don't
21  remember.
22     Q   Okay.  What did you tell them?
23     A   That I felt like I was being
```

41 (Pages 161 to 164)

1  treated different because I was the only --
2  There were two other -- a total of three
3  females in CID.
4      Q   I'm sorry. How many? Three?
5      A   Three. That were investigators.
6  That's not including secretaries or anything
7  like that.
8      Q   Okay.
9      A   I was assigned to Willie
10 Williamson's unit, which was the paper
11 crimes. And she was the supervisor over the
12 Paper Crimes Unit, which consisted of her as
13 a supervisor, myself, Brandy, and it could
14 have been someone else. Rhett Davis, I
15 think he was a part of it initially, too.
16     And my complaint was because Willie was
17 treating me different from Brandy and Rhett.
18 Brandy had been there longer, so she didn't
19 have -- to my knowledge, she didn't have the
20 difficulties with Willie Williamson that I
21 did. But Rhett and I came to CID with a
22 short time between us. Rhett came over -- I
23 don't know exactly how long, maybe a month,

1  maybe two. But it was a short time before
2  he went to CID.
3      And then after he went, I went to CID.
4  I was given cases that the first -- just an
5  estimate -- one hundred cases that I was
6  given was cases that you couldn't do any
7  real investigating on. It was cases that
8  you just have to type a CAN statement in it,
9  that this case is closed or this case is
10 placed inactive until further development or
11 other new leads.
12     Rhett, on the other hand, who did not
13 have any additional CID training, was given
14 cases that he could follow-up on, that he
15 could make arrests with. Rhett was allowed
16 to go out with other investigators to see
17 how they investigate, to shadow them, to
18 learn the investigative techniques, to
19 develop leads, to do what an investigator
20 needs to do.
21     I, on the other hand, had to sit in the
22 office and type these CAN response to these
23 cases that I was assigned to. My cases were

1  assigned different from what Rhett's was.
2  The only different in treatment in myself,
3  Brandy and Rhett was I was the only black
4  female up there. Willie Williamson would --
5  at one point told me she wanted me to change
6  my perfume because she didn't like it. That
7  doesn't have anything to do with job
8  performance.
9      At some point, I was -- I was told that
10 she complained to Lieutenant Williams that
11 I'm talking to other investigators about my
12 cases. And I was not. So I was instructed
13 to only talk to her about my cases. And I
14 told Lieutenant Woodham then that I'm not
15 talking to any other investigators about my
16 cases. I talked to other investigators just
17 in how you doing, about the day, what
18 they're doing, their knowledge in CID.
19     But at some point, I was told to stay
20 away from Sergeant Hamm's office as much and
21 to stay away from Mike Etras' office. And
22 they were the only two that if they were out
23 fingerprinting something or processing some

1  evidence, they would show me what they were
2  doing. And it wasn't something that was
3  being done to take away from the cases that
4  I was working on.
5      Q   Wait a minute. Who told you to
6  stay away from Hamm and Etras?
7      A   Let me correct that. I believe
8  it was Lieutenant Woodham, after Willie
9  complained saying that I was talking to them
10 about cases.
11     Q   And you think it was Woodham who
12 told you not to talk to them?
13     A   That you need to not -- not talk
14 to them but stay out of -- You need to only
15 talk to her about your cases. The
16 accusation was made that I was talking to
17 them about my cases from Willie Williamson.
18 And I was instructed, you need to stay out
19 of there. Stay away. I'm not saying the
20 exact words. But I was instructed to stay
21 away from their offices, limit going and
22 talking to them about cases. If I got
23 something I need to know, then I need to go

## Page 169

1  to Willie Williamson.
2       Q    Okay. Were Hamm and Etras
3  supervisors in CID?
4       A    No. They were higher ranking,
5  but they were investigators.
6       Q    They work in CID?
7       A    Yes.
8       Q    And you say they're higher
9  ranking, they were like supervisors?
10      A    Like sergeants.
11      Q    And what was Willie Williamson?
12      A    She was a sergeant at the time.
13      Q    Okay. Is she black or white?
14      A    White. White female.
15      Q    And the -- Hamm and Etras, you're
16 saying they're white?
17      A    Yes.
18      Q    Now, do you know Rhett -- I'm
19 sorry the -- Brandy, is that the first name
20 you gave me? Bandy or Brandy?
21      A    Brandy.
22      Q    What is Brandy's last name?
23      A    Bowen, I think. I don't know if

## Page 170

1  that's her middle name or not. It may be
2  different.
3       Q    And --
4       A    Brandy Bracken.
5       Q    Bracken?
6       A    Yes. She was a Bowen.
7       Q    And Rhett Davis. Rhett Davis; is
8  that correct?
9       A    Yes.
10      Q    Do you know his background or
11 experience?
12      A    He didn't have any CID
13 experience, as I didn't have any.
14      Q    And how do you know that?
15      A    Because we talked about it, and
16 asked, has he -- Rhett hadn't been to any
17 schools either.
18      Q    I'm just asking you how do you
19 know what his background or experience was?
20      A    Because I spoke to Rhett. We had
21 a conversation because we shared an office
22 together.
23      Q    Based on what he told you; is

## Page 171

1  that correct?
2       A    Yes.
3       Q    And when you talked to -- You
4  said you went to Woodham to express your
5  concerns. He told you to talk -- to report
6  to Willie Williamson?
7       A    I was assigned to her unit after
8  being transferred to CID. And over a short
9  period of time, the way she acted towards me
10 began to not be pleasant at all.
11      Q    And how did she act toward you?
12      A    Indifferent. Treating me
13 different. I had to stay in the office,
14 like I said, and work on cases that you
15 couldn't do really any real investigative
16 work on, just type what she told you to
17 type. And you type that CAN response to
18 each one of them that were placed either in
19 inactive or closed.
20      Q    Okay. You told me that.
21      A    Okay.
22      Q    I mean, what was Brandy doing
23      A    Brandy was a more experienced

## Page 172

1  investigator. She had been up there a
2  longer time and had had some schools.
3       Q    So you're not complaining about
4  how --
5       A    No.
6       Q    -- your treatment as to Brandy.
7  You're complaining about your treatment as
8  compared to Rhett; is that correct?
9       A    I'm saying that I was treated
10 different because that -- the only
11 difference -- I'm noting that this is how
12 I was treated. And the only difference
13 between us was race and sex.
14      Q    That's your opinion; is that
15 correct? That's your contention; is that
16 correct?
17      A    Yes.
18      Q    Okay. Besides having to stay in
19 the office and do the typing, how else were
20 you treated differently?
21      A    Being told not to wear a skirt
22 suit to work. I don't want you looking like
23 a female.

43 (Pages 169 to 172)

1  Q   And who told you that?
2  A   Lieutenant Woodham.
3  Q   And when did he tell you that?
4  A   At some point during the time I
5 was in CID and had to work just in the
6 office. If I wasn't going to be out doing
7 anything in the field, if I had to sit in an
8 office all day and nobody is coming in for
9 an interview or to be talked to and I have
10 to just sit at a desk, there was nothing
11 wrong with the skirt suit. It was a suit
12 that you could wear to court. It was blow
13 the knees with low flat -- not completely
14 flat but a small loafer heel on with the
15 shoe.
16  Q   Okay. Was there any dress code
17 for the department that you knew of?
18  A   There's a dress code. But there
19 was no difference between what I was -- a
20 suit, business casual is what we were.
21  Q   So he told you not to wear a
22 skirt suit. And you said Willie told you
23 not to wear perfume, a certain kind of

1 perfume?
2  A   She wanted me to change the
3 perfume.
4  Q   Was it bothering her sinuses?
5  A   She didn't like -- She said she
6 didn't like the perfume. I can't say it
7 bothered her sinuses. Because there were
8 several people in CID -- in the long
9 hallway, everybody's office is open that are
10 burning candles, that are wearing other
11 perfumes. Ferrell Gill, he can sit in his
12 office down the hall and you can smell him
13 from the other end. So there were other
14 people that had other odors. If you're
15 allergic to a perfume or a smell, then it's
16 going to be a lot of other smells as well,
17 not just one perfume. And it wasn't the
18 cheap, gaudy splash. It was a quality
19 perfume.
20  Q   What was it?
21  A   And it wasn't a whole --
22  Q   What were you wearing? Do you
23 remember?

1  A   I'm sure I could find the name of
2 it.
3  Q   Okay. Anything else? Any other
4 way you were treated differently?
5  A   I'm sure there's several other
6 ones.
7  Q   Did you change -- Did you stop
8 wearing your skirt?
9  A   I only wore the skirt one time.
10 It wasn't a tight-fitting skirt. It was not
11 a -- nothing that was provocative or uncut.
12 It was a business suit for courts. So I
13 couldn't understand why I -- I did not
14 understand why, if I'm sitting in -- if I've
15 got to sit in the office all day --
16  Q   Okay?
17  A   -- why. But I didn't -- he told
18 me not to wear it. Don't want you looking
19 like a female. So I didn't wear it again.
20  Q   Okay. Anything else?
21  A   Other investigators, when they go
22 out to lunch, they don't have to call out
23 for their lunch. They go and have their

1 lunch and come back. I would have to call
2 out and make sure I marked my time wherever
3 I went. I asked to put in -- asked for a
4 couple of schools, like interview and
5 interrogation. They said that was denied,
6 that some other people have to go to that
7 school first.
8  Q   Do you know if anybody got to go?
9  A   I don't know.
10  Q   Who denied you that? Who told
11 you you couldn't go at that time?
12  A   Roy Woodham.
13  Q   Anything else?
14  A   I'm sure there are.
15  Q   I'm sorry?
16  A   I'm sure that there are. But I'm
17 trying to just --
18  Q   Sure. Okay.
19  A   Let me rephrase that.
20    MS. NELSON: Well, why don't we
21 take our lunch?
22 BY MS. NELSON:
23  Q   You also said you talked to Chief

1  Powell --
2  A  Yes.
3  Q  -- about these same issues?
4  A  Yes.
5  Q  And was this when you were in
6  CID?
7  A  Yes.
8  Q  And was Woodham present when you
9  talked to Chief Powell?
10  A  No.
11  Q  What did Chief Powell tell you?
12  A  He'd look into it.
13  MS. NELSON:  Okay.  We'll
14  follow up.  I guess that's a breaking
15  point.  Okay.  Lunch and --
16  MS. ROBERTSON:  We need a
17  little longer than a hour, only because
18  it's hard to find food around here.
19  (Whereupon, a lunch break is taken.)
20  MS. NELSON:  Okay.
21  MS. ROBERTSON:  She worked a
22  full shift last night.  That's why she's
23  kind of running out of gas.  I told her

1  she should have told you that.  But, I
2  mean, I don't think it's affected her
3  testimony.  Other than she's --
4  MS. NELSON:  Tired.  Well, We
5  all are.
6  MS. ROBERTSON:  I mean, as I
7  say, if I thought it was affecting her
8  testimony, I would have done something.
9  I just wanted you to know.  I fussed at
10  her for not telling me.  But apparently
11  it's a little place and there's not
12  anybody to stand in for her.
13  BY MS. NELSON:
14  Q  Okay.  Well, I guess --
15  MS. ROBERTSON:  Did you have
16  something else to tell her?
17  THE WITNESS:  Yeah.  I remember
18  the incident about when RaMonica Conrad
19  came up to CID when I was in CID.  She
20  came up there to get some help on typing
21  a warrant fax sheet.  She was in Patrol
22  Division and I was in CID.  And I told
23  her wait until after my shift was over

1  and I'd be glad to help her and show her
2  how she needed to type it because it was
3  for an -- She ended up obtaining a
4  felony warrant on somebody.  So after my
5  shift was over and my work was done,
6  before going home, I pulled up a blank
7  warrant fact sheet on the computer and
8  showed her what information she need to
9  put in there to obtain the warrant.
10  Lieutenant Woodham came in and
11  spoke, told me what I needed to turn in
12  because I was being transferred from CID
13  to Vice Division.  And then either
14  Willie Williamson came in afterwards or
15  before.  Both of them came in the door.
16  Nobody really said anything.  We was
17  sitting there at the terminal.  I was
18  sitting right next to her while she
19  typed up the warrant fact sheet, because
20  I showed her how to do it.  And sometime
21  later, I got a E-mail cautioning me
22  about letting other people use my
23  terminal.

1  BY MS. NELSON:
2  Q  E-mail from who?
3  A  Ma'am, I didn't hear you.
4  Q  Who did you get a E-mail from?
5  A  Lieutenant Woodham.
6  Q  Okay.  So you got a E-mail from
7  Williamson?
8  A  Yeah.  Something to the effect of
9  cautioning me about letting somebody else
10  use my terminal.  It interferes -- something
11  having to do with possibly interfering with
12  my work.  And I don't know the exact
13  wording.  But it was almost a cautioning
14  letter of letting -- about helping RaMonica.
15  Sometime after that incident, I know
16  that RaMonica wrote a letter to Chief John
17  Powell about the way that any time that we
18  -- and I say we, myself and RaMonica and the
19  other black officers would gather together
20  or someone would be helping another one,
21  that there would be a problem.
22  And let me back up a little bit, too.
23  Try not to be confusing.  Also in the E-mail

## Page 181

1  it stated that there had been a complaint
2  about Carney being up in CID, which I was
3  not aware of. But Carney wrote a letter to
4  the Chief telling him that she felt like any
5  time that myself and her would ever -- if I
6  was helping her, that there was a racial
7  discrimination issue there, any time that we
8  -- I tried to help her or another black
9  officer was up in CID and any time we
10  gathered to do some police department work.
11  It was not a situation where she was doing
12  work on a CID case. She just needed to know
13  how to type up a warrant fact sheet. And it
14  was after my hours when I helped.
15     Q   How do you know she wrote a
16  letter, she, RaMonica?
17     A   Because I saw the letter.
18     Q   Okay?
19     A   And I had a copy. I have a copy
20  of the letter. Well, I don't have it now.
21  My attorney has a copy of the letter that
22  she wrote.
23          MS. NELSON: Have you provided

## Page 182

1  that, too?
2          MS. ROBERTSON: Yeah. I can't
3      swear to it. But I have -- If she gave
4      it to us, we gave it to you. Because, I
5      mean, I would have written you about
6      anything we were holding back.
7  BY MS. NELSON:
8     Q   Okay. And you said you saw the
9  letter. How did --
10     A   Letter complaining about racial
11  discrimination and --
12     Q   And you said it was to John
13  Powell?
14     A   Yes.
15     Q   And how do you know that she --
16  Do you know for a fact that John Powell
17  received it?
18     A   No, but I believe he received it.
19  I wasn't standing there when it was given to
20  him.
21     Q   You've seen the letter. You
22  can't testify whether or not he actually
23  received it?

## Page 183

1     A   No. But according to her, she
2  gave it to him.
3     Q   Okay. But you're saying that you
4  had already been informed that you -- by
5  Woodham that you were about to be
6  transferred to Vice; is that correct?
7     A   Somewhere around that time, yeah.
8     Q   Okay. Now, did you -- I think
9  before the break, you had indicated that you
10  talked to Chief Powell yourself about -- I
11  think you were testifying about the
12  assignment of your duties in respect to
13  Rhett Davis' duties. Do you recall that?
14     A   Yes.
15     Q   Okay. And your last testimony is
16  that when you talked to Chief Powell, he
17  would look into it?
18     A   Yes.
19     Q   Okay.
20     A   But look into the complaints that
21  I said that were occurring based on my sex
22  and race while up in CID. That's what I
23  talked to him about.

## Page 184

1     Q   Okay. And then to your
2  knowledge, did he look into it?
3     A   I don't know whether he looked
4  into it or not.
5     Q   Okay. Did he ever get back with
6  you?
7     A   I was transferred to Vice, so I
8  -- We talked a couple other times but -- And
9  I gave him a couple of documents of
10  complaints and examples of how I was being
11  treated different.
12          (Whereupon, Defendant's
13      Exhibit No. 32 was marked and
14      attached to the deposition.)
15  BY MS. NELSON:
16     Q   Okay. This is the document. I
17  will mark Defendant's Exhibit 32, which was
18  produced by plaintiff, Bates 164. It's
19  labeled Officer Sylvia Summer's Criminal
20  Investigation Division. Is this something
21  you prepared, Defendant's Exhibit 32? Do
22  you recognize that document?
23     A   Yes.

46 (Pages 181 to 184)

1    Q   I know you're reading it. But is
2  that a document that you were referring to
3  that you prepared?
4    A   That's one of the documents.
5    Q   And did you present that to Chief
6  Powell or what did you do with that?
7    A   I presented some documents to
8  Chief Powell in reference to complaints of
9  being treated differently.
10   Q   Okay.
11       MS. ROBERTSON:  She wants to
12   know do you remember giving that to him.
13   Q   Did you give Defendant's Exhibit
14  32 to Chief Powell or did you just document
15  that?
16   A   No, I believe that was one of
17  documents that I gave to him.
18   Q   You're not sure, but you think it
19  might be?
20   A   Yes.
21   Q   Okay. And when did you -- do you
22  know when you prepared that?
23   A   No, I don't.

1    Q   Okay. It's not dated; is that
2  correct? It has no date on it?
3    A   No.
4    Q   No, it does not have?
5    A   No, it's not dated.
6    Q   Okay?
7    A   There's not a date showing on it.
8    Q   I'm sorry. Do you know -- Do you
9  recognize -- Is that like on a computer or a
10  typewriter or --
11   A   Possibly a computer.
12   Q   Okay. Do you have a computer at
13  your house?
14   A   I had a computer at my house.
15   Q   And it looks like one that --
16  what I'm calling these little circles, looks
17  like little bullet points that I'm calling
18  it. One, two, three, four, five -- like,
19  six paragraphs or bullet points. The first
20  one, she accused me of talking to people
21  about my cases. She, is that Willie
22  Williamson?
23   A   Yes.

1    Q   She changed my access so I could
2  no longer view assignments. She, being
3  Willie Williamson?
4    A   Yes.
5    Q   And what access did she change in
6  that you could not view assignments? Who --
7  Just can you tell me what that means?
8    A   When you log into your computer
9  terminal under your access code for
10  whichever division you're assigned to,
11  initially, it was one way and later on it
12  was changed so that I could not view the
13  cases that I was assigned, when before I
14  could. And everybody else could. Let me
15  rephrase that. Several other people could
16  view it because that's the way it was in the
17  beginning. And then all of the sudden, mine
18  was changed to where I could not see what my
19  assignments were.
20   Q   You couldn't see your own
21  assignments or other's assignments?
22   A   That's what I'm referring to, the
23  way things were then.

1    Q   It's your testimony your computer
2  access was changed and you could not review
3  you own assignments?
4    A   I was talking about the
5  assignments that were -- Some of them were
6  my assignments is what I'm referring to.
7  I'm trying to understand exactly --
8    Q   Well, I don't --
9    A   -- what you're asking me.
10   Q   Then if you had work to do -- I
11  mean, tell me what kind of assignments? I
12  don't know what kind of assignments you're
13  talking about.
14   A   You could log into the computer
15  system and see all your cases, the cases
16  that were assigned to you. Not everybody
17  else's, but your cases that were assigned to
18  me, as an investigator.
19   Q   Okay?
20   A   And that's what I was referring
21  to.
22   Q   And you're saying -- your
23  testimony is you couldn't even see the cases

Page 189

1   assigned to you?
2       A    No.  That's not what I'm
3   testifying to.
4       Q    Okay.
5       A    I'm saying that it was changed
6   from what it originally was.
7           MS. ROBERTSON:  Changed from
8       what to what?
9           THE WITNESS:  I'm trying --
10          MS. ROBERTSON:  I know.
11      Because you're just not being very
12      clear.
13  BY MS. NELSON:
14      Q    Are you saying you used to pull
15  it up and you could see what everybody was
16  doing and they changed it and you could only
17  see yours?
18      A    No.  I'm saying before I could
19  pull it up, and pull up my cases, the things
20  that pertained to me, the cases that I was
21  assigned to.  And then after she changed it,
22  I could no longer view that part.  I could
23  only view whatever it was that was left.  I

Page 190

1   could not pull my cases up again.  I was not
2   trying everybody else's cases, just my
3   caseload, how many cases were assigned to
4   me.
5       Q    When you said what was left, so
6   these would have been, like, completed cases
7   or closed cases?
8       A    It includes all the cases that
9   just -- that are assigned to that person.
10          MS. ROBERTSON:  She wants to
11      know after she did whatever she did to
12      change it, what could you see then?
13          THE WITNESS:  I couldn't view
14      the cases that I could previously view
15      before it was changed.
16  BY MS. NELSON:
17      Q    Well, were these cases you were
18  working on?  How did it impact your job, the
19  fact that you could not view these cases?
20      A    I was showing the differences in
21  how things were and how they had changed
22  after the complaints were made.  How did it
23  affect my job?  I couldn't pull up to see

Page 191

1   what cases that were assigned to me, and
2   certain tasks that I was trying to view that
3   I could view before.  But after the access
4   was changed, I could not view that.  I don't
5   know how to make you understand that.
6       Q    Well, I'm having a hard -- it's
7   your understanding that she, Willie
8   Williamson, changed your access because you
9   had complained about the --
10      A    That's not what I'm saying.
11      Q    Okay.  What --
12      A    You asked me about --
13      Q    Why do you claim she changed your
14  access?
15      A    The only way -- the way I can
16  answer that question right now is that is a
17  partial document.  There was another
18  document or other documents that was along
19  with that.  That's just a partial document.
20      Q    Okay.  What -- Well, while we've
21  got this one in front of us, I'm just trying
22  to understand Number 1, what this is.  These
23  appear to be like notes that you made on the

Page 192

1   computer.  We've establish that; is that
2   correct?
3       A    Okay.
4       Q    And you think you might have
5   given this to the Chief, but you're not
6   sure?
7       A    I gave the Chief several
8   documents.
9       Q    Okay?
10      A    Some of the documents set
11  examples like what's listed on that paper.
12  But I'm not going to sit here and tell you,
13  well, this is the exact document that I gave
14  him.  I can't sit here and tell you that.
15      Q    Okay.  When you prepared
16  Defendant's Exhibit 32, were you still
17  working in CID?
18      A    Yes.
19      Q    And do you remember when you
20  transferred to Vice?
21      A    No.
22          (Whereupon, Defendant's
23      Exhibit No. 33 was marked and

Page 193

1  attached to the deposition.)
2  BY MS. NELSON:
3      Q   Okay.  Let me show you
4  Defendant's Exhibit 33.  Okay.  Another
5  bullet.  It says:  She does not speak to me
6  in passing and will walk on the other side
7  of the room.  Who are you talking about?
8      A   Willie Williamson.
9      Q   Okay.  On July 19, 2005, she made
10  the following statement to Rhett Davis:  I
11  have something to tell you but I will wait
12  until you are not in there.  No one else was
13  present and Rhett -- in my office except
14  Sergeant Williamson, Rhett and me.  This let
15  me know that she obviously had a strong
16  dislike for me.  And, again, I feel it is
17  racially motivated.  Did you write that?
18      A   Yes.
19      Q   And --
20      A   I didn't physically handwrite it.
21  But, yes, I'm agreeing with what you're
22  talking about.
23      Q   Well, I mean, did you type -- You

Page 194

1  typed this out?
2      A   Yes.
3      Q   Okay.  And you just -- you felt
4  like that Willie Williamson did not -- she
5  had a dislike for you?
6      A   Yes.
7      Q   Okay.  And it's your feeling that
8  it was racially motivated?
9      A   Yes.
10      Q   Based on what?
11      A   Several incidences that happened
12  when I worked under Willie's supervisor.
13      Q   Well, you told me about the
14  assignments that Rhett got versus what you
15  got.  You feel like that was because of your
16  race?
17      A   Yes.  There were other
18  incidences.
19      Q   Okay.  And what were the other
20  incidences?
21      A   I can't sit here and tell you
22  every last one of them.  But I'm sure there
23  were others.  Let me correct that.  Let me

Page 195

1  correct what I just said.  The only
2  difference, like I said, between me and
3  Rhett was that he was male and I was female.
4  We came around the same time.  In CID, he
5  didn't have any schooling, CID schooling,
6  that I didn't have.  And we were both green
7  coming in.  I'll use that as an example.
8      Q   Okay.  You've told me that.
9  Anything else?  He got assignments that you
10  felt like you didn't get?
11      A   No, that's not what I'm saying.
12  I'm saying I was treated -- We got two with
13  about the same training when it was
14  different but we're being treated completely
15  different.  I'm being ostracized and treated
16  different.  The only difference is --
17  There's other females up in there.  There's
18  herself and there's Brandy.  But I'm not
19  being treated the way they are.  I'm being
20  ostracized and being set aside and not
21  allowed to -- afforded the same
22  opportunities that a person that came in,
23  who doesn't have that type of training, he

Page 196

1  does get to do those -- does get those
2  opportunities to learn, to experience, and
3  to go out and do things.  When I asked about
4  why Rhett is allowed to go out and
5  investigate things but I have to stay in the
6  office, I wasn't given an answer.  It was
7  just, well, that's the way things are right
8  now.  You'll get a chance, too.
9      Q   Who did you ask about that?
10      A   I asked Williamson about it.  I
11  asked Woodham about it.
12      Q   Okay.
13      A   And I've asked others about it.
14      Q   You state here that you were told
15  that you could not visit with Sergeant Keith
16  Gray in his office anymore because I was
17  allegedly spending too much time there or
18  I'd be written up.  Who told you that?
19      A   Roy Woodham.
20      Q   Okay.  And do you know when he
21  told you this?
22      A   No, I don't.
23      Q   It was while you were in CID?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

1    A   Yes, it was.
2    Q   Were you spending time in
3  Sergeant Keith Gray's office?
4    A   My reference in that was when I
5  was called over to Internal Affairs to be
6  asked questions.  And, no, I was not
7  spending too much time in Sergeant Gray's
8  office.  If I was over in Internal Affairs,
9  it was because I was called over in Internal
10  Affairs.
11    Q   And what would you have been
12  called over to Internal Affairs about?
13    A   An internal investigation, a
14  complaint, to see if I knew anything about
15  other incidences.  I could have been called
16  over there for several different reasons.  I
17  can't sit here and tell you each and every
18  time I was called over there.
19    Q   Were you supposed to let somebody
20  know when you went over there to Internal
21  Affairs if it took time away from your work?
22    A   If it was going to take a long
23  time for me to go -- No, I didn't have to

1  just tell somebody if I left the building.
2  But I don't recall having to tell somebody
3  that, oh, I'm going -- I've got to go over
4  to Internal Affairs.
5    Q   How often do you think you spent
6  in Chief Gray's office?
7    A   I don't know.
8    Q   Do you know how many times you
9  went over there?
10    A   No, I don't.
11    Q   And you also state here that:  I
12  received two E-mails from Lieutenant Woodham
13  regarding Officer RaMonica Carney being seen
14  in my office on different occasions.  The
15  E-mails instructed me not to allow another
16  officer to use my computer terminal because
17  it was a violation of CID policy on terminal
18  use.  Was that what you testified to
19  earlier?  That RaMonica Carney had come to
20  your office get your help on -- What did you
21  say?  Faxing a warrant, completing a
22  warrant?
23    MS. ROBERTSON:  Completing a

1  warrant fact sheet.
2    Q   A warrant fact sheet?
3    A   Yeah.  She came to my office for
4  that reason, after hours, for me to help her
5  on that warrant fact sheet.
6    Q   Okay.  This says you received two
7  E-mails from Woodham regarding Carney being
8  seen in your office on different occasions.
9  Would she have come to your office on more
10  than one occasion?
11    A   She could have.  But I don't
12  remember that.
13    Q   One of the E-mails also made
14  reference to an incident involving Officer
15  Carney in a previous problem with her in
16  CID.  What are you referring to there?
17    A   That didn't involve me.  That was
18  something having to do with her and another
19  investigator.
20    Q   Okay.  And, again, you're just
21  not sure what you did with No. 32,
22  Defendant's Exhibit 32?
23    A   As I said before, I gave the

1  Chief more than one document, several
2  documents having examples of -- with a
3  complaint about racial discrimination with
4  bullets like that.  That is possibly one of
5  the documents -- copies of one documents
6  that I gave him.
7    Q   But you didn't -- That's not
8  written on a PD-12, is it?
9    A   No, it's not.
10    Q   And that's generally the way you
11  would communicate with the Chief?
12    A   Not always.
13    Q   I'm going to show you what's
14  marked as Defendant's No. 33.  See if this
15  will refresh your memory as to when you went
16  to CID.  Excuse me.  Strike that.  From the
17  time you went from CID to Vice.  Does that
18  refresh your memory?
19    A   It has a date on there.  Yes.
20    Q   Okay.  And it's October 20, 2005?
21    A   Yes.
22    Q   Do you have any reason to
23  disagree with that?

Page 201

1  A  No.
2  Q  Did -- You're saying that that
3  was not -- Was that a promotion or a lateral
4  move?
5  A  A lateral move.
6  Q  Okay?
7  A  My understanding.
8  Q  And who --
9  A  There was no monetary gain to my
10 knowledge.
11 Q  What were your --
12     MS. ROBERTSON:  That's usually
13 where I start if someone tells me they
14 don't know if it's a promotion or not.
15 Did you get more money?
16     MS. NELSON:  There can be
17 promotions without money.
18     MS. ROBERTSON:  Yeah.  But I
19 think it's always a good starting point.
20 BY MS. NELSON:
21 Q  What were your duties when you
22 moved to Vice?  What was your job when
23 you -- What was your job when you moved to

Page 202

1  Vice?  Let me ask you that?
2  A  As an investigator.
3  Q  And is being in Vice similar to
4  being in CID?  Just tell me how were your --
5  how were your duties different when you
6  moved to Vice as opposed to what you were
7  doing in CID?
8  A  Because Vice Division usually
9  investigates drug activity.
10 Q  Okay.  And so you were
11 investigating -- You were an investigator
12 investigating drug activity; is that
13 correct?
14 A  That's one of the duties, yes.
15 Q  Okay.  Can you tell me the other
16 duties?
17 A  Making undercover buys, doing
18 surveillance, obtaining search warrants, and
19 other things.
20 Q  And who was your supervisor in
21 Vice?
22 A  Andy Martin was one of them.  And
23 Governor Jackson was another one.

Page 203

1  Q  Okay.  How many other
2  investigators were there in Vice?
3  A  I don't know.
4  Q  Did you have any complaints while
5  you were in Vice as to how you were treated?
6  A  Did I have any complaints?  What
7  do you mean?
8  Q  Any complaints while you worked
9  in Vice as to how you were treated?
10 A  Are you asking me did I complain
11 on anybody in Vice for treating me in any
12 way that I didn't like?
13 Q  Yes.
14 A  No.
15 Q  I mean, were you happy working in
16 Vice?
17 A  It was fine working in Vice.
18 Q  Okay.  And how long did you work
19 in Vice?
20 A  I don't know.  It was a short
21 time.  But I don't know.
22 Q  Okay.  And why did you leave
23 Vice?

Page 204

1  A  Because I had incident with my
2  property being messed up, my kids getting
3  sick, myself getting sick.  I missed call
4  out twice due to that.  The house flooded.
5  Red cross had to put my family up in the --
6  at a hotel.  And just a lot of stuff -- a
7  lot of stuff going on then.
8  Q  When you say you missed call out,
9  that means you missed work?
10 A  No.  It means after hours, if
11 they need a Vice investigator to come out
12 and answer a call after the patrol officer
13 has made contact, they have to call you.
14 Then you have to come out and go out the
15 scene.  During the time when I missed call
16 out, there was a mold infestation in my
17 apartment.  My apartment was flooded.  One
18 of my children was real sick and went into
19 the hospital.  Having to find somewhere for
20 my kids to stay, take care of my property,
21 forgot what's going on, and getting sick
22 myself caused me to miss call out.
23 Q  And because you missed call out,

51 (Pages 201 to 204)

**Page 205**

1  were you disciplined?  Did they feel like
2  they couldn't rely on you, that you needed
3  to find another job that was not as
4  critical?
5      A   I can't tell you what they felt
6  like.
7      Q   But because you missed call out,
8  were you encouraged to transfer elsewhere?
9  Did they transfer you elsewhere?
10     A   I was transferred back to Patrol.
11     Q   And who informed you of that?
12     A   Governor Jackson.
13     Q   And what did he tell you?
14     A   I don't remember exact words.
15  But something to the effect that I got all
16  this going on and child sick and missed call
17  out, so I'm going to be transferred back to
18  Patrol Division.
19     Q   Okay.  Did you feel like that
20  that was racial discrimination or sex
21  discrimination?
22     A   I felt like I had a lot of things
23  going on with my family, and that might be

**Page 206**

1  the best thing at the time.
2      Q   So you did not feel that it was
3  race or sex discrimination, did you?  It was
4  a legitimate reason that Governor Jackson --
5      A   I didn't have a problem with his
6  decision.
7      Q   Okay.  And so you went back -- I
8  would object to counsel --
9          MS. ROBERTSON:  I was asking
10     her a question about something
11     unrelated.  I'm sorry.
12     Q   So you went back to Patrol; is
13  that correct?
14     A   Yes.
15     Q   And do you know when that took
16  place?
17     A   No.
18     Q   And who was your supervisor in
19  Patrol when you went back to Patrol?
20     A   I don't remember which one was my
21  supervisor at the time.  I don't remember
22  which squad I went back to.
23     Q   Does -- During the time that you

**Page 207**

1  were supervised by Sergeant Nelms?
2      A   Yes.
3      Q   Does that refresh your
4  recollection that he was your supervisor?
5      A   He was one of my supervisors,
6  yes.
7      Q   Do you remember any others when
8  you went back to Patrol?
9      A   There were other supervisors.
10  Now, if there's a document or something that
11  I can look at -- Which squad are you
12  referring to?  What are you asking me about?
13     Q   Well, I'm asking you questions.
14  I'm trying to follow the different moves you
15  made in your employment.  Do you recall
16  working on the Sixth Squad?
17     A   I recall working on Nelms' squad.
18     Q   Nelms?  But you don't --
19     A   But I can't tell you which one --
20     Q   -- really know them by name?
21  Excuse me.  You remember Nelms.  You don't
22  remember which number it -- which number
23  squad it was; is that correct?

**Page 208**

1      A   No.
2      Q   Okay.  And besides Nelms, do you
3  know who else was supervisors at that --
4  around that time?
5      A   Baum was a supervisor on that
6  squad, I believe.
7      Q   Baum?  Okay.  And do you remember
8  Nelms giving you a performance evaluation
9  where he was concerned that you failed to
10  perform some necessary duties on calls on
11  occasion and relies on supervisors too much
12  for making decisions?
13     A   May I see it?
14     Q   Well, I'm first asking do you
15  remember --
16     A   He could have given -- He, more
17  than likely, gave me an evaluation.  But I
18  don't know what evaluation you're talking
19  to.  Did I receive an evaluation?  Yeah.  We
20  get an evaluation on the squad.
21     Q   No.  I'm asking if you remember
22  Nelms telling you that you relied too much
23  on supervisors?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

# FREEDOM COURT REPORTING

| Page 209 | Page 211 |
|---|---|

**Page 209**

1     A  No, I don't remember Nelms
2 telling me that.
3     Q  Okay. Do you remember any of
4 your supervisors telling you that at that
5 time when you transferred?
6     A  They could have told me that.
7 But I don't remember them telling me that.
8     Q  Okay. Do you feel like you did
9 rely on -- have to rely on supervisors?
10     A  No, I do not.
11     Q  Do you remember them ever
12 commenting that you had good qualities but
13 that they were overshadowed by your lack of
14 confidence and mistakes? And that you
15 needed to improve your dependability and
16 decision making? Do you remember that being
17 discussed with you?
18     A  I remember them making some
19 comments. But what their comments were, no,
20 ma'am, I do not.
21     (Whereupon, Defendant's
22     Exhibit No. 34 was marked and
23     attached to the deposition.)

**Page 210**

1 BY MS. NELSON:
2     Q  You don't remember that? Let me
3 show you this evaluation, Defendant's
4 Exhibit 34, and see if that can refresh your
5 recollection? That's an evaluation to you
6 dated May of 2006; is that correct? You
7 signed that particular evaluation; is that
8 correct? Back on June 1, 2006?
9     A  Yes, that's my signature.
10     Q  Okay. And you got all
11 satisfactories other than the one
12 unsatisfactory dealing with the comment that
13 I read, relying too much on supervisors to
14 make decisions; is that correct?
15     A  Yes.
16     Q  And do you remember who
17 administered or gave you this evaluation?
18     A  No, I don't.
19     Q  Okay.
20     MS. ROBERTSON: That's who made
21 the evaluation.
22     THE WITNESS: She asked me if I
23 knew which one of them presented it to

**Page 211**

1 me. I don't remember which one, but one
2 of them gave it to me.
3     MS. ROBERTSON: Well, I don't
4 think that was her question.
5 BY MS. NELSON:
6     Q  Well, I mean does somebody
7 generally sit down with you and discuss the
8 evaluation?
9     A  Yes.
10     Q  Okay. And I know some of these
11 signatures are hard to read. But I believe
12 the evaluating supervisor was Sergeant
13 Nelms. And then it was reviewed by
14 Lieutenant Drone?
15     A  Evaluations aren't always just
16 sat down and -- when you say discuss,
17 discuss the whole thing. They hand you your
18 evaluation sometimes. You see what it is,
19 sign it or don't sign it if you any
20 questions or anything. If not, then you go
21 back to work.
22     Q  Okay?
23     A  So it's not always discussed.

**Page 212**

1     Q  Okay. Well, did you have any
2 concerns that he stated that you lacked
3 confidence and relied too much on
4 supervisors to make decisions?
5     A  What do you mean did I have any
6 concerns? About what he said about me?
7     Q  Yes.
8     A  I didn't like what he said about
9 me. But that's his opinion.
10     Q  Okay?
11     A  But those aren't the only
12 comments that he had said.
13     Q  He had some good things to say
14 about you, didn't he?
15     A  He always had some bad things to
16 say about me.
17     Q  What were the other bad things?
18     A  Referred to me as a troublemaker.
19 Don't bring any trouble to his squad. And I
20 had never worked for him before.
21     Q  And when did he tell you this?
22     A  When I came to him with a
23 complaint on what I felt like was a officer

53 (Pages 209 to 212)

Page 213

1  safety issue from a dispatcher, something
2  that the dispatchers did. He told me he
3  didn't want to hear that shit. Just go out
4  and do your job. Let me handle the
5  dispatchers. So I told him anyway about
6  whatever the incident was. And he still did
7  not want to listen. So at some point, he
8  did not want to listen to any complaints
9  coming from me.
10    Q   Okay. Did he listen to
11  complaints from anybody else?
12    A   I don't know what he listened to
13  with anybody else.
14    Q   Okay. Did you discuss with him
15  your concern that you were marked
16  unsatisfactory?
17    A   I could have.
18    Q   Okay. Do you remember discussing
19  with anyone else your concerns about this
20  evaluation?
21    A   No, I don't remember discussing
22  anything anybody else.
23    MS. ROBERTSON: Keep your voice

Page 214

1  up.
2    A   No, I don't remember discussing
3  anything with anybody else.
4    Q   Do you remember talking to Chief
5  Powell or going to Chief Powell to talk
6  about this evaluation?
7    A   No, I don't remember talking to
8  him about this evaluation.
9    (Whereupon, Defendant's
10    Exhibit No. 35 was marked and
11    attached to the deposition.)
12  BY MS. ROBERTSON:
13    Q   I'm going to show you what I've
14  marked as Defendant's Exhibit 35.
15    MS. ROBERTSON: Does anybody
16  have any headache aspirin or Excedrin
17  or --
18    MS. NELSON: I don't.
19    MS. ROBERTSON: Can we take a
20  five-minute bathroom break? I was
21  flying back from lunch. Whenever you
22  get at a point that you're comfortable.
23  I mean, it doesn't matter. I mean, it

Page 215

1  can wait.
2    MS. NELSON: I mean, can I just
3  be giving her this document? She didn't
4  remember going to Chief Powell. And I
5  was going to show her Exhibit 35 --
6    MS. ROBERTSON: Sure.
7    MS. NELSON: -- and ask her to
8  review and identify that. Well, I'll
9  hold off questioning her if you want
10  to --
11    MS. ROBERTSON: No. No. I was
12  just -- I just need to go the bathroom.
13  We can ask her about this, because I
14  don't want to interrupt the --
15    MS. NELSON: I'm not quite
16  finished. Okay.
17  BY MS. NELSON:
18    Q   Does that refresh your memory
19  that you wrote this --
20    A   Yes.
21    Q   -- about your evaluation that I
22  had just previously asked you about?
23    A   Yes.

Page 216

1    Q   Okay. And, again, this is a
2  PD-12 to John Powell; is that correct? On a
3  PD-12 form?
4    A   Yes.
5    Q   And that's your signature on Page
6  3; is that correct?
7    A   Yes.
8    Q   And I guess the crux of your
9  evaluation -- I'm going to -- was that you
10  didn't -- you felt like your review, you
11  performance review was not fair and
12  objective; is that correct?
13    MS. ROBERTSON: Object. You
14  can go ahead.
15    Q   Was that -- therefore -- I'm
16  looking at your very last sentence.
17  Therefore, I don't feel that they were fair
18  and objective when doing my evaluation. Is
19  that what that last sentence says?
20    MS. ROBERTSON: But she said
21  one time not fair in Vice. And then one
22  time she says it's not fair and
23  impartial.

54 (Pages 213 to 216)

Page 217

1    MS. NELSON: Well, I'm reading
2  the last -- Okay.
3  BY MS. NELSON:
4    Q   But not in one place in there do
5  you speak anywhere in here about being
6  discriminated against because of your race
7  or your sex, do you?
8    A   No, I didn't put it in there.
9    Q   Now, I'm looking at Paragraph 3
10  where it -- Let me back up. You say in the
11  second paragraph that you got a two on your
12  evaluation, which is satisfactory; is that
13  correct? And you claim that you didn't
14  think the evaluation was fair and unbiassed
15  due to the supervisor's unwillingness to
16  help you with complaints and --
17    A   Okay. I see that there.
18    Q   I mean, I can't read your
19  writing?
20    MS. ROBERTSON: I think it says
21  conflicts.
22    Q   And conflicts that I have sought
23  their assistance on. And then you go on to

Page 218

1  say the complaints were in reference to
2  situations which put your safety and the
3  safety of your family at risk. What are you
4  referring to there?
5    A   Complaints about the dispatchers
6  when it came to not answering me on the
7  radio, or in particular situation where I
8  had -- I was out with a guy that was covered
9  from head to toe -- not going to emergency.
10  That situation was a higher-risk situation.
11  Not going to emergency traffic. And they
12  just sent a regular backup officer from the
13  other side of the city to come over.
14  Different incidences that --
15    Q   Okay?
16    A   -- were happening that wasn't
17  happening to the guys. It was only
18  happening to the females.
19    Q   Okay. Well, let me stop and ask
20  you, I'm not following your complaint about
21  the -- you said dispatchers would not answer
22  you? What dispatchers do you claim were not
23  answering you?

Page 219

1    A   I can't remember the names right
2  now. But I complained to even Captain
3  Dronner on some incidences where I had to
4  give him some names or dates on particular
5  incidences that happened with one of the
6  dispatchers or another dispatcher, but not
7  just one particular dispatcher.
8    Q   Well, is there one particular
9  dispatcher?
10    A   I can't remember their name.
11    Q   Do you remember a particular
12  incident? I mean, when say you call on your
13  radio to dispatch? Ma'am, I'm not a police
14  officer. I don't ride around in a car. I'm
15  trying to understand what you're telling me.
16  I want to make sure I understand your
17  testimony and what you mean that somebody
18  was not answering you. You're in your
19  patrol car and you have --
20    MS. ROBERTSON: Explain to her
21  what --
22    Q   -- you have radio?
23    A   Yeah. I'm going to try to --

Page 220

1    Q   Okay?
2    A   -- give you an example of what
3  I'm trying to say is.
4    Q   Okay?
5    A   When officers call on out on the
6  radio, say, if you've got three officers.
7  Officer Number One calls out. There's a
8  pause. Officer Number Two calls out. And
9  if there's another officer that calls out,
10  the dispatcher is going to answer the first
11  officer that calls out and then the second
12  one in the order that they call in.
13  Usually, it's a courtesy you wait. Let them
14  answer. But there are times when the
15  dispatcher -- I call out first. A couple of
16  other units call out afterwards. And she
17  ignores my call out -- and I'm out on
18  something that I felt was a safety risk --
19  and answer the other officers, and not even
20  acknowledge that I called out.
21    Q   Okay. Who are you talking about
22  that ignored you?
23    A   One of the dispatchers.

55 (Pages 217 to 220)

Page 221

1    Q    A female? You said, she ignored
2    me.
3    A    I'm not talking about one
4    particular person.
5    Q    You're saying all the
6    dispatchers?
7    A    I'm not saying all the
8    dispatchers. I'm saying I cannot tell you
9    the exact ones. But it was more than one
10   that this had happened with.
11   Q    But you can't give me any names
12   or dates?
13   A    No. But I turned in writing to
14   Captain Drone.
15   Q    And when did you turn that in?
16   A    On one of the incidences, I asked
17   to see the Captain about whatever problems
18   that was going on after I felt like it
19   wasn't being looked into by the supervisors.
20   Q    Did you give me the document that
21   you talked about where you wrote to Captain
22   Drone?
23   A    No, I don't have a copy of that

Page 222

1    document.
2    Q    Did you give him a document or
3    just ask to talk to him?
4    A    I asked to talk to him. And he
5    asked for examples of what particular call
6    we was talking about. Because I asked him
7    to listen to the tape.
8    Q    Well, if it was serious enough
9    for you to take it to Captain Drone, it
10   seems like you would certainly remember the
11   situation or the date or the dispatcher that
12   you were complaining about. But you don't
13   remember any of that, do you?
14   A    I cannot tell you their names at
15   this time.
16   Q    Okay. Do you remember the
17   situation?
18   A    I just gave you an example of one
19   situation.
20   Q    Well --
21   A    Another situation is when I was
22   out, again, with a suspect on high-risk
23   stop. Instead of it going -- It should have

Page 223

1    been emergency traffic only. When you got a
2    person on the ground at gunpoint, then it
3    should have been the closest officer to the
4    person that's out with this threat to come
5    to back up that officer. But instead, the
6    backup was dispatched as regular patrol.
7    Q    And how do you know that?
8    A    Because you hear it over the
9    radio.
10   Q    How do you know -- What do you
11   say to the dispatcher that you've got an
12   emergency situation?
13   A    If I stop somebody or I run up on
14   a -- patrolling and stop, see a guy about to
15   enter a house or about to rob somewhere, and
16   I call out that, whatever the signal is for
17   it, if it's a Signal 9 in process or if it's
18   a firearms assault or a man with a gun,
19   certain calls automatically go to emergency
20   traffic only. That means only the person
21   that's out on -- only the primary person
22   would talk and the other person that's
23   going -- that's dispatched to it so that

Page 224

1    everybody is not talking on the radio at the
2    same time.
3    Q    And you're saying it's your
4    testimony you were calling in emergency
5    traffic, or what should have been emergency
6    traffic, but wasn't treated as such?
7    A    Yes.
8    Q    Okay. And what proof do you have
9    of that?
10   A    All the calls are recorded that
11   are dispatched out. So do I have a audio
12   tape or document laying here on the desk or
13   at home? No, I do not.
14   Q    Do you remember the suspect that
15   you had arrested or the person that you
16   arrested that you think this incident
17   happened?
18   A    Brian Shack was the suspect.
19   Q    How many times have you arrested
20   Brian Shack?
21   A    Once.
22   Q    Okay. And this is the same
23   fellow that stayed in jail for a hundred and

56 (Pages 221 to 224)

## Page 225

1    three days?
2        A    For ever how many days that he
3    was in jail.
4        Q    Is that the only occasion that
5    you felt like the dispatchers did not --
6        A    That's not the only occasion.
7    But you was asking me about an example or a
8    person's name.  And that's the -- one of the
9    names that I thought you of --
10        Q    It's your testimony --
11        A    -- that I know it happened.
12        Q    I'm sorry -- that you contacted
13    the dispatcher and you were not placed on
14    emergency traffic; is that correct?
15        A    I'm saying that the call should
16    have been treated as serious and it wasn't.
17    It was treated as regular.
18        Q    And how do you know it was
19    treated as regular?
20        A    Because of the way the -- the way
21    the backup was dispatched.  The officer that
22    responded was on the other side of Dothan.
23    And there were closer officers that could

## Page 226

1    have responded.
2        Q    And how do you know that?
3        A    Because you hear officers calling
4    out their location on the radio.  You hear
5    where they are or you just passed them
6    before you went into the area.  You know
7    who's working in your -- There are different
8    zones assigned.  So there's another zone
9    that's closer to your zone and a zone that's
10    across the city.
11        Q    And who was your backup that day?
12        A    The officer that responded was
13    Joey Evans.
14        Q    And where was he located?
15        A    I believe he was at South Oaks,
16    somewhere near South Oaks and the Circle,
17    somewhere down on the south side.
18        Q    And where were the other officers
19    that you contend should have been there,
20    should have come?
21        A    I'm saying there were officers
22    that were closer.  There's -- In the zone
23    that I was in, the adjacent -- I don't know

## Page 227

1    who -- what officer was in that zone now.
2    But I'm saying the zone right next to it,
3    there's two officers in that zone.  Because
4    usually there's two officers.  Now, it may
5    be one.  But usually there's two officers in
6    that zone.  There was a closer zone to me
7    that somebody else could have come.  Prior
8    to that, there was a officer that was at the
9    Hobo Pantry, which was not far from where I
10    was.
11        Q    Do you know what that officer was
12    doing?
13        A    No, I do not.
14        Q    And you don't really know for a
15    fact if there were other officers in a
16    closer zone, do you?
17        A    There should have been.
18        Q    I understand you're saying there
19    should have been or there are closer zones.
20    But you don't know of any officer that --
21    you can't identified any particular officer
22    in a zone that was closer than Officer
23    Evans, do you?

## Page 228

1        A    What I'm saying is, on my way to
2    the area where he was arrested at, I passed
3    a couple of officers who were -- Now, who
4    the officers were or what car it was, the
5    exact number of the car, the officer's
6    identity, there were a couple of officers
7    that I passed on the way to that area that
8    was just down the street.
9        Q    You don't know who they were, or
10    --
11        A    No, ma'am, I don't.
12        Q    -- color they were, or where they
13    were going, or what their responsibilities
14    were at that time, do you.
15        A    No, I don't.
16        Q    Now, are you claiming -- Do you
17    know the dispatchers?
18        A    No, I do not know all the
19    dispatchers.
20        Q    You don't know any of the
21    dispatchers?
22        A    Do I -- I did know some of them.
23        Q    Okay?

## Page 229

1    A   But on a personal basis, no, I
2    didn't know any of them. But can I tell you
3    each and every dispatcher that worked during
4    my career down here at the City of Dothan?
5    No. Can I tell you a couple of names of the
6    dispatchers that I knew over there? I mean,
7    what are you asking me to tell you?
8        Q   Well, you're saying dispatchers
9    weren't answering your call. Do you feel
10   like they have any reason not to answer your
11   call or provide you the most efficient,
12   safest backup that they could?
13       A   I'm saying that some of the
14   dispatchers, or a few of the dispatchers,
15   had problem with the women officers that
16   worked there, and gave them a hard time on
17   the radio.
18       Q   And who are you talking about?
19   What dispatchers are you talking about?
20   Were they female dispatchers?
21       A   Yes.
22       Q   And what were their names?
23       A   I believe one of them's name was

## Page 230

1    Sherry. I don't know Sherry's last name.
2    But she no longer works for the City of
3    Dothan.
4        Q   Okay. Anybody else?
5        A   I can't remember their names.
6        Q   Other than that not going to
7    emergency, any other complaints about what
8    the dispatchers were doing? You said they
9    gave you hard time or they gave the women a
10   hard time. In what other ways?
11       A   The way they talked to the female
12   officers.
13       Q   How did they talk?
14       A   Skipping -- Ma'am?
15       Q   I'm sorry. Maybe you're
16   trying -- I said how did they talk to them?
17       A   Can we take a break now?
18       MS. ROBERTSON: Answer that
19   question on the table, then we will.
20       A   Okay. Not being courteous, being
21   snappy with them on the radio, answering
22   other officers, other male officers over the
23   female, different things like that.

## Page 231

1        MS. ROBERTSON: I really need
2    to go to the bathroom.
3        MS. NELSON: Okay. Take a
4    break.
5    (Whereupon, a short break was taken.)
6    BY MS. NELSON:
7        Q   I was asking you about
8    Defendant's 35, Ms. Summers?
9        A   Okay.
10       Q   I'm going to try to move on. We
11   talked about the -- talked about the
12   dispatchers. I think you previously
13   testified that Nelms said that -- something
14   to the effect that he didn't -- if you tried
15   to speak to him, he said he didn't want to
16   hear it. Do you job. And let me
17   handle the other parties. You went on to
18   say when there was a conflict during the
19   shift and I sought the assistance of my
20   supervisors, they were unwilling to hear
21   both sides. What are you -- what type of
22   conflict are you talking about?
23       A   I had complained to Sergeant

## Page 232

1    Nelms and Sergeant Baum about the way the
2    dispatchers and -- And I'm not trying to be
3    difficult or nothing like that. But I'm
4    trying to remember a couple of the
5    dispatchers. I believe that it was like
6    three dispatchers that I had problems with.
7    One of them, I think, was Sherry. And I
8    don't know right offhand what the other two
9    dispatcher's names were.
10       Q   Okay. Were they female?
11       A   Yes. Things like not -- They
12   would complain about me not talking loud
13   enough on the radio. But if I came to he or
14   Sergeant Baum about, did you hear this last
15   call I was on, or did you hear the way the
16   dispatcher acted towards me, he didn't want
17   the hear it. And if you come in trying to
18   -- I felt that he should listen to both
19   sides of it. If I have a complaint, at
20   least look into it. Listen to the tape of
21   the call. Because my complaint was that
22   they were not -- they were treating me
23   different from the male officers on duty.

Page 233

1    Q  Okay. Because you said they told
2 you to speak up?
3    A  No. Because -- I'm trying to
4 give you examples of some of the incidences
5 that I complained about, which is: There's
6 a courtesy way of the speaking over the
7 radio. As I said before, by the first
8 officer calling in. If I called in, then
9 they would answer another male officer and
10 not answer me. And these are types of
11 complains that I kept telling them that,
12 listen. They're not answering me on the
13 radio. But yet when they complain about me,
14 you listen to what they say. I don't know
15 if this answers your question or not.
16    Q  And did they ever curse you or
17 use inappropriate language with you?
18    A  You don't cuss on the primary
19 radio. Not saying it never happens, but
20 it's not supposed to I'm not saying that
21 they cursed me out on the radio.
22    Q  Okay. I'm just trying to move
23 on. You said you requested -- I'm back on

Page 234

1 35. You requested to speak with Lieutenant
2 Drone?
3      MS. ROBERTSON: Which paragraph
4 are we on?
5      MS. NELSON: I'm on the bottom.
6 BY MS. NELSON:
7    Q  And that you met with Lieutenant
8 Drone and discussed some of the problems on
9 the shift. Did -- Do you remember meeting
10 with Lieutenant Drone?
11    A  Yes.
12    Q  Okay. And what did he say?
13    A  He said he would look into it.
14 He asked me, at some point in one of the
15 discussions, if I could tell him of an
16 incident or what calls am I referring to.
17 So I gave him a couple of examples of calls
18 that I had been on, and asked him to look
19 into.
20    Q  Okay. Do you know if he did?
21    A  I don't know.
22    Q  Okay. And I see a note on the
23 bottom there, there's a --

Page 235

1      MS. ROBERTSON: I think I had
2 turned the page.
3    Q  It says: Asked her how things
4 were going now on -- That's November 27,
5 '06. And it says fine. Do you remember
6 Lieutenant Drone getting back with you to
7 see how things were going later?
8    A  He could have. But, no, I don't
9 remember --
10    Q  You don't remember?
11    A  -- him getting back with me to
12 ask me about that.
13    Q  And the second page, you were
14 really just taking issue with the comments
15 in your performance evaluation on June --
16 around June the 1st, 2006; is that correct?
17 You said: I am not a unconfident patrol
18 officer who just comes to work and marks
19 time as Sergeant Baum referred to me during
20 my reception of my evaluation. I do not
21 rely on supervisors to make my decision. I
22 am confident in the decisions I make.
23 You're, in essence, just disagreeing with

Page 236

1 performance -- some of the --
2    A  I'm disagreeing with that part of
3 it.
4    Q  That part of the performance --
5    A  Yeah.
6    Q  -- review they gave you?
7    A  Them statements made in the --
8    Q  Okay?
9    A  -- performance review.
10    Q  But you still got a satisfactory.
11 You got a 2. You got a wage increase,
12 didn't you or an increase?
13    A  I could have. I'm referring to
14 the wage increase when I say I could have.
15    Q  Yeah. Now, when you were --
16      MS. ROBERTSON: Do you need to
17 stop to take that?
18      THE WITNESS: Yes.
19 BY MS. NELSON:
20    Q  Okay. When you were in Patrol or
21 in the Police Department, the Department had
22 some procedural, general orders; is that
23 correct?

59 (Pages 233 to 236)

Page 237

```
1    A   Yes.
2    Q   Okay.  Were you given a copy of
3  those?  Were they kept available for
4  everyone?
5    A   I believe I was given a copy.
6    Q   Okay.  And are -- were you
7  familiar with -- They're called PGOs; is
8  that correct?
9    A   Yes.
10   Q   Okay.  And do you know them by
11 number or --
12   A   No.
13       (Whereupon, Defendant's
14       Exhibit No. 36 was marked and
15       attached to the deposition.)
16 BY MS. NELSON:
17   Q   Okay.  Well, do you remember
18 receiving or familiar with a PGO dealing
19 with arresting and booking procedures,
20 PGO-511?  I will show it to -- I'm not --
21 I'm just trying to see what you remember
22 before I show you a document.  I'm getting
23 sort of a stare.  But I'll show you
```

Page 238

```
1  Defendant's Exhibit 36, which is PGO-511
2  dealing with arrests and booking procedures.
3  Have you seen that document before?
4    A   I've seen a PGO -- a reference
5  to --
6    Q   Reference to arrest and --
7    A   Yes.
8    Q   Yeah.  Okay.  And, also as an
9  officer in Patrol, are you familiar with a
10 rule regarding traffic citations that are
11 supposed to be submitted to the Magistrate
12 within forty-eight hours after a traffic
13 citation is issued?
14   A   Am I familiar with a rule?
15   Q   Yes, a rule or requirement?
16   A   I'm not sure what you mean by a
17 rule.  But about turning in tickets in?
18   Q   Yeah.  A rule about turning
19 tickets in within forty-eight hours after
20 they are issued?
21   A   I'm aware of the rule.
22   Q   Okay.  And you know that it's a
23 rule that all traffic citations are supposed
```

Page 239

```
1  to be -- Which, in essence, a traffic
2  citation or a uniform traffic citation -- I
3  think it's called a UTC; is that correct --
4  is suppose to be turned into the
5  Magistrate's office and sworn to within
6  forty-eight hours; is that your
7  understanding?
8    A   Yes.
9        (Whereupon, Defendant's
10       Exhibit No. 37 was marked and
11       attached to the deposition.)
12 BY MS. NELSON:
13   Q   Well, I'm going to show you
14 Defendant's Exhibit 37, and -- which is a
15 memo from Chief Powell to all personnel
16 regarding that particular rule about
17 forty-eight hours.  Have you seen that
18 before?
19   A   No.
20   Q   Never seen that?
21   A   I don't remember.
22   Q   Okay.  Well --
23   A   I don't remember seeing this
```

Page 240

```
1  particular document.
2    Q   But you --
3    A   But I understand what you're
4  talking about.
5    Q   Well, look through that.  And
6  it's Rule 19 of the Alabama Rules of
7  Judicial Administration, that is basically a
8  -- Are you familiar with Rule 19 at all,
9  which is the law that says it's a legal
10 requirement that traffic citations be turned
11 in to the Magistrates within forty-eight
12 hours?
13   A   Okay.  I didn't know about the
14 rule.  But I knew about turning in tickets
15 before forty-eight hours, if that makes
16 sense.
17   Q   Okay.  And you're not only
18 supposed to -- You're supposed to turn them
19 into the Magistrate's office.  And you're
20 also supposed to swear to them in front of
21 the Magistrate; is that correct?
22   A   Yes.
23   Q   Okay.  And also back to PG-511,
```

60 (Pages 237 to 240)

## Page 241

1    when you arrest somebody, the arresting
2    officer is responsible for filling out a
3    complaint; is that correct?
4        A   Yes.
5        Q   And then that complaint is
6    supposed to be sworn to in the Magistrate's
7    office; is that correct?
8        A   Yes.
9        Q   Now, you had mentioned earlier a
10   fellow that you arrested named Brian Shacks?
11           MS. ROBERTSON:  Shanks or
12   something.
13           MS. NELSON:  I think it's
14   Shack. S-H-A-C-K.
15           MS. ROBERTSON:  That's much
16   better than Shanks.
17   BY MS. NELSON:
18       Q   And, obviously, you recall
19   arresting Mr. Brian Shack; is that correct?
20       A   Yes.
21       Q   And that's the only you've
22   arrested him?
23       A   To my knowledge, yes.

## Page 242

1        Q   Okay.  And I think we discussed
2    briefly before, after the arrest, were you
3    aware that he remained in jail, in custody,
4    for over a hundred and three days?
5        A   I was later made aware that he
6    spent some time in jail.
7        Q   And you, in fact, were
8    disciplined and received a written warning
9    for a major offense for failing to comply
10   with PGO-511 in failing to fill out a
11   complaint and swear to the complaint in the
12   Magistrate's office; isn't that correct?
13       A   I was written up for it, yes.
14           (Whereupon, Defendant's
15       Exhibit No. 38 was marked and
16       attached to the deposition.)
17   BY MS. NELSON:
18       Q   Okay.  And I'm going to show you
19   what -- the write-up, which I'm going to
20   mark as Defendant's Exhibit No. 38.  Again,
21   it consists of several pages so I'm going to
22   ask you to go through it.  I can break it
23   down if you'd like.  But it's the pages that

## Page 243

1    deal with the write-up, the notice of your
2    determination hearing and the -- I guess,
3    the ultimate discipline imposed. I'm going
4    to show you 38, and ask if you can just
5    review those documents, and tell me if you
6    have seen those before.  Maybe an easier way
7    is if you'll look with me, Sergeant Summers,
8    on the next to last page.  I think it's
9    marked Bates 063.  Make sure we've got the
10   same set here.  And that is called --
11   entitled The City of Dothan Employee
12   Disciplinary Action Report form.  Do you see
13   that?
14       A   Yes.
15       Q   And then it's got your signature
16   down at the bottom; is that correct?
17       A   Yes.
18       Q   Okay.  And it's basically -- You
19   were charged with a major category offense.
20   And it's Violation Rule 3-42.6.  The six is
21   circled; is that correct?
22       A   I don't see a six circled.  Okay.
23   Okay.

## Page 244

1        Q   Okay.  And you signed that
2    particular document, didn't you?
3        A   Yes.
4        Q   And, I mean, I guess the document
5    can speak to itself.  But it's basically
6    recounting the arrest of Brian Shack.  And
7    you failed to swear to a Magistrate and sign
8    a complaint of arrest of Mr. Shack.  And as
9    a result, he was confined to the Dothan
10   Police Department Detention Facility for a
11   period of a hundred and four days.  Do you
12   see that?
13       A   Yes.
14       Q   And basically that was a
15   violation of PGO-511.  That's a major
16   category offense.  Okay.  And then did
17   you -- You had a opportunity -- And then I
18   see on Page 3 of that, that you had a
19   determination hearing and you were given a
20   chance to respond.  And you have a written
21   response; is that correct?
22       A   Yes.
23       Q   And you had a determination

# FREEDOM COURT REPORTING

Page 245

1  hearing. I think I said that. But
2  ultimately a discipline action --
3  disciplinary action was imposed. And you
4  were suspended for twenty-four hours; is
5  that correct?
6      A   I was suspended. But the length
7  of time, I can't tell you how much time it
8  was.
9      Q   Okay?
10     A   But, yes, I was suspended.
11     Q   Okay. And you did not appeal
12 this disciplinary action, did you?
13     A   No.
14     Q   Okay. And then do you recall in
15 June of 2007, being charged with a major
16 offense for violating the rule, Rule 19,
17 that we discussed regarding the requirement
18 that you turn tickets in within forty-eight
19 hours?
20     A   Yes, I was written up.
21     Q   Okay. And, in fact, you did fail
22 to turn in at least three tickets that you
23 had written. You failed to turn those in to

Page 246

1  the Magistrate within the forty-eight-hour
2  period; isn't that correct?
3      A   Yes.
4      Q   And how did you learn that or who
5  informed you that you had violated this
6  particular rule?
7      A   I don't know who informed me that
8  I violated the rule. I don't remember who.
9          (Whereupon, Defendant's
10         Exhibit No. 39 was marked and
11         attached to the deposition.)
12 BY MS. NELSON:
13     Q   I'm going to show you what I've
14 marked as Defendant's Exhibit No. 39, and
15 ask if you can identify that for me, please?
16 Were you aware that an individual who you
17 had written a ticket to had gone to the
18 Magistrate's office to pay the ticket, and
19 there was no ticket to be found?
20     A   No.
21     Q   Did Sergeant Baxley approach you
22 or question you about tickets you had failed
23 to turn in?

Page 247

1      A   Yes.
2      Q   Okay. Just tell me what you
3  remember about that?
4      A   He called me over the radio or
5  made contact with me while on duty, and told
6  me to meet with him. I met with him. And
7  he asked me did I swear to all my tickets.
8  And I said yes, I believe I did. But let me
9  check. I opened my metal ticket book
10 counter -- I mean, the metal case that your
11 ticket book is kept in. And in the backside
12 of the book is kept -- officers -- well, I
13 kept a little sheet that has a list of the
14 traffic offenses and the codes, written
15 warnings, other documents used while on a
16 traffic stop in the back of that book.
17 Earlier that morning, I wrote some tickets
18 when I first got on the shift. Later that
19 day, I wrote some other tickets. I went to
20 the Magistrate and swore to some tickets and
21 thought that I had sworn to all my tickets.
22 But somehow, in the morning, I had stuck
23 those tickets in the backside of the book,

Page 248

1  and later that day, stuck the other tickets
2  on the front side. So when I went to the
3  Magistrate's office thinking I swore to all
4  my tickets, I still had those three that was
5  stuck in the back of my ticket book. So I
6  didn't swear to them on time. I wasn't
7  aware that they was in backside of the book.
8  I thought I had sworn to all the tickets.
9      Q   Okay. Nothing you intentionally
10 did? You just --
11     A   No.
12     Q   -- failed to swear to them
13 timely? And then did you ultimately -- When
14 that mistake was learned -- I think it was
15 some time later -- did you go swear to them?
16     A   I went then over to the
17 Magistrate's office.
18     Q   Okay?
19     A   I believe it was then or as soon
20 as possible.
21     Q   Okay?
22     A   I went over and swore to the
23 tickets.

62 (Pages 245 to 248)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

Page 249

1    Q    And do you know how much time
2   passed between you writing the ticket and
3   swearing to the ticket?
4    A    No, I don't.
5         (Whereupon, Defendant's
6         Exhibit No. 40 was marked and
7         attached to the deposition.)
8   BY MS. NELSON:
9    Q    And, again, you received a notice
10   of -- I'm going to show you Defendant's
11   Exhibit 40.  You were charged with a major
12   offense, in violation of Personnel Rule
13   3-42.6.  And you were given notice of a
14   determination hearing; is that correct?
15   A    Yes.
16   Q    And you had a determination
17   hearing.  And you were ultimately informed
18   and, I guess, served with the decision of
19   the determination hearing; is that correct?
20   I will show you Defendant's Exhibit 40.
21   A    Restate your question.
22   Q    Well, I'm just saying you were --
23   Go back to 39.  You were informed, I think,

Page 250

1   on June 20th that you were being charged
2   with that offense of failing to turn in
3   those tickets in a timely manner; is that
4   correct?
5    A    Yes.
6    Q    Okay.  And then following that,
7   you were given notice of a determination
8   hearing, which was held on, I believe, on
9   like June 22nd.  And then the final decision
10   of the determination hearing was a finding
11   that you had violated the rule, and that the
12   decision was to terminate your employment.
13   And you received that on June 25th; is that
14   correct?
15   A    Yes.
16   Q    And effective, I guess, that date
17   your employment was terminated?
18   A    I believe so.  That's what it
19   says the date that's on here.
20   Q    Well, you were served on the 25th
21   of June.  I think your actual termination
22   was June 2th.  Now, and you appealed that
23   decision to the Personnel Board; is that

Page 251

1   correct?
2    A    Yes.
3         (Whereupon, Defendant's
4         Exhibit No. 41 was marked and
5         attached to the deposition.)
6   BY MS. NELSON:
7    Q    I'm just going to show you and
8   get you to identify for me, is this your
9   notice of appeal?  Is that your notice of
10   appeal?
11   A    Yes.
12   Q    Okay.  And you had an appeals
13   hearing; is that correct?
14   A    Yes.
15   Q    And you were represented by
16   counsel, Mr. John White?
17   A    Yes.
18   Q    Okay.  And the Personnel Board
19   upheld your termination; is that your
20   understanding?
21   A    Yes.
22         (Whereupon, Defendant's
23         Exhibit No. 42 was marked and

Page 252

1         attached to the deposition.)
2   BY MS. NELSON:
3    Q    Okay.  And I want to show you
4   what I've marked as Defendant's Exhibit 42.
5   Did you get a copy of the Board's --
6   Personnel Board's decision?  Have you ever
7   seen Defendant's 42?
8    A    I don't remember seeing this
9   document.
10   Q    You don't?
11   A    No, ma'am.  I could have.  But I
12   don't remember seeing it.
13   Q    Okay.  You don't remember -- I
14   don't know that your lawyer, John White, did
15   he ever show that to you?
16   A    I don't remember seeing it.  He
17   could have.  But it wasn't given to me.
18   Q    And then when you lost at that
19   level you -- Were you aware that you
20   appealed even again to the Circuit Court of
21   Houston County?
22   A    Yes.
23   Q    And then subsequent to that you

63 (Pages 249 to 252)

## Page 253

1  dismissed your case? Do you understand
2  that?
3      A   That was my lawyer's -- my
4  attorney's decision.
5      Q   Okay?
6      A   His recommendation.
7          (Whereupon, Defendant's
8          Exhibit No. 43 was marked and
9          attached to the deposition.)
10 BY MS. NELSON:
11     Q   Okay. But I'm going to show you
12 Defendant's 43, which is your motion to
13 dismiss with prejudice. That's your
14 signature; is that correct?
15     A   Yes, that's my signature.
16     Q   Okay. I'm going to back up just
17 a minute. After -- Do you remember a time
18 before your termination that you requested
19 another -- a transfer? You went to John
20 Powell and requested a transfer?
21     A   Yeah, I remember requesting a
22 transfer. But I believe I went to Captain
23 Drone. I could have went to John Powell.

## Page 254

1      Q   Okay?
2      A   But I believe it was Captain
3  Drone that I talked to initially.
4      Q   Okay. And why were you seeking a
5  transfer?
6      A   Because on the shift that I was
7  on, I felt like that the supervisors were
8  not fair towards me in their treatment. And
9  I didn't like the way I was being talked to
10 in a derogatory manner. That's why I
11 requested to be transferred.
12     Q   Okay. You said your supervisors
13 were not being fair to you?
14     A   I don't believe they were.
15         (Whereupon, Defendant's
16         Exhibit No. 44 was marked and
17         attached to the deposition.)
18 BY MS. NELSON:
19     Q   Okay. I want to show you
20 Defendant's Exhibit 44, which appears to be
21 a PD-12 that you signed. Do you recognize
22 that document?
23     A   Yes.

## Page 255

1      Q   And do you -- You were basically
2  requesting an opportunity to speak with
3  Captain Drone; is that correct?
4      A   Yes.
5      Q   And you did meet with Captain
6  Drone shortly therefore; is that correct?
7      A   Yes.
8      Q   And tell me what you remember
9  about that conversation that you had with
10 Captain Drone?
11     A   I talked to him about -- reminded
12 him about before when he told me I was going
13 back to Woodham's shift, that I didn't feel
14 like Lieutenant Woodham would be fair
15 towards me since I worked for him in CID,
16 and had complained about not being treated
17 fairly based on sex and race to Powell.
18 I -- we talked about that and I said, I told
19 you that they were not going to be fair.
20 Went back over a couple of problems that
21 were on the shift and asked him about a
22 transfer.
23     Q   Okay. And it's your testimony

## Page 256

1  that you specifically said that you were not
2  being treated fair or that you were not
3  being treated fair because of your sex or
4  race?
5      A   I talked about a lot of issues
6  about on that shift. Some of them were
7  racial and sexual. Because I had also came
8  over to the EEO office and wrote a written
9  statement when I spoke with David Thornton
10 about the issues with Sergeant Charlotte
11 Jenkins.
12     Q   And when did you do that?
13     A   I don't know the exact date. But
14 it was during the time I was on that squad.
15     Q   Was it the time you were on what
16 squad?
17     A   During the time I was on this
18 shift where Lieutenant Roy Whiddoms and
19 Charlotte Jenkins and those supervisors,
20 whatever squad that was, it was during that
21 time.
22     Q   So it would be during the same
23 time you talked to -- you're saying it's the

64 (Pages 253 to 256)

1 same time you talked the Drone?
2     A  I'm not the same time. I said
3 during that time on the shift, during my
4 assignment to that shift.
5     Q  This would be your last patrol
6 squad?
7     A  Yeah.
8     MS. ROBERTSON: Yes.
9     A  Yeah.
10     Q  After you were at Vice?
11     A  Yes.
12     Q  And so you don't know how long
13 you worked there?
14     A  No, I don't.
15     MS. ROBERTSON: How could
16     somebody be denied bond on an unsworn
17     complaint?
18     Q  Do you have a copy -- You said
19 you met with David Thornton?
20     A  Yes.
21     Q  And when did you -- You don't
22 know when you met with him?
23     A  I don't know the date.

1     Q  Okay. And you said you gave him
2 something in writing?
3     A  He told me to write it down. And
4 I sat in the conference room over there and
5 wrote it down the issues and complaints
6 about Sergeant Charlotte Jenkins. He asked
7 me if I ever had any -- he asked me about if
8 I ever had any problems on the shift, I
9 believe, related to race or problems of
10 discrimination, something to that effect.
11 And I wrote down -- wrote the statement, a
12 page of it or maybe even a second page
13 attached to it and gave it to him.
14     Q  Did you hand write it?
15     A  Handwritten.
16     Q  And the whole complaint was about
17 Charlotte Jenkins?
18     A  And some other issues on the
19 squad that myself and Carney -- RaMonica
20 Carney had experience while working under
21 Sergeant Charlotte Jenkins and while on the
22 squad.
23     Q  Were you at -- Did David

1 Thornton -- Did you approach him or did he
2 approach you?
3     A  I believe I was called over to
4 his office.
5     Q  So, to your knowledge, he was
6 looking into some issue regarding Charlotte
7 Jenkins and --
8     A  No. I think it was just
9 regarding -- I don't know what he was
10 looking into. I don't know.
11     Q  But he asked you to come.
12     A  But he asked me about that --
13 about discrimination or any complaints and
14 what they relate to. And I wrote down the
15 issues that were going on.
16     Q  And do you have a copy of that
17 statement?
18     A  He refused to give me a copy.
19     Q  Did you ask him for one?
20     A  Yes, I did.
21     Q  And what did he say?
22     A  It was at the end of the day. He
23 said he had another appointment to go. I'll

1 get you a copy tomorrow. When the next day
2 came, he would not give me a copy. So I
3 went to --
4     Q  Well, did he refuse to give you
5 one or did --
6     A  He refused to give me a copy.
7     Q  Well, did you go and ask him?
8     A  Yes.
9     Q  And what did he say?
10     A  He said he was not going to give
11 me a copy until he talked to Lynn White.
12     Q  Okay?
13     A  So I went to John White and told
14 him he refused to give me a copy of my
15 complaint.
16     Q  Was John White ever your
17 supervisor?
18     A  He was a Chief.
19     Q  Your Chief?
20     A  Yes.
21     Q  Okay. And when did you -- I
22 don't remember. John White was your lawyer
23 at the time?

## Page 261

1    A    Yes.
2    Q    Or did you say --
3    A    But he was no longer Chief.
4    Q    Okay?
5    A    He was the -- he was my attorney.
6    Q    You went to him and then what
7    happened?
8         MS. ROBERTSON: Don't tell her
9    anything that you and Mr. White talked
10   about if he was your attorney. But tell
11   her what happened. Do you understand
12   what I'm saying?
13   A    He told me to --
14        MS. ROBERTSON: Don't tell me
15   what --
16        THE WITNESS: Oh, okay.
17        MS. ROBERTSON: Don't tell her
18   what you and your lawyer talked about.
19   But after you talked to your lawyer,
20   then what happened?
21        THE WITNESS: I went back to
22   David Thornton and asked him to give me
23   a date that I would get a copy of that

## Page 262

1    or my attorney would be sending a letter
2    of demand. He said let him send it.
3    BY MS. NELSON:
4    Q    And did he?
5    A    I don't know.
6    Q    Okay. And you've never seen a
7    copy?
8    A    No.
9    Q    Never seen the complaint? Well,
10   tell me what you remember was in the
11   complaint about Charlotte Jenkins?
12   A    A couple of incidences. One of
13   them was myself, Officer Carney and Officer
14   Truitt were working traffic down on the
15   south end of South Oaks. And we were
16   working traffic, and running radar, and
17   writing tickets. At some point during the
18   shift, Sergeant Jenkins came down and asked
19   us why we -- What are y'all doing Why are
20   y'all down here writing -- Why are y'all
21   down here working this area? You need to go
22   wherever she said and go work that area.
23   And we said we just working, just writing

## Page 263

1    tickets and doing traffic. And So at that
2    time, the radars were -- took the radars
3    from us and gave it to two other male
4    officers that were -- Sent us back to
5    different areas and took the radars from us.
6    Q    She took the radar guns?
7    A    Instructed us to -- I don't mean
8    she physically reached in the car and took
9    the radar.
10   Q    That's what I mean?
11   A    No, that's not what I mean.
12   Q    What do you mean she took them
13   away from you?
14   A    The radars were -- Either she
15   instructed them to be given to two officers
16   up on the other end near Westgate Parkway
17   who said they hadn't requested them and
18   weren't working traffic from the officers
19   that were actually using the equipment.
20   Q    Okay. And how do you know they
21   had not requested them?
22   A    Because either Lindsey or Womack
23   stated that they didn't want them.

## Page 264

1    Q    Those were the two other
2    officers?
3    A    I believe it was Lindsey and
4    Womack.
5    Q    So you felt that -- Is it
6    Sergeant Jenkins?
7    A    Yes.
8    Q    That she had taken your radar
9    from you. Anything else?
10   A    Myself and Officer Carney.
11   Q    And right now I'm talking about
12   what was in the statement that you remember.
13   What do you remember telling David Thornton
14   about? The radar?
15   A    About different instances where I
16   felt like that she was making a difference
17   between us. Every time the -- like, officer
18   would get together and be doing something,
19   she'd separate us and -- and give the
20   equipment to someone else, or there was
21   another incident where I did a traffic stop.
22   Carney was also on the scene, had some
23   problems with guy who was being stopped.

66 (Pages 261 to 264)

Page 265

1  And he became upset. Officer Carney and I
2  are there. Sergeant Jenkins pulls up. We
3  ask for her assistance. And she's hesitant
4  about getting out the car. After leaving
5  that, didn't do anything about it but
6  just -- the guy was issues a ticket and --
7  and gone on. But after the traffic stop,
8  Officer Carney came to me and said Sergeant
9  Jenkins tried to get her to say that I did
10 something wrong so that she could write me
11 up.
12    Q   And what did she try to get her
13 to say about you?
14    A   Tried to get her to say that was
15 I was -- the guy didn't have to give me his
16 information. I was rude to guy, which I
17 wasn't. We had cameras in the car. Just
18 turned the situation around on me, when it
19 was actually the guy that became upset and
20 was refusing to give information for the
21 ticket. So I got it through the Dispatch
22 Center.
23    Q   So the driver that you pulled

Page 266

1  over was be upset and --
2    A   Being difficult.
3    Q   -- being ticketed?
4    A   Yes, and being difficult.
5    Q   And supervisor was asking Carney?
6    A   If I was bothering him.
7    Q   Who had caused the --
8    A   I don't know what her exact words
9  were. But I'm --
10    Q   But she questioned had you done
11 anything to provoke him, so to speak?
12    A   Carney didn't tell me that she
13 questioned it. She kind of stated it in a
14 way and asked Carney if she agreed. And
15 Carney said she did not agree, is what
16 Carney said.
17    Q   But you're relying what Carney
18 said? You didn't hear anything?
19    A   I didn't hear the conversation,
20 no.
21    Q   Okay. Anything else that to you
22 told Davis Jenkins -- I mean, David
23 Thornton?

Page 267

1    A   There may be others, but I don't
2  remember everything that was written on that
3  document. But I remember writing the
4  complaint, yes.
5    Q   And, again, you're not sure what
6  David was doing He had just asked you to
7  come over there and ask you some questions?
8    A   Yes.
9    Q   Okay. Now, I'm going back now to
10 Defendant's Exhibit 44, where you asked to
11 speak to Captain Drone, okay? We're in like
12 June of 2007, correct?
13    A   Yes.
14    Q   Okay. All right. You went --
15 you requested a meeting and he met with you?
16    A   Yes.
17    Q   Okay. I know we're jumping
18 around into different times. But we may --
19 You don't said you don't remember when you
20 talked to David Thornton. What do you
21 remember about your conversation with
22 Captain Drone?
23    A   Asking him about a transfer from

Page 268

1  the shift because I didn't feel like the
2  supervisor -- I felt like some of what the
3  supervisors were trying to write me up or
4  get me in trouble as a retaliation for
5  complaining on them in the past, on the way
6  I was being treated different.
7    Q   And who was writing you up?
8    A   I talked to him about the
9  concerns that I had. I don't -- I'll look
10 back and see when I got written up. But you
11 asked me what did I talked to him about.
12 And it was several different concerns.
13    Q   Well, do you contend that your
14 write-up for violating PGO-511 regarding
15 Mr. Shark, that that was done in retaliation
16 for your complaints?
17    MS. ROBERTSON: Object. You
18 talking about Shack?
19    MS. NELSON: Shack.
20    MS. ROBERTSON: He's been
21 Shank, Shark and Shack. But that's not
22 why I was objecting.
23

Page 269

1    BY MS. NELSON:
2        Q    You can answer?
3        A    Okay. Repeat your question.
4        Q    I said, do you contend you were
5    written up and received a major writing
6    warning, leaving Mr. Shack -- being
7    responsible for Mr. Shack being in jail for
8    a hundred and three, a hundred and four
9    days, was that in retaliation for your
10   making complaints?
11       A    I didn't say that.
12           MS. ROBERTSON: Object. Go
13   ahead.
14       A    I didn't say that was retaliation
15   for that.
16       Q    Okay. Do you say that that was
17   sex discrimination?
18           MS. ROBERTSON: Object.
19       Q    You can answer? Do you think
20   that that action was taken against you
21   because of your sex?
22       A    No.
23       Q    Do you contend that that action

Page 270

1    was taken against you because of your race?
2            MS. ROBERTSON: Object.
3        Q    You can answer?
4            MS. ROBERTSON: She's not
5    charged with knowing what the law is. I
6    say it was because of retaliation.
7            MS. NELSON: Okay. Well --
8            MS. ROBERTSON: I mean, you
9    can't ask her to --
10           MS. NELSON: -- you cannot tell
11   her --
12           MS. ROBERTSON: -- make a legal
13   conclusion.
14           MS. NELSON: That is a not a
15   legal conclusion. That is -- I'm asking
16   her does she have an opinion if that
17   was -- if she was --
18           MS. ROBERTSON: Well, we know
19   there was a male who did the very same
20   thing.
21           MS. NELSON: Quit trying to
22   rehabilitate her when she --
23           MS. ROBERTSON: No. There was

Page 271

1    a male who did the same thing and got --
2            MS. NELSON: Ann, enough is
3    enough. Let her answer.
4    BY MS. NELSON:
5        Q    Do you contend that you were
6    written up regarding the Brian Shack
7    incident for his being in jail by not
8    swearing to the -- being in jail for over a
9    hundred and three days by not swearing to
10   complaint, was that --
11           MS. ROBERTSON: Object.
12       Q    -- based on your race?
13           MS. ROBERTSON: Object. He
14   wasn't in the jail for a hundred and
15   three days.
16           MS. NELSON: Well, the
17   record --
18           MS. ROBERTSON: Well, he served
19   sixty-three on a warrant he already had.
20           MS. NELSON: Well, I'd ask you
21   to quit trying to testify.
22           MS. ROBERTSON: Well --
23           MS. NELSON: You can make your

Page 272

1    objection.
2            MS. ROBERTSON: I object
3    because that's just -- that's just
4    legalese nonsense.
5    BY MS. NELSON:
6        Q    Do you contend your discipline
7    for the Brian Shark arrest was based on your
8    race?
9        A    I don't agree with what some of
10   what was in the evaluation -- I mean, in the
11   write-up on that. Because that's not
12   entirely how it went. But did I receive
13   that? Yes. I don't agree with everything
14   that was in it. Did I think some of the
15   things that had to do with me being written
16   up had related to that sex and race? Yes.
17       Q    Well, now that your attorney told
18   you how to answer. But why do you contend
19   some of it is based on your sex and your
20   race?
21       A    Because all the other --
22           MS. ROBERTSON: Object. Go
23   ahead.

Page 273

1    A    All the other complaints that I
2  complained about, giving examples to
3  different supervisors about how I was being
4  treated from other -- treated different from
5  other white males, and also because I had
6  complained about this, and I complained on
7  these particular supervisors about race and
8  discrimination complaints. And I didn't
9  feel like I should have been put back on
10  Lieutenant Woodham's shift in the first
11  place. I told Captain Drone he was going to
12  retaliate. And he was going to find
13  something to try to write me up for. Did I
14  make the mistake and give him the
15  opportunity to do it? Some of my -- some of
16  what happened is -- I contribute it to, yes.
17  But I did not lock this boy away for a
18  hundred and three days and nobody knew he
19  was in jail. So, some of that -- I believe
20  I answered your question.
21    Q    And who did you complain to about
22  sex and race discrimination?
23    A    Several people.

Page 274

1    Q    I was going to ask you to tell me
2  who?
3    A    Chief Powell.
4    Q    When?
5    A    I don't know the exact dates. I
6  complained to several different supervisors.
7  I talked to Kevin Drone. Other issues that
8  I had, I talked to whoever the immediate
9  supervisor was. And if then they didn't pay
10  any attention, I asked to speak to a higher
11  supervisor. But if you want me the sit here
12  and name each and every name off, I can't
13  tell you that right now at this time.
14    Q    You never put anything in writing
15  about sex or race discrimination, did you?
16    MS. ROBERTSON:  Object.
17    A    No, I'm not going to say I never
18  put anything in writing about racial or
19  sexual discrimination.
20    Q    Other than what you testified to
21  about David Thornton?
22    A    I could have, yes.
23    Q    Could have what?

Page 275

1    A    Put that in writing. But exactly
2  what documents, I'm not going to sit here
3  and tell you, well, I gave this document,
4  that I wrote this statement to, to this
5  supervisor. But did I complain in writing?
6  Yeah. But you asked me if I -- you said I
7  never did it. And I'm not saying I never
8  did it.
9    Q    I said other than -- you
10  testified that you did David Thornton. And
11  you don't have a copy of that.
12    A    Because he wouldn't give me a
13  copy.
14    Q    And I've shown you a number of
15  other documents that you've submitted,
16  either to Chief Powell, and not one of them
17  refer to race or sex discrimination, do
18  they?
19    MS. ROBERTSON:  Object.
20    A    The words racial or sexual
21  discrimination might not be listed on some
22  of the documents. But I did complain of
23  racial and sexual discrimination. And

Page 276

1  that's what I meant by it, and retaliation
2  for complaining about it in the first place.
3    Q    And, again, I'm asking you -- but
4  you can't give me any specific times or
5  places or dates or people that you said that
6  to?
7    A    Other than what I've already told
8  you, I can't think of other names right now.
9  But I'm sure there's other names.
10    Q    When you talked to Chief Powell
11  about this, was anybody else present?
12    A    It could have been, but not
13  always. I talked to him by myself.
14    Q    When you talked to Captain Drone
15  was anybody else present?
16    A    Not always. I've talked to him
17  by myself.
18    Q    But sometimes other people were
19  there?
20    A    It could have been.
21    Q    Well, do you remember anybody
22  that was there?
23    A    I don't know.

Page 277

1    Q   What complaint did you have about
2  Michael Surelly, if any?  Did you have any
3  concern with him?
4    A   I don't remember having any.
5    Q   What about Benny Baxley?  Did you
6  have any concern with him?
7    A   I don't think so.
8    Q   Okay.  You know, I apologize.
9  Let's take a break.  There's going to be a
10 meeting.  And I think the Commission or
11 something is going to meet in here.  And
12 we've got to get out.  So -- I mean, I'm
13 hoping we can finish up in the next hour.
14 But we may have to adjourn across the hall
15 or downstairs.
16 (Whereupon, a short break was taken.)
17 BY MS. NELSON:
18   Q   The disciplinary action that you
19 got for not turning in those three tickets
20 on time, and you didn't comply with the
21 forty-eight hour rule, you know the one I'm
22 talking about?  You said that you found them
23 in your book.  And you just failed to turn

Page 278

1  them in.  And you got a major warning for
2  that.  Is that a written warning that was a
3  major violation; is that correct?
4    A   Yes.
5    Q   Okay.  Do you contend that that
6  write-up or that reprimand or written
7  warning was because of your race?
8    A   No.
9    Q   Do you contend it was because of
10 your sex?
11   A   No.
12   Q   Okay.  And do you contend it was
13 in any way related to complaints or
14 retaliation based on complaints you had
15 made?
16   A   Yes.
17   Q   And why do you contend -- What
18 facts do you have that to contend that you
19 got that write-up based on complaints you
20 had made?
21   A   Because I made the mistake.  And
22 it -- normally if I wasn't -- Normally if an
23 officer didn't have a ticket then somebody

Page 279

1  came to a swear to a ticket, everybody had a
2  pager.  And the Magistrate office would
3  usually page the officer saying that you
4  have ticket not sworn to.  But the way that
5  investigation came about was kept -- I
6  didn't know anything about it until later
7  on.  And it wasn't like I kept the tickets
8  to do something.  It was a mistake that I
9  made by having them in the back of the
10 ticket book.  But the way that the write-up
11 came about I felt like was retaliatory
12 because I made the mistake.
13       MS. ROBERTSON:  Carol, I know
14 this is awful.  But can I have five
15 minutes?  I've got to tell -- I've got
16 to tell somebody to put something in the
17 mailbox so I can get my instructions on
18 how to get to Tallahassee?  Y'all don't
19 even -- Just let me step out and make
20 the call, please.
21       MS. NELSON:  Okay.
22 (Whereupon, a short break was taken.)
23

Page 280

1  BY MS. NELSON:
2    Q   Is it your contention that the
3  Magistrate's office should have radioed you
4  or paged you?
5    A   I didn't say that they should
6  have.  I said they usually would page
7  officers.  There's more than one officer
8  than never swore to a ticket late.  And if
9  something wasn't there or wasn't sworn to,
10 sometimes a officer would get a page saying
11 that do you have this ticket or do you have
12 this document?  And you need to come to the
13 Magistrate's office or ask another officer
14 to come to the Magistrate's office.
15   Q   How would they know to page you
16 or contact you?
17   A   If there was a ticket written by
18 that officer and someone came in with the
19 ticket, the officer's name would be on the
20 ticket.  So, I can't tell you how they
21 develop their system of paging people.  But
22 they do page people.
23   Q   I mean, would anybody in the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

Page 281

1  Magistrate's office know about any -- these
2  alleged complaints that you had made?
3      MS. ROBERTSON: Object.
4      Q   Would be anybody in the
5  Magistrate's office know about your making
6  any type of complaints at work that you've
7  testified to?
8      A   Is there anybody in the
9  Magistrate's office that's aware of this --
10 with Shack or tickets? Yes. If that's what
11 you're asking me. I'm trying to understand.
12     Q   No. Would anybody in the
13 Magistrate's office know that you had -- you
14 testified that you went to Drone or Chief
15 Powell and expressed some concern about some
16 of your supervisors; is that correct? Would
17 anybody in the Magistrate's office have any
18 knowledge of any of that?
19     A   I don't know.
20     Q   Do you know of anybody that a
21 Magistrate has paged them and they've been
22 allowed to come over and swear to a ticket
23 late?

Page 282

1      A   I believe in my hearing that Ann
2  Baxter or one of the Magistrates that spoke
3  at the hearing mentioned about officers
4  getting a page, or maybe even Celia Sellers
5  might have said it, that officers -- sending
6  out a page telling the officer to come to
7  Magistrate's office.
8      Q   But you don't know of any?
9      A   I can't remember any in
10 particular, no.
11     Q   And at the hearing you or your
12 attorney had apparently subpoenaed the
13 records of some officers involving their
14 turning in tickets and whether they turned
15 them in timely. Were you aware of that?
16     A   Yes.
17     Q   Okay. And do you know who those
18 individuals are?
19     A   No, I can't sit there and tell
20 you every name of the officers that turned
21 in a ticket late, no.
22     Q   But is it your understanding that
23 those individuals who were -- the records

Page 283

1  who were subpoenaed at the hearing, is it
2  your understanding that they had turned in
3  some tickets late?
4      A   Yes.
5      Q   Okay. And how did you know about
6  them?
7      A   From the -- some documents I saw
8  with transmittals from other officers. Say,
9  well, I've got these tickets over here.
10 They're late. Or I don't remember exactly
11 how I know of them. But there are several.
12     Q   I'm sorry. Are you aware that
13 there's an exception to the rule about
14 turning in your tickets in if it's a
15 holiday?
16     A   No.
17     Q   You're not aware of that?
18     A   No.
19     Q   To your knowledge, does it apply
20 to parking tickets?
21     A   I don't know.
22     Q   You don't? I'm talking about
23 Rule 19?

Page 284

1      A   I don't know.
2      Q   Now, the ticket you turned in,
3  you testified that you clearly just forgot
4  to turn them in? You've testified to that?
5  You weren't sick? It wasn't a holiday?
6  They weren't parking tickets?
7      MS. ROBERTSON: Well, she
8  wasn't playing baseball. She wasn't --
9      Q   Were you playing baseball?
10     MS. ROBERTSON: I'm just
11 saying, there were about -- And we got
12 more. I mean, the -- that rule is only
13 honored in the breach.
14     MS. NELSON: Well, you got
15 more. Tell me who you got?
16     MS. ROBERTSON: I think we
17 already turned over those names to you.
18 We had a whole passel of them, officers
19 who've turned in tickets anywhere from
20 seventy-two hours to forty-five days
21 late.
22     MS. NELSON: And you're talking
23 about the ones John White asked to be

Page 285

1   subpoenaed?
2      MS. ROBERTSON: No. We gave
3   you some more.
4      MS. NELSON: Okay. And where
5   would that be?
6      MS. ROBERTSON: I don't know.
7   I just know we gave you some more. And
8   when we subpoena the records, it's
9   probably going to be more than that.
10   Like I said, it was a rule honored in
11   the breach or when you wanted to
12   discriminate.
13 BY MS. NELSON:
14    Q  I'm asking you who those people
15 are?
16    A  I don't know all the officers
17 that turned in tickets late. I can't sit
18 here and name off every officer that turned
19 in a ticket late.
20    Q  Do you know any? Do you?
21    A  I believe Sergeant Baxley has
22 turned in some tickets late. I'm trying to
23 think who else was on there. Some of the

Page 286

1 officers -- I can't recall some of the names
2 now.
3      MS. NELSON: Well, Ann, if your
4 contention that you've given me a list,
5 I'd appreciate if you'd tell me --
6      MS. ROBERTSON: I don't know.
7 I'll tell you. I mean, we've given you
8 something because I've seen it.
9      MS. NELSON: Well, at the
10 hearing, John White had subpoenaed a
11 number of --
12      MS. ROBERTSON: Right. And
13 we -- those are -- We turned those over
14 to you.
15      MS. NELSON: Yeah.
16      MS. ROBERTSON: And they had
17 every excuse.
18      MS. NELSON: Yeah. They were
19 parking tickets. There were holidays.
20 There were illnesses, sicknesses.
21      MS. ROBERTSON: I don't see any
22 There's not any exception for illnesses.
23 Got a white boy who locked Brian Shack

Page 287

1 up, too, and didn't get -- signed a
2 complaint.
3 BY MS. NELSON:
4    Q  Well, you didn't even fill out a
5 complaint on Brian Shack, did you?
6    A  I believe I did.
7    Q  No.
8    A  No. Let me rephrase that. I
9 didn't transport him to the jail. The
10 transporting officer would be the one to
11 pull the complaint in the jail and attach it
12 to the arrest report.
13    Q  You were the arresting officer;
14 is that not correct?
15    A  Yes. I arrested him on scene and
16 went on to break. Joy Evans transported him
17 to jail so I could go ahead and go on break,
18 and had him processed in the jail. When a
19 prisoner is taken into the jail, the arrest
20 report is turned in. And as they're being
21 booked, either the officer that takes the
22 prisoner in will get a complaint and write
23 the arresting officer's name on it and their

Page 288

1 name as a witness, if they were a witness to
2 it. If the officer forgets to pull a
3 complaint, the sergeant or whoever the
4 person is that's doing booking on the inside
5 of it will pull the complaint and attach it
6 to the arrest report. And then later, it's
7 sent to Magistrate's office.
8    Q  But you were the arresting
9 officer? And you were the one responsible
10 for filling out the complaint; isn't that
11 true?
12    A  Yes.
13    Q  And you did not fill out a
14 complaint, did you?
15    A  I believe I did.
16    Q  That was not your testimony at
17 the Personnel Board hearing? Are you aware
18 of that?
19      MS. ROBERTSON: Object.
20 Argumentative.
21    A  No. Because in my response, I
22 wrote that I believe that I had filled out
23 that complaint. I mentioned that I believe

## Page 289

1   I had filled out that complaint because -- I
2   mean, that I had sworn to that complaint.
3   Because there several arrests that were on
4   the swear board. I went to the Magistrate's
5   office and swore to them. And I don't know
6   whose names were on the compliant at time
7   when they asked about do I remember this
8   incident or if I signed the complaint. And
9   as I told Corporal Bracken then, I believe
10  that I did. But I can't tell you because of
11  the length of time that had passed.
12      Q   You believe you did, but you
13  don't know for a fact that you did? You did
14  not fill out a complaint, did you? You
15  don't have any further --
16      MS. ROBERTSON: Wait. She
17  wasn't charged with not filling one out.
18  Object.
19      A   I believe I signed the complaint
20  when I went over to Magistrate to swear to
21  the complaints that were on the board. Did
22  I fill out one? I don't remember having to
23  fill out one because the person that takes

## Page 290

1   the prisoner to the jail is usually the
2   person that will write the officer's name on
3   it, the charge, criminal trespass, and if
4   there were a witness, they would put their
5   name at the bottom. If the officer -- if
6   the arresting officer brought suspect down,
7   an arrestee down, and forgot to get the
8   complaint and fill it out and give it to the
9   sergeant in the jail, then the sergeant in
10  the jail would pull a complaint, a blank
11  one, write the charge that they're arrested
12  on and who the officer was on there and turn
13  it in the Magistrate's office. Then the
14  officer comes in and swears to those things
15  that are on the swear board, those arrests
16  that were made on the swear board.
17      Q   But the ultimate responsibility
18  to fill out the complaint the arresting
19  officer?
20      A   Yes.
21      Q   And the complaint that you
22  actually swore to was some one hundred and
23  three days after Brian Shark had been

## Page 291

1   arrested; is that not true?
2       A   I was instructed to fill out
3   another complaint and take it over to the
4   Magistrate's office.
5       Q   And that was done several months
6   after his arrest; is that true?
7       A   Yes.
8       Q   Do you recall ever receiving an
9   evaluation of your performance in the year
10  of 2007, or had you been terminated by the
11  time it was time to do that?
12      A   I don't remember receiving an
13  evaluation during that time that you're
14  asking me about.
15      Q   Do you know a individual named
16  Tanya -- Tonya Snell, S-N-E-L-L?
17      A   Do I know her? I don't remember
18  who Tonya --
19      Q   Do you remember arresting
20  somebody by that name?
21      A   No, I don't remember that. I
22  could have. But, no, I don't remember that.
23      Q   Do you remember arresting

## Page 292

1   Ms. Snell but not filling out a complaint on
2   her?
3       A   No.
4       Q   Now, you said you -- Do you
5   remember an incident arresting an individual
6   from Georgia and getting into a discussion
7   with him requiring him to give you his
8   Social Security number?
9       A   That could have been a traffic
10  stop. But do I remember a particular person
11  from Georgia? No. Because I -- more than
12  likely, I stopped several people from
13  different areas.
14      Q   Do you remember being -- him
15  being upset or concerned or angry because
16  you were insistent that he'd have to give
17  his Social Security number? And Sergeant
18  Jenkins told you the Social Security number
19  was not required?
20      A   It could have. Possibly the same
21  traffic stop that I talked about earlier.
22      Q   Did anybody ever speak to you
23  about going to different restaurants in

Page 293

1  Dothan and leaving and not paying when you
2  were called out for a call?
3      A   No.
4      Q   Have you ever done that?
5      A   I didn't go to a restaurant and
6  leave and not pay.
7      Q   Do you ever go to the Waffle
8  House across from the Medical Center?
9      A   I could have.
10     Q   And you --
11     A   I've ate at several different
12 restaurants.
13     Q   Are you aware that a district
14 manager at that Waffle House complained
15 about you walking out without paying?
16     A   No.
17     Q   I'm going to try to clarify
18 something that you testified earlier when I
19 was asking you about after your termination
20 -- Well, strike that. Earlier on in the
21 day, I asked you about EEOC charges. It was
22 kind of when we -- earlier in the day when
23 we got started. Do you remember that?

Page 294

1      A   Yes.
2      Q   And you faxed, I think it was
3  like a letter to the EEOC. I think it was
4  under your friend's or neighbor's fax. It
5  looks like 3 and 4; is that correct? And
6  that was done -- I will show you 3 and 4.
7  That was June 20 at, like 11:00 p.m. that
8  night; is that correct?
9      A   Yes.
10     Q   Okay. And that's after you had
11 been -- after you had received the major
12 offense write-up for not turning in your
13 traffic tickets in forty-eight hours; is
14 that correct?
15     A   I believe it's the same day. But
16 it possibly could be. Yes.
17     Q   Okay?
18     A   But that's not the first time
19 that I contacted them and made the complaint
20 when they opened up the complaint. That's
21 the written documentation filed to them
22 after I talked to the lady.
23     Q   You say you talked to them

Page 295

1  before?
2      A   Yes.
3          (Whereupon, Defendant's
4      Exhibit No. 46 was marked and
5      attached to the deposition.)
6  BY MS. NELSON:
7      Q   Well, I'm going to show you --
8  I'm trying to clear something up here --
9  Defendant's Exhibit 46?
10         MS. ROBERTSON:  You're going to
11     clear something up that the EEOC did?
12     That ought to be interesting. I wish I
13     had that power.
14     Q   This appears to be another -- it
15 appears to be the same letter, but where you
16 had faxed this letter to the EEOC from,
17 like, a Wal-Mart fax. Can you explain to me
18 what that is? It looks like that was faxed
19 to the EEOC on June 27th?
20     A   I don't remember where it was
21 faxed. But, yeah, that's my signature.
22     Q   Okay?
23     A   That is a fax that I sent.

Page 296

1      Q   Do you remember why you resent
2  the same letter? Did they tell you to
3  resend it, or --
4      A   I don't remember why. I just
5  sent the documentation back.
6      Q   Okay. And then, to your
7  knowledge, did you talk to somebody on the
8  phone or did they tell you they were going
9  to help you write up your charge in a more
10 formal way?
11     A   I talked to someone on the phone.
12 But what the conversation, the exact
13 conversation, I can't sit here and tell you
14 verbatim. But I talked to them prior to the
15 faxing.
16         (Whereupon, Defendant's
17     Exhibit No. 47 was marked and
18     attached to the deposition.)
19 BY MS. NELSON:
20     Q   Well, I'm going to show you what
21 I've marked as 47, which appears to be a
22 more formal charge of discrimination that's
23 typed up on an EEOC form. Is that your

74  (Pages 293 to 296)

1 signature on that document?
2    A  Yes.
3    Q  Okay. And did you actually type
4 that or did somebody at the EEOC type that
5 and then mail it for you to sign?
6    A  They sent the forms to me.
7    Q  You didn't actually go up to
8 Birmingham; is that correct?
9    A  No, I didn't.
10    Q  Okay. But -- And it's, like,
11 based on what you told them? That's what
12 they wrote down to your knowledge?
13    A  I don't know what they're
14 procedures for writing down. I told them
15 incidences and what was going on. And they
16 put it in their own summary.
17    Q  Okay. And sent it to you and you
18 signed it and you sent it back?
19    A  Yes.
20    Q  And you signed it on July the
21 10th, 2007; is that correct?
22    A  Yes.
23    Q  Okay. But it does acknowledge

1 that they put a note that the original was
2 received on 6/20/2007; is that correct? Is
3 that what it says?
4      MS. ROBERTSON: She is talking
5 about right here.
6    Q  I'm sorry. Down at the very
7 bottom?
8    A  Is that original? It said
9 amended charge. Original received 6/20/07.
10    Q  And that's the June 20th, 2007
11 that you faxed to them at 11:00 p.m., 11:01
12 p.m.; is that correct?
13    A  Yes.
14    Q  Okay. And did you ever send any
15 documents to the EEOC that you know of?
16    A  I believe so.
17    Q  Do you know what you sent to
18 them?
19    A  No, I don't.
20    Q  Okay. Were you represented by
21 counsel at the time?
22    A  No. I don't know. John White
23 might have been. I don't think so.

1    Q  Was John White representing you?
2    A  I don't remember whether he was
3 or wasn't. He could have been during that
4 time.
5    Q  Okay. Does Mr. Roy Jackson, does
6 that ring a bell, the person you were
7 talking to at the EEOC?
8    A  He could have been.
9      (Whereupon, Defendant's
10      Exhibit No. 48 was marked and
11      attached to the deposition.)
12 BY MS. NELSON:
13    Q  Okay. Did you request this --
14 write that letter to him, Defendant's
15 Exhibit 48?
16    A  Yes.
17    Q  Requesting a right to sue?
18    A  Yes.
19    Q  And did you receive a right to
20 sue?
21    A  Yes.
22      (Whereupon, Defendant's
23      Exhibit No. 49 was marked and

1      attached to the deposition.)
2 BY MS. NELSON:
3    Q  Okay. I'm going to show you what
4 I've marked as Defendant's Exhibit 49. Do
5 you remember, did you ever receive that?
6    A  No, I don't remember receiving
7 this.
8      (Whereupon, Defendant's
9      Exhibit No. 50 was marked and
10      attached to the deposition.)
11 BY MS. NELSON:
12    Q  I will show you what I've marked
13 as Defendant's Exhibit No. 50. Did you
14 receive -- do you remember receiving this?
15    A  I received a letter. But I don't
16 know that this is the one.
17      (Whereupon, Defendant's
18      Exhibit No. 45 was marked and
19      attached to the deposition.)
20 BY MS. NELSON:
21    Q  Okay. Okay. I think I got off
22 on my numbers. But I'm going to show you
23 what I've marked as Defendant's Exhibit 45,

Page 301

1   which appears to be a letter to your counsel
2   and you were copied on it. Do you remember
3   receiving that? Do you remember receiving
4   that?
5      A   The first letter that they sent
6   me, I didn't get. The second document they
7   sent me I did receive. But I don't know
8   which one of those documents it is.
9      Q   I will show you what -- This is
10   what, 52? I don't know how we got out of
11   order.
12        MS. ROBERTSON: Yeah. And this
13   one says 45.
14        MS. NELSON: I know. I think I
15   somehow got --
16        MS. ROBERTSON: And then I
17   see -- the last one I see is 50.
18        MS. NELSON: Okay. 51. I'm
19   sorry. I just got out of order.
20      (Whereupon, Defendant's
21      Exhibit No. 51 was marked and
22      attached to the deposition.)
23   By Ms. Nelson:

Page 302

1      Q   I'm going to show you 51. And
2   this is a document that your attorney
3   produced to me in this lawsuit. Can you
4   identify that document for me, 51, and tell
5   me what that is? Have you ever seen that
6   document?
7      A   Yes, a copy of that document.
8      Q   And how did you get that
9   document?
10      A   I believe it was from RaMonica
11   Carney.
12      Q   And she copied you on it; is that
13   correct?
14      A   What do you mean she copied me on
15   it?
16      Q   Looks like she copied you on the
17   document?
18      A   Yes.
19      Q   Okay. All right. I'm sorry.
20   May I see it for just a second?
21        MS. ROBERTSON: Sure.
22      Q   It appears this is a description.
23   The first part of it is when she -- you were

Page 303

1   in CID and she went to get your assistance
2   with a warrant fact sheet?
3      A   Yes.
4      Q   And it also recounts that
5   Lieutenant Woodham came in to discuss your
6   transfer. And she stopped assisting -- you
7   stopped assisting Carney to tend to Woodham.
8   You testified to me about that, didn't you?
9      A   Yes.
10      Q   Do you know if -- This is
11   addressed to Chief Powell. Do you have --
12   Do you know for a fact whether this was
13   actually given to Chief Powell or presented
14   to Chief Powell?
15      A   I didn't see her give it to him.
16   But she stated she gave him the --
17      Q   But you don't have any personal
18   knowledge of that, do you?
19      A   I wasn't there when she gave it
20   to him.
21      Q   Your attorney was required to
22   give me a list of people that have knowledge
23   about your claims. And I'm just going --

Page 304

1   some of them, we've talked about. I'm any
2   just run through those real quick. And if
3   you can tell me who some of these
4   individuals are, okay? Officer Tawan
5   Truitt, who is that?
6      A   He was a patrol officer.
7      Q   And what knowledge would he have
8   about your lawsuit or your claims?
9      A   He was there on the incident
10   where he and I and Carney were split up and
11   sent to different areas and the equipment
12   was given to other white male officers and
13   taken away from us.
14      Q   The radar equipment?
15      A   Yes.
16      Q   Bobby Ashley?
17      A   Yes.
18      Q   He's a police officer; is that
19   correct?
20      A   Yes.
21      Q   And what knowledge would he have
22   about your lawsuit?
23      A   I don't know exactly knowledge.

76 (Pages 301 to 304)

1  But he knew some of the incidences. I don't
2  know what he knows. But he knows up some of
3  them.
4      Q   When you say some, I'm not sure
5  what you're talking about? Would have some
6  knowledge about your work -- your working
7  for the City of Dothan?
8      A   Ask me your question again --
9      Q   Well, I'm just --
10     A   -- so I can make sure I
11 understand what you're asking me.
12     Q   Did you work with Bobby Ashley?
13     A   Yes, I did.
14     Q   And what department was he in?
15     A   In Patrol.
16     Q   Do you know what squad?
17     A   I don't remember what squad.
18     Q   And you're just saying he may
19 have some knowledge about your employment
20 when y'all worked together; is that correct?
21     A   Yes.
22     Q   Steven Hamm? You talked a little
23 about Sergeant Hamm; is that correct?

1      A   Yes.
2      Q   He was one of your supervisors?
3      A   Yes.
4      Q   Gave you a evaluation, I believe?
5      A   Yes.
6      Q   What other knowledge would he
7  have?
8      A   I don't know what all he knows.
9  But he's aware of some incidences. I
10 complained to him before.
11     Q   About what?
12     A   Officer not backing me up on a
13 call when he was just two blocks away.
14 Difficulties with getting other officers to
15 back me up. Problems based on race and sex
16 while he was my supervisor.
17     Q   Now, when you say an officer not
18 backing you up, would this be where you had
19 called in and Dispatch had alerted an
20 officer to back you up?
21     A   Yes.
22     Q   So are you blaming this on the
23 dispatchers?

1      A   No. I said the officer didn't
2  come.
3      Q   The office wouldn't come? What
4  officer didn't come to back you up?
5      A   Lee Nelms.
6      Q   And when was that?
7      A   I don't remember what.
8      Q   Do you remember the incident?
9      A   I went to Sergeant Helm and
10 complained about it. But what year it was
11 in, what month is was in, I can't tell you
12 that.
13         MS. ROBERTSON: She wants to
14     know if you remember the incident.
15     A   Yeah. The incidence.
16     Q   Yeah. What was the incident? Do
17 you remember the situation?
18     A   It was a traffic stop, a
19 high-risk traffic stop that I had two guys
20 pulled over in a high-crimes area in front
21 of a crack house. Dispatch sent an officer
22 from the south side of the PD, which is two
23 blocks away from where I was. And the

1  officer never showed up. He called out that
2  he was on the south side of PD.
3      Q   Do you know who the officer was?
4      A   Lee Nelms.
5      Q   Lee Nelms. Okay. Any other
6  situation that you remember that you contend
7  you didn't get backup?
8      A   There are other situations. But
9  I can't remember right now.
10     Q   Joey Evans? He transported Brian
11 Shark after the arrest? Is that what you
12 said about Joey Evans?
13     A   Brian Shack, yes.
14     Q   Brian Shack? Any other knowledge
15 that Joey Evans would have about your
16 claims?
17     A   He could have. But I don't know
18 what he knows.
19     Q   Corporal John Bracken? Do you
20 know what knowledge he has about your
21 complaint?
22     A   He was in Internal Affairs. He
23 did the investigation.

Page 309

1  Q  Okay. Which investigation?
2  A  For Brian Shack.
3  Q  Okay. Ray Owens?
4  A  He was in Internal Affairs.
5  Q  Did he do part of the
6  investigation?
7  A  He had something to do it. I
8  don't know what his roll was in it or his
9  knowledge of it.
10  Q  To your knowledge, did Internal
11  Affairs investigate both Brian Shack and the
12  failing to turn in the tickets timely?
13  A  I don't know. Could have.
14  Q  You do know that they
15  investigated the Brian Shack matter?
16  A  Yes.
17  Q  Okay. Charles Parker?
18  A  He's a sergeant in the jail.
19  Q  And what knowledge would he have
20  about your claims?
21  A  I don't know what he knows.
22  Q  He would have known you when you
23  were a jail security officer?

Page 310

1  A  Yes.
2  Q  What about Robert Cole? What
3  knowledge would he have about your claim?
4  A  He's the other -- he's a white
5  male officer that arrested Brian also and
6  didn't swear to his complaint.
7  Q  Okay. And how do you know that?
8  A  Because I was told about it from
9  other officers and from my attorney.
10  Q  Did you hear the testimony about
11  Robert Cole at your -- Strike that. Did you
12  hear the testimony regarding Robert Cole and
13  his role in arresting Shack at the appeals
14  hearing?
15  A  I heard some testimony. Whatever
16  it was testified in there. But I can't tell
17  you exactly what was said during that
18  hearing.
19  Q  Captain Larry Drone? We talked
20  about him some. Any other knowledge that he
21  would have other than what we talked about
22  today?
23  A  I don't know. He could have.

Page 311

1  Q  And Lieutenant Woodham? We've
2  talked a good bit about him; is that
3  correct? Any other knowledge that he might
4  have --
5  A  I don't know.
6  Q  -- that we haven't talked about
7  today?
8  A  I don't know.
9  Q  And Michael Surelly? We've
10  talked about him. Any knowledge that he
11  would have about your lawsuit or claims?
12  A  I don't know if he knows about it
13  or not. It's just -- I don't know. We
14  talked about him. And I told you the things
15  that I could recall. But I don't know what
16  all he knows.
17  Q  Okay. Benny Baxley? We talked
18  about him; is that correct?
19  A  Yes.
20  Q  Okay. But I believe your
21  testimony was that you really didn't have
22  any problems with Surelly or Benny Baxley;
23  is that correct?

Page 312

1  MS. ROBERTSON: Object.
2  A  Not that I can recall, no.
3  Q  I guess the record will speak for
4  itself. John Powell, Chief John Powell?
5  We've talked about him. You originally sued
6  John Powell? Were you aware of that?
7  A  Those were -- My lawyer --
8  Q  You lawyer did that?
9  A  -- did that, did the paperwork.
10  Q  But Chief Powell has been
11  dismissed. Are you aware of that?
12  A  No.
13  Q  He's been dismissed from the
14  lawsuit. Are you aware of that?
15  A  No.
16  Q  Charlotte Jenkins? We've talked
17  about her, correct?
18  A  Yes.
19  Q  Any -- other than what your
20  testimony has been today, any other
21  knowledge that you have that we have not
22  discussed? I know we talked about a lot,
23  and it's been a long day.

78 (Pages 309 to 312)

1    A   It may be. I don't know.
2    Q   John White? Is that your
3  attorney, John White?
4    A   Yes. He was my attorney.
5    Q   Well, other than being your
6  attorney, what knowledge would he have about
7  --
8    A   He was the Chief of Police during
9  my career as a police officer.
10    Q   And also later your attorney; is
11  that correct?
12    A   Excuse me.
13    Q   And later your attorney?
14    A   Yes.
15    Q   Dwayne Herring? Who is that?
16    A   He's a supervisor that worked for
17  the police department.
18    Q   And what knowledge would he have
19  about your claims against the City?
20    A   I don't know.
21    Q   Dave Elkins? Who is that?
22    A   He was a police officer that
23  worked for the City of Dothan.

1    Q   And what knowledge would he have
2  about your lawsuit?
3    A   He knows of some incidences. But
4  I don't know what he aware of or if he has
5  knowledge about the lawsuit. I'm sure
6  people talk. But I don't know what was said
7  to him.
8    Q   Well, when I say your lawsuit,
9  just the claims that you are making in your
10  lawsuit or knowledge that would support your
11  claim while you were employed?
12    A   I can't.
13    Q   You're just not sure?
14    A   No.
15    Q   Peter Nunez?
16    A   Nunez.
17    Q   N-U-N-E-Z. I'm sorry?
18    A   We worked together.
19    Q   Okay. Where did y'all work
20  together?
21    A   In Patrol.
22    Q   Do you remember which squad?
23    A   No.

1    Q   And his knowledge would be
2  working with you?
3    A   I don't know what his knowledge
4  is.
5    Q   Okay. What about Keith Gray?
6    A   He was my supervisor. He was in
7  Internal Affairs. So he had some knowledge
8  of complaints made to him and through
9  Internal Affairs. And some of the
10  complaints --
11    Q   You said at one point -- Excuse
12  me -- that you -- he called you over there
13  to question you about some incidents?
14    A   Yes.
15    Q   Christine Ortiz? O-R-T-I-Z. Who
16  is that?
17    A   She's a police officer for the
18  City of Dothan.
19    Q   What knowledge would she have
20  about your claims against the City?
21    A   I don't know what knowledge she
22  would have about my claims against the City.
23  But we have had past discussions about the

1  difficulties of female working in CID and
2  different things that were said, such as
3  they'll never put a female in Violent
4  Crimes.
5    Q   And who said that?
6    A   She told me Lieutenant Roy
7  Woodham.
8    Q   But you didn't hear him say that?
9    A   I didn't hear him, no.
10    Q   Michael McCall? Who is that?
11    A   He worked in CID. And he was
12  also my FTO.
13    Q   Your what?
14    A   My Field Training Officer. I
15  mean, he worked in Internal Affairs. I
16  think that's what I said.
17    Q   But, I'm sorry. I thought you
18  said he worked in CID?
19    A   I meant Internal Affairs.
20    Q   I'm sorry.
21    A   That's was a --
22    Q   Okay?
23    A   And I'm making a correction to

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

# FREEDOM COURT REPORTING

Page 317

1 that.
2 Q Okay?
3 A I meant Internal Affairs. And he
4 was my Field Training Officer.
5 Q What is that?
6 A Field Training Officer is person
7 that you're put with after you come from
8 police academy, prior to.
9 Q Okay. Michele Blue?
10 A I'm not sure exactly who that is.
11 Q Brad Boan?
12 A Sergeant with the police
13 department.
14 Q We talked about him a little.
15 Thomas Groomes, G-R-O-O-M-E-S?
16 A He's a captain with the fire
17 department.
18 Q And what knowledge would he have
19 about your case?
20 A Me giving some documents to Chief
21 Powell. Me talking to him about the
22 difficulties and being upset over different
23 incidences that happened. He's a friend of

Page 319

1 just was at the restaurant. We were at the
2 restaurant eating whenever I met with Chief
3 Powell.
4 Q And what restaurant was that?
5 A Outback Steak House.
6 Q Okay. And --
7 A I believe that was where it was.
8 Q Do you know, approximately in
9 your time of employment, when that was?
10 A No, I don't.
11 Q What time of the year it was?
12 A No, I don't.
13 Q What squad you were working on?
14 What department?
15 A No, I don't.
16 Q Stephanie Johnson?
17 A She was a sergeant in the jail.
18 Q Ann Baxter?
19 A She works for the Magistrate's
20 office.
21 Q And you mentioned her testimony
22 at the hearing. Anything else that she
23 would have knowledge about?

Page 318

1 mine.
2 Q Okay. And what would he know
3 about the documents you gave to Chief
4 Powell?
5 A He was there at the restaurant
6 when Chief Powell and I -- when I showed
7 Groomes the documents. And after Chief
8 Powell came in, and he and I went outside, I
9 gave the documents that I had shown to
10 Groomes to Chief Powell.
11 Q And what documents were those?
12 A Some of the complaints about how
13 I felt I was being discriminated against.
14 Q Okay. Were they different than
15 any documents I've shown you today?
16 A They could have been. I don't
17 know. You asked me several questions over
18 one document, when I told you that was a
19 partial document. There were other
20 documents. But I can't tell you exactly how
21 many documents was there. But it wasn't
22 just one document that I gave to him during
23 that time. Thomas Groomes, Captain Groomes

Page 320

1 A I don't know what all she knows.
2 She could have more knowledge.
3 Q David Thornton? He's the EEO
4 officer you testified?
5 A Yes.
6 Q And you've talked about your
7 interaction with him. Any other knowledge
8 that he would have?
9 A I don't know.
10 Q Tiffany Sherman?
11 A She used to be a dispatcher for
12 the City of Dothan.
13 Q Is she one of the dispatchers
14 that you contend --
15 A No, I didn't have any problem --
16 Q -- treated you differently? No
17 problem with her?
18 A No.
19 Q And what does she know about your
20 case or complaints?
21 A She heard or was working on a
22 couple of occasions whenever there was a
23 problem with other dispatchers.

80 (Pages 317 to 320)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660

## Page 321

1    Q   RaMonica Carney? We've talked
2    about her. Any other testimony or knowledge
3    that she would have other than what we've
4    talked about?
5    A   I don't know.
6    Q   Judge Rose Gordon? What
7    knowledge would she have about your case?
8    A   I don't know. She knows about
9    Shack. I don't know what all Judge Gordon
10   knows.
11   Q   LaVera McClain?
12   A   She's a Magistrate in the
13   Magistrate's office. She was also a
14   supervisor in the jail.
15   Q   Okay. Jeffrey Shulmerick?
16   A   Police officer for Dothan.
17   Q   He was involved in the write-up
18   you got for not turning in the tickets on
19   time; is that correct?
20   A   It could have been.
21   Q   Okay. Do you know of any other
22   reason he'd be listed here?
23   A   I don't know.

## Page 322

1    Q   Mike Etras?
2    A   He worked in CID when I was
3    assigned there. And he was also, at some
4    point, I think, assigned to Internal
5    Affairs.
6    Q   And what knowledge would he have?
7    A   I don't know what all he knows.
8    Q   You've also listed some people
9    that you claim would have knowledge about --
10   Well, let me ask this. How do you contend
11   that you have been damaged as a result of
12   losing your job?
13   A   I lost my residence,
14   transportation, a way to take care of my
15   family, just whatever property I had other
16   than personal items.
17   Q   And how soon did you go -- You
18   drew unemployment, you said. Then you went
19   to work for Level Plains; is that correct?
20   Do you know when you started going to work
21   for them?
22   A   When did I start working if Level
23   Plains?

## Page 323

1    Q   Yes, ma'am.
2    A   No, ma'am. I don't know the
3    exact date. I think you asked me several
4    questions about that earlier.
5    Q   Yeah. I thought maybe you could
6    remember. Because you thought you had been
7    terminated in 2008. But it was 2007. And
8    you're not sure if you started at Level
9    Plains in 2007 or 2008?
10   A   It was late in the year. But,
11   no, I don't know which one it was.
12   Q   Okay. Well, and then you listed
13   people that would claim to support how
14   you've been damaged. And you've got your
15   children. You've got Tawan Truitt and Bobby
16   Ashley. And how could they testify as to
17   how you've been damaged?
18   A   I don't know.
19   Q   What about Chief Lanise Bonds?
20   Who is that?
21   A   My current chief.
22   Q   And what evidence would he have
23   to support --

## Page 324

1    A   I don't know what evidence he
2    would have.
3    Q   Callie Alaine?
4    A   She's a -- an attorney that --
5    Well, she's a friend first of all. And I
6    had asked her a question early on when I
7    wasn't employed and before I had an
8    attorney. And so that's how -- But she's an
9    Assistant DA in, I think, Tuskegee.
10   Q   Thomas Groomes? We've talked
11   Keith Gray. We've talked about -- You
12   discussed your lawsuit with Keith Gray?
13   A   We've talked about several of the
14   circumstance. And he's aware of it. Yes.
15   Q   Tiffany Sherman? Who is that?
16   A   I just said that she was a
17   dispatcher that worked for Dothan.
18   Q   Okay. I'm sorry. Tammy Liceter?
19   A   She's a friend of mine.
20   Q   Somebody you've talked to about
21   your case or your job?
22   A   Yes.
23   Q   Dave Elkins?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35209 877-373-3660**

## Page 325

1    A  Yes. We -- you asked me a couple
2  of --
3    Q  Okay. Jackie King?
4    A  A friend of mine.
5    Q  Saline Rashod?
6    A  My brother.
7    Q  You talked to Jackie king and
8  Saline Rashod? Rashed. I'm sorry. How do
9  you sat that?
10    A  Saline Rashed.
11    Q  You talked to him about your
12  case?
13    A  I talked to him about my
14  circumstance. Yes.
15    Q  Franklin James?
16    A  He's a NAACP president or a
17  member.
18    Q  Talked to him about your case.
19    A  Yes.
20    Q  Ed Phone?
21    A  He's a member of the NAACP.
22    Q  You talked to him about your
23  case?

## Page 326

1    A  Yes.
2    Q  You never worked with either one
3  of those, did you?
4    A  No.
5    Q  Okay. Belvia Jones?
6    A  Member of the NAACP.
7    Q  You talked to her -- Is that a
8  female?
9    A  Yes.
10    Q  You talked to her about your
11  case?
12    A  I talked to her about the
13  circumstances, yes.
14    Q  Now, when you say circumstances
15  of your employment and losing your
16  employment?
17    A  Yes.
18    Q  Michael McCall? I think we
19  talked about him. Anybody that I didn't
20  name that you've talked about your case, has
21  knowledge about your case?
22    A  It could be. But I can't think
23  of anybody right at this time.

## Page 327

1    Q  I'm looking over your EEO charge.
2  A lot of this, I think we've talked about.
3  You claim you have been refused the same
4  training schools as other white males. What
5  training schools do you contend you have not
6  been allowed to attend?
7    A  Other better quality schools that
8  are in either Meridian or -- not necessarily
9  the place, but RCT gives some more extensive
10  classes. Some requests for those have been
11  turned down. And other white males were
12  allowed to go. You asked me about that
13  earlier when I was in CID. And I told you
14  about the interview and interrogation and
15  requesting classes.
16    Q  Okay. And what white males do
17  you contend were allowed to go on some of
18  this training that you were not allowed --
19    A  I can't give you their names
20  right now.
21    Q  You contend you complained to
22  this City EEO office? That was your
23  testimony about when you said that David

## Page 328

1  Thornton called you over; is that correct?
2    A  Yes.
3    Q  You claim you talked the City
4  Manager. Did you talk to City Manager?
5    A  Yes.
6    Q  Who did talk to?
7    A  Mike West.
8    Q  And when did you talk to him?
9    A  Shortly after he got here.
10    Q  Do you know when that was?
11    A  Shortly after he became City
12  Manager. But I don't know the dates.
13    Q  Do you know what your job was at
14  the time?
15    A  I believe in Patrol.
16    Q  Do you remember what issues you
17  talked to him about?
18    A  Being treated differently.
19    Q  By who?
20    A  Based on -- by different
21  supervisors. Based on being a minority,
22  being black. Other issues in the
23  department. And I wasn't the only one that

1 he talked to.
2     Q  Who else did he talk to?
3     A  One of the dispatchers. Carol --
4 It's a black female. Either her first or
5 last name is Carol, I don't know her name
6 right now. He talked to Lieutenant Gray.
7 And there were other people that he talked
8 to. But I don't know everybody else that he
9 talked to.
10     Q  Did he call you over here?
11     A  I believe he did.
12     Q  Was he investigating or looking
13 into any particular issue that you were
14 aware of?
15     A  I believe he was looking into
16 discrimination or complaints about
17 discrimination.
18     Q  That who had filed?
19     A  I don't know.
20     Q  It was not you? You didn't seek
21 him out?
22     A  No.
23     Q  The Chief of Police? We've

1 talked about that. Bear with me. I'm
2 trying to finish up. Other than Robert
3 Cole, do you contend that there was anyone
4 else treated differently than you for
5 failing to swear a warrant in the proper
6 time?
7     A  I don't know.
8     Q  All right. You also contend that
9 back in June just when you met with Captain
10 Don, prior to your termination, that someone
11 had told you that they were out to get you,
12 or the quote is out to get her. Do you
13 recall that?
14     A  Yes.
15     Q  Who made -- Did somebody make the
16 statement that somebody was out to get you?
17     A  To be careful, that they're out
18 get you or out to fire you. They're looking
19 for something to fire you for.
20     Q  And who said that?
21     A  RaMonica Carney and Bobby Ashley.
22 It wasn't their exact words, but something
23 to that effect.

1     Q  Do you have -- Is one of the
2 things you're seeking is to get your job
3 back with the City of Dothan?
4     A  Am I seeking to get my job back?
5 I wouldn't be opposed to it, no.
6     Q  It took you a while to answer
7 that. Are you just thinking about it?
8     A  No. Just trying to answer the
9 question.
10     Q  Are you aware that the City has
11 policies which prohibit harassment and
12 discrimination?
13     MS. ROBERTSON: Object.
14     MS. NELSON: I'm asking does
15 she --
16     MS. ROBERTSON: Well, I think a
17 policy something that's actually
18 enforced. And if it's a piece of paper,
19 it's not --
20     MS. NELSON: Well, I object to
21 your speaking.
22     MS. ROBERTSON: Well, you're
23 the one who was telling me you were just

1 trying to do something. I was just
2 objecting.
3     THE WITNESS: I don't know what
4 about the policy is about that. I know
5 I made complaints about it.
6 BY MS. NELSON:
7     Q  When you left the City, did you
8 immediately seek other jobs?
9     A  Yes, I did.
10     Q  And where all did you look?
11     A  Ozark Police Department, Headland
12 Police Department, Eufaula Police
13 Department.
14     Q  Did you obtain any interviews?
15     A  Yes.
16     Q  Were you ever given a reason why
17 you were not hired at those places?
18     A  For Ozark, with all the articles
19 that was put in the Police Department
20 concerning me in Dothan, they decide to wait
21 until after the hearing. Everything was put
22 on the television, the internet, the
23 newspaper just the day before or the day of

Page 333

1  the hearing, on front page of the paper or
2  close to the front page of the paper. So
3  they were concerned about that.
4      Q   Did you -- Did they tell you
5  that?
6      A   I was asked, well, what are you
7  going to do about Dothan? Are you going to
8  go back if they give you your job back?
9      Q   And they were waiting until that
10 was resolved; is that what your saying? Is
11 that what your saying?
12     A   Yes.
13     Q   Okay. Do you know if you or your
14 attorneys were responsible for that being in
15 the paper or on the news?
16     A   No, not to my knowledge.
17     Q   Okay?
18     A   That came from the City of
19 Dothan, to my knowledge.
20     Q   I'm sorry?
21     A   It came from the City of Dothan,
22 to my knowledge.
23     Q   But you don't know that, do you?

Page 334

1      A   No, I do not. I know I didn't
2  put it in the paper.
3      Q   Well, the newspaper around here
4  is pretty active. Is that -- Would you
5  agree with me on that?
6      A   I don't know.
7      Q   In covering things?
8      A   They could be.
9      Q   Do they cover other Personnel
10 Board hearings?
11     A   Not all.
12     Q   And how do you know that?
13     A   I haven't seen every Personnel
14 Board hearing on the television. Do they?
15     Q   I'm asking you? Do you know how
16 Personnel Board hearings there are?
17     A   No, ma'am, I don't.
18     Q   Do you have any knowledge as to
19 when the City of -- the City became aware of
20 your EEOC charge?
21     A   No, I don't.
22         MS. ROBERTSON: Well, I object.
23     She filed two.

Page 335

1      Q   Well, I disagree. But do you
2  have any evidence as to when they received
3  any EEOC charge that you filed? Do you have
4  any evidence of when the City may have
5  received notice that you filed any EEOC
6  charge?
7      A   No, I don't have when they were
8  notified.
9          MS. NELSON: Can y'all give me
10     about five minutes? And let me see
11     if --
12         MS. ROBERTSON: Sure.
13         MS. NELSON: -- I can finish
14     up?
15 (Whereupon, a short break was taken.)
16 BY MS. NELSON:
17     Q   I've just got a few more
18 questions. I believe I asked you this
19 morning, your not on any medication. But
20 are you under the care of a doctor at this
21 moment?
22     A   No.
23     Q   Okay. Do you have a regular

Page 336

1  doctor that you see?
2      A   Only when I'm sick. But, no, I
3  don't have a regular one, a regular doctor.
4      Q   Okay. Who do you go to?
5      A   Emergency room or FirstMed or --
6      Q   Okay?
7      A   -- whatever doctor I can get an
8  appointment for.
9      Q   Okay. Do you have, like, a
10 OB-GYN or gynecologist or anything like
11 that, that you see regularly or not really?
12     A   No.
13     Q   Okay. Is there a particular
14 pharmacy or drugstore that you use if you
15 ever get medications?
16     A   Walgreens or CVS, Wal-Mart,
17 different pharmacies.
18     Q   Okay. You haven't been to see,
19 like, a psychologist or a counselor or
20 anything about losing your job?
21     A   No. If I should go see a
22 psychiatrist or psychologist or something,
23 their career is over because it's going to

84 (Pages 333 to 336)

## Page 337

1  come back. And it's going to be held
2  against them.
3      Q   I'm sorry, if an officer does
4  that?
5          MS. ROBERTSON: Policeman.
6      A   If a policeman seeks a therapist
7  or distress or depression, most officer
8  don't want to go to one because if that's
9  ever listed in your history, then it's going
10  to be -- it's going to count against you.
11     Q   Where did you get that
12  understanding from? Is that just --
13     A   Officers talking.
14     Q   -- officers talk?
15         MS. ROBERTSON: They used to
16  tell you that on Law and Order. But
17  it's been cancelled.
18     Q   Do you currently have a car?
19     A   Yes.
20     Q   And I know -- and I appreciate
21  your being here. It's been a long day. But
22  I'm just -- And I've asked you lots of
23  questions. But I'm just going to give you

## Page 338

1  one more opportunity to -- Have you
2  basically told me everything, all the facts
3  that you know of that would support the
4  claims that you've made against the City of
5  Dothan in this lawsuit?
6          MS. ROBERTSON: Object.
7      A   I'm not saying I told you all the
8  facts, or I can't make that statement. But
9  I've told you the things that I can recall
10  and tried to answer the questions that you
11  asked me and give you the answers to
12  questions that I can answer -- answers that
13  I can provide to you. Are there other
14  things -- incidences or something I might
15  have missed? It could be.
16     Q   Well, is there any one thing that
17  stands out in your mind, that, oh my gosh,
18  she didn't ask me that or I can't believe I
19  didn't tell her about that?
20         MS. ROBERTSON: Object.
21     A   I don't know.
22     Q   Did anybody ever use any type of
23  derogatory language or a racial slur or

## Page 339

1  sexual slur towards you?
2      A   Did anybody --
3      Q   At the -- I'm sorry. Any of your
4  supervisors at the City of Dothan?
5      A   There could have been. But I
6  cannot sit and tell you a supervisor that
7  said something. You're asking me if
8  somebody said something directly to me,
9  called me a derogatory name or are you
10  talking about saying something around me? I
11  told you what I can remember.
12     Q   I'm asking if you remember
13  anybody -- any supervisor, to your face,
14  called you a derogatory name?
15     A   I can't think of a supervisor.
16     Q   And isn't that the type of thing
17  that you would remember if they had done
18  that?
19     A   There's a lot of things to try to
20  remember. There's a lot of things that
21  happened. There's a lot of stress that went
22  along with a lot of things that happened.
23     Q   Well, I'm saying --

## Page 340

1      A   So you're asking me question
2  after question after question. And I'm
3  trying to answer you're question and give
4  you an answer.
5      Q   If somebody had used a derogatory
6  or racial slur toward you, that's something
7  you would remember, wouldn't you? Wouldn't
8  you remember that?
9      A   I believe so.
10     Q   And you don't you sit here today,
11  remember anything like that happening, do
12  you?
13         MS. ROBERTSON: Object.
14     A   I don't know. I don't think so.
15  I don't know.
16         MS. NELSON: I do want to get
17  her tax returns. And, I mean unless,
18  there's something a little unusual about
19  having to question her about, I think
20  I'm done.
21         MS. ROBERTSON: Okay.
22         MS. NELSON: Okay. Thank you.
23         MS. ROBERTSON: Thank you.

85 (Pages 337 to 340)

Page 341

1    (Furthermore, the witness saith not.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 342

1            CERTIFICATE
2
3    STATE OF ALABAMA:
4    COUNTY OF BUTLER:
5
6        I hereby certify that the above and
7    foregoing deposition was taken down by me in
8    stenotype and the questions and answers
9    thereto were transcribed by means of
10   computer-aided transcription, and that the
11   foregoing represents a true and correct
12   transcript of the testimony given by said
13   witness upon said hearing.
14       I further certify that I am neither of
15   counsel, nor of kin to the parties to the
16   action, nor am I in anywise interested in
17   the result of said cause.
18
19       /S/Renny D. McNaughton
         RENNY MCNAUGHTON, CCR
20       CCR #411 Expires 9/30/10
         Commissioner for the
21       State of Alabama at Large
         My Commission Expires:
22       12/27/2011
23

86 (Pages 341 to 342)