IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SYLVIA SUMMERS | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 1:08-cv-784-MEF |
| | ) | |
| CITY OF DOTHAN, ALABAMA, | ) | (WO—Publish) |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This lawsuit is brought under 42 U.S.C. § 1983—for violations of the Fourteenth

Amendment and 42 U.S.C. § 1981—and under Title VII of the Civil Right Act of 1964,

codified at 42 U.S.C. §§ 2000e et. seq. ("Title VII").  Sylvia Summers ("Summers")

claims sex discrimination, race discrimination, and retaliation against the defendant, City

of Dothan, Alabama ("City of Dothan"), allegedly occurring during her employment with

the Dothan City Police Department.  (Doc. # 1, at 3, ¶ 14).  The action is now before the

Court on three motions: (1) the City of Dothan's Motion for Summary Judgment, (Doc. #

31), filed on July 19, 2010; (2) Summers's Motion to Strike Defendant's Untimely

Evidentiary Submission and Argument ("Motion to Strike"), (Doc. # 44), filed on August

16, 2010; and (3) the parties' Joint Motion to Extend Pretrial Deadlines ("Joint Motion to

Extend") filed on October 20, 2010.  (Doc. # 56).  For the following reasons, this Court

finds (1) that the Motion to Strike, (Doc. # 44), is due to be GRANTED in part and

DENIED in part; (2) that the Motion for Summary Judgment, (Doc. # 31), is due to be

GRANTED; and (3) that the Joint Motion to Extend, (Doc. # 56), is due to be DENIED as

MOOT.

## I. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over the case pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)–(4) as well as 42 U.S.C. § 2000e-5(f)(3).  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3).

## II. FACTS[1] AND PROCEDURAL HISTORY

### A.  The Rules, Regulations, and Policies

The City of Dothan's Personnel Rules and Regulations ("the Personnel Rules") govern its employees, all of whom are provided with a copy of the Personnel Rules in an employee handbook.  (Doc. # 32, at 2).  The Personnel Rules provide that "[i]t shall be the duty of all City employees to comply with and to assist in the compliance of the provisions of the Personnel Rules."  (Doc. # 33 Ex. E, McKay Aff. Ex. A. § 3-10(1)). Offenses, including failures to comply with the Personnel Rules and applicable laws, are categorized into three classifications—Minor, Major, and Intolerable—based upon their level of seriousness.  *Id.* § 3-20(1)–(3).  Although not defined, Minor offenses result in discipline that is "designed to be positive in nature, whereby employees are accorded the opportunity to correct their behavior or performance."  *Id.* § 3-20(1).  Major offenses are those "that are extremely serious in nature but not so serious that a discharge is required

---

[1] This recitation of "facts" is based upon the Complaint, (Doc. # 1), the Motion for Summary Judgment as well as the brief and evidence in support thereof, (Docs. # 31–33), and the Response in opposition to the summary judgment motion as well as the evidence in support thereof.  (Docs. # 39–40).

upon committing the first such offense." *Id.* § 3-20(2). "The first 'Major' offense committed shall result in a 'final warning' and a one (1) to twenty-(20) day suspension without pay." *Id.* § 3-20(2)(a). "Violation of any subsequent 'Major' offense within two years shall be grounds for discharge." *Id.* Included in the Personnel Rules is a "Schedule of Disciplinary Penalties" that provides a non-inclusive list of infractions that fall into each classification of offense. *Id.* §§ 3-40–3-44. Infractions considered to be Major offenses include "[a]ction(s), or lack of action(s) that could endanger the life or health of self or others, that could cause undue financial loss to the City, negligence in carrying out assigned tasks or duties or responsibilities of one's position." *Id.* § 3-42(6). The Personnel Rules also provide for a grievance and appeal procedure. *Id.* § 5-30. Under this procedure, an employee first files a complaint with his supervisor. *Id.* § 5-30(1). "In the presentation of grievances, grievants are assured of freedom from restraint, interference, discrimination, or reprisal." *Id.* If unsatisfied with the department head's disposition of the grievance, the employee can then appeal to the Personnel Board. *Id.* § 5-30(2).

The City of Dothan maintains an Equal Opportunity and an Affirmative Action Plan ("The Equal Opportunity Plan") in order to assure "equal opportunity for all applicants and employees . . . based on a policy of nondiscrimination in personnel procedures and practices." (Doc. # 33 Ex. E, McKay Aff. Ex. B). The Plan prohibits discrimination because of, inter alia, race and gender, in such areas as recruiting, hiring,

the terms and conditions of employment, and promotions. *Id.*

Police officers in the Dothan Police Department ("Police Department") are expected to follow additional rules and regulations. (Doc. # 32, at 4). The Police Department "provides its offices with standard procedural guidelines in the form of Procedural General Orders ('PGOs')." *Id.* PGO 511 provide the criteria for, inter alia, arrest procedures, booking procedures, warrants, and jurisdiction. *Id.*; *see also* Doc. # 33 Ex. F, Powell Aff. Ex. A. Section II(A) of PGO 511 provides that:

> [t]he Officer shall be responsible for obtaining warrants in State misdemeanor cases the same working day, if possible, or the next working day the Magistrate is available. Prisoners charged with State misdemeanors or felonies will not be transferred without warrants unless ordered by the judge with jurisdiction in the particular offense or the sheriff of the affected county.

(Doc. # 33 Ex. F, Powell Aff. Ex. A).

Finally, police officers must also abide by the by the laws of the state, including Rule 19 of the Alabama Rules of Judicial Administration ("Rule 19"), which provides the requirements for issuing traffic tickets. (Doc. # 32, at 4). Rule 19(6)(a)(i) states:

> Each law enforcement officer shall complete and sign the ticket, serve a copy of the completed ticket upon the defendant, and without unnecessary delay, normally within 48 hours, acknowledge under oath the facts alleged therein before any person within the judicial branch of government who is authorized by the State of Alabama to administer oaths and file the court copies of the ticket with the court having jurisdiction over the alleged offense.

(Doc. # 33 Ex. F, Powell Aff. Ex. D). Thus, officers in the Dothan Police Department are expected to swear to Uniform Traffic Citations ("UTCs") within 48 hours after issuance.

4

## B.  Underlying Facts

### i.  Initial Hiring

Summers is an African-American female.  (Doc. # 32, at 5; Doc. # 39, at 2).  On June 12, 2000, the City of Dothan hired her as a Jail Security Officer.  (Doc. # 32, at 5; Doc. # 39, at 2).  Summers alleges that she was subjected to racial and sexual discrimination during her employment as a Jail Security Officer.[2]   (Doc. # 1, at 3, ¶ 16).  During this time, Summers complained about the alleged discrimination to supervisors and management.[3]  (Doc. # 1, at 4, ¶ 21; Doc. # 32, at 5).  Summers alleges that the City of Dothan took no disciplinary action against these other employees in response to her complaints.  (Doc. # 1, at 4, ¶ 21).  The City of Dothan does not contest that no such disciplinary action was taken but does contend that it "fully investigated" Summers's

---

[2] Specifically, she claims that one male co-worker told her that he did not like working with women and that she could not help him if they got into an altercation with a prisoner because women were not as strong as men.  (Doc. # 1, at 3, ¶ 17).

She also alleges that a white male co-worker asked her "why all black guys liked to play with their genitals."  *Id.* at 4, ¶ 18.  The co-worker then allegedly proceeded to "make sexually inappropriate references to his own genitalia, stating that when a man got to be his age, 'you build a shed to put your tools under,' and 'you may not see it, but when you whistle for it, it will come out.'"  *Id.*  Another male co-worker responded to these comments by stating, "Just because you see gray on top, it doesn't mean there is no fire in the furnace."  *Id.* at 4, ¶ 19.  Summers understood this to be referring to male genitals.  *Id.*

Finally, Summers alleges discrimination in the job assignments given to her.  *Id.* at 4, ¶ 20 ("[Summers] was also treated differently then her white male co-workers in job assignments. [She] was not allowed to process inmates and/or to fingerprint inmates as were the male officers. Further, [she] was not allowed to use the computer as were the male officers.").

[3] Summers alleges that her supervisors retaliated against her by giving her "write ups for the same or similar actions taken by white, male co-workers and [giving her] poor job evaluations."  (Doc. # 1, at 4, ¶ 22).

complaints.  (Doc. # 32, at 5).  Summers claims that she was subjected to retaliation after

her complaints in that "she received write ups for the same or similar actions taken by

white, male co-workers and she received poor job evaluations."  (Doc. # 1, at 4, ¶ 22).

She also asserts that her job was threatened.  *Id.*

### *ii.* **Subsequent Transfers**

During the City of Dothan's investigation into Summers's complaints of

discrimination, she was promoted to Police Officer on April 22, 2001 and assigned to the

Patrol Division.  (Doc. # 1, at 4, ¶ 23; Doc. # 32, at 5).  Plaintiff alleges sexual and racial

discrimination during her time in the Patrol Division.  (Doc. # 1, at 4–5, ¶ 24) (claiming

that if Summers "was sent out on a call and required backup, the back up [sic] was

unnecessarily delayed by being sent from across town instead of calling the closest officer

available").  Summers complained to her new supervisors.  *Id.* at 5, ¶ 25.  She further

alleges retaliation for these complaints.  *Id.* at 4–5, ¶ 24.  The City of Dothan contends,

and Summers does not dispute, that she "received a number of disciplinary infractions

and had a number of performance issues" throughout 2002 and 2003.  (Doc. # 32, at 6).[4]

---

[4] Specifically, in May of 2002, Summers received a 12-hour suspension for a motor
vehicle collision that occurred on April 1, 2002, which was determined to be a Major offense.
(Doc. # 32, at 6).  On May 9, 2002, Summers did not report for duty, which was the third time
she had done so.  *Id.*  For this she received formal counseling and was charged with a Minor
offense.  *Id.*  Also in May of 2002, Summers received a performance evaluation which noted that
she needed to work on keeping track of time-sensitive deadlines, such as "turn[ing] in tickets,
swear[ing] to complaints, and attend[ing] court and regular duty."  *Id.*  This performance
evaluation also gave her an "unsatisfactory" score in the "dependability" category.  *Id.* at 6–7.
Furthermore, on October 2, 2002, Summers made an arrest without appropriate backup
and received a written warning for a Minor offense.  *Id.* at 7.  She was also involved in second

In or around May of 2004, Summers was transferred to the Environmental Compliance Bureau.  *Id.* at 7.  In November of 2004, she was transferred to the Criminal Investigations Division ("CID"), (Doc. # 1, at 5, ¶ 26; Doc. # 32, at 7), where she alleges further discriminatory treatment as well as retaliation for her former complaints.  (Doc. # 1, at 5, ¶ 27).[5]

### *iii.*  The Shack Incident

On April 5, 2006, Officer Summers arrested Brian Shack ("Shack") for criminal trespass as well as several outstanding warrants.  (Doc. # 32, at 10; Doc. # 39, at 4).[6] Officer Joey Evans ("Officer Evans") was the assisting officer during the arrest and, afterwards, transported Shack to the Dothan City Jail.  (Doc. # 39, at 4).  Shack was booked on the outstanding warrants as well as the new criminal trespassing charge.  *Id.* According to Summers, the "usual practice" in situations where the arresting officer does not transport the arrestee to the jail is "for the transporting officer to fill out the first part of the complaint form, attach it to the arrest report, and send it through channels where

---

motor vehicle collision on November 17, 2003.  *Id.*  After the Employee Safety/Committee Accident Review Board determined that Summers was "careless and had caused or contributed to the accident," she received a five-day suspension.  *Id.*

[5] Specifically, Summers alleges that she "was not assigned cases in the same manner as were her CID co-workers and was not allowed to work her cases as were the other officers in CID."  (Doc. # 1, at 5, ¶ 28).  She also claims that she was reprimanded for affiliating with other African-Americans and "told to curtail her contact with other African American [sic] officers while at work."  *Id.* ¶ 29.  According to Summers, another African-American co-employee also filed a written complaint of racial discrimination based upon this.  *Id.*

[6] After this incident, Summers claims to have "raised concerns that the dispatchers and other police officers did not respond to her requests for backup."  (Doc. # 39, at 4 n.2).

7

ultimately it is posted on the 'swear board' at the magistrate's office for the arresting officer to sign." *Id.* at 5. "If a complaint is not properly turned in, the person remains in jail without any record of an arrest." (Doc. # 32, at 10). With regards to Summers's arrest of Shack, no paperwork was completed by either Summers or Officer Evans so that the Municipal Court had no record of his arrest. *Id.* As a result, Shack remained confined in the jail for 104 days[7] until a Magistrate Judge released him on July 17, 2006.[8] (Doc. # 33 Ex. F, Powell Aff. Ex. B).

During this time, on June 1, 2006, Summers claims that she submitted a written complaint to the Chief of Police, John Powell ("Chief Powell"), addressing her poor job evaluations, prior conflicts, and unfair treatment by supervisors. (Doc. # 1, at 5, ¶ 30). She also claimed that her supervisors spoke profanely towards her in a derogatory manner and that she was subject to unequal and unfair treatment. *Id.* In support of this, Summers cites to a Police Officer's Statement of Events form dated June 1, 2006 with Chief Powell as the recipient. Doc. # 39, at 2; *see also* Doc. # 33 Ex. B-35. Chief Powell, however, denies any knowledge of Summers's alleged complaints of discrimination or retaliation. (Doc. # 33 Ex. F, Powell Aff. ¶ 19). In July of 2006, Summers was transferred to the First Squad Patrol Division. (Doc. # 1, at 5 ¶ 31).

_____

[7] In its brief, the City of Dothan states that Shack was in jail for 103 days, (Doc. # 32, at 10–11); however, the evidence they cite to—the memorandum from an internal affairs officer who investigated the incident—states that it was 104 days. (Doc. # 33 Ex. F, Powell Aff. Ex. B).

[8] The Magistrate Judge found that 37 of these days were applied to fines owed on other charges. (Doc. # 33 Ex. F, Powell Aff. Ex. B).

In late July of 2006, Chief Powell learned of the Shack incident and assigned the matter to Lieutenant Ray Owens ("Lt. Owens"), who then assigned it to Corporal John Brackin ("Corp. Brackin") in Internal Affairs for investigation. (Doc. # 32, at 11; Doc. # 39, at 5). On January 8, 2007, Corp. Brackin completed his investigation and turned in his report and recommendation to Chief Powell. (Doc. # 33 Ex. F, Powell Aff. Ex. B). He determined that Shack had been held in jail for "104 days without a complaint of arrest being properly signed" until being released on July 17, 2006. *Id.* He stated that Summers did not go to the Magistrate's office to swear to the complaint until July 28, 2006, after being notified of Shack's release. *Id.* He also determined that this inaction subjected the City of Dothan and the Police Department to undue financial loss. *Id.* at 4. Thus, Corp. Brackin found that Summers had violated PGO 511 § II(A) and had committed a Major offense under Personnel Rule 3-42(6).[9] *Id.* On January 12, 2007,

---

[9] Corp. Brackin's investigation also contained a section entitled "Points of Concern or Checks and Balances." (Doc. # 33 Ex. F, Powell Aff. Ex. B). In this section, he suggested that "[s]pecific guide lines [sic] should be addressed as to who should start the complaint process." *Id.* He noted that PGO 511 "outlines that the arresting officer should swear to the complaint on the day of the arrest or the next business day." *Id.* However, he recommended that "[i]t should be the responsibility of the **transporting [o]fficer** to pull this complaint from the complaint cabinet and attach it to the arrest report." *Id.* (emphasis in original).

Summers also argues that "the investigation uncovered numerous problems with [the City of Dothan's] procedures and uncovered facts which suggested that a number of [the City of Dothan's] employees were potentially responsible for the absence of the complaint." (Doc. # 39, at 6). For example, she points out that Corp. Brackin's report states that if Sergeant William Banks ("Sgt. Banks")—the officer who booked Shack at the jail—"'would have placed a blank complaint [form] with the arrest report or insured that Officer Summers pulled the complaint [form] the end result could have been possibly avoided.'" *Id.* at 9 (emphasis omitted) (quoting Doc. # 33 Ex. F, Powell Aff. Ex. B). Similarly, on April 28, 2006, Shack filled out an Inmate Request/Grievance Form seeking to use the phone and become a trustee. *Id.* She contends that Sergeant David Lewis ("Sgt. Lewis")—the officer who responded to the grievance—"took thirty-

Chief Powell then charged Summers with a Major offense and administered a final written warning a few days later.  (Doc. # 1, at 5–6, ¶¶ 32–33; Doc. # 32, at 12).  Summers did not appeal this determination to the Personnel Board.  (Doc. # 32, at 12).

During the investigation of Summers's arrest of Shack, Internal Affairs discovered that Officer Robert Cole ("Officer Cole") had also arrested Shack for criminal trespassing and failed to timely swear to the complaint.  (Doc. # 32, at 12; Doc. # 33 Ex. F, Powell Aff. ¶ 8; Doc. # 39).  Corp. Brackin also investigated this incident and turned in his report and recommendation on January 5, 2007.  (Doc. # 33 Ex. F, Powell Aff. Ex. C).  His investigation revealed that Officer Cole had arrested Shack on November 22, 2005 and that he filled out an arrest complaint.  *Id.*  He did not sign it at this time because no Magistrate Judge was available.  *Id.*  According to Corp. Brackin's report and recommendation, the Magistrate's office then called Officer Cole to remind him to sign the complaint form.  *Id.*  When Officer Cole arrived at the office, the complaint that he had completed earlier could not be found, so he left and did not return to sign it.  *Id.*  Thirteen days after his arrest, Shack appeared in front of a Magistrate Judge, who determined that he had been in the jail for thirteen days without a signed complaint against him.  *Id.*  The Magistrate Judge then nolle prossed the charge due to Officer

---

three days to respond to [it] and then failed to check with the Magistrate's office to determine whether Shack was properly incarcerated."  (Doc. # 39, at 9) (emphasis omitted).  Corp. Brackin's investigation determined that if Sgt. Lewis had cross-referenced the Detention records, showing the open criminal trespassing charge, with the Magistrate records, then "the end result could have possibly been avoided."  (Doc. # 33 Ex. F, Powell Aff. Ex. B).

Cole's lack of action.  *Id.*  Corp. Brackin determined that Cole's inaction also subjected

the City of Dothan to undue financial loss.  *Id.*  However, he recommended that Officer

Cole receive a Minor offense for violating Personnel Rule 3-41(7),[10] *id.*, which he did

receive.  (Doc. # 32, at 13; Doc. # 39, at 12).

### iv.  The Missing UTCs and Summers's Termination

On March 15, 2007, Summers issued three UTCs to motorists in Dothan.  (Doc. #

32, at 16).  However, she did not swear to the UTCs within 48 hours as required by Rule

19.  Over one month later, on or around April 17, 2007, one of the motorists went to the

Magistrate's office to pay the traffic ticket; however, there was no record of the ticket

because Summers had failed to turn in the three UTCs.  (Doc. # 32, at 16; Doc. # 39, at

13–14).  Another police officer who "had spoken to the motorist regarding the missing

UTC" called Sergeant Benny Baxley ("Sgt. Baxley") who then informed Lieutenant Roy

Woodham ("Lt. Woodham") of the missing UTCs.  (Doc. # 32, at 16–17; Doc. # 39, at

13–14).  Investigating at Lt. Woodham's request, Sgt. Baxley met with Summers and

discovered that she had the unsworn UTCs tucked in to the backside of her book.  (Doc. #

32, at 17; Doc. # 39, at 14).  Summers immediately went to the Magistrate's office and

swore to the tickets over a month after issuing them.  (Doc. # 32, at 17; Doc. # 39, at 14).

On April 25, 2007, both Lt. Woodham and Sgt. Baxley wrote memorandums to

---

[10] Personal Rule 3-41(7) states that a Minor offense includes "[i]naccura[cy], careless[ness], failure to comply with standard procedures, [and] mak[ing] recurring errors." (Doc. # 33 Ex. E, McKay Aff. Ex. A.)

Chief Powell regarding Officer Summers.  (Doc. # 32, at 18; Doc. # 39, at 14–15).  Lt. Woodham discussed her failure to comply with the 48-hour rule for swearing to UTCs and stated, "I personally know of several times in her employment where Officer Summers has been counseled in similar matters of time sensitive follow-up of police actions."  (Doc. # 33 Ex. F, Powell Aff. Ex. E).  He also noted Summers's receipt of a Major offense less than six months earlier for the Shack incident.  *Id.*  Chief Powell again contacted Lt. Owens in Internal Affairs to investigate the matter and also referred it to the legal department.  (Doc. # 32, at 19).  After completing its investigation, Internal Affairs recommended charging Summers with a Major category offense.  *Id.*  "Based on [Summers's] conduct, Chief Powell made the decision to administer a write-up for a major category offense in accordance with the [Personnel Rule] 3-42(6)."  *Id.*[11]

On June 20, 2007, at 4:07 p.m., Summers was served with notice of a Determination Hearing set for June 22, 2007, in which she was to be charged with her second Major offense for her failure to timely turn in the three UTCs.  *Id.* at 21.  That same day, at 11 p.m., Summers faxed a written statement to the Equal Employment Opportunity Commission ("EEOC") alleging sex and race discrimination.[12]  *Id.*  At her

---

[11] On June 12, 2007, Summers met with Captain Larry Draughon ("Captain Draughon") and complained about the alleged unfair treatment by her male supervisors—including, Lt. Woodham and Sgt. Baxley—as well as her problems with the dispatchers.  (Doc. # 1, at 6, ¶¶ 37–38; Doc. # 32, at 20).  She told him that "she was not treated fairly by her supervisors, had been told they were 'out to get her,' and complained about Lt. Woodham making remarks about her wearing a dress suit."  (Doc. # 1, at 6, ¶ 38).  At this time, she also requested a transfer to another shift.  (Doc. # 32, at 20).

[12] In her Response, Summers does not contest the timing of these two events.

Determination Hearing, Summers argued that her failure to submit the UTCs was a "good faith mistake." *Id.* On June 25, 2007, Summers's employment with the Police Department was terminated for receiving two Major offenses within six months. *Id.* at 22. She appealed her termination. *Id.*

The City of Dothan received notice of Summers's EEOC charge on July 3, 2007, eight days after her termination. *Id.* at 21. On July 10, 2007, Summers amended her EEOC charge to reflect her termination. *Id.* at 22. Finally, on August 1, 2007, Summers's appeal was heard by the Personnel Board. *Id.* For Summers's appeal, her merit system attorney had subpoenaed the Police Department for the UTC records of other police officers. (Doc. # 39, at 15). The evidence produced demonstrated several previously unknown violations of the 48-hour rule for UTCs by these other officers. *Id.* The Personnel Board ultimately ratified the decision to terminate her on September 19, 2007. (Doc. # 32, at 22).

## C.  Procedural History

On September 23, 2008, Summers filed this action pursuant to § 1983—for violations of the Equal Protection Clause of the Fourteenth Amendment and § 1983—and Title VII, alleging discrimination on the basis of race and gender in the form of disparate treatment as well as retaliation for complaining of such discrimination during her employment with the City of Dothan. (Doc. # 1).[13]  Count II alleges race and sex

---

[13] Count I alleged race and sex discrimination as well as retaliation in violation of Title VII against Chief Powell in his official capacity. (Doc. # 1, at 8–9, ¶¶ 51–60). However, Count I

discrimination as well as retaliation in violation of Title VII. *Id.* at 9–10, ¶¶ 61–70. Count III claims race discrimination and retaliation in violation of the Equal Protection Clause of the Fourteenth Amendment and § 1981, brought pursuant to § 1983. *Id.* at 11–12, ¶¶ 71–84. Finally, Count IV alleges sex discrimination and retaliation in violation of the Equal Protection Clause of the Fourteenth Amendment, brought pursuant to § 1983. *Id.* at 12–14, ¶¶ 85–98.

On July 19, 2010, the City of Dothan filed a Motion for Summary Judgment as to all of these counts, (Doc. # 31), a brief in support of this motion, (Doc. # 32), and an evidentiary submission. (Doc. # 33). Summers filed Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("the Response") on August 5, 2010. (Doc. # 39). One week later, on August 12, 2010, the City of Dothan filed Defendant's Reply Brief in Support of its Motion for Summary Judgment ("the Reply"). (Doc. # 41). The City of Dothan also filed another evidentiary submission, (Doc. # 42), including new and additional evidence in support of its motion for summary judgment. In response, Summers filed her Motion to Strike such new and additional evidence. (Doc. # 44).

### III.  DISCUSSION

### A.  THE MOTION TO STRIKE

Summers contends that the City of Dothan's Reply and evidentiary submission in

---

was dismissed by this Court's January 30,2009 order, (Doc. # 23), granting Chief Powell's motion to dismiss.  (Doc. # 5).

support thereof "are improper because both contain additional evidence and argument that were not timely raised in [the City of Dothan's] initial brief and evidentiary submission." (Doc. # 44, at 2).  She points to this Court's Uniform Scheduling Order and its requirement that dispositive motions be filed by July 19, 2010 and that a "'brief and all supporting evidence shall be filed with any such motion.'"  *Id.* at 1 (quoting Doc. # 26, at 1).  Thus, Summers objects to three additional exhibits filed as part of the City of Dothan's evidentiary submission in support of its reply brief: (1) Exhibit E, the affidavit of Delvick J. McKay II; (2) Exhibit F, Summers' initial disclosures; and (3) Exhibit G, the affidavit of Judge Rose Evans Gordon.[14]  *Id.* at 2 n.1.  Similarly, she argues that consideration of this additional evidence would be inappropriate because she has not had the opportunity to rebut it.  *Id.* at 3–6.

Despite this Court's Uniform Scheduling order, "[a]ccording to Rule 6(b), a court may enlarge the time period in which a party has to act, even upon motion made after the expiration of the specified time period, where the failure to act was the result of 'excusable neglect.'" *Osahar v. U.S. Postal Serv.*, 136 Fed. Appx. 259, 260–61 (11th Cir. 2005) (citing Fed. R. Civ. P. 6(b)).  However, the City of Dothan has not filed any motion for extension nor has it sought leave of this Court to file additional evidentiary

---

[14] Exhibits A through D are the final deposition transcripts for Officers Benny Baxley, Michael Cirulli, Roy Woodham, and Joey Evans.  (Doc. # 44, at 2 n.1).  Summers herself submitted the rough draft forms of these depositions in her August 5, 2010 Response and "does not object to the submission of the final version of these transcripts."  *Id.*  Thus, Exhibits A through D will be considered in ruling on the summary judgment motion.

submissions with its reply brief.  Nor has the City of Dothan made an affirmative showing of excusable neglect or of newly-discovered evidence.  Therefore, this Court will not consider such untimely additional evidence when ruling on the City of Dothan's motion for summary judgment.  *See Gary v. Ga. Dep't of Human Res.*, No. 4:03-CV-164(CDL), 2005 U.S. Dist. LEXIS 46991, at *2–3 (M.D. Ga. Nov. 3, 2005) (refusing to consider an "untimely affidavit" because the plaintiff "filed no additional motion to extend the deadline" at issue and because she made no showing that the untimeliness was the result of excusable neglect or that the affidavit's content was "newly discovered evidence extracted from a previously missing source") (citing Fed. R. Civ. P. 6(b)), *aff'd*, 206 Fed. Appx. 849 (11th Cir. 2006); *Mosley v. Meristar Mgmt. Co., LLC*, 137 Fed. Appx. 248, 250 (11th Cir. 2005) ("Absent an affirmative showing . . . of excusable neglect according to Fed. R. Civ. P. 6(b), a court does not abuse its discretion in refusing to accept out-of-time affidavits.") (citing *Useden v. Acker*, 947 F.2d 1563, 1571–72 (11th Cir. 1991), *cert. denied*, *Useden v. Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel*, 508 U.S. 959 (1993)), *reh'g denied, reh'g en banc denied*, 163 Fed. Appx. 850 (11th Cir. 2005); *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 959 (N.D. Ga. 1995) (excluding one declaration that "was not submitted with Defendant's original Motion for Summary Judgment, but only with Defendant's Reply Brief" because the plaintiff did "not have an opportunity to respond to this 'new' evidence"), *aff'd without opinion*, 87 F.3d 1331 (11th Cir. 1996), *reh'g en banc denied*, 99 F.3d 1157 (11th Cir. 1996).

16

Additionally, Summers argues that this Court should strike an argument by the City of Dothan based upon Lt. Woodham's deposition.  (Doc. # 44, at 7–9).  She does not object to the inclusion of this deposition in the evidentiary supplement, since she herself filed a rough draft of it in her Response to the summary judgment motion.  *Id.* at 2 n.1. However, Summers objects to the inference that the City of Dothan took from this testimony—namely, that Lt. Woodham was unaware that Summers was the officer who failed to turn in the UTCs.  *Id.* at 7–8.  She contends that the actual testimony contradicts this inference, or, in the alternative, that the testimony is ambiguous and should be construed in the light most favorable to her as the non-moving party.  *Id.* at 7.  Despite such contentions, Summers admits that "[w]hether or not Lt. Woodham knew that Officer Summers wrote the UTCs at first is not important" because the punitive action at issue is the memorandum he wrote to Chief Powell regarding the matter.  *Id.* at 8.  Since the memorandum referred to Summers and the UTC incident, she claims that there is no dispute that Lt. Woodham was aware that Officer Summers wrote the UTCs at the time he sent it to Chief Powell.  *Id.*  This Court declines to strike these legal arguments and will consider them, if at all, under the proper summary judgment standard.

Thus, Summers's Motion to Strike, (Doc. # 44), is due to be GRANTED in part and DENIED in part.  It is granted with respect to Exhibits E, F, and G of the Evidentiary Submission in Support of Defendant's Reply Brief, (Doc. # 42), and this Court will not

consider arguments in the reply brief that are based upon that evidence.[15]  It is denied with respect to the arguments raised by the City of Dothan based upon Lt. Woodham's deposition testimony.

## B.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."[16]  *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–23; *see also Fitzpatrick v. City*

_____

[15] Summers advances other arguments as to why this evidence, or parts thereof, should be stricken.  Because this Court finds the Exhibits and the City of Dothan's arguments based on them to be untimely, such additional reasons for striking need not be considered.

[16] "An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is 'merely colorable' or is 'not significantly probative.'" *Lewis*, 908 F. Supp. at 943–44. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  "Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case." *Id.* at 944 (citing *Anderson*, 477 U.S. at 248).

*of Atlanta*, 2 F.3d 1112, 1115–16 (11th Cir. 1993) ("For issues, however, on which the non-movant would bear the burden of proof at trial, . . . '[t]he moving party may simply show[]—that is, point[] out to the district court—that there is an absence of evidence to support the non-moving party's case.'") (quoting *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437–38 (11th Cir. 1991)).

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex* 477 U.S. at 324. *To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (emphasis added). A plaintiff must present evidence demonstrating that he can establish the basic elements of his claim. *Celotex,* 477 U.S. at 322. A court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## C. THE § 1983 CLAIMS

Pursuant to § 1983, Summers brings claims for violations of the Fourteenth Amendment—namely race discrimination, gender discrimination, and retaliation—and § 1981—namely race discrimination and retaliation.  (Doc. # 1, at 11–14, ¶¶ 71–98); *accord Butts v. County of Volusia*, 222 F.3d 891, 893 (11th Cir. 2000) ("[Section] 1983 constitutes the exclusive remedy against state actors for violations of the rights contained in § 1981.") (citing *Jett v. Dallas Indep. Sch. Distr.*, 491 U.S. 701, 731–36 (1989)). Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Because of § 1983's requirement that the actions be taken under color of state law, a plaintiff bears the burden of "demonstrat[ing] that 'the conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the State.'" *Gene Thompson Lumber Co. v. Davis Parmer Lumber Co.*, 984 F.2d 401, 403 (11th Cir. 1993) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

Here, the City of Dothan contends that Summers has failed to present any evidence that the allegedly discriminatory actions complained of were done under the color of state law.  (Doc. # 32, at 25–26).  Because this is an issue upon which Summers bears the ultimate burden of proof, her failure to present evidence in support of it would justify summary judgment in favor of the City of Dothan as to the § 1983 claims.  *See Celotex*,

20

477 U.S. at 322–23; *Fitzpatrick*, 2 F.3d at 1115–16.  When considering the state action

requirement, this Court must look to the particular discriminatory actions alleged—e.g.

firing because of race or gender—as opposed to the more general action—e.g. firing.

*Denno ex. rel Denno v. Sch. Bd of Volusia County, Florida*, 218 F.3d 1267, 1276 (11th

Cir. 2000) (focusing the state action issue on whether a school had a policy of banning

Confederate symbols, not on whether this action was pursuant to a more general policy

permitting the school to ban items), *reh'g en banc denied*, 235 F.3d 1347 (11th Cir.

2000), *cert. denied*, 531 U.S. 958 (2000); *Gordan v. Ottersbach*, No. 93-2232-CIV-T-

17A, 1997 U.S. Dist. LEXIS 3178, at *21 (M.D. Fla. Mar. 6, 1997) (looking to whether

an officer's actions of "seizing, arresting and charging [an individual] *without probable*

*cause*" were under color of state law for purposes of municipality liability).

 Under this color-of-state law requirement, a municipality can only be held liable

under § 1983 "when execution of a government's policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to represent official policy,

inflicts the injury."  *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694

(1978); *see also Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) ("[A]

municipality may be held liable [under § 1983] for the actions of [an employee] only

when municipal 'official policy' causes a constitutional violation.") (citing *Monell*, 436

U.S. at 694–95).  Thus, to satisfy the under-color-of-state law standard, a plaintiff in a §

1983 suit against a municipality must establish that the acts giving rise the injury arose

from one of three sources: (1) "an official government policy"; (2) "the actions of an official fairly deemed to represent government policy"; or (3) "a custom or practice so pervasive and well-settled that it assumes the force of law." *Denno*, 218 F.3d at 1276.[17]

### i. Official Policy

Summers has failed to present evidence that any of the allegedly discriminatory actions were taken pursuant to an official policy. In fact, in her Response, she completely failed to address the City of Dothan's arguments on this issue, discussing only the merits of the underlying discrimination claim and making no mention of § 1983's requirement that the action be taken under color of state law. Additionally, the undisputed evidence before this Court establishes that the official policy of the City of Dothan was to prohibit race and gender discrimination in all personnel procedures and practices and to prohibit retaliation for complaining of discrimination.[18] This undisputed evidence also establishes

---

[17] Where, as here, a plaintiff sues a municipality under § 1983, he cannot premise liability upon the doctrine of respondeat superior. *See Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable under § 1983 on a respondeat superior theory."); *Gold*, 151 F.3d at 1350 ("The Supreme Court has placed strict limitations on municipal liability under section 1983. There is no respondeat superior liability making a municipality liable for the wrongful actions of its [employees]."); *see also Butts*, 222 F.3d at 893 ("[A] plaintiff who sues a municipality under § 1983 for a violation of the rights contained in § 1981 may not rely upon the doctrine of respondeat superior.") (citing *Jett*, 491 U.S. at 731–36).

[18] The City of Dothan's Equal Opportunity Plan states the following:
The City of Dothan will implement a Civil Service System which offers equal opportunity for all applicants and employees and which will be based on a *policy of nondiscrimination in personnel procedures and practices*. . . . To this end, definite commitments derived from the policy include the policy and practice of the City of Dothan to . . . [i]nsure that *all personnel procedures, policies, and actions*, such as compensation, fringe benefits, transfers, layoffs, rehires, training programs, and social and recreational programs, *will be administered without regard to race , creed,*

the City of Dothan's official policy against racial or sexual harassment.[19]

### ii.  Official Representing Government Policy

Nor has Summers presented evidence establishing the alleged discrimination

resulted from "the actions of an official fairly deemed to represent government policy."

*Denno*, 218 F.3d at 1276.  For an official to be fairly deemed to represent government

policy, "the acting official must be imbued with final policymaking authority" in that his

"decisions in the area are [not] subject to meaningful administrative review."  *Id.*

(citations omitted).  Summers's Complaint and Response include allegations of

mistreatment by other police officers, by dispatchers, and by superiors such as Captain

Draughon and Chief Powell.  However, she has offered no evidence or argument

regarding the policymaking authority of these persons within the particular area that their

_____

> *national origin, handicapped persons, sex or age*; except when sex or age is a bona
> fide occupational qualification;

(Doc. # 33 Ex. E, McKay Aff. Ex. B) (emphasis added).  The Equal Opportunity Plan further
specifies an official policy of nondiscrimination in the areas of recruitment, hiring, the terms and
conditions of employment, promotions, and contracting.  *Id.*  Additionally, the grievance
procedure provided in the Personnel Rules states an official policy against retaliation for
complaints.  *Id.* Ex. A.

> [19] The Personnel Rules state the following:
> The purpose of this policy is to help assure a working environment where all
> employees can maximize productivity in their jobs by eliminating offensive or
> threatening conduct that might interfere with maximum productivity.  There are
> several types of anti-social behavior that can interfere with this goal including: (1)
> *sexual harassment*; (2) *racial, religious and other forms of harassment* and (3)
> [v]iolence and threats of violence.  All of these types of behavior can distract
> employees from their job-related duties, and *it is the policy of the City of Dothan to
> prohibit and eliminate these types of behaviors*.

(Doc. # 33 Ex. E, McKay Aff. Ex. B § 11-80(1)) (emphasis added).

actions were undertaken.  Additionally, the undisputed evidence establishes that the City

of Dothan has a grievance and appeal procedure. (Doc. # 33 Ex. E, McKay Aff. Ex. A).

Under this procedure, an employee first files a complaint with his supervisor.  If

unsatisfied with the department head's disposition of the grievance, the employee can

then appeal to the Personnel Board, which Summers did in regards to her termination.

*See* Doc. # 32, at 22; Doc. # 39, at 13.  Thus, not only has Summers failed to establish the

policymaking authority of any of the persons at issue, but the undisputed evidence

establishes that they are subject to administrative review.  Summers has presented no

evidence or argument that this administrative review is anything but meaningful.

### *iii.*  **Custom or Practice**

Finally, Summers has failed to establish that the allegedly discriminatory actions

were undertaken pursuant to a "custom or practice so pervasive and well-settled that it

assumes the force of law." *Denno*, 218 F.3d at 1276.  To prove a pervasive custom or

practice, the plaintiff must establish a "'persistent and widespread practice'" of the

alleged acts of discrimination "about which the [City of Dothan] knew or of which

practice it had constructive knowledge, because 'normally random acts or isolated

incidents are insufficient to establish a custom.'" *Id.* at 1277 (quoting *Church v. City of*

*Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994)).  Here, not only has Summers failed to

argue a pervasive custom or practice of discrimination, but her main argument is that the

City of Dothan did *not* follow its normal policies or customs with regards to disciplining

and firing her.  *See, e.g.*, Doc. # 39, at 3 (arguing that Summers was disciplined for the UTC incident "even though the Police Department *did not have a policy and practice of enforcing the 48 hour rule*") (emphasis added).   Summers also points to Officer Cole—a white, male officer who turned in a complaint form for an arrestee but failed to sign it within the applicable time period, resulting in the charges being dismissed after the unsigned complaint was lost.  (Doc. # 39, at 11).  She states that he was only charged with a Minor offense whereas she was charged with a Major offense for violating the same rule.  *Id.* at 12.  Assuming these allegations are true, such isolated incidents are still insufficient to establish a pervasive custom or policy.  *See Denno*, 218 F.3d at 1277.

In sum, Summers failed to proffer sufficient evidence to establish that the allegedly discriminatory acts were done under color of state law.  Indeed, she has failed to even argue the color-of-state-law requirement of § 1983 even after the City of Dothan demonstrated her failure to present evidence on this issue.  Thus, Summers has not established a "genuine" factual dispute with a "real basis in the record" as to the under-color-of-state-law requirement.  *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (citing *Matsushita*, 475 U.S at 586–87), *reh'g en banc denied*, 16 F.3d 1233 (11th Cir. 1994), *reh'g denied*, No. 92-2485, 1994 U.S. App. LEXIS 40941 (11th Cir. Feb. 16, 1994).  Given that Summers bears the ultimate burden of proof on this issue, this Court finds that the City of Dothan has met its burden on summary judgment and is entitled to judgment as a matter of law on the § 1983 claims.  Therefore, the City of

Dothan's motion for summary judgment is due to be GRANTED with respect to the

Fourteenth Amendment and § 1981 claims brought pursuant to § 1983.

## D.  THE TITLE VII CLAIMS

Title VII prohibits employers from "discriminat[ing] against any individual with

respect to his compensation, terms, conditions or privileges of employment, because of

such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-

2(a)(1).  In Count II of the Complaint, Summers alleges sex discrimination, race

discrimination, and retaliation "with respect to discipline, her termination, and other

terms, conditions, and privileges or her employment" in violation of Title VII.  (Doc. # 1,

at 9–10, ¶¶ 62–70).  Prior to examining the merits of Summers's Title VII claims, this

Court must first determine whether she has met the procedural requirements for bringing

such claims—namely, the 180-day time bar in 42 U.S.C. § 2000e-5(e)(1).

### *i.*  The 180-Day Time Bar

For Title VII claims, a plaintiff must satisfy the prerequisites of 42 U.S.C. §

2000e-5(e)(1) before filing a private civil action.  *See Thomas v. Ala. Council on Human*

*Rels., Inc.*, 248 F. Supp. 2d 1105, 1114 (M.D. Ala. 2003) (citing *Nat'l R.R. Passenger*

*Corp. v. Morgan*, 536 U.S. 101, 109 (2002)).  Pursuant to this provision, a plaintiff must

file a charge of discrimination with the EEOC "within one hundred and eighty days after

the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); *accord*

*Pijnenburg v. W. Ga. Health Sys., Inc.*, 255 F.3d 1304, 1305 (11th Cir. 2001) (11th Cir.

2001) ("It is settled law that in order to obtain judicial consideration of [a Title VII]

claim, a plaintiff must first file an administrative charge with the EEOC within 180 days

after the alleged unlawful employment practice occurred."), *reh'g en banc denied*, 273

F.3d 1117.[20]  "[I]f a plaintiff fails to file an EEOC charge before the 180-day limitations

period, the plaintiff's subsequent lawsuit is barred and must be dismissed for failure to

exhaust administrative remedies."  *Thomas*, 248 F. Supp. 2d at 1115 (citing *Brewer v.

Alabama*, 111 F. Supp. 2d 1197, 1204 (M.D. Ala. 2000)).

        In deciding whether any of the alleged acts of discrimination and retaliation are

untimely filed, this Court must determine *when* such acts occurred.  *Thomas*, 248 F. Supp.

2d at 1115.  This determination in turn depends on whether the plaintiff has alleged a

"hostile environment" claim or "discrete retaliatory or discriminatory acts such as

termination of employment, failure to promote, denial of transfer, or a refusal to hire."  *Id.*

(citing *Morgan*, 536 U.S. at 110, 114).  Because Summers alleges discrete incidents of

discrimination and retaliation, each one "occurr[ed] on the day that it happen[ed]."  *Id.*

---

[20]  The 180-day procedural time-bar is an integral part of the statutory scheme of bringing
discrimination claims under Title VII.  As the *Thomas* court stated:
        '[S]trict adherence' to this procedural requirement 'is the best guarantee of
        evenhanded administration of the law.' *Mohasco Corp. v. Silver*, 447 U.S. 807, 826,
        65 L. Ed. 2d 532, 100 S.C. 2486 (1980).  By choosing this relatively short deadline,
        'Congress clearly intended to encourage the prompt processing of all charges of
        employment discrimination.'  *Id.*  Indeed, this procedural rule, is not a mere
        technicality, but an integral part of Congress' statutory scheme that should not 'be
        disregarded by courts out of a vague sympathy for particular litigants.'  *Baldwin
        County Welcome Ctr. v. Brown*, 466 U.S. 147, 152, 80 L. Ed. 2d 196, 104 S. Ct. 1723
        (1994).
248 F. Supp. 2d at 1115.

As the *Thomas* court explained:

> "Each incident of discrimination and each retaliatory adverse employment
> decision constitutes a separable actionable 'unlawful employment practice.'"
> *Morgan*, 122 S. Ct. at 2073.  Consequently, "discrete discriminatory acts are
> not actionable if time barred, even when they are related to acts alleged in
> timely filed charges."  *Morgan*, 122 S. Ct. at 2072.

*Id.*  Therefore, all acts of alleged discrimination that occurred prior to 180-days before the

filing of Summers's EEOC charge are "untimely filed and no longer actionable."

*Morgan*, 536 U.S. at 114.

Here, Summers filed her EEOC charge on June 20, 2007 and amended that charge

on June 30, 2007 after she was terminated.  (Doc. # 32, at 21; Doc. # 39, at 17).  Only the

termination of her employment covered by the amended charge and the acts of alleged

discrimination that occurred within 180 days before the initial charge—namely,

December 22, 2006—are actionable.  *See Morgan*, 536 U.S. at 114 ("[O]nly incidents that

took place within the timely filing period are actionable.").  On June 1, 2006, Summers

was transferred to the First Squad Patrol Division.  (Doc. # 1, at 5, ¶ 31).  While a

member of First Squad Patrol, Summers's employment was terminated in June of 2007.

*Id.* at 7, ¶ 43.  Therefore, only the alleged acts of discrimination and retaliation that

occurred while Summers was a part of the First Squad Patrol, including the termination of

her employment, *and* after December 22, 2006 can serve as the basis for her Title VII

claims.  Although Summers is unclear as to what exactly are the allegedly discriminatory

actions during this time period, at the very least, they include the discipline for the Shack

incident, the discipline for the UTC incident, and her termination. This Court finds that all of Summers's Title VII claims relating to alleged discriminatory or retaliatory acts occurring prior to December 22, 2006 are time-barred by the procedural requirements of 42 U.S.C. § 2000e-5(e)(1) and that the City of Dothan is entitled to judgment as a matter of law for these claims.

### ii.  The Disparate Treatment Claims

In *McDonnell Douglas Corporation v. Green*, the Supreme Court set forth a burden-shifting framework for disparate treatment claims under Title VII.  411 U.S. 792, 802–03 (1973).  The plaintiff bears the initial burden of establishing a prima facie case of discrimination.  *Id.*  When direct evidence of discrimination is lacking,[21] a plaintiff may establish disparate treatment with circumstantial evidence by "show[ing] (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably."  *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing

---

[21] Direct evidence of discrimination is "defined . . . as evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'"  *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998)), *cert. denied*, 529 U.S. 1109 (2000).  In plainer language, direct evidence of discrimination consists of "'only the most blatant remarks, whose intent could be nothing other than to discriminate . . . .'" *Id.* at 1359 (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081–82 (11th Cir. 1990); *see also Earley*, 907 F.2d at 1081 ("One example of direct evidence would be a management memorandum saying, 'Fire [the plaintiff]–he is too old.'").

Here, this Court has been unable to ascertain any direct evidence of discrimination.  In fact, Summers herself relies upon the circumstantial evidence standard set forth in *McDonnell Douglas*.  (Doc. # 39, at 19–20).

29

*Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (per

curiam)); *see also Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)

("A plaintiff establishes a prima facie case of disparate treatment by showing that she was

a qualified member of a protected class and was subjected to an adverse employment

action in contrast with similarly situated employees outside the protected class.") (citing

*McDonnel Douglas*, 411 U.S. at 802), *reh'g en banc denied*, 116 Fed. Appx. 257

(2004).[22]

---

[22] Summers correctly points out that "[t]he Eleventh Circuit 'generally has eschewed an
overly strict formulation of the elements of a prima facie case' and the inquiry at summary
judgment is 'whether an ordinary person could reasonably infer discrimination if the facts
presented remain unrebutted.'" (Doc. # 39, at 19) (citing *James v. Arrow Co.*, 75 F.3d 1528, 1531
(11th Cir. 1996)).  However, even in *James*, the Eleventh Circuit pointed to similarly situated
employees outside the protected class who received more favorable treatment as the evidence
which established an inference of discrimination.  75 F.3d at 1533 (reversing grant of summary
judgment for the employer in an age discrimination case where the plaintiff established that
younger employees were hired when she was fired).
      The lack of strict formulation for a prima facie case of discrimination refers to the several
ways that a plaintiff can establish an inference of discrimination.  *See Nix v. WLCY Radio/Rahall
Comm'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984) ("The prima facie case method was never
intended to be rigid, mechanistic, or ritualistic.  A prima facie case of discriminatory discharge
may be established in different ways.") (citations omitted), *reh'g en banc denied*, 747 F.2d 710
(11th Cir. 1984).  For example, a plaintiff can establish the fourth and final element for a
discharge-discrimination case, as here, by showing either "the plaintiff was subject to differential
treatment, that is, he was either (a) replaced by someone who was not a member of the plaintiff's
protected class or (b) a similarly situated employee who was not a member of the protected class
engaged in *nearly identical conduct* and was not discharged."  *Keel v. Roche*, 256 F. Supp. 2d
1269, 1285 (M.D. Ala. 2003) (emphasis in original) (citations omitted), *aff'd*, 99 Fed. Appx. 880
(11th Cir. 2004); *see also Nix*, 738 F.2d at 1185 (stating that the fourth element in such a case
can be the showing that the plaintiff was fired "and 'that the misconduct for which [he] was
discharged was nearly identical to that engaged in by [an employee outside the protected class]
whom [the employer] retained'") (citing *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th
Cir. 1982)).
      Because Summers has not presented any evidence or argument respecting the race or
gender of her replacement, this Court will consider her claims under the similarly-situated-
employees standard.  While the burden "is not onerous," Summers must still establish the

Under *McDonnell Douglas*, once the plaintiff has established a prima facie case of discrimination, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." 411 U.S. at 802; *see also Damon*, 196 F.3d at 1361. The employer has a burden of production, not a burden of persuasion, and it need not persuade the court that it was actually motivated by the proffered reasons. *Wilson*, 376 F.3d at 1087 (citing *Burdine*, 450 U.S. at 254–55).

If an employer satisfies its burden by articulating a non-discriminatory reason, it rebuts the presumption of discrimination created by the prima facie case. *Id.* "A plaintiff then bears the ultimate burden of proving them to be pretext for . . . discrimination." *Damon*, 196 F.3d at 1361; *see also McDonnell Douglas*, 411 U.S. at 805 ("[A Title VII plaintiff] must be given a full fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for [the adverse employment action] were in fact a coverup for a . . . discriminatory decision.").

Here, the parties disagree over whether Summers has established a prima facie case of disparate treatment. The City of Dothan does not dispute the first two elements of a prima facie case of disparate treatment. Rather, the disagreement between the parties

---

existence of similarly situated employees outside of her class who were treated more favorably. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *see also Miller-Goodwin v. City of Panama City Beach, Fla.*, No. 09-12598, 2010 U.S. App. LEXIS 14038, at *12–14 n.2 (11th Cir. July 8, 2010) ("[N]o plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule. The plaintiff must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better.").

arises over whether Summers can establish the third and fourth elements—namely adverse employment action and more favorable treatment of similarly situated employees outside of her protected classes—as to some or all of her remaining claims. *See* Doc. # 32, at 29–41. There must be some evidence from which a reasonable factfinder would find discrimination—namely, evidence of similarly situated employees outside the protected class who have been treated more favorably. That is lacking here.

### a.  Standard for Similarly Situated Employees

To establish a prima facie case of discrimination, Summers must show that the City of Dothan treated similarly situated employees outside of her protected classes more favorably. In order for other employees to qualify as comparators, a plaintiff "must show that the 'employees are similarly situated in *all relevant aspects*.'" *Knight*, 330 F.3d at 1316 (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)) (emphasis added); *see, e.g., Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005) (doctor discharged from clinic due to patient complaints about his conduct who could not show that he was replaced by someone outside his protected class or that a comparable person outside of his protected class received "nearly identical" complaints, but was not fired, failed to establish a prima facie case); *Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1259 (11th Cir. 2001) (reversing judgment in favor of the plaintiff because the employer was entitled to judgment as a matter of law where plaintiff's comparator engaged in fewer instances of misconduct than plaintiff), *cert. denied*, 534 U.S. 976; *Maniccia v. Brown,*

171 F.3d 1364, 1368-69 (11th Cir. 1999) (affirming summary judgment in the employer's favor where the alleged misconduct of comparators was not sufficiently similar to support disparate treatment claim); *Holifield*, 115 F.3d at 1563 (affirming summary judgment where the plaintiff failed to produce sufficient evidence that non-minority employees with which he compares his treatment were similarly situated in all aspects, or that their conduct was of comparable seriousness to the conduct for which he was discharged); *Jones v. Gerwens,* 874 F.2d 1534, 1540-42 (11th Cir. 1989); *Nix,* 738 F.2d at 1187 (African-American plaintiff who was replaced by another African-American after termination for violation of work rule failed to make out a prima facie case of race discrimination because he did not meet his burden of showing that a white employee in similar circumstances was retained while he was fired).

In evaluating the similarity of the comparators identified by the plaintiff, the most important variables in a discriminatory-discipline case are the nature of the offenses committed and the nature of the punishments imposed.  *See Jones,* 874 F.2d at 1539. Both the "quantity and the quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples and oranges." *Maniccia,* 171 F.3d at 1368.  In making this analysis a court must keep in mind that "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules[.]" *Id.* at 1369.  "Moreover, the actions of the employer toward the proffered

comparators are only relevant if the decisionmaker knew of the prior rule violations by the comparators and took no action against them." *Walton v. Neptune Tech. Group, Inc.*, No. 2:08-cv-5-MEF, 2009 U.S. Dist. LEXIS 97213, at *37 (M.D. Ala. Oct. 20, 2009) (citing *Jones,* 874 F.2d at 1542).

### b.  The Shack Incident

Here, Summers spends much of her Response arguing that she did nothing wrong with regards to the Shack incident.  (Doc. # 39, at 4–11).  However, a prima facie case of discrimination is not established when a plaintiff shows merely that she did not, in fact, violate a work rule that the employer found her to have violated.  *Miller-Goodwin*, 2010 U.S. App. LEXIS 14038, at *12–14 n.2 ("[N]o plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule.  The plaintiff must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better.").  Instead, a plaintiff fired for misconduct must show "'that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained.'"  *Nix*, 738 F.2d at 1185 (citing *Davin*, 678 F.2d at 570).

Summers claims that the "investigation [into the Shack incident] uncovered numerous problems with [the City of Dothan's] procedures and uncovered facts which suggested that a number of [the City of Dothan's] employees were potentially responsible

for the absence of the complaint." (Doc. # 39, at 6). She then argues that despite such evidence, "blame for the incident [was placed] solely on Officer Summers and not the other individuals named in the report—none of whom were disciplined." *Id.* However, the alleged misconduct of these other employees was not nearly identical to Summers's.

For example, Summers claims that Officer Evans was supposed to fill out the first part of the complaint and post it on the swear board. *Id.* at 5. However, the undisputed evidence before this court shows that section II(A) of PGO 511—the work rule that Summers was charged with violating in the Shack incident—states that "[t]he Officer shall be responsible for obtaining warrants in State misdemeanor cases the same working day, if possible, or the next working day the Magistrate is available." (Doc. # 33 Ex. F, Powell Aff. Ex. A). The City of Dothan interpreted this work rule as meaning that the *arresting* officer, not the transporting officer, bore the ultimate responsibility of filling out and swearing to the complaints for misdemeanor arrestees. (Doc. # 32, at 10). The City of Dothan was entitled to interpret its rule this way. *Maniccia*, 171 F.3d at 1369. Summers herself admits that it was "usual practice" for the arresting officer to swear to the complaints; however, she also contends that it was also "usual practice" for the transporting officer to "fill out the first part of the complaint form, attach it to the arrest report, and send it through channels where ultimately it is posted on the 'swear board' at the [M]agistrate's office for the arresting officer to sign." (Doc. # 39, at 5). Officer Evans misconduct, if any, was *not* a violation of the same work rule that Summers's was

35

found to have violated—namely the arresting officer's ultimate responsibility of swearing

to a complaint as soon as possible—but rather a the transporting officer's responsibility of

posting complaints to the swear board.  Thus, this Court finds that Officer Evans's

alleged misconduct was not nearly identical to Summers's and that he is not a similarly

situated employee for purposes of her Title VII disparate treatment claims.[23]

Summers does argue that Officer Cole, a white male, violated the same rule

regarding the swearing of complaints but that he only received a Minor offense while

Summers received a Major offense.  *Id.* at 6.  The investigation into Summers's own

incident with Shack brought this incident to the City of Dothan's attention.  (Doc. # 32, at

12).  In its motion for summary judgment, the City of Dothan asserted that Officer Cole

arrested Shack on November 22, 2005 and that he filled out an arrest

complaint—something which the Magistrate's office had no record of for Summers's

arrest of Shack.  *Id.* at 12.  At this point, the Magistrate's office became aware that Shack

was in jail on that pending charge—again, something which did not happen in Summers's

arrest of Shack for criminal trespassing.  *Id.*  Summers does not dispute these facts.

---

[23] Summers also points out that the investigation reveals that "'[i]f Sgt. Banks would
have placed a complaint [form] with the arrest report or insured that Officer Summers pulled the
complaint [form] the end result could have been possibly avoided.'" (Doc. # 39, at 9) (quoting
Doc. # 33 Ex. F, Powell Aff. Ex. B).   (emphasis omitted).  She additionally contends that Sgt.
Lewis waited thirty-three days to respond to Shack's grievance and failed to check with the
Magistrate's office to determine if Shack was properly incarcerated.  *Id.*  Again, none of these
instances of alleged misconduct are nearly identical to Summers's failure to timely fill out and
sign the complaint as the arresting officer.  Thus, neither Sgt. Banks nor Sgt. Lewis are similarly
situated employees.

The parties do, however, appear to disagree over what happened next.  Taking the facts in the light most favorable to Summers—and indeed, as the facts appear from the City of Dothan's own evidentiary submissions—the Magistrate's office then called Officer Cole to remind him to sign the complaint form.  (Doc. # 39, at 11; Doc. # 33 Ex. F, Powell Aff. Ex. C).  When Officer Cole arrived at the office, the complaint that he had completed earlier could not be found.  (Doc. # 39, at 11; Doc. # 33 Ex. F, Powell Aff. Ex. C).  Officer Cole left and did not return to sign the complaint.  (Doc. # 39, at 11; Doc. # 33 Ex. F, Powell Aff. Ex. C).  Thirteen days later, Shack appeared in front of a Magistrate Judge, who determined that he had been in the jail for thirteen days without a signed complaint against him.  (Doc. # 33 Ex. F, Powell Aff. Ex. C).  The Magistrate Judge then nolle prossed the charge due to Officer Cole's lack of action.  (Doc. # 39, at 11; Doc. # 33 Ex. F, Powell Aff. Ex. C).  In the ensuing investigation, it was determined that this incident—like Summers's own incident with Shack—violated PGO 511§ II(A) and subjected the City of Dothan to undue financial loss, (Doc. # 39, at 11–12; Doc. # 33 Ex. F, Powell Aff. Ex. C).  Although this was grounds for a Major offense under the City of Dothan's Personnel Rules, (Doc. # 33 Ex. E, McKay Aff. Ex. A), Officer Cole was only charged with a Minor offense.  (Doc. # 39, at 11–12; Doc. # 33 Ex. F, Powell Aff. Ex. C).  Officer Summers, on the other hand, was charged with a Major offense.   (Doc. # 39, at 12; Doc. # 33 Ex. F, Powell Aff. Ex. C).

Despite the fact that Officer Summers and Officer Cole violated the same rule and

both were found to have subjected the City of Dothan to undue financial loss, their

*misconduct* is not nearly identical such that Officer Cole would be a similarly situated

employee.  *See Maniccia,* 171 F.3d at 1368 (holding that the "quantity and the quality of

the comparator's *misconduct* must be nearly identical") (emphasis added).  The City of

Dothan found that "[b]ecause Cole filled out an arrest complaint and attempted on two

occasions to sign the necessary documents, his conduct, though not acceptable, was not as

serious as that of [Summers] who totally failed to turn in any paperwork to the

Magistrate's office regarding Shack's arrest."  (Doc. # 32, at 13).  In sum, the City of

Dothan found the circumstances underlying the two incidents to be "entirely

distinguishable."  *Id.* at 39.  The City of Dothan is entitled to differentiate between

Officer Summers and Officer Cole based upon the severity of their conduct.  In *Nix*, the

Eleventh Circuit explained:

> Punitive action against employees for violating work rules must not
> differentiate on the basis of any of the criteria reprobated by Title VII.  When
> an individual proves that he was fired but one outside his class was retained
> although both violated the same work rule, this raises an inference that the rule
> was discriminatorily applied against the individual, regardless of the race or
> sex of the replacement. [The plaintiff] could therefore establish a prima facie
> case of . . . discrimination by establishing that he was fired but [an employee
> outside his protected class] was retained for 'nearly identical' conduct. . . .
> [The plaintiff] has failed to link this inconsistency . . . with a discriminatory
> motive.  Nondiscriminatory differences just as readily explain the differences
> in treatment. . . .  If an employer applies a rule differently to people it believes
> are differently situated, no discriminatory intent has been shown"

738 F.2d at 1186 (citations omitted).  Thus, the *Nix* court found that the plaintiff had

failed to establish a prima facie case of discrimination.  *Id.* at 1187; *see also Cannon v.*

38

*Dyncorp*, 462 F. Supp. 2d 1190, 1202 (M.D. Ala 2005) ("[A] nondiscriminatory deviation from general policy cannot create an inference of discrimination.").

Here, as in *Nix*, nondiscriminatory differences just as readily explain the different offense levels charged to Officer Cole and Summers.  The City of Dothan concluded, and this Court agrees, that the conduct of Officer Cole was not nearly identical to and was, in fact, much less severe than Officer Summers's conduct.[24]  Thus, with regards to her conduct during and discipline for the Shack incident, Summers has failed to establish a similarly situated employee outside of her class who was treated differently.  *See Lochin v. Verizon Fla., LLC*, No. 8:09-cv-1535-T-23TBM, 2010 U.S. Dist. LEXIS 110097, at *12 (M.D. Fla. Oct. 15, 2010) ("[A]n employee generally qualifies as similarly situated if the employee (1) answered to the same supervisor, (2) worked under the same standards of conduct and (3) engaged 'in the same conduct *without such differentiating or mitigating circumstances that would distinguish the[] [employee's] conduct or the employers treatment of the[] [employee]' as a result of the conduct*.") (quoting *Sanguinetti v. United Parcel Serv., Inc.*, 114 F. Supp. 2d 1313, 1317 (S.D. Fla. 2000)) (emphasis added).  As such, the City of Dothan is entitled to judgment as a matter of law for the Title VII claims arising from Summers's discipline for the Shack incident.

### c.  The UTC Incident

As for the UTC incident, Summers's entire argument rests upon the grounds that

---

[24]  Even taking out the 37 days which Shack served in lieu of fines on other charges, Shack still served 67 days in jail for a charge that had no sworn complaint against him.

the City of Dothan does not have a policy or practice of enforcing the 48-hour rule for

UTCs and that she was the only one disciplined for having violated it.  (Doc. # 39, at

12–15).  However, in order for other employees to be similarly situated, the Summers

must "show that [the Internal Affairs investigator] who recommended that [s]he be

disciplined, or Chief Powell, who acted on that recommendation, *knew of*, and condoned,

*prior* similar violations."  *Jones,* 874 F.2d at 1542 n.14.  In other words, the employer

must have been "aware of prior [rule violations and] . . . consciously overlooked them" *at

the time he disciplined the plaintiff.  Id.* at 1542; *see also Moreland v. Miami-Dade

County*, 255 F. Supp. 2d 1304, 1314 (S.D. Fla. 2002) ("[E]ven if [the employer] knew

about the other violations [by other employees], the evidence does not show that [the

employer] consciously overlooked those violations *when he disciplined [the plaintiff]

more severely*.") (emphasis added).

      Here, the City of Dothan clarified in its Reply that, "unless a late UTC is brought

to the attention of the City, as was the case with [Summers], the Police Department does

not have knowledge of and is not on notice of whether a UTC was turned in late."  (Doc.

# 41, at 9).  As Summers herself points out, "[a]t Officer Summers' appeal hearing, [the

City of Dothan] was confronted with evidence that a number of police officers wrote

tickets that were not sworn to within 48 hours."  (Doc. # 39, at 13).  She further admits

that "[t]*he only reason the other police officers' UTCs were even reviewed was because

[her] merit system attorney subpoenaed those records*" and that "the Police Department

40

does not normally go through UTCs and determine if they are timely." *Id.* at 15 (emphasis added). Thus, not only has Summers failed to demonstrate that either the investigator or Chief Powell had knowledge of these prior violations at the time they disciplined her, the reasonable inferences from the evidence demonstrate that they only gained this knowledge, at the earliest, when the subpoenas for the appeal were served. Nothing in the record indicates that these other tickets resulted in a citizen being unable to pay them, as occurred in Summers violation of the 48-hour rule, such that would give the investigator or Chief Powell knowledge of their violations.[25] This Court cannot permit a Title VII plaintiff to dig up prior *unknown* violations and then demand that the employer either face charges of discrimination or punish the other employees months after their violations occurred. Such a course would essentially require employers to do the impossible: discover and punish *all* violators so that they could not serve as the basis for a discrimination claim months, or even years, down the road. The purpose of Title VII is to prevent discrimination, not to police employers' procedures for uncovering violations of their work rules.

Having failed to establish similarly situated employees outside of her protected class who violated the 48-hour rule—and of which violations the investigator or Chief Powell had knowledge when they disciplined Summers for her own violation of that

---

[25] Again, as in *Nix*, nondiscriminatory differences just as readily explain the failure to discipline these other officers—namely, that the City of Dothan actually became aware of Summers's violation after the citizen attempted to pay a ticket.

rule—Summers has failed to establish a prima facie case of discrimination with respect to the UTC incident.  Also, having identified no further comparators, Summers has failed to establish prima facie cases of discrimination for the other alleged adverse employment actions taken against her.  Thus, the City of Dothan's motion for summary judgment as to the race and sex discrimination claims is due to be GRANTED.[26]  *See Holifield,* 115 F.3d at 1562 ("*If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.*") (emphasis in original).

### iii. The Retaliation Claims

Title VII prohibits employers from retaliating against an employee "'because [s]he has opposed any practice made an unlawful employment practice by [Title VII] or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [under Title VII].'" 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation under either the opposition clause or the

---

[26]    In the alternative, this Court finds that the City of Dothan is entitled to summary judgment on Summers's race and sex discrimination claims because the Court is satisfied that no reasonable jury could find that Summers not shown that the legitimate, non-discriminatory reason proffered by the City of Dothan for the termination of Summers's employment was a pretext for intentional discrimination.  Although Summers may perceive her discipline and termination as harsh, such a finding is insufficient to support a Title VII discrimination claim.  *Nix*, 738 F.2d at 1187 ("Title VII is not a shield against harsh treatment at the workplace.  Nor does the statute require the employer to have good cause for its decisions.  The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.") (citations omitted).  For this additional reason, the motion for summary judgment as to the race and sex discrimination claims is due to be GRANTED.

participation clause, a plaintiff must "show that (1) she engaged in activity protected

under Title VII; (2) she suffered an adverse employment action; and (3) there was a

causal connection between the protected activity and the adverse employment action."

*Crawford*, 529 F.3d at 970 (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266

(11th Cir. 2001)).

Here, assuming *arguendo* that Summers can establish a prima facie case of

retaliation, this Court finds that the City of Dothan is still entitled to summary judgment

on the retaliation claim because Summers has not established that the City of Dothan's

reasons for her termination are pretextual.  As in discrimination claims, once the plaintiff

establishes a prima facie case, the burden then shifts to the employer to establish a

legitimate, nondiscriminatory reason for the adverse employment action.  *Sullivan v. Nat'l*

*R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (1999) ("Once the plaintiff makes out a prima

facie case, 'the burden shifts to the defendant to rebut the presumption of retaliation by

producing legitimate reasons for the adverse employment action.'") (quoting *Raney v.*

*Vinson Guard Serv.*, 120 F.3d 1192, 1196 (11th Cir. 1997)), *reh'g en banc denied*, 182

F.3d 938 (1999), *cert. denied*, 528 U.S. 966 (1999).  "This intermediate burden is

'exceedingly light.'" *Holifield,* 115 F.3d at 1563 (citing *Turnes v. AmSouth Bank, N.A.,* 36

F.3d 1057, 1061 (11th Cir. 1994)).  It is a burden of production, not of persuasion,

meaning that the employer need not persuade the court that it was actually motivated by

the proffered reason.  *See Burdine*, 450 U.S. at 253-255; *see also Meeks v. Computer*

43

*Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994).

If the employer satisfies this burden of production, "the presumption of
discrimination [or retaliation] is eliminated and 'the plaintiff has the opportunity to come
forward with evidence, including the previously produced evidence establishing the prima
facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given
by the employer were not the real reasons for the adverse employment decision.'"
*Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citations omitted).
Merely establishing a prima facie case does not entitle a plaintiff to survive a summary
judgment motion.  *Campbell v. Gannett Co.*, No. 2:05-cv-615-MEF, 2006 U.S. Dist.
LEXIS 49584, at *26 (M.D. Ala. July 19, 2006) ("The establishment of a prima facie case
does not in itself entitle a plaintiff to survive a motion for summary judgment.") (citing
*Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987); *Pace v. S. Ry. Sys.*,
701 F.3d 1383, 1389 (11th Cir. 1983)).  After an employer proffers its non-discriminatory
or non-retaliatory reasons for its actions, "'[i]n order to avoid summary judgment, a
plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that
each of the employer's proffered . . . reason is pretextual.'" *Id.* (citing *Chapman*, 229 F.3d
at 1037).

Here, Summers argues pretext because "[the City of Dothan] determined that
Officer Summers was responsible for the fact that Brian Shack remained in jail even
though there was no evidence that she did anything wrong."  (Doc. # 39, at 24).  She

points out that she was the only employee disciplined for that incident.  *Id.* at 9.  She also

claims disparate discipline "for her honest mistake in failing to turn in three tickets."  *Id.*

at 24.  However, "[t]he inquiry into pretext centers on the employer's beliefs, not the

employee's belief, and to be blunt about it, not on reality as it exists outside of the

decision-maker's head."  *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265

(11th Cir. 2010) (citing *Holifield*, 115 F.3d at 1565).  The issue here is not whether

Summers actually did anything wrong, but rather "whether her employer[] [was]

dissatisfied with her for these or other nondiscriminatory reasons, even if mistakenly or

unfairly so, or instead merely used those [reasons] . . . as cover for discriminating against

her because of her [race or gender]."  *Id.* (citing *Elrod v. Sears Roebuck & Co.*, 939 F.2d

1466, 1470 (11th Cir. 1991)); *see also Sweeney v. State of Alabama Alcoholic Bev.*

*Control Bd.*, 117 F. Supp. 2d 1266, 1273 (M.D. Ala. 2000) ("[W]hat is material is

whether or not the employer believed the allegations [of work rule violations] to be true,

not whether they were in fact true.").  As this Court has explained:

> Thus, to establish pretext the employee must show more than facts establishing
> that she did not commit the work rule violation.  The employee must point to
> evidence which raises a question as to whether the decisionmaker, in fact,
> knew that the violation did not occur and, despite this knowledge, fired the
> employee based upon the false premise of an alleged work rule violation.  For
> example where the employer relies on a subordinate's report that a plaintiff
> violated a work rule,
>
>> the plaintiff must establish pretext by showing (or, at least,
>> pointing to evidence that suggests) that the employer either did
>> not rely on that report or that the employer did rely on that report
>> but knew it was false.  In either case, the plaintiff would have
>> shown that the employer was likely lying about the reasons for

45

its behavior and that, by definition, is pretext.

*Sweeney*, 117 F. Supp. 2d at 1273 (De Ment, J.) (quoting *Elrod*, 939 F.2d at 1470).

Summers has presented no evidence to suggest that Chief Powell did not believe that she had violated both PGO 511 § II(A) and the 48-hour rule for UTCs when he disciplined her.  Essentially, Summers simply argues that she did nothing wrong and that the City of Dothan should not have punished her for the Shack incident or the failure to turn in the three UTCs.  This Court will not consider the "wisdom or accuracy" of the City of Dothan's determination that Summers's was responsible for the Shack incident or that she violated the 48-hour rule in failing to turn in three tickets.  *Id.*; *see also Chapman*, 229 F.3d at 1030 ("'[F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions.'") (quoting *Elrod*, 939 F.2d at 1470).  In fact, the undisputed evidence establishes that Summers did not timely swear to the complaint for Shack and did not turn in the UTCs within 48 hours.  Simply claiming that she did nothing wrong and was, in fact, a good employee is insufficient to establish pretext.  *Id.* ("[The] plaintiff cannot succeed simply by quarreling with the wisdom of [the proffered] reason . . . [because the courts] must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees.") (citations omitted).

Summers further argues that pretext is evident from Officer Cole's receipt of a Minor offense for failing to swear to a complaint and the fact that no other officers were disciplined for violating the UTC 48-hour rule.  (Doc. # 39, at 24).  It is true that pretext

46

can be shown by the fact that "other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Boyland v. Corr. Corp. of Am.*, No. 09-14583, 2010 U.S. App. LEXIS 16501, at * 6 (11th Cir.  Aug. 6, 2010).  As with establishing a prima facie case of discrimination, a plaintiff making such a claim of pretext must show that the comparators are similarly situated "*in all relevant aspects*."  *Rioux v. City of Atlanta*, 520 F.3d 1269, 1280 (11th Cir. 2008) (internal citations omitted) (emphasis added), *reh'g en banc denied*, 285 Fed. Appx. 741 (2008).  "Misconduct merely 'similar' to the misconduct of the disciplined plaintiff is insufficient."  *Id.*  Again, the "quantity and quality of the comparator's misconduct" must be "nearly identical" to that of the plaintiff.  *Id.*

As shown above, Summers has failed to point to any similarly situated employees outside of her protected class who received more favorable treatment with regards to any of the alleged employment actions taken against her.  Therefore, Summers has failed to establish pretext and the City of Dothan's motion for summary judgment is due to be GRANTED with respect to the Title VII retaliation claims.

**E.  Motion to Extend**

As Summers has no claims due to survive summary judgment, the parties' Joint Motion to Extend is due to be DENIED as MOOT.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that:

1.  The Motion to Strike, (Doc. # 44), is GRANTED in part and DENIED in part;

2.  The City of Dothan's Motion for Summary Judgment, (Doc. # 31), is GRANTED;

3.  The Joint Motion to Extend, (Doc. # 56), is DENIED as MOOT.

4.  The Clerk of the Court is DIRECTED to remove the above-styled case from the trial docket.

The Court will enter a separate final judgment consistent with this Memorandum Opinion and Order.

DONE this the 29th  day of October, 2010.

/s/ Mark E. Fuller
_____
CHIEF UNITED STATES DISTRICT JUDGE

48